Erik A. Christiansen, USB #7372
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone:  801-532-1234
Facsimile:  801-536-6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher F. Robertson (*pro hac to be filed*)
**SEYFARTH SHAW LLP**
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA  02210-2028
Telephone:  617-946-4989
Facsimile:  617-790-6774
crobertson@seyfarth.com

*Attorneys for Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC*

<table>
<tr><td colspan="2" align="center"><strong>IN THE UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF UTAH, CENTRAL DIVISION</strong></td></tr>
</table>

| | |
|---|---|
| PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> TREVOR R. MILTON, M&M RESIDUAL, LLC and T&M RESIDUAL, LLC, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 2:22-cv-00166-CMR <br><br> Magistrate Judge: Cecilia M. Romero <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC (collectively "Hicks") for

their Complaint against Defendants Trevor R. Milton, M&M Residual, LLC and T&M Residual,

LLC (collectively "Milton"), allege as follows:

4884-0231-5272

## SUMMARY

1.     This case involves the private sale of real property in Utah by Hicks to Milton in exchange for a combination of cash and securities.  Specifically, as part of the transaction in which Milton purchased 4678 acres of property in Utah, Milton provided Hicks an Option Agreement, which was subsequently amended, in which Hicks was granted an option to purchase 515,095 shares of the stock of Nikola Corporation at a strike price of $16.50.  In agreeing to accept securities as part of the consideration for the sale of property, Hicks actually and reasonably relied on direct statements made to him by Milton regarding Nikola's business, its technical achievements, and the resulting value of Nikola stock, as well as the public statements made by Milton regarding Nikola.  As detailed in an unsealed criminal indictment filed by the United States Attorney, as well as a civil action filed by the Securities and Exchange Commission (SEC), these statements were false and fraudulent.  When the truth was revealed publicly, the share price of Nikola plummeted and destroyed the value of the option provided to Hicks as consideration for the sale of the real property.

2.     Trevor R. Milton, the founder, largest stockholder, and former Chief Executive Officer and Executive Chairman of Nikola, a publicly traded company, engaged in a fraudulent scheme to deceive retail investors about Nikola's products, technical advancements, and commercial prospects for his own personal benefit in violation of the federal securities laws. Milton did so primarily by leveraging his social media presence and frequent appearances on television and podcasts to flood the market with false and misleading information about Nikola. He also repeated these falsehoods in private one-on-one conversations with Hicks and others, in connection with purchases of real estate and sale of Nikola securities as consideration.

4884-0231-5272

3.      Milton founded Nikola in 2015 with the primary goals of manufacturing semi-trucks that run on alternative fuels with low or zero emissions and building an alternative fuel station infrastructure to support those vehicles.  To accomplish these goals, Nikola needed to raise billions of dollars to develop vehicles and infrastructure that had never before been developed or adopted on a commercial scale.  Over the course of several private offerings, and then in connection with a business combination with a special purpose acquisition company ("SPAC"), Nikola raised more than $1 billion dollars, most of it from institutional investors. After entering into a business combination with the SPAC, Nikola began trading on the Nasdaq Global Select Market ("Nasdaq").

4.      Before Nikola had produced a single commercial product or had any revenues from truck or fuel sales, Milton embarked on a relentless public relations blitz aimed at a class of investors he called "Robinhood investors."  Through frequent nationally televised media appearances and a ubiquitous presence on social media (where he garnered over 100,000 followers on Twitter alone), Milton built a significant following for himself and Nikola.  In these appearances and on social media, Milton presented himself as a different type of CEO – one who "cared" and was "transparent" with the average investor.  As part of his publicity campaign, Milton encouraged prospective investors to follow him on social media to get "accurate information" about the company "faster than anywhere else."  In reality, however, Milton used his platform to mislead investors, which helped inflate and bolster Nikola's stock price.

5.      From approximately November 2019 through September 2020, Milton's numerous statements in tweets and media appearances, individually and taken together, painted a picture of Nikola that diverged widely from its then-current reality.  Milton sold a version of

3

Nikola not as it was – an early stage company with a novel idea to commercialize yet-to-be proven products and technology – but rather as a trail-blazing company that already had achieved many groundbreaking and game-changing milestones.  In presenting his version of Nikola to investors, including Hicks, Milton repeatedly made false and misleading statements about core aspects of Nikola's products, technological advancements, and commercial prospects, including, among others:

     (a)     Falsely claiming that Nikola's first semi-truck prototype, the Nikola One, could be driven under its own power, and using a misleading video to create the false impression that the Nikola One was, in fact, driving under its own power;

     (b)     Falsely claiming that Nikola was producing hydrogen, that it was doing so at a cost that was four times less than the prevailing market rates, and that it had obtained electricity at costs that made hydrogen production profitable;

     (c)     Falsely claiming that Nikola had significantly developed or already completed a prototype of an electric pickup truck, the Badger, and that this vehicle used primarily Nikola's proprietary components;

     (d)     Falsely claiming that Nikola had obtained "billions and billions and billions and billions" of dollars of committed truck orders;

     (e)     Falsely claiming that Nikola had developed a "game-changing" battery technology and that Nikola was manufacturing and developing multiple key vehicle components "in-house"; and

     (f)     Falsely claiming that the total cost of ownership of Nikola's trucks was 20-30 percent below that of diesel vehicles.

6.      At the time he made the misstatements identified above, Milton knew that Nikola had not accomplished what he claimed. Instead, much of what Milton represented as accomplishments were, at best, internal targets years away from completion and subject to significant execution risks or, worse, ideas conceived only on paper.  As a result, Milton made numerous materially false and misleading statements about critical aspects of Nikola's business.

7.      Milton had motive to lie about the company's accomplishments, given his position as Nikola's largest stockholder and his compensation structure, which provided the opportunity for additional stock awards by sustaining a run-up in Nikola's stock price. As detailed below, upon the completion of the Business Combination, Milton held approximately 25 percent of Nikola's stock and further stood to earn millions more shares if Nikola's stock reached certain price milestones and remained at each milestone for a specified period of time. Milton ultimately reaped tens of millions of dollars in personal benefits as a result of his misconduct.  In addition, Milton sold securities as consideration in purchases of prime ranch properties in Utah, including the purchase of Wasatch Creeks Ranch from Hicks.

8.      Milton violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Milton also violated Utah Code Section 61-1-22, and committed common law fraud. Hicks seeks damages for these violations, including but not limited to treble damages under the Utah Code for intentional or reckless conduct, statutory interest, costs and attorney's fees; as well as any such further relief the Court may deem just and appropriate.

4884-0231-5272

## JURISDICTION AND VENUE

9.       This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331,

because the claims involve federal questions.  This Court has supplemental jurisdiction over the

state law claims pursuant to 28 U.S.C. § 1337.

10.      In connection with the conduct described in this Complaint, Milton, directly or

indirectly, made use of the mails or means or instruments of transportation or communication, or

of facilities of a national securities exchange, in interstate commerce.

11.      Venue is proper in this District pursuant to Section 20 of the Securities Act, 15

U.S.C. § 77t and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Milton transacted business

in this District, and certain of the acts, practices, transactions, and courses of business

constituting violations of the securities laws alleged in this Complaint occurred within this

District.  The real property that was sold by Hicks to Milton is located in this District, and Milton

currently resides in this District.

## PARTIES

12.      Plaintiff **Peter Hicks** is a resident of Massachusetts and is the President of Hicks

Management Group.  Hicks Management Group was incorporated in 1988 in Massachusetts, and

is engaged in real estate development and investment.

13.      Plaintiffs **Hicks, LLC** and **Wasatch Hicks, LLC** are real estate holding

companies that held real property in Utah, which was sold to Milton.  This property was known

as Wasatch Creeks Ranch, and formerly Wasatch Back Ranch.

14.      Defendant **Trevor R. Milton** is a resident of Oakley, Utah.  In 2015, he founded

Bluegentech LLC, which in July 2017 converted from a limited liability company to a Delaware

4884-0231-5272

corporation and changed its name to Nikola Corporation ("Legacy Nikola"). Milton was Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Legacy Nikola from its inception until June 3, 2020, when Legacy Nikola entered into the Business Combination (as defined below). From June 3, 2020 until September 20, 2020, Milton was Nikola's Executive Chairman. In this executive officer position, Milton supervised Nikola's CEO. According to Nikola's filings with the Commission, Milton resigned as Executive Chairman of Nikola and from Nikola's Board of Directors on September 20, 2020.

15.     Defendants **M&M Residual, LLC** and **T&M Residual, LLC** are Arizona limited liability companies that are controlled and beneficially owned by Trevor Milton. These entities along with Milton executed the Option Agreement with Hicks in connection with the sale of Wasatch Creeks Ranch to Hicks.

## NON-PARTY ENTITIES

16.     **Nikola**, incorporated in Delaware and headquartered in Phoenix, Arizona, describes itself as a vertically integrated zero emissions transportation system provider that designs and manufactures battery electric vehicles ("BEV"), hydrogen fuel cell electric vehicles ("FCEV"), and hydrogen station infrastructure. On June 4, 2020, Nikola's common stock and warrants began trading on the Nasdaq under the symbols NKLA and NKLAW, respectively.

17.     Nikola was previously known as VectoIQ Acquisition Corp. ("VectoIQ"), a Delaware corporation headquartered in New York, New York. VectoIQ was formed in January 2018 as a SPAC for the purpose of effecting a business combination with one or more businesses. VectoIQ completed an initial public offering in May 2018, at which time its securities began to be quoted on The Nasdaq Capital Market.

4884-0231-5272

18.     On June 3, 2020, VectoIQ consummated a business combination with Legacy Nikola pursuant to a Business Combination Agreement, dated March 2, 2020 (the "Business Combination Agreement").  Under the Business Combination Agreement, a wholly-owned subsidiary of VectoIQ merged into Legacy Nikola, with Legacy Nikola remaining as the surviving company and as a wholly-owned subsidiary of VectoIQ, which then changed its name to Nikola Corporation (the "Business Combination").

19.     **Riverbend Bar Milton Ranch, LLC** ("Riverbend") is an Arizona limited liability company owned and controlled by Milton.  Riverbend purchased Wasatch Creek Ranch pursuant to a purchase and sale agreement dated June 2, 2020.

20.     **Mark A. Russell** is the current Chief Executive Officer of Nikola.  According to SEC filings, Russell is also a beneficial owner of T&M Residual, LLC.

## FACTUAL ALLEGATIONS

## I.     Nikola Background and the Business Combination

21.     Milton founded Nikola in 2015 with the primary goals of manufacturing semi-trucks that used alternative fuels with low or zero emissions and building a station infrastructure to support those vehicles.  Since approximately 2016, Nikola has focused on producing FCEV Class 8[2] trucks. Later, Nikola also began to develop Class 8 BEV trucks.

22.     Although BEV cars have existed for a number of years, FCEV cars are less common and FCEV Class 8 trucks have never been commercially deployed.  The lack of commercial deployment of FCEV trucks thus far is largely due to the high barriers to entry, including, among other things, the high cost of dispensable hydrogen compared to traditional

fuels, and the high cost of hydrogen dispensing infrastructure, which is uneconomic to build without vehicles to support it.

23.    Milton claimed that Nikola could solve the barriers to entry by, among other things: (i) offering a bundled lease for its trucks that included the cost of hydrogen fuel; (ii) constructing a nationwide network of hydrogen refueling stations around routes of customers who have committed to lease Nikola's trucks; and (iii) obtaining cheap electricity that would enable the company to produce hydrogen at a fraction of current market rates.

24.    Nikola's business plan required billions of dollars of capital to finance the development and manufacturing of trucks and station infrastructure, which were not expected to generate profits until years in the future.  From 2015 through March 2020, Nikola raised over $500 million through private offerings directed mostly at institutional investors.

25.    In November 2019, VectoIQ targeted Nikola as a potential business combination partner.  On March 2, 2020, VectoIQ and Nikola entered into the Business Combination Agreement, as well as certain related agreements, pursuant to which Nikola would merge with a subsidiary of VectoIQ and effectively become the surviving, publicly-traded entity when the transaction closed.

26.    In connection with the Business Combination, Legacy Nikola investors had their stock converted to VectoIQ common stock, and VectoIQ raised from institutional investors approximately $525 million in a private investment in public equity ("PIPE") offering.  Milton participated in the PIPE marketing efforts by, among other things, making presentations at investor meetings.

27.     As a result of the Business Combination, Nikola received, according to its filings with the Securities and Exchange Commission, a net contribution of approximately $594.5 million from VectoIQ, an amount that excludes a $70 million payout to Milton made at the closing of the transaction.  The parties consummated the Business Combination on June 3, 2020. The following day, Nikola's stock began trading on the Nasdaq.

28.     Between March 2, 2020 when the Business Combination was announced, and June 3, 2020 when it was effected, investors could buy and sell VectoIQ stock based on the reasonable anticipation that upon the completion of the Business Combination, an investor's ownership of VectoIQ stock would make them an equity owner of Nikola.  In addition, during this same period, Milton utilized options to purchase his soon-to-be publicly traded Nikola securities as consideration for several private real estate transactions, including the purchase of Wasatch Creeks Ranch from Hicks.

## II.     Milton's Roles at Nikola and his Control Over the Company

29.     Until the Business Combination, Milton served as Nikola's CEO, was Chairman of its Board of Directors, and was its largest stockholder.  Immediately after the Business Combination, Milton held, through a vehicle he wholly owned and controlled, approximately 25 percent of the company's stock, and he remained the company's largest stockholder during the relevant period.

30.     Following the Business Combination, Milton switched roles from CEO to Executive Chairman.  Milton explained on the *Chartcast* podcast that his change in title was a promotion that allowed him to have nearly unfettered control over the company:

> I can assume any role [I] want[] at any time, whenever it needs and
> all . . . roles report directly up to the executive chairman . . . in

10

> other words, the CEO reports directly to me and I have the ability
> to . . . assume or manage any division, any person . . . anyone
> inside the company, any given time I need to, because they believe
> that I have . . . more knowledge and more vision than anyone in the
> company. And so they wanted to make sure I had no restrictions on
> that.

31.     Retaining control of Nikola was important to Milton.  For example, when a

member of Nikola's Board of Directors urged Milton in January 2020 to appoint to Nikola's

Board additional independent members with public company experience, Milton responded, in

part:

> The most important [sic] is that I fully control the board at all
> times and have people who work well with my personality....No
> one sees the future like I do, and if you get too many world class
> brilliant people on the board, you will end up fighting over
> everything as they think they are the smartest in the room every
> time.

32.     Milton personally hired Nikola's CEO, Chief Financial Officer, and Chief Legal

Officer.

33.     At all relevant times, Milton was Nikola's primary public spokesman, and he had

ultimate control and authority over the company's social media posts and press releases.  Further,

Milton often participated in meetings with prospective investors, industry partners, and potential

customers.

34.     Milton was a hands-on executive. He engrossed himself in the details of Nikola's

technology and product development process.  He participated in weekly update meetings with

senior technical and business leaders. During these meetings, and regularly at other times, he

received updates on Nikola's product development, technology, and commercial activity directly

4884-0231-5272

from Nikola's technical leads.  Milton worked with engineers, often huddling with them in front of computer screens to discuss technical matters.

35.     In fact, Milton was purportedly so central to Nikola's business that Nikola disclosed in its filings with the Commission in the spring and summer of 2020 the risks associated with its dependence on Milton.  Nikola warned in these filings that it is "highly dependent" on Milton's services, because he is "the source of many, if not most, of the ideas and execution driving Nikola."  Accordingly, Nikola cautioned that if Milton could not continue employment with the company, it "would be significantly disadvantaged."

36.     Milton viewed and touted himself publicly as a technological expert in several aspects of electric vehicles. During a May 5, 2020 appearance on the *Rise of the Young* podcast, Milton claimed:

> I'm not trying to ever be too confident or – or brag about things, but this is important to help you understand that answer. There's two people in this world that know EVs better than anyone, and that's Elon and myself. There's no one in this world that – I can go into any meeting with Volkswagen, Daimler, Volvo. You could put 30 PhDs in that room, and I would run circles around every one of them. Because they only know one thing, that's all they know. . . . So there's very few people that know the EV industry or the whole entire vehicle like I do or like Elon does, so we're probably the top two guys in the world that know this shit, and we know it better than anybody.

37.     Milton managed in a hard-charging, demanding, and intimidating manner.  He frequently operated in a silo, making it difficult for Nikola's technical leads to adjust to decisions he made or projects he initiated.  At times, Milton announced company initiatives on Twitter without first consulting with – or even informing – relevant technical or business leads.  It was not unusual for Nikola's engineers, executives, and even marketing personnel to find out about

company initiatives, timelines, or product features by reading a Milton tweet or watching him in an interview.  For example, on June 25, 2020, Milton sent a series of tweets from his personal account in which he claimed that Nikola would offer a drinking fountain in the Badger.  This information came as a complete surprise to Nikola's designers, engineers, and marketing personnel.  When informed of the tweets, one engineer questioned whether "this [is] a joke," a marketing employee wrote that his "head is fuzzy," and a designer texted, "[u]hhhhh what."

## III.   Milton's Social Media Activity and Fixation with Stock Price

38.     In the months leading up to and after the Business Combination, Milton pursued a deliberate communications strategy with the intent of creating maximum exposure for himself and Nikola to retail investors to increase and maintain Nikola's stock price.  This strategy consisted of a ubiquitous social media presence coupled with frequent podcast and television appearances.

39.     Milton used his personal Twitter account (@nikolatrevor) and personal Instagram account (@lakepowelltrevor) to publish material information about Nikola.  As of September  15, 2020, more than 104,600 users followed Milton on Twitter and more than 36,500 users followed Milton on Instagram.

40.     Milton repeatedly urged television viewers and podcast listeners to follow his social media accounts, claiming he used them to communicate "accurate data" about Nikola in a way that would enable followers to receive information "way faster than you get it anywhere else."  Milton's statements on June 30, 2020 during a nationally televised interview on Fox Business encapsulate his view of using social media to interact with Nikola's investors:

> Well, I don't think that the market really – this is I think one of the
> things that many people have missed. The investors around the

world right now are tired; they're tired of like an executive sitting in an office behind his chair, making millions of dollars and, you know, forgetting about the average factory worker or even the consumer. So, there's unparalleled contact between myself, the executive chairman and the founder of Nikola, and all of our fans. I mean, you heard in the previous segment about social media, there's a lot of negative in social media, but there's also a lot of positive that you can create with it. And I took the, uh, I took the decision I wanted to create the positive . . . . And through this social media experience, where people can actually feel like they're part of it, they can talk to you, they can ask you questions, the transparency, the, the market they're just tired of the older executive that just don't care. And that's why you see the market evaluation of Nikola do well is because finally there's executives out there that they can talk to, that they can voice their problems, their opinions with and they actually get a response. Go on my Twitter Nikola Trevor and you'll see . . . you'll literally see answers to probably two thirds of every tweet out there.

41.   Milton exponentially increased his social media activity in anticipation of and after Nikola became a public company in mid-2020. This is illustrated in the following chart that approximates his activity on his personal Twitter account (@nikolatrevor):

| Year | Approximate Number of Tweets (including Replies) Per Year |
|---|---|
| 2016 | 14 |
| 2017 | 22 |
| 2018 | 52 |
| 2019 | 137 |
| 2020 | 2,283 |
| **TOTAL** | **2,508** |

42.   To further increase investor awareness of Nikola around the time of the Business Combination, Milton embarked on a self-proclaimed "media blitz." As part of this campaign, he participated in over a dozen nationally televised interviews and appearances and dozens of

podcast appearances.  As detailed below, Milton made multiple false and misleading statements during these appearances.

43.     Milton's "media blitz" and social media activity was closely connected with his fixation on, and desire to increase and maintain, Nikola's stock price.  Around the time of the Business Combination, Milton became intensely focused on Nikola's stock price, which was very volatile.

44.     On days when Nikola's stock price declined, Milton regularly attempted to direct Nikola's senior executives to take actions to stop the price decline.  Senior executives received frantic phone calls or text messages from Milton on such days in which he urged the executives to "do something."  Milton also spoke of needing to put out "good news" or some kind of announcement "to get people excited" as a way to counteract price declines or maintain support for the stock price.

45.     For example, following a short period of stock price decline in August 2020, Milton sent a text message to a senior Nikola executive requesting to "talk strategy ASAP." Milton went on to say that the "continual stock decline is going to erode any confidence in our stock.  We have to do something . . . . We can't just sit here and watch it collapse."  Another time, in late July 2020, Milton contacted a different Nikola senior executive to discuss the possibility of Milton buying shares of Nikola "for the company's health" because Nikola has had "zero news for two weeks and it's important to prevent our stock from losing credibility."

46.     Senior Nikola executives and some members of Nikola's Board of Directors impressed upon Milton in the summer of 2020 that volatility in Nikola's stock price was to be expected, and that his focus should instead be on long-term performance.  As the senior

15

executives explained to Milton, Nikola had a relatively small float following the Business Combination due, in part, to a significant portion of the stock being subject to lock-up agreements, resulting in stock price movements being largely driven by retail investors and algorithmic trading firms.

47.     However, Milton's focus remained on the stock price and his attempts to influence the retail investors who he viewed as driving it. To that end, Milton tracked the daily number of new Robinhood users who held Nikola stock. On June 8, 2020, Milton shared a tweet with a senior Nikola executive reflecting that over 36,000 new Robinhood users became Nikola stockholders that day. The senior executive responded, in part, by expressing his amazement at how many calls he received "from retail investors today that have no clue about Nikola, other than their friends told them to buy. A lot of hype out there with retail investors," to which Milton replied: "That's how you build a foundation. Love it."

48.     Milton's focus on the stock price was not surprising, as he was personally incentivized to push Nikola's stock price higher. First, as the company's largest stockholder, he stood to benefit financially if he could increase Nikola's stock price, and to sustain that increase beyond the six-month period following the Business Combination. During this period, Milton was contractually prohibited, with some exceptions, from transacting in Nikola stock. Second, Milton's employment agreement following the Business Combination tilted heavily toward equity. For example, Milton and Nikola's senior executives (who also held significant amounts of Nikola stock) each earned an annual salary of $1, but stood to be paid millions of dollars by participating in the company's equity incentive plans. Third, because he had used options to purchase his Nikola stock as consideration for private real estate transactions, including his

purchase of Wasatch Creeks Ranch from Hicks, he was incentivized to support Nikola's stock price and at a minimum assure it stayed above the strike price of the options he had provided.

49.     One part of the equity incentive plan provided that Milton could earn, incrementally, up to 4,859,000 restricted stock units ("RSUs") as "Performance Awards" if the company's stock price reached milestones of $25, $40, and $55 per share.  Under the employment agreement, the share-price milestones were achieved, and incremental RSU awards were earned, when Nikola's stock traded at or above a share price milestone for at least 2014 consecutive trading days during a three-year period.  On August 21, 2020, Milton received the maximum award of 4,859,000 RSUs based on reaching these milestones.

## IV.     **Milton's Material Misrepresentations to Investors**

50.     From approximately November 2019 through September 2020, in his capacity as CEO and later as Executive Chairman of Nikola, Milton made materially false and misleading statements on numerous, critical topics related to Nikola's capabilities, technology, reservations, products, and commercial prospects.  The false and misleading statements made during this time period remained in the public domain and accessible to investors and prospective investors through at least September 20, 2020.

51.     Milton made the false and misleading statements in tweets from his personal Twitter account, posts to his personal Instagram account, tweets from Nikola's corporate Twitter account, in Nikola press releases, and in television and podcast appearances in which he was identified as Nikola's CEO or Executive Chairman.

52.     Milton's tweets and Instagram posts were published instantaneously to his Twitter and Instagram followers, respectively, and also were publicly available.  When tweeting or

posting material information about Nikola from his personal accounts, Milton did so in his capacity as CEO or as Executive Chairman of Nikola.  Beginning at least as early as June 2020 and continuing through September 20, 2020, Milton included the following publicly available bio on his Twitter account: "Founder, Executive Chairman of @nikolamotor Nasdaq traded: NKLA.  It's our duty to leave the world a better place and inspire people. Instagram: lakepowelltrevor."

53.     At all relevant times, Milton had the authority to publish, and to cause Nikola to publish, material information about Nikola from its corporate Twitter account (@nikolamotor), without approval from any other person.  As of September 15, 2020, more than 81,400 people followed Nikola on Twitter. At all relevant times, Milton also had authority to cause Nikola to publish press releases, and to publish content on Nikola's website.

### A.     False and Misleading Statements about the Nikola One

#### (i)     Capabilities of the Nikola One Semi-Truck

54.     Nikola began its truck development program in 2016, when it unveiled its first truck prototype, the Nikola One. At a December 2016 unveiling event for Nikola One, Milton repeatedly and falsely stated that the Nikola One was fully functioning.  In June 2020, in responding to the publication of an article that questioned the accuracy of Milton's December 2016 statements about the Nikola One, Milton re-adopted the 2016 statements, telling the market – again falsely – that the Nikola One could have been driven in 2016.

55.     In or around June 2016, Milton began to promote an unveiling event for the Nikola One scheduled for December 1-2, 2016.  Nikola invited potential investors, suppliers, and potential customers to the event, and publicized that it would live-stream the event on its

website. In the weeks leading up to the event, Milton represented that the Nikola One would be "working" or "functioning."  For example, on October 16, 2016, in response to a question from a Twitter user about whether the December 1, 2016 event would be a "[d]esign unveiling or a functional prototype," Milton responded, via Nikola's corporate Twitter account, "functioning. Fully built truck at event."

56.      In or about August 2016, however, Milton had pivoted the Nikola One from the original CNG-powered concept to a hydrogen fuel cell vehicle.  A fuel cell converts hydrogen to electricity.  This fundamental design change ensured that the prototype to be shown at the unveiling event in December would not be operable, as integrating and testing FCEV components would require significant additional time.  A few weeks before the event, Nikola's chief engineer informed Milton that the truck would not be functioning at the unveiling event unless the event was postponed.  Milton made the decision to proceed as scheduled with the knowledge that the vehicle to be unveiled would not be functioning.

57.      The unveiling event was live-streamed on Nikola's website.  In his remarks at the December 1, 2016 event, Milton said, despite full knowledge of facts to the contrary, that the Nikola One "fully functions and works which is really incredible."  He went on to tell the audience that "you're going to see that this is a real truck, this is not a pusher."  The following day, Milton recorded an interview with Roadshow, a website focused on the auto industry, from inside the Nikola One.  A video of the interview was posted to YouTube and was available publicly to investors and prospective investors. As of August 2020, this video was viewed on YouTube approximately 280,000 times.  In the interview, Milton repeated the claim that the Nikola One displayed at the event was fully functioning:

> This isn't just a pusher like a lot of vehicles that they unveil or just
> vehicles that don't actually function. . . . This is a fully
> functioning, you know, vehicle, which is really incredible. You can
> go through, you can, you know, we can change out pretty much
> everything we want, all the temperatures.  I mean this is a fully
> functioning vehicle. It's not just a not just a pusher.  It's what they
> call in the automotive world a vehicle that they just push and it
> doesn't move. . . .

58.     On June 17, 2020, Bloomberg published an article titled *Nikola Founder*

*Exaggerated the Capability of His Debut Truck*.  The article reported, among other things, that

Milton made statements at the December 2016 unveiling event that implied the Nikola One was

drivable, which alarmed people at the event who were familiar with the truck's capabilities, or

lack thereof.

59.     That same day, Milton responded to the article on his personal Twitter account, in

aggressive and highly personal terms.  He doubled down on his prior deceptions, tweeting:

"Everyone at the event knew we didn't drive it because it wasn't safe, although it could be driven

if we wanted to with safety and time put into it without the fuel cell.  The truck built could have

been driven w/testing."  Later that day, Milton texted a member of Nikola's Board of Directors,

boasting, in reference to his tweets earlier in the day, that "[s]hare value went up after my

response."  Then, on or about June 26, 2020, Milton made a similarly deceptive statement in an

interview on CNBC's *Fast Money*: "I mean, the answer was is every part of that truck was

functional. We just didn't feel safe driving it at that time.  That was our first truck what, four or

five years ago.  It was all operable, but it wasn't really that safe, like it could've killed someone

in the audience."

60.     Milton's June 2020 statements were categorically false.  The two reasons Milton

proffered for why the Nikola One was not driven in 2016 – safety concerns and lack of testing –

were false.  Rather, in the words of one Nikola engineer, in December 2016, the truck was "not even remotely ready to operate."  The Nikola One was not operable at the time because, among other reasons:

> (a)      all electrical components were powered through a cord running from an external power source, rather than the truck's battery;

> (b)      neither the fuel cell nor the hydrogen gas storage tanks had been installed;

> (c)      the air compressor and the turbine had not been commissioned;

> (d)      the gearboxes had not been assembled, and certain parts necessary for assembly of the gear boxes had not arrived;

> (e)      the vehicle-level controls had not been completed; and

> (f)      the human-machine interface, which Milton touted, consisted simply of off-the-shelf tablets set into a dashboard and were not integrated with the truck's systems.

61.      At the time of his June 2020 statements, Milton knew or was reckless in not knowing that the Nikola One he presented at the unveiling event as "a fully functioning vehicle" was not, in fact, fully functioning.  At the time of the unveiling event, Nikola was a small start-up company and many of its engineers reported directly to Milton.  A mechanical engineer who had a key role in the Nikola One's development updated Milton often, such that Milton was intimately aware of the status and progress of the prototype.  According to one engineer, Milton worked on the truck with the engineers, and as a result was aware that the truck had not been driven before the event and could not be driven at the event.  When told by engineers that the truck would not be functioning by the scheduled date of the event, Milton nevertheless decided

4884-0231-5272

to proceed as scheduled, and went on to tout the truck as fully functioning – in 2016 and again in 2020.

62.     When Milton made the statements in his June 2020 tweets and during the CNBC interview, Nikola's stock was publicly traded. These statements were material because an investor would consider whether Nikola's first prototype was functioning to be important to their investment decision.

(ii)     *The Nikola One "In Motion" Video*

63.     After the December 2016 unveiling event, Nikola did not perform any further work on the Nikola One.  Yet, Milton continued to misrepresent the Nikola One to investors and potential investors through a video posted to the company's website and its social media accounts.

64.     In or about early 2018, Nikola participated in a commercial shoot for a leading supplier and manufacturer of parts for the trucking industry.  For the commercial shoot, the non-functioning Nikola One prototype truck was hauled to the shooting location by a "lowboy" semi-truck trailer.  At this time, and more than a year after the unveiling event, the Nikola One still could not run under its own power.  It was towed to the top of an inclined stretch of road and then filmed rolling down the incline. This towing-and-rolling process was repeated three times to have sufficient footage for the commercial.

65.     Milton attended the commercial shoot.  He then obtained raw video footage shot that day.  Milton provided the footage to a Nikola digital media employee, whom he instructed to create a short clip of a rolling Nikola One for the purpose of posting the clip on social media. The employee created the clip and showed it to Milton, who directed certain edits to be made.

22

Milton ultimately approved a final version of the clip, which had been sped up two- to-three times.  This had the effect of making the Nikola One appear to move faster than it was.

66.     On or about January 25, 2018, Milton posted, or directed the posting of, the edited video clip to Nikola's Twitter and Facebook accounts.  And at Milton's direction, the digital media employee posted the clip to Nikola's YouTube account.  The video embedded in Nikola's tweet and on its YouTube post shows the Nikola One moving on a road, seemingly at a high rate of speed.  The video does not have any narration or text.  The text of the tweet in which the video was embedded states: "Behold, the Nikola One in motion.  Pre-production units to hit fleets in 2019 for testing.  The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category: weight, acceleration, stopping, safety and features – all with 500-1,000 mile range!"

67.     Milton drafted the text of this tweet.  The video posted on YouTube had similar text accompanying it: "Behold, the 1,000 HP, zero-emission Nikola One semi-truck in motion. Get ready for the pre-production units to hit fleets next year in 2018 for testing . . . ."

68.     The video and the caption on the January 25, 2018 tweet and YouTube post were misleading because the video showed the Nikola One moving down a road with text that told viewers to "behold" the Nikola One "in motion," while omitting the fact that the truck was rolling down an incline due to gravity rather than under its own power.  The "In Motion" video thus left viewers with the false impression that the Nikola One was capable of moving under its own power.  However, Milton knew then that the Nikola One could not be driven under its own power.  In addition to knowing, as described above, that the Nikola One was not functioning,

Milton attended the filming of the commercial and was aware that the Nikola One was towed up an incline from which it was filmed rolling down.

69.     The "In Motion" video remained posted on Nikola's corporate Twitter, Facebook, and YouTube accounts, as well as on its website, and was available for viewing by investors and prospective investors until at least September 2020.  The misleading video, as presented on Nikola's social media accounts and website, was material to investors during the period that VectoIQ and Nikola were publicly traded because it purported to show that as early as January 2018, Nikola had a truck that could drive.  Hicks was specifically directed by Milton to review materials that were available on the Internet, and he did so prior to agreeing to accept the option to purchase Nikola stock as part of the consideration for the sale of Wasatch Creeks Ranch. Nikola finally took down the video from its social media accounts and website after the Securities and Exchange Commission initiated an investigation and specifically requested information about the video.

**B.     False and Misleading Statements about Hydrogen Production, Costs, and Capabilities**

*(i)     Background on Nikola's Hydrogen Production Plans*

70.     A key aspect of Nikola's business plan is its planned development of hydrogen production and fueling station infrastructure to support its FCEV trucks. In order to support the trucks that it projects to put on the road, Nikola needs to produce tens of millions of kilograms of hydrogen each year.  To do so, Nikola represented to investors that it intends to produce hydrogen via electrolysis, a process that uses electricity to split water into hydrogen and oxygen. However, producing Nikola's projected amount of hydrogen via electrolysis would require a massive amount of electricity.  In fact, Nikola has projected that, when its hydrogen station

24

network is fully built out, this network would annually consume approximately 5 percent of all electricity consumed in the U.S. today.

71.     According to Nikola's projections, the price of electricity comprises 75-85 percent of the cost of producing hydrogen via electrolysis.  For purposes of its projections, which Nikola has disclosed to the public, it assumed it could obtain electricity at an average of $0.035 per kilowatt-hour ("kWh") – a rate significantly cheaper than prevailing industrial rates – based on its expected large consumption and its goal of obtaining lower-cost renewable electricity during non-peak hours or sourcing it "behind the meter" (*i.e.*, from a source other than the grid). Nikola disclosed that if it is not able to obtain electricity at a significant discount to prevailing rates, it would not be profitable. Accordingly, Nikola's ability to produce hydrogen – and do it cost effectively – is a critical component of the company's overall business model.

> *(ii)     Misrepresentations about Nikola's Hydrogen Production Capabilities*

72.     During the time period that Milton was CEO and Executive Chairman (2015-September 2020), Nikola: (i) never produced a single kilogram of hydrogen, (ii) did not have a station permitted to produce hydrogen, and (iii) did not have any contracts signed with any electricity providers.  Instead, during this time, Nikola developed internal financial models that included electricity price targets required to reach future profitability.

73.     Yet, when it came to hydrogen production, Milton misrepresented aspects of Nikola's business that it had *planned* or *modeled* as something that had *already* happened. As detailed below, Milton made several false and misleading representations about: (i) Nikola's then-current ability to produce hydrogen; (ii) Nikola's then-current cost to produce hydrogen;

and (iii) the cost at which Nikola had already obtained electricity and the methods by which Nikola obtained its electricity for hydrogen production.

a)   <u>Nikola's Hydrogen Production Capability</u>

74.   Concerning Nikola's then-current ability to produce Hydrogen, Milton made the following material misrepresentations:

(a)   On December 2, 2019, at an event with Nikola's original equipment manufacturer ("OEM") partner that was live-streamed on Nikola's website, Milton stated:

> We're building out the hydrogen station right now globally. In America we've already got the largest hydrogen station in the western hemisphere at our headquarters. Can produce over 1,000 kilograms a day on site, we're planning to expand that up to, up to essentially eight tons, which is about 8,000 kilograms a day. That'll be done in Phoenix, Arizona. The station's already up and operational for pumping right now.

(b)   In an interview on the *Tesla Daily* podcast on or about June 3, 2020, Milton said:

> But one thing that's really interesting about hydrogen is that you can create hundreds of megawatt hours of energy into hydrogen in times of the day where it would all be wasted anyways. And so it's one of those – and energy is so cheap now that this is one point I've told people. If you pull energy out on your car in California you're gonna pay – you can pay anywhere from 12 to 30 cents a kilowatt hour in California for energy. Depends on where you're at. *When I produce hydrogen I'm paying under 4 cents everywhere I go. And that's because we're doing it behind the grid in large quantities and that's where people fill up.* So what we're able to do is really drive down the cost of energy. It might be less efficient; that's true. But it's actually cheaper per mile. (Emphasis added).

(c)   In an interview on the *Autoline After Hours* podcast on or about June 11, 2020, Milton had the following exchange with the host:

26

4884-0231-5272

MILTON: And we just ordered $30 million worth of equipment two days – or three days ago for our electrolyzer. So, it's – all it takes is just electricity, clean energy from hydro, wind, or solar. And we can produce it all 24 hours of the day, never paying peak rates, never buying dirty energy, all zero emission. So, if you really love zero emissions –

HOST: You make it on site?

MILTON: We do. We make it on site.

HOST: You make it on site at the station?

MILTON: Yes. And that's why it's so – this is – you know, people don't get Nikola . . . we have the largest hydrogen station in the western world at our headquarters.  So, we've already proven it . . . . Now we're down two, three bucks a kilogram and it's pretty awesome."

75.    In addition to the above public statements, Milton made similar statements to Hicks regarding Nikola's hydrogen capacity and expected profitability based on hydrogen sales in connection with the discussions leading to his purchase of Wasatch Creeks Ranch.  All of these claims about Nikola's current ability to produce hydrogen were false.  At the time of Milton's statements, Nikola had not produced, and was not capable of producing, any hydrogen.

            b)    Nikola's Cost to Produce Hydrogen

76.    Concerning Nikola's current cost to produce hydrogen, Milton made the following misrepresentations:

            (a)    On January 23, 2020, Milton tweeted from his personal account:

"Hydrogen costs have plummeted through @nikolamotor efforts not other OEM's [sic].

Our costs are below $3 per kg. Diesel parity is $4/kg. Game is over for diesel. . . ."

(b)      The same day, a Twitter user tweeted at Milton asking him to "confirm that is compressed green electrolytic hydrogen at $3/kg, today?  How soon will that be available for public purchase, any update on that timeline?"  Milton replied "Yes."

(c)      On or about March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast: "Up until Nikola came in the market, hydrogen was around $16 a kilogram, U.S. dollars.  Now Nikola is producing it well below $4 a kilogram.  We have driven the cost down times almost four times.  That's how – you know, one-fourth the cost of normal hydrogen production, Nikola is now at."

(d)      In a June 4, 2020 interview that appeared on the *Yahoo! Finance* website, Milton stated: "When we first started, hydrogen was $16 a kilogram. We can now produce it for well under $4 a kilogram.  So we've cut – it's one quarter of the cost now than it was just a few years ago. And we're now cheaper to operate per mile than diesel."

(e)      On June 9, 2020, Milton replied on his personal Twitter account to another user, who appeared to have been citing a source projecting dispensed hydrogen to be priced at $6.00 to $8.50 per kilogram by 2025, "[w]e are already under $4 working on $3."

(f)      On June 10, 2020, Milton tweeted from his personal account in reply to a user who asked, "[w]ondering if I could get your thoughts on how you intend to lower the cost/kg of hydrogen?" Milton responded: "We are now below $4 per kg which is the lowest in the world. We started at $16 and now we are at $4.  We plan on reducing that again.  The key is to order tons of equipment, scale it and buy clean energy cheap."

(g)      In a June 18, 2020 article in the Irish Times titled *Nikola Motor Takes a Big-Money Punt on the Hydrogen Future*, Milton is quoted as follows: "We can now produce hydrogen for between $2 and $4 a kilogram.  We're now cheaper than diesel to operate per-mile and we're almost at parity with a battery electric per-mile, and ultimately that's game over for diesel."

(h)      On or about July 6, 2020, Milton stated on the *Founder Hour* podcast: "We drove hydrogen down from 16 dollars a kilogram down below four dollars a kilogram now. So why is that?  Well, why is that important?  Because now, I can provide zero emission to a truck cheaper than diesel.  We've now won the game."

(i)      On the *Chartcast* podcast recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton stated that Nikola has been able to "chop the cost of hydrogen from $16 per kilogram down to – we're down below $3 per kilogram on our hydrogen right now. . . ."

(j)      On or about July 14, 2020, the Observer.com posted on YouTube a video of an interview with Milton. Milton stated in this interview: "We build all of our hydrogen through clean energy directly from the energy source. So we go contract with like wind farms or solar farms or whatever. And with that, what we do, is we take that energy and we produce hydrogen 24 hours a day with it. And then we can produce that very cheap like you know like $2, $3 a kilogram. We're under $4 a kilogram for hydrogen. . . ."

(k)      In an interview on the *This Week in Startups* podcast on or about July 31, 2020, Milton claimed that "what we did is we've been able to drive hydrogen to under $4

a kilogram, we're about $3 a kilogram on hydrogen now." When asked by the host how Nikola got "from 14 to 3 – is there some special sauce there," Milton replied, "[y]eah, very simple. It's all about – it's about standardization. . . . So in America right now, there's no two hydrogen stations that were actually developed on the same platform, they're all engineered from the ground up separately . . . . So we, we developed the first ever standard hydrogen station that can be produced in the thousands."

(l)　　In an interview on the *Barron's Roundtable* show on Fox Business on or about August 1, 2020, Milton was asked by the anchor: "right now hydrogen, which powers those cells is about four times as expensive as diesel. Why do you like fuel cells and how can you make this actually work?" Milton responded:

> Yeah, that's, uh, that was a big problem we tackled. That's why we came into the market. We saw an opportunity to bring the cost of hydrogen down going zero emission and putting it on parity or lower than diesel. And that's the first time in history that's been able to be done. So it went from about $16 a kilogram, we're down now below $4 a kilogram and there's lots of reasons for that. But the main one is standardization of a hydrogen station worldwide has allowed us to drive that cost down dramatically.

77.　　Milton's claims that Nikola had either "solved," "driven down," or otherwise achieved this cost of production were false and they grossly misled investors and prospective investors, as Nikola did not have the ability to produce hydrogen, much less at the prices that Milton represented. As an initial matter, any claims about Nikola's current cost to produce hydrogen were false simply because Nikola had not then produced *any* hydrogen – a fact Milton knew.  Further, and as discussed in more detail below, at that time Nikola did not have *any* agreements with electricity providers that would have enabled it to produce hydrogen at Milton's claimed cost – a fact Milton also knew.  Given that electricity costs make up 75-85 percent of

hydrogen production costs, Milton's claims about Nikola's supposed ability to produce hydrogen at the specified costs – without Nikola having any agreements in place to lock in electricity costs – were false.

78.     The figures that Milton cited as Nikola's current costs were, in reality, Nikola's *projections* at which future production, if it ever occurred, could be profitable.  Once again, Milton presented to investors something Nikola hoped to do as something it had already achieved.  As discussed below, he also made these same false representations to Hicks in conversations leading to the purchase of Wasatch Creeks Ranch in an effort to convince Hicks to accept options for Nikola stock as part of the consideration for the transaction.

79.     Contrary to Milton's claims, Nikola had not achieved cost reductions from the "standardization" of its hydrogen stations.  Instead, it had installed only one demonstration station, which at times dispensed, but never produced, hydrogen, and was still evaluating various design and production options for its future stations.

80.     Milton knew or was reckless in not knowing that his claims about Nikola's actual production of hydrogen, its ability to produce hydrogen, and the cost at which Nikola was purportedly producing it were false and misleading.

81.     Milton was personally involved in numerous discussions and email exchanges within the company about Nikola's inability to produce hydrogen. For example, on December 2018, Milton was informed that the City of Phoenix denied Nikola a permit to install electrolyzers (which are used to produce hydrogen through electrolysis) at Nikola's Phoenix headquarters, making it impossible to produce hydrogen there.  Instead, the City of Phoenix only permitted storage and dispensing at this location.  Then, in February 2020, Milton asked

31

employees to create plans to install electrolyzers at Nikola's headquarters because "this will give us a complete system that works on site we can show investors." Nikola personnel notified Milton via email in March 2020 that installing electrolyzers "will take 5-6 months to get the site permitted for hydrogen production plus another 5-6 months to get the electrical supply and construction completed." As a result, and as Milton knew, Nikola had to purchase hydrogen from other suppliers for use in testing at its headquarters station. Nikola still, to this day, does not produce any hydrogen at its headquarters, or at any location. Further, Milton was aware that Nikola had not standardized the design of its hydrogen station because he had participated in the internal evaluation process for station design.

82.    Milton was also aware that Nikola was not producing any hydrogen because, in May 2020, he asked an employee on Nikola's hydrogen infrastructure team to accelerate a previously planned purchase order for electrolyzers for Nikola's first five planned stations. As with certain other corporate actions he directed, Milton appeared principally concerned with investor perception. As Milton explained to the employee, "[t]his [accelerated purchase order] will give us great news to disclose leading up to the merger." On May 31, 2020, Milton sent an email to Nikola's Board of Directors seeking approval, on one day's notice, of a nearly $31.5 million purchase order for electrolyzers. Milton justified the purchase order, in part, as follows:

> 2nd major point. IPO. I am getting ready to go on a media blitz and the most critical item in our business model is that we don't have stations. I would like to announce this on Monday as huge news. This will help our stock, create much stronger following and base layers of investors and it also will ease the criticism I am going to get going into interviews. I believe our PIPE and SPAC will be very happy to hear we are moving on our stations and not delaying.

c)    Nikola's Cost to Obtain Electricity

83.    Concerning the costs at which Nikola had supposedly obtained electricity and the methods it used to do so, Milton made the following misrepresentations:

(a)    On May 30, 2020, Milton tweeted from his personal account in response to a user's question about "where the electricity comes from." Milton stated: "Wind solar and hydro for most. That's all we really touch is non carbon energy. Creating it on site under contracts give us 3 or 4 cents per kWh clean energy making hydrogen very competitive and cheaper than diesel."

(b)    On June 9, 2020, Milton tweeted from his personal account: "We source energy directly with either wind farms, solar or hydro electricity.  Once we broker a 20 year agreement, we feed it into the federal lines, pay some small fees, then take it out on location.  This ensures the energy is clean and we don't pay post meter rates."

(c)    On June 9, 2020, Milton also tweeted from his personal account: "I am the biggest supporter of BEV and FCEV. We take all energy behind the meter which allows us to get below $.04 per kWh and guaranteed clean energy. Once you go post meter, you can't control the energy, you get 50% dirty energy. I am trying to help and educate. Not hurt BEV."

(d)    Again on June 9, 2020, Milton tweeted from his personal account: "Yes, we have stations going up in Canada and they use clean energy for our hydrogen.  Solar, Wind and Hydro give us under $4 per kg hydrogen."

(e)    On June 10, 2020, Milton tweeted from his personal account:

I love both BEV & Hydrogen. Here's the breakdown to combat all
the lies. A loaded truck w/full weight & average weather

33

conditions. H2 is now under $4 per kg and working on sub $3 per kg. . . . 15 min full [sic] time & 10,000 lbs lighter . . . . Before anyone goes and slams me about cost of hydrogen, we don't produce it in the city, we do it behind the meter at about $.04 / kWh on PPP clean energy. That's why hydrogen makes sense for long haul. You're not fighting utilities and rates.

(f)      On June 21, 2020, a Twitter user asked Milton, "can you please explain how Nikola is achieving cheap power along freeways?  And how will you still achieve cheap power for stations inner city?  This is more of the game changer for nikola [sic] in my opinion.  Thanks." Milton responded: "Freeway allows you 20 year PPP without paying high fees to transport through utilities. It is nearly 5x cheaper to produce h2 on freeways, where hydrogen excels."

(g)      On June 21, 2020, Milton published on LinkedIn an article he wrote titled *Trevor Milton: Hydrogen vs Battery Electric-Why Nikola is the Leader-Reality Sets In*, in which he wrote: "Most hydrogen that Nikola makes is on the freeway . . . . Nikola uses energy transmitted on the federal transmission lines before we enter the utility. We buy this clean energy directly from Wind, Solar and Hydro facilities directly. This allows us to get sub $.04/kwh 20-year agreements on the freeways."

(h)      On the *Chartcast* podcast recorded on or about July 17, 2020 and published by the podcast on or about July 19, 2020, Milton claimed:

> So the energy on the freeway, we, we, we tap directly into the main federal transmission lines and we contract directly with groups . . . an example would be like, you know, um, would be like a Tennessee Valley Authority. . . . So out on the freeways where the federal transmission lines are, and we can tap in, and we've, we've already preplanned all these, these locations where they can go. Um, and we're gobbling up the best locations right now.

Milton further claimed that "[w]e only look at areas where we can get this energy for sub, you know, sub three or four cents a kilowatt hour, guaranteed 24 hours a day. And we've been able to do that in almost every one of our major locations that we're going up, and we're gobbling up those locations." Milton also asserted that "we have exact costs for our customers" and "every contract we've been doing right now has been to where we get very good discounts, if not free for a lot of energy, you're talking about, you know, $2 a kilogram, buck, buck 50, buck 80."

(i) In an interview with Jessica Meckmann published on LinkedIn on or about July 17, 2020, Milton stated: "We are contracting with wind, solar and hydro plants for energy and so far have been able to source plenty of energy under $.04 per kWh. Most of it is much lower in the 2.5 [cents] per kWh range."

(j) On August 3, 2020, a Twitter user asked Milton to share how he reduced the price of hydrogen in a way that was "more technical than standardized stations." Milton replied: "Essentially, $.04 kWh equals under $4 per kg. We are already locking in much lower than $.04 per kWh on our stations going in as they are on freeways with 20 year PPA. That along with other things I mentioned get us below that."

84. Milton's assertions that Nikola was already procuring electricity for hydrogen production from renewable or "clean" sources was false, because it had not, at that time, secured any electricity from any source, including from any of the sources that Milton claimed.

85. Similarly, Milton's assertions linking Nikola's cheaper electricity costs along freeways with its ability to "tap" into federal electricity transmission lines also was false,

35

because Nikola had not tapped into federal lines for purposes of hydrogen production, and had not secured any rights to do so (along freeways or elsewhere).

86.     Milton's assertions regarding procuring electricity at specified rates or through Power Purchase Agreements ("PPAs") also were false, as at the time Nikola had neither contracted for any specific electricity rates nor entered into any PPAs for purposes of hydrogen production. Here, as elsewhere, Milton took electricity rates that Nikola *modeled* as targets and presented them in public statements as rates that Nikola had already *achieved*.

87.     Finally, Milton's comments about Nikola "gobbling up" station locations and its stations "going up in Canada" were flatly false, as Nikola had not secured any locations and had not built any stations, other than installing a demonstration dispensing station at its headquarters.

88.     Milton knew or was reckless in not knowing that his claims on these topics were false. As detailed above, Milton was aware that Nikola was not producing any hydrogen at all. Milton was also aware that Nikola had not entered into any PPAs.

89.     On June 9, 2020 – the day Milton tweeted multiple misrepresentations about electricity prices – Nikola's Global Head of Infrastructure Development forwarded Milton an email from an electrolyzer supplier concerning costs and delivery. This employee sought Milton's input on the delivery schedule for the accelerated purchase order, noting that "we don't have PPA's [sic] executed yet to support these electrolyzers." Further, Milton attended a July 2020 Board of Directors meeting at which Nikola's hydrogen infrastructure team apprised the Board that the company had not yet entered into any PPAs and that rate negotiations with electricity providers were ongoing at the time. In fact, the only rate agreement that the company has entered into to-date occurred *after* Milton left Nikola in September 2020.

90.     Because Milton was aware, at the time he made these statements, that Nikola had

not entered into any PPAs or other rate agreements with any providers and that it was not

producing any hydrogen, Milton was also necessarily aware that Nikola: (i) had not sourced any

"clean" or renewable electricity, (ii) was not acquiring cheaper electricity along freeways by

tapping into federal lines, and (iii) was not acquiring electricity at specified rates.

91.     Further, Milton was aware that Nikola was not "gobbling up" station locations

and was not in the process of building any stations in Canada. Because Milton was kept apprised

of Nikola's station development efforts, he knew that these efforts had not even remotely

progressed to the point he represented publicly.

92.     All of the false and misleading statements detailed above were material. Given the

importance of hydrogen production at economic costs to Nikola's business, an investor would

consider it important in making an investment decision that Nikola was not, in fact, already

producing hydrogen, much less at a cost that would be profitable. An investor also would

consider it important that Nikola was neither able to obtain the electricity rates that Milton

represented nor to do so from renewable sources.

### C.     False and Misleading Statements about the Badger Pickup Truck

93.     On February 10, 2020, Nikola published a press release titled "Nikola Unveils the

Nikola Badger Pickup."  The press release touted the Badger as the "World's Most Advanced

Zero-Emission FCEV/BEV Pickup with an Estimated 600 mile Range."

94.     Milton's unveiling of the Badger was straight out of his Nikola One playbook.

That is, Milton continued his pattern of touting capabilities of vehicles that, in the case of the

Nikola One, was not functioning, and in the case of the Badger, simply did not exist beyond a

computer-generated imagery (CGI) rendering of an illustration created by a Nikola employee

many months before.

95.     Having decided, in or around February 2020, that Nikola would develop a pickup

truck he called the Badger, Milton went on to make misrepresentations about the Badger's

timeline for development and Nikola's proprietary contributions to its design.

96.     Milton made the following statements regarding the timing of the Badger's

development:

(a)     The February 10, 2020 press release (which Milton drafted, over which he

had ultimate authority for its content, and authorized its distribution) stated that the

Badger "is engineered to deliver 980 ft. lbs. of torque, 906 peak HP and 455 continuous

HP," "was designed to handle 0-100 mph launches with minimal loss of performance and

to operate on grades up to 40% through advanced software blending of batteries and fuel-

cell," and was "engineered to outperform all electric pickup trucks on the market in both

continuous towing, HP and range."

(b)     The same day, on February 10, 2020, a Twitter user replied to a tweet

from Milton's personal account that promoted the prior day's press release, commenting

that "the spec sheet looks ridiculously exaggerated . . . ." Milton responded: "Specs are

dead on actually."

(c)     On or about April 20, 2020, Milton stated on the *Truck Show Podcast*,

referring to the Badger: "We built the thing to be a true vehicle."

(d)     On or about May 30, 2020, Milton stated on the *JMac Investing* podcast:

Soon I'll be announcing when we're going to show off the Badger
to the whole world. And this thing is insanity. It is the most

38

beautiful truck I think the world has ever seen. It's a fully
functioning vehicle inside and outside, HVAC, and everything,
windows, all of it works. I shouldn't say all of it – I'll probably
have a couple of pieces that'll break on me, but hey, that's part of
the process of building the truck, but it's a real [sic] truck. It's not
just some mock up thing that other people have done. This is a
real, real truck.

(e)     On June 8, 2020, Milton tweeted from his personal account in reply to a

user who asked, "when will the first prototype be produced?" Milton replied: "Already."

(f)     In an interview on the *Raging Bull* podcast on or about June 29, 2020,

Milton stated regarding the Badger: "So together we literally built the most badass pickup

truck the world had ever seen, and it's the reason why Nikola is on the front page of

almost every news organization out there around the world right now."

(g)     On July 1, 2020, Milton tweeted from his personal account in response to

a user who questioned "how are you able to get the truck ready in 4 months." Milton

replied: "Exactly, which means it's not fake. Truck real. It's going to be fun releasing

teaser videos leading up to #nikolaworld2020 of the #nikolabadger."

(h)     On or about July 19, 2020, Milton stated on the *Jimmy Rex Show* podcast:

"So we . . . had been working on it [the Badger] for a while. I decided to put my teams on

it. We got it done."

97.     The statements that Nikola had "designed" or "engineered" the Badger to meet

98.     particular specifications misled investors regarding the state of Badger's

development at the time of its announcement. When Milton announced the truck in February

2020, there was no Badger. At that time, Nikola had not performed any engineering work or any

design work, other than CGI renderings of the Nikola employee's prior illustrations. An OEM

engineer, who visited Nikola's offices in February 2020 to conduct diligence in connection with a potential partnership to build the Badger, summed up the Badger's state at the time as "vaporware."

99.     Milton's subsequent statements asserting that a prototype was already completed were false and misleading, because the Badger prototypes were not delivered until December 2020 – nearly three months *after* Milton resigned from Nikola. When Milton made the statement in April 2020 that Nikola "built this thing to be a true vehicle," the truck was in early stages of conceptual development. Moreover, the third-party suppliers Nikola had contracted to build the Badger prototypes used some show car technology for the vehicles, which were not engineered or intended to be used for production. Similarly, in June and July 2020, when Milton again touted the Badger as being "built," "done," "real," and a "fully functioning vehicle inside and outside," the third-party suppliers were then only completing computer-aided design (CAD) and beginning tooling. In the same month, Nikola's Vice President of Technology referred to the Badger in an internal email as "vapor ware" [sic] "with no technical plan."

100.    Milton made other, similarly misleading statements in which he asserted that the Badger could perform up to certain estimated specifications, including a 600-mile range on the FCEV model and a 300-mile range on the BEV model, a 0-60 mph time of approximately 2.9 seconds, 906 horsepower, and 980 ft. lbs of torque. Milton cited one or more of these specifications in: (i) the February 10, 2020 press release, (ii) a February 10, 2020 tweet in which he confirmed the specifications cited in the press release, (iii) a February 13, 2020 Instagram Live post on his personal account, (iv) a June 15, 2020 interview on CNBC's *Fast Money* program, (v) a June 29, 2020 appearance on the *Raging Bull* podcast, (vi) a July 1, 2020

interview on the *Mark Haney Show* podcast, (vii) a July 19, 2020 interview on the *Jimmy Rex Show* podcast, and (viii) a July 31, 2020 interview on the *Stockcast* podcast. These performance specifications were, at best, misleading, because Milton omitted to disclose that they were based entirely on models and simulations conducted by Nikola's engineers using aggressive assumptions provided to them by Milton – except the range, which, on information and belief, was not based on *any* modeling or simulations.

101.    At the time he made the statements regarding the timing of the Badger's development detailed above, Milton knew or was reckless in not knowing that his statements were false and misleading.  The Badger was Milton's project from the beginning.  It was his idea to produce the truck, and he personally pushed the project forward. By virtue of regularly interfacing with the Badger's designers, engineers, and suppliers that constructed the Badger prototypes, Milton was at all times aware of the status of the Badger's development.

102.    Further, in early June 2020, a Nikola employee who led the Badger's design informed Milton that one third-party supplier was six to eight weeks from beginning tooling. And at a meeting of Nikola's Board of Directors on July 23, 2020, at which Milton was present, Nikola provided to the Board materials indicating that the prototypes would not be completed until at least November.  Ultimately, two Badger prototypes were delivered to Nikola in December 2020.  Finally, Milton was aware that the performance specifications he cited were based on simulations and models only, because he was the one who requested this work to be performed.

103.    All of the false and misleading statements detailed above were material, as an investor would consider it important in making an investment decision that Nikola had not already designed, engineered, or completed a prototype of the Badger.

104.    Milton made the following statements regarding the proprietary nature of the Badger:

(a)    On or about April 20, 2020, Milton stated on the *Truck Show Podcast*: "We spent a billion dollars essentially on our hydrogen program . . . with our semi-truck and we're the leaders in hydrogen technology around the world. . . . We took that billion dollars in knowledge and put it into this pickup truck."

(b)    On or about June 11, 2020, Milton stated in an appearance on Cheddar News: "We've made it very clear that we don't want to build this [Badger] on our own. So we developed all the tech. We've built the whole truck, and now what we want to do is partner with a big OEM."

(c)    On or about June 29, 2020, Milton stated on the *Raging Bull* podcast:

> So when we built all this technology, we had billions of dollars
> spent on the electrification platforms for our big trucks. I know I
> could take that money, all that technology that's been built, and
> port it over to the most advanced pickup truck in the world. . . .
> Now, we're going to use an existing OEM to build our Nikola
> Badgers. So we own all the tech. So all the cool stuff you guys
> want, the design, the inside, the connectivity with your phone . . .
> all the e-axles or, you know the electric motors, the batteries, the
> controls, all that's done by Nikola. . . .

(d)    On September 9, 2020, one day after Nikola and General Motors announced a strategic partnership pursuant to which General Motors would engineer and manufacture the Badger, Milton engaged on his personal Twitter account with a user who

commented that the Badger is "[n]ot Nikola, but a General Motors Badger. The unveiling

at Nikola World will not even be the truck being sold, only the dream of what could have

been. . . ." Milton replied: "Actually it is the truck being sold. It's all Nikola. Sharing

parts has nothing to do with who's [sic] truck it is. . . ."

(e)     On or about September 9, 2020, Milton stated on the TD Ameritrade

Network: "So this is how it works, we actually build the Nikola Badger from the ground

up ourselves, the whole thing . . . ." In response to a question about "what's the important

IP that's coming from you guys," Milton stated:

> Yeah, the battery supply from the sale comes from GM, the cells
> and the module. The rest of the vehicle, like the over-air updating,
> the software, the controls, the infotainment, the design of the
> vehicle, the cab, the interior of the cab, even the, even the driver
> profile, we've been all the way down to suspension, that all comes
> from Nikola, with some support of GM's integration team, but
> GM's gonna handle the, they've already built a multi-billion dollar
> platform for their electric truck platform, so we've, we've took our
> technology and our existing Badger, we overlaid it on theirs, used
> what we could, implemented theirs, and then we built the rest
> around, um, around ours. So it's probably 70 percent Nikola 30
> percent GM when it comes to, um, the parts that are really
> important to us . . . .

105.    Milton misrepresented the nature of the Badger prototypes that Nikola was

building. Contrary to Milton's statements, Nikola did not "put" or "port" a billion dollars of

semi-truck technology into the Badger. Nikola never developed a Badger FCEV prototype, and

little, if any, of Nikola's technology was used on the Badger BEV prototype. Nikola retained two

third-party suppliers to build the BEV prototype using "donor" vehicles manufactured by another

OEM. The upper body was built by a supplier in Europe, while the chassis was built by a

supplier in Michigan, and then the two parts were integrated. For these same reasons, Milton's

statements that the Badger was being built "from the ground up" and Nikola "own[s] all the tech" and "developed all the tech" in the Badger were false and misleading.

106.    Further, Milton falsely claimed that the versions of the Badger that GM had agreed to build for Nikola were full of technology and components proprietary to Nikola. Contrary to Milton's assertion that the Badger would be "70 percent Nikola," GM planned to use nearly all of its own parts and components to build the Badger.

107.    Milton knew or was reckless in not knowing that the statements regarding the proprietary nature of the Badger detailed above were false. Milton was a key point of contact in dealing with both third-party suppliers and approving their scopes of work and purchase orders, which referenced, among other things, that the suppliers would use donor vehicles.  As such, he understood that they were developing prototypes using donor vehicles sourced from another OEM. He also made the decision to build the prototypes only in the BEV version (and not the FCEV version).  Finally, Milton was substantially involved in negotiations with GM and was aware that GM would be using primarily its own parts and technology to manufacture the Badger.  Prior to making the statements relating to GM, Milton received documents reflecting the proposed allocation of responsibilities for the Badger between GM and Nikola. These documents showed that nearly all technology and parts on the Badger would be GM's responsibility.

108.    The false and misleading statements about Nikola's purported proprietary technology detailed above were material, as an investor would consider it important in making an investment decision that Nikola had not successfully leveraged its proprietary technology to build the Badger, and that the Badger did not, in fact, contain proprietary Nikola technology.

Moreover, Milton made similar false representations concerning the Badger directly to Hicks in one-on-one conversations in connection with his purchase of the Wasatch Creeks Ranch.

### D.     False and Misleading Statements about Truck Reservations and Orders

109.    As a pre-revenue company, Nikola consistently emphasized to potential investors that its pre-order book, which it characterized as a "backlog of interest," was a sign that the company was primed for profitability in the near future based on interest in its flagship FCEV semi-truck product.  The company represented in its filings with the Commission and other public statements that it had over 14,000 FCEV truck pre-orders projected to fill at least 2-3 years of production and representing billions of dollars in future revenue.  Nikola's public filings disclosed that all but 800 of the reservations represented indications of interest and were cancellable at any time.

110.    On or about July 31, 2020, Milton had the following exchange on the *This Week in Startups* podcast regarding Nikola's truck reservations:

> MILTON: Our margins are gigantic, and we have ten billion doll – ten – over ten billion dollars in preorder reservations like, like customers signed ready for us to deliver them trucks and it's –
>
> HOST: Letters of intent.
> MILTON: – it's just a great.
>
> HOST: – these are people who want to have -- what -- and why do those trucks – why do those shippers want to switch off diesel? Is it because of – they have goals in terms of greenhouse gases or is it they see this as the future and they wanna invest in it or is it cost?
>
> MILTON: No, real quick, I wanna correct something. Not letter of intents, they're actually contracts. We've got –
>
> HOST: Contracts, got it.
>
> MILTON: Yeah, billions and billions of dollars with the contracts. So I want to be clear about that 'cause a lot of people have thought

> that it's just like, a non-committal thing, it's not. These are like,
> sign on the dotted line, billions and billions and billions and
> billions of dollars in orders. Now, we have to deliver, and they can
> get out if we don't deliver, but that's how it is with any contract
> you do in life, like –
>
> HOST: Right.

111.    Milton's statements that there were "billions and billions of dollars with

contracts" that are different from a "non-committal thing" and are "sign on the dotted line,

billions and billions and billions of dollars in orders" were false and misleading. In reality, and as

the company disclosed in its own filings, at the time Milton made these statements Nikola had

only one customer whose order for 800 FCEV trucks could be characterized as binding.  There

were not billions and billions of dollars in binding orders.

112.    Milton further clouded the true nature of the reservations by touting that the

company's production facilities were "sold out" for many years.  For example, in an interview on

Cheddar News on or about August 5, 2020, in response to a question about how the pandemic

impacted Nikola's order list, Milton claimed:

> Actually, as a matter of fact, you seen them increase. And I think
> they're – which is really strange. At first I thought, oh, man, I
> wonder what this is going to do to – to – you know, to the – to
> everything. I had no idea. I don't think anyone knew, right? And
> the orders actually came in – they've come in bigger and stronger,
> and we've had to turn a lot of people away. So for our hydrogen
> truck, we – we essentially have to pick and choose who we can
> work with because we're sold out for so many years.

113.    This statement was false and misleading because Nikola was not "sold out," as all

of the reservations except for an 800-truck order were non-binding, fully cancellable indications

of interest.  By stating that Nikola was "sold out," Milton created the misleading impression that

Nikola's capacity for truck production had already been filled.

114.     Milton knew or was reckless in not knowing that his reservations-related assertions were false.  Milton was personally involved in soliciting reservations from several potential customers.  He communicated to potential customers that the reservations were cancellable for any reason at any time.  For example, on May 9, 2016, as part of his efforts to secure the largest reservation Nikola had received to-date, Milton wrote to a potential customer, "[y]ou have full ability to cancel at any time before the options, color and major deposit is made . . . ."  He went on to note to the same reservation holder on three separate occasions that the reservation was cancellable, even going so far to note "you can cancel at any time and get [the deposit] back all the way up to the final order . . . ."  Another time, Milton cited the non-binding nature of the reservations in an attempt to convince a potential customer to *double* the amount of reservations in which the customer was originally interested. Milton wrote to this party, "[y]ou had asked for 50 trucks that would have been $500 for each deposit.  What I did since it is fully refundable at any time, is put you down for 100 at $250.  You can cancel at anytime any of those."

115.     Milton's statements about the nature of the non-binding reservations were material as an investor would consider it important in making an investment decision whether Nikola actually had binding orders in the billions of dollars for its flagship product.

116.     Milton also made false and misleading statements regarding a different order for refuse trucks.  On August 10, 2020, Nikola announced that it had entered into an agreement with a publicly-traded waste collection company for an order of 2,500 to 5,000 trucks.  On the same day, Milton tweeted from his personal account a link to Nikola's press release announcing the order and claimed that it was the "[l]argest class 8 zero emission order in the industry 2,500

guaranteed."  In another tweet that same day from his personal account, Milton promoted his

upcoming appearance on CNBC's *Fast Money* to discuss "the 2,500 – 5,000 (1-2 billion dollar)

binding truck order!"  Then, when he appeared on *Fast Money* on or about August 10, 2020,

Milton again stated that the "contract" was "worth about, between 1 and 2 billion dollars, um,

they have the right – or they're obligated to buy up to 2,500 of these electric trash trucks, and

they have the option to go up to 5,000."  Milton later referred to the billion plus dollar value of

the order in tweets from his personal account on August 16, 2020 and the TD Ameritrade

Network interview on August 19, 2020, in which he referred to the order as "a couple-billion-

dollar contract."

117.    The statements that the order for 2,500 trucks was "guaranteed" and that the

customer was "obligated" to purchase trucks were false and misleading.  Under the terms of the

agreement, which Milton personally negotiated, for the customer to incur any obligation a series

of conditions would have to be met, not all of which were even under Nikola's control.  Among

the conditions was a requirement for Nikola to achieve multiple development milestones before

the customer was obligated to order any trucks.  If Nikola did not meet the requirements for the

initial phase, the customer had the right to terminate the agreement. Moreover, if the parties

could not agree on essential terms (including price, service and parts network, warranties,

training program, and more), the customer had the ability to terminate the agreement anytime on

30 days' notice.  Finally, even if Nikola could meet all of those obligations, the customer still

had the right to cancel its orders without liability or penalty as long as the delivery date was 120

days out.  Accordingly, it was false and misleading for Milton to describe this highly contingent

and cancellable order as guaranteed, without any qualification.

118.    Milton's statements that valued the transaction with the customer at $1-2 billion also were misleading because they created the false impression that the parties had agreed on the price of the trucks. But the agreement did not have a price term.  Rather, the agreement provided that the parties would negotiate the price later. For this reason, the customer specifically made a request to Milton that Nikola not include any reference to price or value of the transaction in any press release announcing the transaction.  While Nikola abided by this request, Milton immediately and repeatedly claimed, as detailed above, that the value of the deal was $1-$2 billion.

119.    Milton knew or was reckless in not knowing the truth about the contractual terms of the agreement, because he personally negotiated it.  The statements Milton made about this transaction were material because an investor would consider it important in making an investment decision to understand the true nature of what Nikola claimed was one of its largest orders for trucks.

**E.    False and Misleading Statements about Game-Changing Battery Technology**

120.    In November 2019, Milton directed Nikola to issue a press release claiming that Nikola "has achieved" a significant breakthrough in battery technology that would result in enormous performance gains for Nikola's vehicles. As described further below, this press release and Milton's subsequent similar claims misled investors about the true status of this technology.

121.    For BEVs and FCEVs, batteries have three main components: cells, modules, and packs. Cells are the smallest component. Cells are contained within modules, and modules are arranged in packs. The design of these modules and packs can have a significant impact on

battery performance and safety. Cells, which are considered more of a commodity, are typically purchased from one of a few main worldwide suppliers.

122.     In May 2019, Milton sent an unsolicited email to a research professor at a U.S.-based university concerning research on lithium sulfur batteries that the professor was conducting.  A lithium sulfur cell uses different chemistry than a lithium-ion cell, which is the current conventional chemistry for rechargeable battery cells. Milton told the professor that Nikola was "looking at contributing financially and licensing some of your results."  Milton lied to the professor by stating that Nikola was "doing some programs with a few universities," and then asked if the professor would reveal some details of her research.  Over the ensuing week in May 2019, Nikola executed a confidentiality agreement with the university and obtained access to the results of certain of the professor's research.  This research was in its early stage.

123.     Milton visited the professor and, after this visit, directed Nikola in September 2019 to enter into a preliminary term sheet, which contemplated terms of a sponsored research agreement.  Nikola executed a Sponsored Research Agreement with the university on or about October 31, 2019.

124.     Under the Sponsored Research Agreement, Nikola was to provide a modest amount of funding ($250,000 initially) to sponsor the lithium sulfur battery technology research that the professor at University 1 was conducting.  In exchange, any intellectual property developed with Nikola following entry into the agreement would be shared between Nikola and the university.

125.     Approximately 18 days after executing the Sponsored Research Agreement, Milton tweeted from his personal account, teasing a significant announcement the following day:

"Tomorrow, it all changes. I finally get to talk about it.  The news everyone has been waiting for. Diesel trucks are obsolete for good.  We solved what no one else could.  It's time for other OEM's [sic] to stop producing diesels immediately.  See press tomorrow #emissionsgameover."

126.     The next day (November 19, 2019), Nikola issued a press release titled "Nikola Corporation to Unveil Game-Changing Battery Cell Technology at Nikola World 2020."  Milton drafted this press release, had ultimate authority over its content, and authorized its distribution. The purpose of the press release was for Nikola to "announce details of its new *battery."* (Emphasis added.)

127.     In the press release, Milton made several unqualified claims about the battery technology, which he is quoted describing as "the biggest advancement we have seen in the battery world." Milton claimed the following in the press release about what he asserted as *Nikola's* purported "prototype cell":

    (a)     "record energy density of 1,100 watt-hours per kg on the material level and 500 watt-hours per kg on the production level";

    (b)     "could increase the range of current EV passenger cars from 300 miles up to 600 miles with little or no increase to battery size and weight";

    (c)     "technology is also designed to operate in existing vehicle conditions";

    (d)     "cycling the cells over 2,000 has shown acceptable end-of-life performance";

    (e)     "Nikola's battery electric trucks could now drive 800 miles fully loaded between charges" and "hydrogen-electric fuel cell trucks could surpass 1,000 miles between stops and top off in 15 minutes";

(f)     "World's first free-standing electrode automotive battery"; and

(g)     "40% reduction in weight compared to lithium-ion cells" and "50% material cost reduction per kWh compared to lithium ion batteries."

128.    The same day, Milton took to Twitter, where on his personal account he: (i) quoted the press release, in part, in one tweet, (ii) repeated the same claims as in the press release in another tweet ("Nikola has developed the most energy dense, safe battery in the world . . . . It would double the range of every electric vehicle and nearly double the range of every fuel cell. Making it available even to competitors."), and (iii) in a third tweet, further misrepresented Nikola's purported "game-changing" achievement ("[y]ou're talking 600+ mile range in a model 3 Tesla. You're talking 50% less cost than Lithium Ion. You're talking mass adoption of zero emission vehicles.  Could be worth hundreds of billions if owned by one company but we decided to share it with the competition for greater good.").  When a Twitter user responded to this last tweet asking, "[i]s it actually real though, or is it another Joi Scientific style 'breakthrough,'"  Milton replied to the user, "It's real. I've seen it with my own eyes and watched them cycle."

129.    On or about December 2, 2019, Milton was asked on the *Shift* podcast to comment on Nikola's November 19, 2019 battery announcement having been met with "some curiosity," and to address skeptics "who might doubt that such a battery exists." Milton responded, in part:

> Once we got the technology nailed down, we actually have over 2,000 cycles on our battery, which would mean it would be more than a million-mile battery. It would actually – our battery beats the Tesla battery in every metric, in every situation, and it's half the cost and it's double the range. So, you know, for us, that was an exciting thing to be able to tell the world, and I actually

52

> appreciate the critics. I'm totally fine with it; I enjoy it. Because
> every time I prove them wrong, it drives them absolutely insane
> and they have to go back and admit they were wrong. For me,
> that's the funnest part of it.

130.    On or about March 12, 2020, Milton stated on the *Transport Topics Roadshow* podcast that "[w]e can – we're double the cycle life of a regular lithium-ion, and we're about half- to one-quarter the cost to produce the lithium-ion and we don't have any of the expensive metals . . . we should have productionized cells probably by the years end."

131.    The statements in the November 19, 2019 press release, the press release as a whole, Milton's November 19, 2019 tweets, and his statements on podcasts on December 2, 2019 and March 12, 2020 were all false and misleading.  The November 19, 2019 press release was posted to Nikola's website and, together with the accompanying tweets, remained accessible to the public through at least September 2020.

132.    While these statements contained detailed claims about functionality, reduced costs, increased vehicle range, energy density, number of cycles, and weight, they failed to disclose that these attributes were applicable to *coin size* battery cells that were being developed and tested in a controlled lab environment as part of a university research project. This fact was significant because to scale these coin-size lab-level cells to even a prototype size – which had not been done at the time of the press release and was, according to the professor, about a year away – would require significant further development with no assurance of comparable performance levels. From there, developing the cells from prototype pouch size cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications.  Having omitted these critical facts, Milton created the misleading impression that Nikola was in possession of a breakthrough technology that was on the verge of

being deployed into its vehicles where it would perform in accordance with the represented specifications.  Moreover, Milton deliberately misled investors that Nikola developed the technology, when, in reality, Nikola paid $250,000 to license coin-size cell technology created by someone else.

133.     Milton knew or was reckless in not knowing that his statements in the November 19, 2019 press release, the accompanying tweets, and the podcasts detailed above were misleading, because he knew the true state of the university's battery technology. Milton was deeply involved in battery development issues at Nikola, working directly with technical leads on various initiatives.  With respect to this technology in particular, Milton introduced the professor to Nikola, was present at meetings about the technology with the professor, and, as such, was fully aware of the current state of technology, who was actually developing it, and the remaining challenges to operationalize it.  Indeed, when Milton described the technology to Nikola's Board of Directors in an email sent a few days prior to publishing the November 19, 2019 press release, Milton referred to the cycling of "sample" cells, noted that the technology "has worked on sample size batteries," and disclosed that "nothing is certain" when it comes to scaling.  The press release and accompanying tweets and podcast statements (detailed below) omitted even these bare qualifications.

134.     All of the misleading statements detailed above were material, as an investor would consider it important in making an investment decision that Nikola was (or was not) in possession of a significant breakthrough in battery technology, which technology is critical to increasing the adoption and market appeal of electric vehicles.

**F.      False and Misleading Statements about In-House Components**

135.    Milton held a strong view that Nikola should design and manufacture key semi-truck components "in-house," similar to other high-tech OEMs that were perceived as having created significant value and competitive advantage by designing and manufacturing their own components, in particular, batteries. Milton also responded strongly to suggestions that Nikola was solely an "integrator" and perhaps not as valuable as an OEM that designed and manufactured its own key components.

136.    In 2020, Milton repeatedly stated that "all major components" were designed or made by Nikola "in-house." But what Milton presented to the public about Nikola's in-house design and manufacturing programs, capabilities, and achievements relating to the battery and the inverter, and the true state of those programs, diverged widely.

137.    At the time Milton made these statements, Nikola already had unveiled its second generation prototype, the Nikola Two, an FCEV for long-haul applications. According to its filings with the Commission, Nikola intends to produce this vehicle beginning in the second half of 2023 or in 2024. In 2019, Nikola began to work with an OEM partner on the Nikola Tre, a shorter-haul truck that Nikola and its OEM partner intend to begin producing in a BEV version in 2022 and in an FCEV version in 2023 or 2024.

138.    On or about February 14, 2020, in an interview on Fox Business, Milton said: "[W]e're probably one of the only companies in the world that does everything ourselves. We do our own batteries, we do our own frames, we do our own vehicles from the ground up, our own inverters, our own infotainment, you know, the cool screens. So ultimately, that entire truck from the ground up is designed by Nikola, and they do cost a lot of money . . . ."

139.    On or about June 29, 2020, Milton was asked on the *Raging Bull* podcast "who is the manufacturer of the battery?"  Milton replied:

> The battery is actually done by Nikola. We own all the tech and we're building all the batteries in-house. So it's all owned by Nikola, but it will be done at a big plant. We're going to build a plant next to ours that will essentially build all the batteries for all of our applications. But we use other people's cells. So we use, like, LG, Samsung, Panasonic. We use their cells, but the rest of the entire battery is all our tech, like the cooling, the thermal, the structural, the battery management system, the software; all that's all Nikola.

140.    On July 1, 2020, Milton tweeted from his personal account in response to a comment from a Twitter user who asserted that Nikola did not make its batteries: "We don't make the cells. We make the entire pack like the top guys do.  We do have an OEM making our truck but all internals are Nikola's IP; batteries, inverters, software, ota, infotainment, controls, etc.  We own it all in-house.  Just not the plant to build the truck."

141.    On July 5, 2020, Milton tweeted from his personal account: "All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc. you don't care about the truth you're just out to be a keyboard warrior."

142.    On July 14, 2020, Milton stated the following on an Instagram Live video posted on his personal Instagram account:

> One difference of us compared to everyone is we're the – really the only group out there that does full dielectric fluid submersion batteries. I'm gonna walk out here and show you that in a second. So what does that mean? That means our batteries are actually completely immersed into fluid. Now, watch our competitors follow us on that one, too. Why? Because you can cool and heat your batteries much faster, much more efficiently, and you're also able to stop thermal propagation, something that other people cannot do. So, pretty cool.

56

143.    In the same video, Milton further stated:

So this is to everyone who's questioning what we do. Alright, so
first of all, who makes our batteries? Who makes Nikola's
batteries? Nikola does. Do we make the cells? No, we do not. We
buy the cells from either people like Samsung, LG, Panasonic, or
other groups.

. . .

We do however, make everything in our battery. All the cooling,
the thermal, the battery management system, the software, the
hardware, everything except for the cell. So let that clear up any of
the lies and the, the fake lies out there about how Nikola doesn't do
shit, it's quite interesting. You could not build a truck like this if
you don't pretty much do everything. . . .

144.    On or about July 31, 2020, when asked on the *This Week in Startups* podcast,

"[y]ou do make your own battery packs," Milton replied, "we do make our own battery packs,

that's the key, that's the key element because of the cost." Milton then went on to say that the

"battery pack is 30 percent of your vehicle's cost, or 40. So it's one of the most important things

to actually bring in-house. And so we do make our own battery packs. The whole truck is our

design, is our, is our build, but another manufacturer's gonna actually be spitting it out on their

assembly line." When the host then asked Milton if he "is gonna be in the battery business, you

are gonna build battery packs," Milton replied that "[y]ou'll never make it as an OEM if you

don't build your own battery. That's the most critical part." Milton also stated during the same

podcast: "the tech is ours. So the battery – like, all the important stuff like software, batteries, or,

or eAxle designs, it just means we use someone else to, to build them in the thousands for us, but

we own all the tech."

145.    In a YouTube video posted on or about August 24, 2020 on the Tesla Joy

YouTube Channel, Milton stated: "So the things that we do insource is all of our controls, all of

our inverters . . . . All of that is actually done in-house in Nikola     But what we do not do is manufacture those in mass production. So we design and engineer them. . . . Same thing with our inverter. We designed our own inverter. We actually have full prototypes here."

146.    All of these statements were false and misleading. Nikola did not design or develop any functioning inverters in-house.  In reality, Nikola has used third-party "off the shelf" inverters for all its semi-truck prototypes, and it planned to use third-party inverters for the Nikola Tre.  And, while Nikola entered into an agreement to develop inverters with a supplier in early 2018, that effort was terminated in the spring 2020 due to a lack of progress.  Finally, Nikola's own in-house inverter program, which would take years to complete, was only in its nascence at the time Milton made the misleading statements detailed above.

147.    The statements above relating to batteries were also false and misleading.  Some of these statements created the misleading impression that Nikola manufactured its own batteries.  In truth, Nikola uses a third-party supplier to manufacture batteries for its first production vehicle, the Nikola Tre BEV, and Nikola does not have the capability to manufacture these batteries on its own.  Similarly, other claims created the misleading impression that Nikola designed the entire battery. But, the supplier designed the modules for the batteries that Nikola is using for the Nikola Tre BEV, and Nikola relied on the assistance of this supplier to design the battery pack.

148.    The statements regarding a submerged battery technology were further misleading because they omitted to disclose that these batteries were only being used in two prototypes and had severe functional limitations and associated safety issues, leading investors and prospective investors to believe that these batteries were viable when, in fact, they were not.  Specifically, the

third-party supplier who helped Nikola develop the batteries mandated that they could only be run on a vehicle with a state-of-charge limitation of 30 percent, due to safety test failures. Milton knew or was reckless in not knowing that his statements about the submerged batteries were misleading as he learned, at least as of February 2019 or sooner, about the batteries' functional limitations and safety issues first-hand from the third-party supplier.  In an email sent on February 5, 2019, Milton wrote, "I will agree to one of two of those [restrictions] but it can not (sic) be my financial penalty as a result of your lack of [] not delivering what was promised. . . . These are test packs, not production . . . . We do not accept your demands on these batteries with exception to the state of charge on vehicle."

149.    Milton knew or was reckless in not knowing that Nikola was using and planned to continue to use "off the shelf" third-party invertors.  For an October 2019 meeting of the Board of Directors, Milton received materials that referred to inverters for the Nikola Tre as "off-the-shelf."  And, he was directly involved in terminating the inverter co-development effort with a supplier, even requesting a refund from the supplier due to lack of success.

150.    Milton knew or was reckless in not knowing the true state of Nikola's battery manufacturing and design capabilities. Milton was deeply involved in, and led aspects of, Nikola's battery development projects. Milton was aware that Nikola could not make the Nikola Tre BEV's batteries in-house and was pursuing a third-party supplier as the only realistic option for supplying the batteries for the Nikola Tre BEV.  In an early April 2020 battery program update sent to Milton, a Nikola Vice President of Technology wrote that "on the basis of Tre timing alone, the only possible considerations would be [the supplier's] design. . . ."  Milton was also aware the batteries produced for the Nikola Tre BEV would contain the supplier's modules,

because in November 2019, Milton personally signed a multi-million dollar purchase order for those modules. He was further aware that Nikola was negotiating a battery supply contract – ultimately entered into in August 2020 – with the supplier, which specified that the supplier's modules would be used.

151.    Tellingly, Milton sought to conceal Nikola's relationship with the supplier for fear that it would undermine his false narrative about Nikola's design capabilities.

(a)    In November 2019, Milton sent an email to a Nikola employee instructing him to negotiate, as part of one of Nikola's agreements with the supplier, the ability for Nikola to approve any disclosure of the companies' relationship. Milton wrote that Nikola "will never give" such approval because he "did not want the image issue with our investors."

(b)    On June 4, 2020, a Twitter user tweeted at Milton expressing concern that he "heard that [the supplier] ... supplies the batteries" to Nikola.  The user was concerned because he saw negative views of the supplier's battery testing process on a public website.  Milton provided an evasive response to this user, stating: "We do our own batteries at Nikola and have since day 1.  We do however test with everyone and if a supplier builds a better battery we would use them.  That goes for all supplied parts on our vehicle."

(c)    In September 2020, after Nikola had already entered into the battery supply agreement, the supplier sought Nikola's permission to identify it as a customer as part of its road show in connection with a go-public transaction.  Milton opposed the request stating, "[i]t will leak everywhere and hurt our image."

152.     All of the misleading statements detailed above were material, as an investor would consider it important in making an investment decision whether Nikola manufactured its own inverters and batteries, and had capabilities to and did fully design batteries in-house.  These statements, taken together, also furthered the impression that Nikola's in-house design program was more robust and further along than it actually was.  As reflected by his statement on the *This Week in Startups* podcast, Milton recognized the potential value to Nikola of manufacturing and designing the entirety of the battery.

**G.     False and Misleading Statements about Total Cost of Ownership**

153.     Commercial vehicle buying decisions, particularly for large corporate fleets, are driven, in part, by the total cost of ownership ("TCO"), an analysis of the lifetime cost of a truck, from the acquisition through the operating period.

154.     Prior to March 2019, Nikola touted that the TCO of its FCEV trucks would be up to 20 percent cheaper than diesel trucks.  In March 2019, Nikola's CFO emailed Milton third-party research that Nikola had recently obtained regarding, among other metrics, the TCO of Class 8 semi-trucks. In his email to Milton, the CFO noted that the third-party firm cited TCO for diesel trucks in the "$.85-$.95 range," and that "for our purposes, we will use $.95 . . . ."

155.     Also in March 2019, a Nikola financial analyst notified Nikola executives – including Milton – that the TCO cost the company was using for diesel trucks was too high, and that the projected TCO for Nikola would be, at best, on par with diesel.  Finally, in April 2019, Nikola's Head of Business Development sent Milton and other senior executives notes from her discussions with semi-truck fleet representatives who provided feedback regarding Nikola's

61

TCO. This executive reported that Nikola's actual and potential customers noted that Nikola's "costs are high and not at parity with diesel."

156.    Having learned this information, Nikola's Finance department removed the claimed TCO cost savings, as compared to diesel, from its private offering documents in or around March 2019. More than a year later, Nikola claimed in presentations that were attached to its filings with the Commission that its projected TCO costs were at parity with, but not significantly less than, diesel.

157.    Despite knowing that Nikola's projected TCO was – at best – on par with diesel, Milton repeatedly made false statements about Nikola's truck being cheaper, on a TCO basis, than diesel trucks:

(a)    In an interview on the *Founder Hour* podcast on or about July 6, 2020, Milton claimed that Nikola's TCO, as compared to diesel, "we're like 20 to 30 percent sometimes, cheaper. So it's game over, essentially. If you don't own a Nikola truck, you're gonna go bankrupt."

(b)    In a July 14, 2020 Instagram Live video posted to his personal Instagram account, Milton stated "we charge cost per mile, that's it. Everything all in, service, warranty, maintenance, the entire thing, including the hydrogen fuel, it's under a dollar a mile and, and in some area – it depends on how many miles you drive a year. That can range much cheaper than that, all the way up to about a dollar a mile. It depends on – that is, um, that is – that's it how would – that's how it's built out and that's much – it's 20 to 30 percent less than diesel."

(c)      In an interview on the *Chartcast* podcast on or about July 17, 2020, which was published by the podcast on or about July 19, 2020, Milton stated: "You have essentially 30, you know, you're almost, you, you're 25, 30% less than a diesel engine to operate, um, which is game over for diesel."

(d)      In an interview on the *Stockcast* podcast on or about July 31, 2020, Milton stated that "diesel's dead in the trucking world. And why is that? Because trucking operates on eight percent margins, somewhere around there. So, if you're eight percent less than diesel, it's already game over and so that's why it's so great. We're almost 20 to 30 percent less than diesel right now and we're working on, you know, if we can get really good, if we can get down to two dollars a kilogram."

158.    As detailed above, all of these statements were false because Nikola's projected TCO was not significantly cheaper than diesel, as Milton knew or was reckless is not knowing. Milton's misrepresentations about TCO were material, because an investor would consider it important in making an investment decision that Nikola's flagship FCEV product, which faced adoption barriers, was not actually cheaper to own than its diesel competitors.

## V.      **Additional Indicia of Milton's Scienter**

159.    As alleged throughout this Complaint, Milton knew or was reckless in not knowing that his statements detailed herein were false and misleading, and Milton made these statements with the intent to influence investors, prospective investors, private parties with whom he had transacted for the purchase of real estate, and Nikola's stock price.  Milton engaged in additional conduct, described below, that indicates his scienter.

160.     In 2019 and 2020, Nikola's senior executives had repeated conversations with Milton about his misuse of social media.  Milton's relentless social media activity, and his associated fixation on Nikola's stock price and efforts to affect it, became a concern to these senior executives.  Among other things, these senior executives were concerned that Milton's statements in these forums were not accurate, and some senior executives advised Milton to be accurate when making public statements on social media and other contexts.  Some members of senior management viewed Milton's social media activity as his means for pumping up Nikola's stock.

161.     In or around 2019, Nikola's Chief Legal Officer advised Milton about the perils of inaccurate tweets, specifically referencing the Commission's then-recent charges against another auto company executive arising from certain allegedly misleading statements he made in tweets from his personal account relating to material information about the company.  In or around early 2019, a senior Nikola executive explained to Milton that tweets from his personal account were the legal equivalent of a company press release, as Milton would be viewed as speaking on behalf of the company in any format.

162.     Then, in a series of ongoing conversations in 2019 and 2020, Nikola's then-President advised Milton to let Nikola's Chief Legal Officer pre-screen any tweets that Milton planned on posting from Nikola's corporate account.  With few exceptions, Milton did not have anyone pre-screen any of his tweets.  And throughout 2020, senior executives continued to urge Milton to be accurate in his public statements and to reduce his social media presence.

163.     Further, senior Nikola executives attempted other tactics in the spring and summer of 2020 to try to rein in Milton's social media presence, to no avail. On at least one

occasion, they enlisted the help of a member of Nikola's Board of Directors who they believed could influence Milton. And they scheduled media training for all senior executives with a third-party service provider, but Milton did not attend.

164.     In general, Milton responded to feedback about his social media presence and his public statements about Nikola by asserting that these senior executives did not understand current capital market dynamics or what he was trying to accomplish with retail investors, and that he needed to be on social media to put out good news about Nikola to support its stock price.

165.     As alleged above, Milton had a financial incentive to increase and support the price of Nikola's stock, based on the shares he held and the shares he was entitled to earn if Nikola reached and sustained certain stock price milestones.  During negotiations of the Business Combination, Milton resisted the inclusion of provisions that would have required him to be locked up from transacting in Nikola securities for any period of time, and, when that became infeasible, sought to negotiate as short of a lock-up period as possible.  He sought this short lock-up in part to allow himself to use his Nikola stock as consideration for private purchases of real estate, including Wasatch Creeks Ranch.  Ultimately, Milton agreed to a one-year lock-up pursuant to a Registration Rights and Lock-up Agreement.

166.     Carved out from the lock-up was Milton's $70 million cash-out at the time of the Business Combination and up to an additional $70 million in stock that could be sold six months after the Business Combination.  Despite these lucrative carve-outs from the lock-up, Milton almost immediately sought to shorten his lock-up.  In a July 7, 2020 email exchange with a member of Nikola's Board of Directors, Milton justified being released from the lock-up by citing the "over 400% gain" that he delivered, making "everyone else millionaires and

billionaires." Lifting the lock-up, according to Milton's reasoning, would "allow us to manage our estates and finances the right way."

167.   Milton's efforts bore fruit almost immediately. On July 17, 2020, just over a month after entering into the Registration and Lock-up Agreement, Milton, Nikola, and the other parties to the agreement agreed to amend it.  Under the terms of the amendment, which Milton specifically requested, (i) Milton's lock-up period was shortened from one year to just under six months, and (ii) Milton was permitted to transfer up to 16 percent of his shares solely to the extent necessary to pledge such shares as collateral in connection with indebtedness incurred by him for the purpose of purchasing additional shares of Nikola stock.

## VI.    Relevant Securities Offerings and Filings

168.   In connection with the Business Combination, on March 13, 2020, VectoIQ filed with the Commission a Registration Statement on Form S-4, which included a Preliminary Proxy Statement, Prospectus, and Information Statement.  On May 8, 2020, this Registration Statement was declared effective and VectoIQ filed a Prospectus, a Notice of Meeting, and Proxy Statement.

169.   On June 15, 2020, Nikola filed with the Commission a Registration Statement on Form S-1 relating to (i) the issuance of Nikola common stock issuable upon the exercise of warrants originally issued by VectoIQ, and (ii) the offer and sale from time to time of Nikola common stock held primarily by the PIPE investors, VectoIQ's sponsor, and certain of its affiliates. This Registration Statement was declared effective on July 17, 2020.

170.   On July 17, 2020, Nikola filed with the Commission a Registration Statement on Form S-1 relating to the offer and sale from time to time of Nikola common stock held by the

founding shareholders of VectoIQ and by certain pre-Business Combination investors in Nikola (including entities controlled by Milton). This Registration Statement was declared effective on July 27, 2020.

171.    Many of Milton's false and misleading statements alleged in this Complaint were made at the time securities were being offered and sold pursuant to these registration statements. In addition, during this same period Milton was utilizing options to purchase his Nikola stock as consideration for offers and purchases of private real estate, including Wasatch Creeks Ranch.

## VII.    Events Leading to Milton's Resignation from Nikola

172.    On September 10, 2020, a financial research firm that represented that it had taken a short position in Nikola, Hindenburg Research ("Hindenburg"),  published a report asserting, among other things, that Milton made misrepresentations about Nikola's business. Nikola's stock price fell approximately 24 percent on news of the report.  Nikola disclosed in its filings with the Commission that on September 20, 2020, Milton resigned from his position as Executive Chairman.

173.    On February 25, 2021, Nikola filed its Form 10-K for the year ended December 31, 2020.  In the filing, Nikola admitted that certain statements Milton had previously made were "inaccurate in whole or in part, when made."  Nikola's stock price fell further on the filing of the Form 10-K and dropped a total of approximately 57 percent during the time period between the date of the research firm's report and the day after the release of the Form 10-K.

174.    On July 29, 2021, the United States Attorney for the Southern District of New York announced that it had arrested Milton and unsealed an indictment against Milton for the acts described in this complaint.  The same day, the Securities and Exchange Commission filed a

civil complaint against Milton in the United States District Court for the Southern District of New York alleging the conduct alleged in this complaint.  Those cases are pending.  Part of the security for the bond posted by Milton to avoid custody included the Wasatch Creeks Ranch.

**VIII.  Milton's Misrepresentations in Connection with the Sale of Securities Used to Purchase Wasatch Creeks Ranch from Hicks**

175.    In addition to the motives highlighted above, Milton was motivated to falsely inflate the value of Nikola stock because he repeatedly offered stock as consideration for purchases and attempted purchases of real property, including ranch property in Utah. Specifically, on numerous occasions he either offered to purchase or purchased ranch property with a combination of cash and options to purchase shares of Nikola stock.  These options provided that the option-holder could purchase the Nikola stock once it became free to trade in December 2020.  Milton thus not only had a motive to lie about Nikola and its business prior to these real estate transactions, but he also had a motive to lie after the transactions in order to keep the option value high until the options could be exercised and the shares then sold into the public market.

176.    With regard to the purchase of the Wasatch Creeks Ranch by Milton from Hicks, a Utah real estate broker, David Anderson, first contacted Hicks in April 2020 to inform Hicks that he had an interested buyer.  This potential buyer was Milton.

177.    Anderson scheduled a call for April 10, 2020 between Milton and Hicks.  Prior to this call, Anderson communicated an offer for the property of a combination of cash and an option to purchase Nikola stock.  Specifically, the offer was for a cash payment of $7.5 million combined with an option to purchase a "very substantial" amount of Nikola stock.

178.    During the April 10, 2020 call, which lasted for more than an hour and included Milton, Anderson, Peter Hicks and his son Lucas Hicks, Milton discussed at length his own background and the background and current business and operations of Nikola.  This discussion was critical because Hicks was not familiar with either Milton or Nikola, and a substantial component of the proposed purchase price for the Wasatch Creeks Ranch was an option to purchase shares of Nikola held or controlled by Milton.

179.    During this April 2020 conversation, Milton reiterated many of the false statements described above.  Among other misrepresentations, Milton stated the following:

(a)    Nikola trucks would be in the market in less than fourteen months and commercial production would begin in 2021;

(b)    Nikola has confirmed orders for trucks up to its production capacity;

(c)    Nikola has billions and billions of dollars of committed orders and Nikola could convert 80% of those orders to "hard" orders.  Nikola only had not done so because of concerns about the ability to produce that many trucks within the timeframe of those orders once they became "hard" orders.

(d)    The Nikola One truck was a fully functioning truck that had many completed and functioning attributes that outperformed diesel trucks;

(e)    Nikola was already producing and pumping hydrogen at the largest hydrogen station in the western hemisphere;

(f)    Nikola was gobbling up and cornering the hydrogen facilities market and locations between Arizona and California, and locations would be almost impossible for competitors to get.

4884-0231-5272

(g)     Nikola already had contracts to purchase inexpensive hydrogen, and the profit model of the company includes its hydrogen energy and leasing model, through Nikola's existing fueling station network on major trucking routes;

(h)     The Badger truck was developed with almost exclusively Nikola proprietary technology, and was a functioning truck with exceptional range.

(i)     Nikola had developed game changing battery technology that would revolutionize the electric vehicle market.  Nikola's battery beats other battery technology in every metric, in every situation, and its half the cost and its double the range.

(j)     Nikola has developed virtually all of its key technologies in-house, including batteries, inverters, software, controls and infotainment.

(k)     The cost to own Nikola trucks was ridiculously lower than its competitors.

(l)     Milton had started, built and sold many successful businesses, and that many investors had made huge amounts of money on these prior businesses.

180.    After the April 2020 conversation, the parties initially were not able to agree on terms for the purchase of Wasatch Creeks Ranch.

181.    For nearly two months, there were no direct conversations between Hicks, Milton or Anderson on Milton's behalf.  However, during this period, Hicks followed the public news and information on Nikola, including the progress of the SPAC and the anticipated price of Nikola shares once the SPAC was completed.  Hicks also reviewed public statements by Milton that appeared to confirm the information that had been represented in the April 2020 conversation.

182.     On June 1, 2020 at 10:07 a.m. EDT, Hicks received a text from Anderson

indicating that Milton was "in town and he wants to tour your ranch this morning."  Anderson

explained that Milton's interest in Wasatch Creeks Ranch was further piqued by the opportunity

to also buy the adjacent Bertagnole ranch and combine the two: "If he buys yours, he'll buy the

Bertagnoles as well."  Hicks texted Anderson that he and Milton could tour the property.

183.     At 3:30 p.m. EST Milton texted to Hicks on David Anderson's phone his new

offer:

> $8.5m cash. 30 day due diligence. 15 day close. 1mm deposit.
> $8.5m of options at today's closing price. 6 months form merger
> options are available for exercise.  No obligation to exercise if you
> don't want.  If shares are $67.94 at 6 month mark, you only pay
> 33.97 per share and make the difference.  Shares can instant be
> sold that day on the Nasdaq.  The 33.97 is real time quote but the
> option will be at today's closing price if you sign the contract
> today.

184.     Hicks accepted Milton's offer later that afternoon and the parties worked late into

that evening on a Purchase and Sale Agreement ("PSA").  Nikola paralegal Mark Gale sent the

initial draft of both the PSA and the option agreements to Hicks' Utah Counsel Matt Anderson.

Gale's work was being overseen by Nikola chief legal counsel Britton Worthen, so Nikola was

aware of the proposed transaction and the fact that part of the consideration would be options to

purchase Nikola stock owned or controlled by Milton.  Despite the fact that Nikola's counsel was

aware of the transaction, it does not appear that the fact that Milton was selling his shares

through options in private transactions was disclosed at the time in any of Nikola's SEC filings

or in any separate communications to shareholders.  Rather, disclosures were only made many

months later after the share price had plummeted and the options had expired.

185.    The parties continued to negotiate the terms of the PSA and the option agreement on June 2, 2020 and June 3, 2020.  The PSA and option agreements were signed by all relevant parties around Noon on June 3, 2020.  David Anderson texted Hicks at 12:03 p.m. EST: "Congrats Peter!  Wild ride to say the least.  Hope you got some sleep last night"

186.    Per the terms of the PSA, there was a due diligence and closing period that followed the execution of the agreements.  If Hicks fulfilled his obligations as seller, but Milton failed to meet his obligations as buyer, Milton stood to lose his deposit of $1 million.  Thus, it was critical for Milton that the price of Nikola stock remained strong, which was echoed by David Anderson in numerous communications after June 3, 2020.  For example, on June 4, David Anderson texted:  "In case you aren't watching CNBC this morning…I sent to you a video link, [Milton] was on CNBC talking about Nikola.  Maybe the video link didn't come through?  Stock is up today.  Now NKLA ticker $35.750"  On June 8, 2020 David Anderson texted Hicks the Nikola stock price of $40.74, and on June 9, 2020, he texted Hicks the Nikola stock price of $79.67.

187.    The final closing of the transaction did not occur until August 14, 2020.  In the period between June 3, 2020 and August 14, 2020, Milton confirmed that all of the conditions represented by Hicks regarding the property had been met.  During that same period, the parties realized that there had been a "scriveners error" with regard to the option agreement.  Instead of references to Hicks, the document referenced an unrelated entity that may have been a different option purchase by Milton.  In an email dated August 11, 2020 from Mark Gale at Nikola (and copied to Britton Worthen) to Matt Anderson, Milton acknowledged this error, as well as the fact that (i) the number of shares and strike price had to be adjusted to reflect the Nikola stock split

that had occurred in the interim, and (ii) the original option exercise period would have violated the lock-up period imposed upon Milton by Nikola as part of the SPAC, notwithstanding Milton's efforts to shorten it.

188.    On August 14, 2020, the transaction closed and an amended option agreement was executed by Hicks and Milton.  The amended option agreement provided that Hicks was granted an option to purchase up to 515,095 shares of Nikola stock at a strike price of $16.50 per share.  Based on the share price of Nikola on that day, the option was worth in excess of $15 million.  In deciding to close, Hicks relied upon his private conversations and public statements Milton had represented regarding Nikola, which the company has now admitted were false and fraudulent.

189.    That same day, Anderson texted Hicks "Congrats on the ranch closing!"  Milton also emailed Hicks: "We are about to have the best 4 months of Nikola in history so I am excited about that as well."

190.    Less than a month later, Hindenburg Research published its report, causing the stock price of Nikola to plummet.  In response to an inquiry from Hicks about his options, Milton emailed Hicks on September 16, 2020:

> I can't do anything as of now due to the fact we are in communication with the SEC.  While I can't go into detail, I can tell you we have not done anything wrong, it was a coordinated attack to discredit us.  Much like Telsa, this a fact of life where people target you and try to hurt you.  They made a reported 51 million USD on the first attack and unknown amount in the whole process.  They do it for the money, not truth."

Four days later, Milton resigned from Nikola and as the revelations of false statements and fraud discussed herein began to mount, the stock price of Nikola continued to fall, destroying the value of the options provided to Hicks.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

191.   Hicks re-alleges and incorporates paragraphs 1-190 by reference as if fully set forth herein.

192.   Milton, directly or indirectly, in the offer or sale of securities to Hicks, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

      (a)     employed a device, scheme, or artifice to defraud; and/or

      (b)     obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      (c)     engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

193.   By reason of the foregoing, Milton violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

194.   Hicks re-alleges and incorporates paragraphs 1-190 by reference as if fully set forth herein.

4884-0231-5272

195. By engaging in the acts and conduct alleged herein, Milton, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

      (a)      employed a device, scheme, or artifice to defraud; and/or

      (b)      made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      (c)      engaged in acts, practices, or courses of business which operated, or would operate, as a fraud or deceit upon any person.

196. By reason of the foregoing, Milton has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

### Violations of Sections 61-1-1 and 61-1-22 of the Utah Code

197. Hicks re-alleges and incorporates paragraphs 1-190 by reference as if fully set forth herein.

198. By engaging in the acts and conduct alleged herein, Milton, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

      (a)      employed a device, scheme, or artifice to defraud;

(b)      made an untrue statement of a material fact or to omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; and/or

(c)      engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

199.    By reason of the foregoing, Milton violated Utah Code Sections 61-1-1 and 61-1-22.

## FOURTH CLAIM FOR RELIEF

### Common Law Fraud

200.    Hicks re-alleges and incorporates paragraphs 1-190 by reference as if fully set forth herein.

201.    By engaging in the acts and conduct alleged herein, Milton made material misrepresentations in connection with the purchase of Wasatch Creeks Ranch and committed a fraud on Hicks.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendant violated the provisions of the federal and Utah securities laws alleged herein, and also committed fraud;

4884-0231-5272

**II.**

Awarding Hicks damages, including but not limited to multiple damages as provided under Utah Code Section 61-1-22(2) for reckless or intentional conduct, prejudgment interest and attorney's fees and costs; and

**III.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a jury trial on all claims, causes of action, and issues properly triable before a jury.

DATED this 14th day of March, 2022.

/s/ Erik A. Christiansen
Erik A. Christiansen
Parsons Behle & Latimer

Christopher Robertson (*pro hac to be filed*)
Seyfarth Shaw LLP

*Attorneys for Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC*

77