# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

| | |
|---|---|
| PETER HICKS, HICKS, LLC and WASATCH HICKS, LLC, Plaintiffs, v. TREVOR R. MILTON, M&M RESIDUAL, LLC and T&M RESIDUAL, LLC, Defendants. | Case No. 2:22-cv-00166<br>Judge Howard C. Nielson, Jr.<br>Magistrate Judge Daphne A. Oberg |

30(b)(6) AND PERSONAL DEPOSITION OF PETER HICKS
FOR HICKS, LLC AND WASATCH HICKS, LLC
Volume 1

Taken on Monday, April 22, 2024
9:36 a.m. to 5:02 p.m.

At HATCH LAW GROUP PC
22 East 100 South, Suite 400
Salt Lake City, Utah 84111

Reported by: Abigail D.W. Johnson, RPR, CRR, CRC
CA CSR #14598

him to get more interested.
Q. Okay. And how old was he at the time?
A. 23.
Q. 23? Let's talk about April 10th, 2020, the phone call.
Do you recall what time the call took place?
A. Not the morning.
Q. The afternoon?
A. Afternoon, late afternoon. Of course, we have a two-hour differential. So I'm not sure whether it was afternoon here or early evening where we were. I don't know.
Q. Okay. Where were you physically located at that time?
A. In a room in my house.
Q. But which room?
A. My son's bedroom.
Q. And where was Lucas?
A. The same place.
Q. You guys were in the same room together for the call?
A. Yes.
Q. Okay. And were you on the same phone?
A. No.

Q. So you were on what phone?
A. My phone was on speaker phone.
Q. Like a cell phone?
A. Yes.
Q. What type of phone was it?
A. iPhone.
Q. iPhone? Do you recall what -- what model it was?
A. No idea.
Q. Do you typically use iPhones? I mean, some people --
A. Typically for all of the times that matter.
Q. You know, some people are devout Android users or iPhone users. I don't know if, you know, you prefer one or the other.
A. I have trouble just getting one thing right.
Q. Okay. Well, in the event that the -- it was an iPhone, you don't know what make or model?
A. I do not.
Q. I guess model, not make.
And Lucas was on a different phone?
A. No, he was on -- we were on speaker phone, my speaker phone.
Q. I understand, thank you. So you were both

using your phone together; correct?
A. Correct.
Q. Okay. And how was the call initiated? Like, who called who?
A. David set it up. David -- I think he put Trevor on the phone first and then patched me in. It could have been the other way around, but I think that's how he did it.
Q. And if I understand right, the participants on the call were yourself, Lucas, David Anderson, Trevor Milton; is that right?
A. Correct.
Q. Nobody else?
A. Correct.
Q. And do you still have the phone that you were using when you were on that call that day or have you gotten rid of it sense?
A. I don't have it.
Q. What happened to it?
A. I exchanged it for a new phone.
Q. Okay. How many times did you exchange for a few phone since the phone that you had at that time?
A. Once.
Q. Once? So the phone you have today is your newer phone?

A. Correct.

Q. All right. And it is also an iPhone; correct?

A. Correct.

Q. Okay. Were you, I guess, communicating at all with Lucas during the call other than, I guess, separate and apart from what was being said on the phone call? By that I mean, like, a separate, like -- texting or chatting somehow, anything like that?

A. No.

Q. When did you change phones?

A. Two or three years ago.

Q. If you could, please, just to the best of your memory, help me pin that down to a year and a month?

A. It would have been the winter of two to three years ago. I just don't know which.

Q. Well, that's -- right now, it's 2024. So you're saying it could have been in the winter of 2022 or the winter of 2021?

A. Yes.

Q. And how -- how would you find -- be able to find out when you -- when you switched phones?

A. There has got to be some transaction information someplace. I assume I bought it on a

credit card.

Q. Did you have anyone help you when you upgraded your phone, or is that something you do yourself?

A. I do myself? I don't think so.

Q. Do you have someone help you?

A. Yeah, I went to an Apple store. Is that what you mean?

Q. Yeah, I'm just trying to figure out -- some people just do it themselves, people go to the store. How did you do it?

A. I'm really incapable of doing it myself.

Q. Okay. So you took your old phone to an Apple store where?

A. Stewart, Florida.

Q. Okay. And do you recall the address or location of where that was?

A. It was probably Route 1.

Q. And you walked in and said, Give me a new iPhone or --

A. Yeah, effectively, yes.

Q. Okay. And did they give it to you on the spot?

A. I believe it was all done in one transaction. I sat there probably -- the way that

works with those folks, at least an hour.

Q. And they transferred all the data from your old phone on to the new phone?

A. I say, Here it is. I need a new phone. Can you do it? And you guys can transfer it and all of that for me? And they said yes.

Q. And why did you need a new phone?

A. Because I dropped my phone in the sand and it started malfunctioning. I kept trying to use it, and it kept malfunctioning more and more and more to the point where I realized I got to pay the bill and buy a new phone.

Q. Can you describe what you mean by "malfunctioning"?

A. Yeah, I don't really remember anymore. All I know is that certain things wouldn't work. And then more things wouldn't work. And then more things wouldn't work.

Q. Okay.

A. And so finally, I realized they weren't going to solve themselves, and I had to get a new -- a new phone.

Q. Tell me, what didn't work? Are you saying that, like, you couldn't get -- you couldn't make phone calls on the phone?

A. I just don't remember anymore.
Q. Did emails work?
A. All I remember is different things. It wasn't just one category. Different things weren't working. And pretty soon, I couldn't use the thing -- that's all I remember.
Q. Well, can you give me any details at all about what the things are that weren't working on the phone?
A. No.
Q. And you said you dropped it on the sand?
A. Well, in the sand, yeah. I dropped it --
Q. Did it shatter or break?
A. No, no. What happened was the sand got all up in here.
Q. And you are pointing to where the charging cable appears?
A. Yeah, all of this stuff right here. It might have got in here. That's the only place I could think where it could breach. It got all in here. And I couldn't get the -- I tried to blow-dry the sand out. I tried everything I could, figuring that would potentially solve it, and nothing solved it. And it just got progressively worse and worse. So I couldn't use it anymore.

Q. There was no, like, cracks or breaks on the screen or anything like that?
A. No, it was in the sand.
Q. How much time passed between when you dropped it and when you upgraded the phone to a new phone?
A. Less than a week.
Q. Okay. Were you unable to text on the phone? Did that stop working?
A. I wish I could remember the specifics. All I know is that some things would work, other things wouldn't work, and then more and more things wouldn't work. That's all I remember.
Q. Okay. And if I understood your testimony correctly, then, you didn't do anything personally to transfer data from your old phone to your new phone? That was all done at the Apple store?
A. Yeah, it's way beyond me to be able to do that kind of stuff. So I give it to those guys. I said, Guys, give me a new phone and make everything happen.
Q. Okay. And so after the -- the transfer, like, took place, did you notice that anything was missing on your phone that should have been on there that you took note of?

A. No.

Q. What are the issues -- you know, I was going to cover this later, but we might as well just talk about it now, one of the issues in the case that has arisen are the certain text messages between you and Lucas were lost, as we understand it, on your phone.

Can you tell me what happened there?

MR. ROBERTSON: I'm going to object to that, just the foundation.

Go ahead.

THE WITNESS: All I know is what I told you. I mean, I don't know anything that was missing. All I know is this is -- this is what happened. And that's -- that's a fact. I don't know what else to say.

BY MR. PACE:

Q. So in the -- we have supplemental response to a request for production and discovery requests in this case. I'm just going to read to you what was written in there by you or your lawyers, whoever wrote it.

It says, [reading] Plaintiffs cannot produce any text messages between Peter Hicks and Lucas Hicks exchanged prior to 2021 because plaintiffs do not

possess those text messages. After a thorough search of his phone, Plaintiffs have confirmed that no texts between Plaintiffs and Lucas Hicks exist prior to July 2021.

Is that a true statement?

A. It sounds accurate. I know it's -- that sounds like the right date.

Q. So is it your testimony that after your phone was upgraded to the new phone, that all text messages between you and Lucas Hicks were no longer on the phone?

A. Well, that says otherwise.

Q. It looks like prior to July 2021.

A. My testimony is I dropped the phone in the sand. It got mucked up. It got worse and worse. I got a new phone. And I don't have any answers or explanations beyond that. That's all I know.

Q. Well, this is the question: Are there text messages on your phone right now between you and Lucas Hicks that are dated prior to July 2021?

A. You photocopied my phone. You would know that more than I would.

Q. I want you to answer the question, please. It was represented to us that there were none.

So I want you to confirm whether that is an

accurate statement or you know it to be inaccurate.
A. I think it's accurate.
Q. Okay. Is it your testimony under oath that there are no text messages between you and Lucas Hicks prior to July 2021 on your phone?
MR. ROBERTSON: Objection. Asked and answered.
BY MR. PACE:
Q. You can answer the question. Well, we didn't cover this, but with objections, they are for the record. There is not the judge here to rule on them.
MR. ROBERTSON: You can answer.
THE WITNESS: Could you repeat it, please?
BY MR. PACE:
Q. Yeah, is it your testimony under oath that there are no text messages on your phone right now that you have between you and Lucas Hicks that are dated prior to July of 2021?
A. I think that is accurate. But you folks would know better than I, because you photocopied my phone. You know what is in it.
Q. Well, I want to know: Are all text messages with everyone missing on your phone prior to July of 2021 or is it just between you and Lucas?

A. I don't know the answer to that question.
Q. Have you ever noted that any text messages with anyone else other than Lucas were missing?
A. No.
Q. So you have all the text messages with everyone, all of your other contacts, and the only ones that were lost were between you and Lucas?
A. I don't know the answer to that. There may be others that are missing. I don't know the answer because I haven't looked.
Q. Did you delete text messages between you and Lucas?
A. No.
Q. Do you have any explanation for how they disappeared from your phone?
A. I have no explanation other than dropping the phone in the sand.
Q. In -- in one of the court filings in this case, it is Docket 52, this is what your counsel wrote, they said -- I'm going to quote from page 4 Note 16 [reading] Plaintiff Peter Hicks has since changed his phone and in the process lost text messages exchanged with Lucas Hicks.
Is that an accurate statement?
A. So I'm told.

Q. Well, I don't want to have it be based on what you have been told. I want it based on your knowledge.
Is that accurate?
A. I think it is.
Q. Okay. All right. Let's get back to --
Tell me where the beach is where you dropped your phone at. This is really important; right?
A. Do you want the answer?
Q. I do want it. I want to know. Because I want to test your memory on this and see what the --
A. Okay.
Q. You know, you are telling me this -- your testimony about what happened here. I would like some details to see how well you remember it. So tell me where the beach is.
A. Well, I don't know what they call the beach, but if you take a highway over the two bridges to get to the outside island, there's a Marriott resort right there. It's on a beach there. It was a beach there. I don't know which grain of sand, but it was the beach there.
Q. Were you there alone or with anyone else?
A. With my wife.

Q. With your wife?
A. I don't know that she was literally with me the moment -- she probably was -- when I dropped it, but I think if she was I would remember and I would have been lectured in a major way.
Q. Right. Let's come back to the -- to the April 10th -- before we went on this detour, we were talking about April 10th, 2020, the phone call.
We established you and Lucas were in the same room together on your phone. That's the setting, right, when this call took place?
A. Correct.
Q. All right. Did you record the call?
A. Did I record the call? No.
Q. Did Lucas record the call?
A. I think I can say the answer is yes.
Q. And why are you hesitant in saying that?
A. I don't know much about it, but -- I'm not hesitant. Yes, he recorded the call.
Q. And how do you know that he recorded it?
A. I was told.
Q. By Lucas?
A. No. In a conversation -- no. How I first learned it?
Q. No, my question is: Who told you that

Lucas recorded it?

A. Privileged.

MR. PACE: Are you asserting privilege, Chris, are you instructing him not to answer on this question?

MR. ROBERTSON: I think that you have got to lay a little bit better foundation. I think that you are jumping about three steps. So I want you to break it down.

MR. PACE: You are talking to me?

MR. ROBERTSON: No, you. I mean, yeah, I will -- I will assert privilege to that broad question, but I think there is a way to break it down and get the pieces of what happened.

MR. PACE: Let me ask the question again.

BY MR. PACE:

Q. Who told you that Lucas recorded the phone call? And I'm not asking you to tell me any communications between you and your lawyer here. So if that's the case, and you can't answer it without it coming from an attorney, then let me know that, but I guess --

A. It was in the context of a privileged conversation involving attorneys.

Q. What -- did Lucas tell you that he recorded

a phone call?

A. No, he went to an attorney.

Q. Did -- your answer is Lucas never told you that he recorded the phone call?

A. Any conversations were in the context of attorney conversations.

Q. So you were in a room with an attorney when Lucas told you that he recorded a phone call?

A. I don't think --

MR. ROBERTSON: You can answer yes or no.

THE WITNESS: Was I in a room?

MR. ROBERTSON: Not in a room, were you on -- no one was in a room.

BY MR. PACE:

Q. You know, I -- are you --

MR. ROBERTSON: It was COVID.

BY MR. PACE:

Q. Did -- I would like an answer to that question before we move on to other questions here. Can we restate that one? Do you have it?

(Record read.)

THE WITNESS: No.

BY MR. PACE:

Q. Were you on the phone with Lucas when he told you that he recorded a phone call?

A. I don't remember.
Q. Okay. So --
A. I think I was in the room with him, but it could have been on a phone call. I don't recall.
Q. I want to make sure I understand this right. You're telling me that you are aware that Lucas recorded the call; is that right?
A. Correct.
Q. And you're telling me that the source of that information did not come from Lucas?
A. The source of the information did come from Lucas.
Q. Okay. So Lucas told you that, that he recorded the call; right?
A. Correct.
Q. When did he tell you that?
A. After having retained an attorney and --
Q. I'm looking for a date or a month. If you can tell me when, you know.
A. Well, I could tell you it was after the -- after the AS USA had reached out to us to interview me.
Q. And your testimony is you had no knowledge that Lucas recorded this phone call prior to that time?
A. Correct.
Q. So you --

inaccurate statement that was made about [reading] less than a week later, plaintiffs hired Mr. Robertson in anticipation of the underlying suit?

A. Well, again, in anticipation of a suit, if other good things didn't happen, then, yeah, with that parenthetical, I guess that's accurate.

Q. Okay. Did you -- what is the date that you hired the law firm Seyfarth Shaw to represent you --

A. Well Seyfarth Shaw was already one of the law firms that represented me.

Q. Well the representation to the court is that the plaintiffs hired Mr. Robertson in anticipation of the underlying suit less than a week later. I'm trying to pin down the date, if you can tell me if you know or not, between September 10th and, say, September 17th, 2020?

A. I don't know what day it was.

Q. Was it somewhere in there?

MR. ROBERTSON: Objection. Go ahead.

THE WITNESS: It would make sense to me that it would be somewhere in there.

BY MR. PACE:

Q. Okay. All right.

A. But I just don't know.

Q. I understand. And as a result of -- you

are anticipating the underlying suit, you claim privilege over various emails that are after the date September 17th, 2020, that are between you and Mr. Lucas; is that correct? I didn't mean "Mr. Lucas." I meant your son, Lucas.

A. Can you state that again?

Q. Yeah. We have had an issue that is still pending in the court about privilege on certain documents. The claim that has been made, at least in filings by you in this case, is that since every document on Lucas Hicks' privilege log is dated after September 17th, 2020, the documents are necessarily in anticipation of the current litigation.

Are you aware that that has been stated to the court in this case?

(Exhibit No. 73 was marked for identification.)

MR. ROBERTSON: I'm going to object. Whatever filings that were made in the court speak for themselves. We have been through this. There is lots of briefing on it. Lucas is a part owner in the business. That's the basis of privilege. I'm not going to let this witness answer what his lawyers have determined the basis of the privilege is.

MR. PACE: That's not my question.

MR. ROBERTSON: The way you characterize it -- that was your question.

MR. PACE: I would like to ask the question, please, unless you are going to instruct him not to answer.

MR. ROBERTSON: I might. Go ahead and ask the question. I might.

BY MR. PACE:

Q. I'm asking if -- are you aware that the claim has been made that every document on that privileged log, because it's dated after September 17th, 2020, is necessarily in anticipation of the current litigation?

MR. ROBERTSON: I'm going to object.

But I will let you answer it, if you can.

THE WITNESS: Is necessarily in anticipation of the what?

BY MR. PACE:

Q. The current litigation, meaning this lawsuit.

MR. ROBERTSON: The same objection.

Go ahead, you can answer.

THE WITNESS: I'm sorry, I hate to do this. I'm going to ask you to repeat it again.

MR. PACE: Do you have that one?

(Record read.)

THE WITNESS: I guess I'm aware of that.

(Clarification by the reporter.)

BY MR. PACE:

Q. Okay. So it would be true to say then that the plaintiffs were anticipating this lawsuit against the defendants as early as September 17th, 2020; correct?

MR. ROBERTSON: Objection.

THE WITNESS: I didn't know you were still looking for an answer.

BY MR. PACE:

Q. Yeah, I have a question and I would like you to answer it, please.

THE WITNESS: Can you read back it again, please?

(Record read.)

MR. ROBERTSON: Objection.

THE WITNESS: Is it accurate that -- am I supposed to answer?

MR. ROBERTSON: Yeah, if you can.

THE WITNESS: It is accurate with the parenthetical I stated earlier.

BY MR. PACE:

Q. And if I remember that right, it was that

you were going to try to work it out first, something like that. I don't mean to put words in your mouth. What was the parenthetical?

A. That -- two things, I wanted the feds to sort it out because they had better access to the truth than I. And better capabilities of ferreting out the truth than I and also subject to me not being able to effect a friendly work out with Mr. Milton.

(Clarification by the reporter.)

BY MR. PACE:

Q. Okay. What steps did you take, if any, to ensure that relevant documents were preserved after September 17th, 2020, when you were anticipating litigation?

A. I took the steps of not doing otherwise.

Q. Meaning what?

A. I took the steps of -- I didn't have to take any steps because I wasn't allowing any documents to be -- what's the term, impacted. What steps did I take?

Q. Did you do anything in particular to preserve evidence after September 17th, 2020, to ensure that it wasn't lost or destroyed?

A. Well, I think all evidence is --

MR. ROBERTSON: Well, and don't -- yeah,

and now we are to maybe even privilege. So --

MR. PACE: And I don't want to get into privileged discussions, Chris.

MR. ROBERTSON: This is tricky. But, yeah, I mean --

BY MR. PACE:

Q. And the kind of things I'm talking about is normally in litigation, when the parties are on notice that there is -- if litigation is reasonably foreseeable, they will take steps to preserve documents or should anyway, for example, taking backup copies, collecting emails, collecting relevant text messages, you know, compiling them, storing them so that they are not lost or deleted, things like that.

A. They are on my computer. They are on my phone, and I have internet backup. So what am I supposed to do?

Q. Sounds like you -- so you didn't do anything -- well, what did you do, if anything, other than just what you normally do?

A. I normally don't delete anything, so I didn't know there was more that needed to be done. I continued to use my computer. I continued to use my phone.

Q. What did you do to guard against the

possibility that the texts would be lost on your phone as they were when you switched them?

MR. ROBERTSON: Objection.

THE WITNESS: I continued to use my phone. I had a breakage protector on it like this. I have nothing more.

BY MR. PACE:

Q. Okay. Would you agree that as of September 17th, 2020, the plaintiffs had enough information from having read the Hindenburg report to believe that Trevor Milton had committed wrongdoing that would warrant a lawsuit?

MR. ROBERTSON: Objection.

THE WITNESS: Can I answer it?

MR. ROBERTSON: Yeah, please.

THE WITNESS: No.

BY MR. PACE:

Q. You wouldn't agree with that?

A. No.

Q. Why not?

MR. ROBERTSON: We have to be very careful about privilege. But I'm trying to let him answer as much as possible.

MR. PACE: Yeah, and I'm very clear, I don't want you to --

MR. ROBERTSON: You know he has lawyers at this point. So you're asking him his assessment of litigation risk, litigation intent after you know he has hired me.

MR. PACE: I have made it very clear --

MR. ROBERTSON: It's tricky.

MR. PACE: I have made it very clear that I don't want you to disclose to me privileged communications with your lawyer. Don't do that.

MR. ROBERTSON: You can answer the question no, which you answered. The why is -- gets very much into privilege.

MR. PACE: I don't think that it's appropriate to -- I understand the concern.

MR. ROBERTSON: I'm not. I'm not. I'm not. Go ahead.

MR. PACE: I would like him to be able to just answer it if he can. If you can't without revealing attorney-client privileged communications, you can just say that. But if you can, then I would like to know what your answer is.

THE WITNESS: Hindenburg has serious allegations. I was not in the position, certainly not on September 17th, whenever you're saying, to know truth from fiction.

BY MR. PACE:

Q. Okay. Let's move on to an exhibit. Actually, we are going to look back at 35. This one is page 298 of Exhibit 35.

A. Yep.

Q. The text on the top of the page, September 12th, 2020. You say to Lucas "My virtuoso performance re wcr has a third act. Call."

Do you see that?

A. Yeah, I do.

Q. What is that in reference to?

A. Well, the first act is buying it. Well, the second act is selling it, but for -- behavior to your client. Well, and the third act is, Well, heck, now that this has come out, maybe I can get what I want, which is cash and go home.

Q. Is this a reference to thinking about filing a lawsuit against defendants?

A. No, it's a reference to -- actually, what's the date on this? Yeah, a reference to within days I acted on this and I asked Trevor if he would buy out my options for cash. I thought this was a situation where he would be motivated to buy me out for cash. And cash, as we all know, is what I preferred. And so yeah, that was the third act.

Q. And you are saying cash is what you preferred. We talked through the actual offer terms that were made back and forth and you didn't -- I guess you never came back with a counter that was all cash. I thought we had discussed that, that you had gotten an offer from Trevor that was 9 million cash and you rejected it, and then you had accepted the 8.5 cash and 8.5 stock?

A. Right. But maybe what I didn't characterize to you is, from Trevor, that was take it or leave it. Eight and a half or not. Eight and a half, 8 and a half or nine, there you go.

Q. And I had asked you what the number was in cash you would have taken, you didn't have an answer for me; right?

A. It didn't matter at that point. I mean, that's the way Trevor asked, is his deal is his deal.

Q. All right. Well, in any event, you're saying that the "virtuoso performance" is what you're going to leverage this Hindenburg report against Trevor to try to get cash now?

A. I wasn't going to leverage it per se. He was in a situation where I thought he would be naturally motivated to pay me cash . It proved I was wrong. That's what I thought. That was the logical

thing to me.

Q. Could you explain to me your thinking on why you thought he would want to pay you cash?

A. Yeah, because, you know, among other things on these call -- not call options -- what do we call those options? What are we calling these options? At some point, he was going to have to report them. And it seemed to me that given the mess that he had made for himself, if he paid me cash in extinguishing them, then maybe then he would be better off.

Q. Okay. So that's -- that's what you're referring to when you said "virtuoso," "third act"?

A. Well, that's the third act of the three-step virtuoso, yes.

Q. Okay.

A. Virtuoso being I thought I was going to get cash. I was grievously mistaken.

Q. I got it. Let's look at Exhibit 20.

MR. SNOW: Exhibit 20?

MR. PACE: Yeah, 20.

BY MR. PACE:

Q. All right. Here, we have an email on September 11th, 2020, from Bob Heinemann at Wells Fargo to you.

Do you see that?

A. I do.
Q. And he's saying, "Hi Peter, In reference to your question about shorting NKLA, here are the variables that you must consider."
Do you see that?
A. I do.
Q. Had you contacted Bob Heinemann prior to him sending you this email to ask again about shorting Nikola?
A. I'm guessing I called him.
Q. And that was in reaction to the Hindenburg report I take it?
A. Yes.
Q. And he comes back and reports to you that -- essentially that what it would take to short Nikola and what the rates and expenses would be. Is that fair to say?
A. I think so.
Q. He didn't tell you that you couldn't do it here, did he?
A. No.
Q. Earlier I thought that you told me that when you asked him the first time, you had said you couldn't do it or something like that?
A. I think we know why at this point.