# EXHIBIT 8

TP One

# Transcript of **Lucas Hicks**

Thursday, March 21, 2024

***Peter Hicks, et al. v Trevor R. Milton, et al.***

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 139472

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
-------------------------------------------------X

PETER HICKS, HICKS, LLC and WASATCH HICKS, LLC

PLAINTIFFS,

V. Case No.: 2:22-cv-00166

TREVOR R. MILTON, M&M RESIDUAL, LLC and T&M RESIDUAL, LLC,

DEFENDANTS.
-------------------------------------------------X

DATE: March 21, 2024
TIME: 10:09 A.M.

VIRTUAL DEPOSITION by the Plaintiff, of a witness, LUCAS HICKS, taken by the respective parties, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the above date and time, before Makeda Edwards, a Notary Public of the State of New York.

A P P E A R A N C E S:

SEYFARTH SHAW LLP
Attorneys for the Plaintiffs
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210
BY: CHRISTOPHER ROBERTSON, ESQ.
PHONE: 617-946-4989
E-MAIL: crobertson@seyfarth.com

HATCH LAW GROUP, PC
Attorneys for the Defendants
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
BY: ADAM M. PACE, ESQ.
PHONE: 801-869-1919
E-MAIL: pace@hatchpc.com

CURTIS M. TUTTLE LAW, PLLC
Co-Counsel for the Defendants
P.O. Box 536
Bountiful, Utah 84011
BY: CURTIS M. TUTTLE, ESQ.
PHONE: 435-253-0378
E-MAIL: ctuttle@cmtpllc.com

MCDERMOTT WILL & EMERY
Attorneys for the Witness
LUCAS HICKS
1 Vanderbilt Avenue
New York, New York 10017
BY: JENNIFER LEVENGOOD, ESQ.
EDWARD B. DISKANT, ESQ.

ALSO PRESENT:
AYDALINE GARCIA, VIDEOGRAPHER, TP One

* * *

learning more as well. And, you know, with my limited summer of investment banking experience, you know, maybe I could be, you know, some help in this area.

Q. Okay. I see you were home in Milton, Massachusetts at the time?

A. I was.

Q. Where was your father located physically at the time of the call?

A. I believe we were in the same room.

Q. Same room, okay. And had you done anything to prepare ahead of that call for questions you might want to ask?

A. I had prepared the questions.

Q. Okay. And did you type those out on your phone?

A. Phone or computer, yes.

Q. Okay. Let's just take a look real quick at Exhibit 2. I'll share that in one second.

Are you able to see either on your screen or on a paper copy what's Exhibit 2?

A. I have it.

Q. And are you familiar with this document?

A. Yes.
Q. What is it?
A. So the top section appears to be kind of prepared thoughts and questions and then that side, okay, and you kind of have, thereafter, notes from the call.
Q. And where is the divide between those two? If you could point us to it in the document just where it starts.
A. Yeah. So I don't know if there's -- I haven't, you know, looked at this totally up and down, but it appears to be the line that says page 13, that appears, to me, to be approximately that divide.
Q. Okay. And was this -- did you prepare this document yourself?
A. Yes.
Q. And was it on a computer or on your phone?
A. I don't remember. This is, you know, in the Apple Notes App you can kind of tell what you can do via either device.
Q. Okay. This was taken in Apple Notes?
A. Yeah.

Q. And other than this document that we're looking at, do you have any other written notes on what was said on the phone call on April 11, 2020?

A. I don't believe so.

Q. And sitting here today, do you have a memory of what was said on the call exactly?

A. What do you mean by that? Like remember exactly what was said on the call?

Q. Yeah. Probably not, I would imagine, but I'm just asking how good your memory is.

A. I remember the call.

Q. How long was the call?

A. Probably roughly an hour.

Q. And did you speak during the call?

A. Yes.

Q. What did you say?

A. Sorry?

Q. What did you say?

A. I think for the most part, I asked Trevor questions and, I don't know. We had a dialogue about him, his history with the company.

Q. Okay.

A. And the company's history -- all
those things.
Q. Did you record the April 11, 2020
phone call?
MS. LEVENGOOD: Objection. This
question implicates matters subject to
Mr. Hicks' invocation of his rights
under the 5th Amendment. I am
instructing my client not to answer.
MR. PACE: Okay. And I take it
you'll follow your counsel's
instruction.
THE WITNESS: I will.
Q. Did anyone ask you to record that
call?
MS. LEVENGOOD: Objection -- the
same objection. The question
implicates matters of Mr. Hicks'
invocation of his rights to 5th
Amendment. I'm instructing him not to
answer.
MR. PACE: Okay. I'm going to
have a series of these kind of
questions -- and so I understand your
objection.

And Mr. Hicks, I understand that you're saying you're going to follow the objection. I still got to go through it and get my questions out.

But yeah, if you could just tell me same objection and then, you know, and you're pleading the -- the 5th.

You're pleading the 5th Amendment on these questions; is that right?

MS. LEVENGOOD: Objection. Mr. Hicks -- through counsel -- he's already previously invoked. That invocation has been found to be sufficient by the U.S. Attorneys Office in the Southern District of New York, as well as Judge Lehrburger in this case.

He doesn't need to invoke on the record here.

MR. PACE: No. I am asking you to invoke it on the record here that you're pleading the 5th Amendment in response to my questions as the privilege basis for not answering.

I'd like that clear on the record.
Please state that.
MS. LEVENGOOD: Mr. Pace, Mr. Hicks has already invoked on this record through counsel. He will not need to invoke here. We can move on.
MR. PACE: Okay. I just want to make sure that it's very clear that the reason that Mr. Hicks is not answering these questions is because he's invoking the 5th Amendment. And if you disagree, then state what your position is. But if you don't disagree with it, as I understand, I'm going to keep asking some questions here.
Q. At what point during the phone call did you start recording it?
MS. LEVENGOOD: Same objection. I'm instructing him not to answer.
Q. Yeah. And just to speed through this, Mr. Hicks, you're going to follow every single one of the instructions that your counsel gives you; is that right?
THE WITNESS: Yes.

Q. Okay. Did you record all of the phone call or just part of it?

MS. LEVENGOOD: Same objection. I'm instructing him not to answer.

Q. What device did you record it on?

MS. LEVENGOOD: Same objection. I'm instructing him not to answer.

Q. Did you ask any permission of any of the parties to the call before you started recording it?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

Q. What did you do with the recording after the call when you took it?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

Q. Did you transfer the recording that you created of the call from your phone to any other electronic devices after it was created?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

Q. What other electronic devices was

the recording that you created of the call transferred to?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

Q. Did you edit or manipulate the recording made of the April 11, 2020 phone call after it was initially recorded?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

Q. Did you ask anyone else to edit or manipulate the recording that you made of the April 11, 2020 phone call after it was recorded?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

Q. Did you provide a copy of the recording that you made of the April 11, 2020 phone call to anyone else?

MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.

MR. PACE: Counsel, just, I guess to move it along, I assume that

you're going to assert this objection to any question that I ask about a recording; is that correct?

MS. LEVENGOOD: That would be being correct, Mr. Pace.

BY MR. PACE: Okay.

Q. What can you remember, just based on your memory, about what Trevor Milton told you about his company, Nikola, during that phone call?

A. It was a long phone call. Can you be more specific? There were a lot of topics discussed?

Q. Yeah -- no. That's about as specific as I can get. What I'm interested in finding out is what memory you have so we can have your testimony on the record of what was said by Mr. Milton to either you or Peter during that call about Nikola?

A. My memory of what was said -- we talked a lot about a number of topics. We talked about the trucks. We talked about corridor on the Southwest part of the United States. We talked about the stock and it's potential for upside announcements. What else

did we talk about?

We talked about his history and we talked about how the company was set up for the future, his role going forward.

What else did we talk about? We talked about why he was -- why he was interested in, you know, using a call option on a stock as consideration of the transaction. We talked about Covid, we talked about batteries. We talked about obviously hydrogen power.

Yeah, I don't know. That would be some of the topics.

Q. Okay. What do you recall about him telling you the way he was interested in using an option agreement for the purchase?

A. I remember him being interested and providing other people, you know, good people as he saw them, with upside opportunities to make money and that that made him happy.

Q. And at the time in April of 2020, did you understand that Nikola was a pre-revenue company?

A. I believe I did.

Q. Okay. I asked you earlier about whether you were aware of any appraisals or

valuations of the ranch when it was purchased from Mr. Floyd Hatch. So I have the same question for you about, you know, in connection with the sale of it Mr. Milton.

Are you aware of there being any written appraisal or valuation of the ranch that, you know -- that's the question. Do you understand the question? I can reask it if it's not very clear.

A. Can you reask it?

Q. Yeah. I just want to know in connection with the sale of this ranch to Mr. Milton, did you ever see a written appraisal or valuation for the ranch?

A. I don't remember seeing one.

Q. Well, what was the process that you and your father, you know, used to figure out what number to sell it to Peter -- I'm sorry -- to Mr. Milton for?

MS. LEVENGOOD: Objection. Vague.

A. Yeah. Could you be more specific?

Q. All right. So Mr. Milton had come first with an offer, right? You said -- and then if you don't remember the exact terms of

contemplating borrowing 2 million from Mr. Barton, 1.5 million from mom -- is that a reference to your mom?

A. Yeah.

Q. Okay. And balance from me -- do you recall any discussions with Peter about this, the subject of this email?

A. No.

Q. He's talking about needing to pull the trigger by 10 a.m. the next day. Do you know why?

A. No.

Q. Let's take a look at Exhibit 34.

A. Okay.

Q. Yeah. This is Peter sending an email to Trevor, you know, confirming that he sent wires for 7 million to buy 483,425 shares at a price of 14.48, right?

A. Sorry. Say that one more time.

Q. Yeah. This is an email that Peter's sending to Trevor, you know, and I'm paraphrasing, but he's stating that he sent $7 million -- wired $7 million in order to purchase 483,425 shares at a price of 14.48 per share.

Do you agree with that?
A. I agree with that.
Q. Okay. Did you do any calculations yourself at this time to evaluate what profit that would return?
A. I don't know.
Q. Is that something Peter just handled?
A. I don't know.
Q. You don't know? Do you have any idea how much profit was made by selling these shares at this price?
A. I don't remember.
Q. You and Peter both made money off that, right?
MS. LEVENGOOD: Objection. Foundation.
A. I believe it was a profitable transaction.
Q. Okay. Did you have any involvement in negotiating that 14.48 share price?
A. No. But again, my recollection is it was just some discount to the share price on that day.
Q. Okay. All right. Let's look at

Exhibit 35. These are the text messages that you produced in response to our subpoena.
A. Okay.
Q. And I know there's a lot here. I'm going to refer to them just by the number that's in the bottom right hand corner. I'm not going to ask you about every single one of these. I just have a few that I want to go over with you.
So why don't we start by looking at number 280.
A. We're going backwards or can I kind of get rid of these?
Q. I mean, they're there for your reference if you need to look at any of them. I'm not intending to ask you about every single one.
A. Okay.
Q. But I want to start at page 280.
A. Yeah, go for it.
Q. Okay. Are you the one -- is it you in blue and Peter in, I guess whatever that is, black or gray?
A. It looks like I'm on the right, my dad's on the left.
Q. Got it. Here you're telling -- on

May 12, 2020, you're telling your dad I think you have to do it at 7.5 base assuming the diligence doesn't run forever. Kind of a no-brainer.

Do you see that?

A. I do.

Q. What did you mean by that?

A. I think it's self-explanatory. I, you know, (indiscernible) I'm advocating to sell the ranch to Trevor at to deal with seven and a half in cash and seven and a half in the form of an option.

Q. Okay. Without, you know, handling or counteroffering to try to go higher, your advice was just do it right now, it's a no-brainer?

A. I -- you know, at this point in time, yeah. That's what it says.

Q. Do you recall Peter, in responding to you saying whether he thought it was a no-brainer or not?

A. No. And if it's kind of of like everything else, if it's not here it must not have happened.

Q. You know, the texts that are given

to us, you didn't give us all the texts that you had with your dad about the Milton transaction, right? I understand that some were withheld.

Do you agree with that?

MS. LEVENGOOD: Objection.

MR. ROBERTSON: Form and foundation.

MS. LEVENGOOD: Yeah. Sorry. Objection to form. But also objection this calls for privileged material, discussions with counsel. I'm instructing the witness not to answer to the extent that it would implicate any of those legal discussions.

MR. PACE: And that's the fifth amendment privilege that you're asserting again for the record; is that correct?

MS. LEVENGOOD: No. This is just purely attorney-client communications and privileged discussions regarding the production of specific to documents.

MR. PACE: Okay. So thank you for clarifying.

Q. I'm not asking you to tell me anything that you talked about with your lawyers about producing documents to me. So don't tell me anything about that in any of your answers to my questions.
But did you personally go search for text messages to provide in response to that subpoena?
A. Yes, and I did so, you know, fully.
Q. Are there text messages between you and your father talking about the recording that you took of that April 11, 2020 --
MS. LEVENGOOD: Objection. Objection. The question implicates matters of Mr. Hicks' 5th Amendment privilege. I'm instructing the witness not no answer.
Q. Okay. So there were text messages that weren't provided on the basis of that privilege then. Am I understanding that correctly?
MS. LEVENGOOD: Same objection. I'm instructing the witness not to answer.
MR. PACE: Okay.

Q. Let's take a look at -- back at the texts page 289, please.
A. Sorry. 289?
Q. Yeah. 289. Just let me know when you've got that page and you're ready, please.
A. I got it.
Q. Okay. This is a text, August 4, 2020. Peter is asking you, send me evidence what day Nikola merged. And then you respond with a link to the SEC website, in reference to page 5, right?
A. Yeah.
Q. And earlier we looked at a prospectus and I had directed your attention to page 5. You know, I don't know if that's the same one or not, but is it fair to assume here that you would have gotten that information out of an SEC filing to be able to respond to your dad's question?
A. Yup.
Q. And then down below that, Peter asked you to explain to me the 1.9. I might have a theory.
What's that in reference to?
A. I don't know.

Q. You have no idea?
A. No.
Q. You say: Yes, that is what it says. Okay, do I have to explain right now?
What did you mean by that?
A. I mean, that's self-explanatory.
Q. I take it you don't really have any memory of this looking at the text right now.
A. Nothing beyond what's on the page.
Q. Okay. Let's take a look at text number 298. I know these numbers are kind of small in the corner. I have to squint to see them.
A. All right.
Q. Sorry. This is the September 12, 2020 -- this is after the Hindenburg Report had come out, if this were oriented in time. Peter is texting you saying my virtuoso performance re WCR has a third act call.
Do you see that?
A. I do.
Q. And WCR, of course, is a reference to the Wasatch Creeks Ranch; do you agree with that?
A. I do.

Q. And what did Peter tell you about his virtuoso performance?
A. I have no idea.
Q. Did you call him back when he asked you to call?
A. Well, he asked me to call a second time, so probably not immediately.
Q. Right. But it seems like he wanted you to call him because he told you twice; is that fair to say?
A. Yeah.
Q. Do you remember calling him back about this?
A. No.
Q. Do you think -- do you have any reason to think you didn't call him back?
MS. LEVENGOOD: Objection. Asked and answered.
A. I might have, I might not have. I have no idea.
Q. Do you have a recollection --
(Simultaneous cross-talk.)
A. -- frequently. So I'm sure I called him at some point, you know, within the next period of time as I generally do.

Q. Is it your testimony that you have no idea what Peter meant by virtuoso performance having a third act?

A. Yes.

Q. Is that a reference to him filing a lawsuit?

MS. LEVENGOOD: Objection. Asked and answered.

A. Yeah, I don't know.

MR. ROBERTSON: Objection.

Q. Let's look at page 301, please. This is Peter sending you a link to an article. It looks like it's from Finance on Yahoo about why a Nikola short squeeze could be coming very soon.

Do you recall getting this text?

A. No.

Q. Did you read the article?

A. I have no idea.

Q. Does this refresh your memory of whether you guys were discussing a short of your own at this time?

A. Could be correlated. I have no idea.

Q. Look at page 303, please. This is

you asking your dad, any response from Trevor on September 25, 2020, and he says call.

Do you have any idea what this is about?

A. I -- the chronology is hard to follow but, you know, presumably there was some communication with Trevor before that. Him telling me to call could be related or unrelated.

Q. You don't have a memory about what -- what that issue was?

A. No.

Q. Can you look at page 306, please.

This is November 18, 2020 -- Peter to you -- says if Trevor offers me stock value right now, would you take it? You said depends need to discuss.

What -- what did you discuss with your father about this?

A. I don't know if we did. I, you know, I mean my dad wanted to talk about it. Presumably we talked about it but to the specifics I, you know, I have no idea.

Q. Did you ever answer his question?

A. Over text, if I did we'd had it.

down on Christmas Eve?
A. Do I recall seeing a reference to it outside of this? No.
Q. Nevermind. Let's strike that question and move on.
Let's look at 306.
A. I'm sorry. Say that one more time.
Q. I was going to say page 306 but I --
A. (Indiscernible.)
Q. But that might be the one we're on-- no. That's the same one we're on. 312, please.
A. We were just on 312.
Q. Oh, we were just on 312. Yeah, you're right. I'm sorry. I got distracted for a second there.
All right. Has Peter ever told you that he lost his phone at any point?
A. I don't know.
Q. You know nothing about Peter losing his phone?
A. I don't know. My dad loses things from time to time. I'm a little bit forgetful myself so -- but I don't know.
Q. Yeah. I'm talking about in connection with this lawsuit.

We've asked for Peter to produce copies of text messages on his phone and we were told that he's lost a phone. I haven't had a chance to ask him about that yet, but I'm asking you do you know anything about him having lost a phone that would have had, you know, texts on it or content on it related to this lawsuit?

A. I have no idea.

Q. At any point, you know, from 2020 to today, you've never heard anything at all from your father saying that he's lost a phone; is that fair to say?

I didn't catch your answer. I'm sorry.

A. I don't remember --

Q. Okay.

A. -- one way or the other. I, you know, who knows.

Q. Are you aware of Peter ever having deleted text messages off of his phone?

A. I'm not aware of that.

Q. Are you aware --

A. I'm aware he does regularly delete e-mails.

Q. Do you know if Peter deliberately

deleted text messages off his phone in order to
protect you from the 5th Amendment issue you
keep raising on the recording?
MR. ROBERTSON: Objection.
MS. LEVENGOOD: Objection.
Foundation. Yeah -- sorry. Also
objection to the 5th Amendment issue
to the extent that this does implicate
Mr. Hicks' 5th Amendment privilege,
I'm instructing the witness not to
answer.
MR. PACE: I just want to be
clear, my question is whether he's
aware of Peter, you know, deliberately
deleting those, you know, anything
with having to do with a recording,
you're instructing him not to answer
that question?
MS. LEVENGOOD: Yes.
MR. PACE: Okay.
MR. DISKANT: Adam --
(Simultaneous cross-talk.)
MR. ROBERTSON: I'll renew my
objection. There's no foundation for
any of that.

MR. PACE: Ted, did you have a comment or something or --

MR. DISKANT: Just give us one second.

MR. PACE: Yeah, no problem.

MR. DISKANT: Actually, could I trouble you to repeat the question, the last question pending or if you want to have it read back, that's fine.

MR. PACE: Yeah. I could do my best to -- I don't know. Do we have capability to read back or?

THE COURT REPORTER: Yes. Just give me one moment.

(Pause in proceedings.)

(Whereupon, the referred-to question was read back by the reporter.)

MR. PACE: Yeah. Ted, do you need to do something further with that or?

MS. LEVENGOOD: Yeah. We'll just reiterate that this question does implicate Mr. Hicks' invocation of his

5th Amendment right and we're
instructing the witness not to answer.
MR. PACE: Thank you.
A. Are you aware of any dispute arising between your father and David Anderson regarding anything?
MS. LEVENGOOD: Objection.
Vague.
A. I'm not aware of disputes between my dad and David Anderson.
Q. Okay. I mean, anything being related to the Trevor Milton transaction.
A. Just in general, I don't know. I'm not aware of any disputes between the two of them.
Q. Did you ever have any contact with anyone at Hindenburg research about that report after it came out --
A. No.
Q. -- or even to this day?
A. No.
Q. Okay. I think those are my questions. I'll -- I appreciate your time today and I'll pass the witness.
MR. ROBERTSON: Thanks.

EXAMINATION BY
MR. ROBERTSON:
Q. Good afternoon, Mr. Hicks. My name is Chris Robertson. I represent the entities and your dad, Peter Hicks. Just a couple of clarifying questions.
Let's kind of start where we finished.
To the extent that you were asked through a subpoena to search for and produce texts from your phone, did you do that?
A. Yes.
Q. And did you provide those texts to your counsel for production to -- in response to that subpoena?
A. Yes.
Q. Okay. And did also respond to a subpoena that was issued by the government -- or by Mr. Milton in the criminal case and produced information in response to that subpoena?
A. Yeah.
Q. And do you believe your responses again, carving out what your lawyers may have decided to produce or not produce, are complete and comprehensive?

A. I do.
Q. Okay. There are -- for the three points in time that we talked about today and I just want to clarify, there was this April timeframe when you first spoke with Mr. Milton, correct?
A. Yes.
Q. Okay. And at that time in April, no transaction occurred, right?
A. Yes.
Q. Okay. Then we talked about June and there was a point in time in June where discussions started up again about a potential transaction, correct?
A. Yes.
Q. And then ultimately an agreement was reached to sell the ranch in connection for a combination of cash and a stock option, right?
A. Yes.
Q. Okay. But the deal didn't close in June, right?
A. Correct.
Q. The deal then closed later in August of 2020; is that right?
A. Yes.

Q. Okay. And you may or may not recall but do you recall that at some point between June and August the stock option had to be redone?

A. I recall.

Q. And both it had to be rewritten and the terms changed; do you recall that?

A. I do.

Q. And then whatever was finalized among the parties speaks for itself, correct?

A. Yeah.

Q. In September you -- Mr. Pace asked you about the Hindenburg Report which came out in early September 2020. Do you recall that and being asked about that today?

A. I do.

Q. Do you recall that during from September to the end of the year 2020, that Mr. Milton was still professing his innocence?

MR. PACE: Lack of foundation.

A. I do.

Q. What you recall in the research you did and the -- the materials that you were asked about, at any point during that period did Mr. Milton ever admit that he had engaged in fraud

or any criminal activity?
(Simultaneous cross-talk.)
MR. PACE: Lack of foundation.
THE COURT REPORTER: I'm sorry. I didn't hear the answer.
A. He did not.
Q. And very quickly, so when we talked about the stock option and I think there was a reference in one of the documents, this was not a cashless option, correct?
A. It was not.
Q. Which meant that in order to exercise the option, money had to be provided to Mr. Milton, correct?
A. That is correct.
Q. And so you talked about risk. So in doing the option, there was a risk that the time period between when that money was provided and the shares were provided, the share price could change, correct?
A. Sure. And also beyond that, the time it takes to actually sell the shares as well.
Q. Okay. And on that point, as part of-- you were shown the numbers by Mr. Pace.

Did you have an understanding that in any transaction there would be additional costs, brokerage costs and other costs?

A. Yes.

Q. Okay. And those would have to be factored in, correct?

A. Yes.

Q. Okay. And do you know whether there might be tax consequences as well?

A. There may or may not have been.

Q. Do you know what a 1031 Exchange is?

A. I do.

Q. Okay. And do you have a general understanding that in your father's business some of the transactions he conducts are subject to Section 1031 of the Internal Revenue Code?

A. I do.

Q. Okay. And so do you understand that when he does transactions, those tax implications have to be considered as well?

A. Absolutely.

Q. Okay. And you had mentioned that that in one of the e-mails we saw that as we got into December and then even into January that one of the things you thought was that Mr.

Milton may have wanted the cash. Do you recall that?

A. Could you say that one more time?

Q. In doing a deal or proposing a transaction for your father or, you know, the entity to do, do you recall that Trevor ever offered any proposal that did not involve him receiving cash for his shares?

A. I understand. No, he did not.

Q. Okay. So whatever was proposed, he was going to benefit financially from it in exchange for his stock?

A. Yeah.

Q. Okay. And again, just under your recollection, correct?

A. Yes.

Q. Okay. Lastly, one quick question, you were asked about sort of, you know, communications in April and May and June of 2020.

Do you recall that?

A. Yes.

Q. And you were actually at home in Milton at that time, right, because of Covid?

A. Yup.