# EXHIBIT 11

# EXPERT REPORT OF H. SCOTT TUCKER

**Peter Hicks, et al. v. Trevor Milton, et al.**

**Utah District Court, Central Division**

**Submitted June 24, 2024**

APTEGRA

## I. INTRODUCTION

My name is H. Scott Tucker, and my business address is 4347 N. Chestnut Oak Dr, Lehi UT 84043. I am over the age of 18 and have personal knowledge of the facts stated herein. I have been retained by Defendants Trevor Milton, et al, by and through Defendants' counsel.

Among other things, I was asked to review the evidence and opine relative to the ESI (Electronically Stored Information, including data and metadata) in this case.

This report was prepared at the request of Defendants' counsel. It describes the process by which data was analyzed and my findings, as well as related opinions were prepared.

## II. COMPENSATION & PRIOR TESTIMONY

For my work on this case, I charge an hourly rate of $425 per hour for forensic analysis and expert witness consulting, and $525 per hour for deposition and trial preparation and testimony. I am also reimbursed for my expenses for work performed in connection with this case.

I have received no additional compensation for my work in this case, and my compensation does not depend upon my testimony or the outcome of the case. A list of all the cases in which I have provided testimony at deposition or trial within the last four years and of publications authored in the previous ten years are included in my curriculum vitae, attached hereto as **Exhibit A**.

## III. EXPERIENCE & QUALIFICATIONS

I expect to testify regarding my background, qualifications, and experience relevant to the issues in this litigation. My curriculum vitae, which provides information about my education, employment, and publications, is attached hereto as **Exhibit A**. A summary of my qualifications and experience is also provided below.

I am the President of Aptegra Consulting, LLC ("Aptegra"), based in Lehi, Utah, which offers information technology and litigation consulting services relating to, among other things, software development, digital forensics, and electronic discovery. I am also an instructor in the Master of Science in Information Systems ("MSIS") and Master of Cybersecurity Management ("MCSM") programs at the University of Utah, where I have taught a graduate level course in Digital Forensics (including a section on e-discovery), IS 6571, each year since 2012.

In addition, I have been awarded several certifications in information technology, including Certified Information Systems Security Professional (CISSP) from the International Information System Security Certification Consortium, also known as (ISC)2, Certified Cyber Forensics Professional (CCFP), also from (ISC)2, Certified Computer Forensics Examiner (CCFE) from the Information Assurance Certification Review Board or IACRB, and Certified Mobile Forensics Examiner (CMFE) also from IACRB. I am also certified as a Cellebrite Advanced Apple Forensic examiner (CAAF).

I have held technical roles in the information technology industry since the beginning of personal computing in the early 1980s. Prior to my work at Aptegra, I was (i) the Chief Technical Officer at KMT Software, Inc. ("KMT") and before that, (ii) a Director of Product Development at Lotus Development Corp, and (iii) a Director of Research and Development at OptionWare, Inc.

I am named as a co-developer of information technology that is the subject of a U.S. Patent (the 3-D spreadsheet). I am the author or co-author of several information technology books published by Simon & Schuster, Random House, and Bantam. I have served as an expert witness for both Microsoft (MS-DOS) and for Google (Google Sheets).

## IV. BACKGROUND AND SCOPE

I was retained by counsel for Defendants, to examine two questions. First, I was asked to evaluate Plaintiffs' explanations made concerning the loss of text message exchanges between Peter Hicks and Lucas Hicks (**"Missing Messages"**), including the explanations for why certain of those exchanges were not on Peter Hicks' iPhone for production to Defendants in discovery. It is my understanding that Plaintiffs claimed in discovery they could not produce any text messages between Peter Hicks and Lucas Hicks prior to July 2021 because they did not exist, and that Defendants were able to obtain *some* texts through a subpoena to Lucas Hicks and related motion to compel that demonstrated that relevant texts between Peter Hicks and Lucas Hicks had at one time existed on Peter Hicks' phone. The Missing Texts are identified on the Table of Texts Between Peter and Lucas Hicks included with this report, which lists the text messages that were produced by Lucas Hicks and indicates whether the texts were present on Peter Hicks' phone and iCloud backup when it was forensically examined. The vast majority of the Missing Texts are from the time period between April 8, 2020 and March of 2021, and relate either to Plaintiffs' investigation of Nikola and its stock prior to Plaintiffs' sale of the subject property to Defendants in June 2020; to Plaintiffs' discussions about Trevor Milton and Nikola leading up to the exercise period of the stock options at issue in the lawsuit, which began on December 1, 2020 and ended on December 31, 2020; or to Plaintiffs negotiation of a stock purchase agreement with Defendants between January and March of 2021. Further, Consilio's Text Message Pivot

spreadsheet included with this report shows that 343 message threads between Peter Hicks and Lucas Hicks (other than the Missing Texts) were collected from Peter Hicks' phone from June 2020 to March 2022:

| Family Date | Lucas <+[redacted]31> | Lucas Hicks [redacted]@gmail.com> |
|---|---|---|
| Jun/2020 | 1 | 0 |
| Jul/2020 | 3 | 0 |
| Aug/2020 | 7 | 0 |
| Sep/2020 | 3 | 0 |
| Oct/2020 | 3 | 0 |
| Nov/2020 | 9 | 4 |
| Dec/2020 | 5 | 4 |
| Jan/2021 | 4 | 1 |
| Mar/2021 | 17 | 5 |
| Apr/2021 | 26 | 6 |
| May/2021 | 19 | 4 |
| Jun/2021 | 32 | 4 |
| Jul/2021 | 29 | 5 |
| Aug/2021 | 27 | 8 |
| Sep/2021 | 18 | 5 |
| Oct/2021 | 20 | 0 |
| Nov/2021 | 18 | 0 |
| Dec/2021 | 19 | 0 |
| Jan/2022 | 19 | 0 |
| Feb/2022 | 15 | 0 |
| Mar/2022 | 3 | 0 |
| Grand Total | 297 | 46 |

Second, I was asked to examine a computer file (LH_00000342.wma), alleged by Plaintiffs to be an audio recording ("**Audio Recording**") of an April 2020 phone call, in which the participants were purportedly Peter Hicks, Lucas Hicks, Trevor Milton, and David Anderson. I was asked to forensically evaluate the data and metadata for the Audio Recording, to consider the purported circumstances of its creation and opine as to its authenticity, for the purposes of aiding the Court's determination of admissibility. This report describes and summarizes my findings.

## V. MATERIALS CONSIDERED

I have relied on the following data and information in forming my opinions.

1. Court filings

    a. Complaint (ECF No. 2)
    b. Plaintiffs' Opposition to Defendants' Short Form Discovery Motion for In Camera Review of Communications Between Peter and Lucas Hicks (ECF No. 49)
    c. Plaintiffs' Opposition to Defendants' Short Form Discovery Motion to Compel Responses for Production Nos. 3, 4, and 12 (ECF No. 52)

2. Discovery materials

    a. Plaintiffs' Supplemental Response to Defendants' First Set of Discovery Requests to Plaintiffs (*see* ECF No. 51-1)
    b. Text messages produced by Lucas Hicks (LH00000275-LH00000340)
    c. Audio recording (LH_00000342.wma)

3. Depositions

    a. Lucas Hicks Deposition
    b. Peter Hicks Deposition, Vol. 1
    c. Peter Hicks Deposition, Vol. 2

4. Consilio/Relativity documents

    a. Narrative re: Consilio's scope of work
    b. 2023.12.28 Search Terms and Protocol
    c. 20240118 Text Messages Pivot
    d. 20240618_Lucas Threads Metadata.xlsx
    e. 20240618_Message Threads With Lucas Hicks Before 6.1.2020.xlsx
    f. 20240620_Message Threads With Lucas Hicks Before 7.1.2021.xlsx

g. Relativity database re: texts on Peter's devices/iCloud account

5. Table of texts between Peter and Lucas Hicks

I have also relied on various reference materials and research I have performed as part of my examination, which I have referenced as footnotes throughout the report.

## VI. FORENSIC ANALYSIS

### Background in Digital Forensics

For the past twelve years, I have taught a graduate level course in Digital Forensics (IS 6571) in the Operations and Information Systems department of the David Eccles School of Business at the University of Utah.

Taught, as it is, to graduate management students, my class has emphasized durable fundamental principles of forensics, presenting an overview of select scientific and legal topics such as forensic imaging and e-discovery, and featuring hands-on computer and mobile forensic imaging and examination, guest speakers from the digital forensic, e-discovery, and legal community, and a group term project. It is intended to be academically rigorous, with high expectations of qualified students of proven academic achievement. The students in my class take it as an elective in their Master of Information Systems, Master of Cybersecurity Management, Master of Business Administration, Master of Accounting degrees, or occasionally other programs, such as Juris Doctor.

I am not a lawyer, and nothing in this report is intended as legal advice, nor do I express a legal conclusion. Nevertheless, the law is inextricably intertwined with forensics, with respect to the characteristics of evidence, the need for authentication, and, since digital forensics practitioners often serve as experts, the role the expert witness plays for the court. In this report, I speak about the law as it is presented in the literature of forensics and as it has been explained to me by counsel.

Properly understood, digital forensics is a branch of forensic science. The National Institute of Science and Technology (NIST) publication *Guide to Integrating Forensic Techniques into Incident Response*[1] defines forensic science and digital forensics thus:

---

1 See https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-86.pdf p. ES-1. See also, https://www.merriam-webster.com/dictionary/forensic, defining, "forensic," as, "belonging to, used in, or suitable to courts of judicature or to public discussion and debate," or, "relating to or dealing with **the application of scientific knowledge to legal problems**." (emphasis added)

> *"Forensic science is generally defined as the application of science to the law. Digital forensics, also known as computer and network forensics, has many definitions. Generally, it is considered the application of science to the identification, collection, examination, and analysis of data while preserving the integrity of the information and maintaining a strict chain of custody for the data."*

As I understand it, forensic practitioners apply science to assist triers of fact in their determination of admissibility.

**Applicable Legal Standards of Admissibility**

As previously discussed, forensics is the application of science to the law. Digital forensics does not dictate the standards of admissibility to the law; rather, it is the law that dictates the standards of admissibility to forensics. While I am not qualified to practice law, as a digital forensic expert and instructor, I need to possess an understanding of the applicable legal standards for admissibility in order to practice my profession.

As I understand it, under the rules of evidence, evidence will only be admissible provided certain requirements are met. Within the realm of forensics, perhaps the most important requirement is that the evidence must be *authentic*.

Rule 901(a) of the Federal Rules of Evidence states a simple, general rule of evidence authentication: *"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."*

Rule 901 follows up with examples in part (b). An example of interest to digital forensic examiners includes 901(b)(4), Distinctive Characteristics and the Like, which states *"The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."* Also noteworthy are examples 901(b)(9) and 901(b)(10), which provide additional ways to authenticate evidence, including *"Evidence describing a process or system and showing that it produces an accurate result."*

Finally, Rule 902 provides for some evidence to be self-authenticating (i.e., requiring no extrinsic evidence of authenticity to be admitted) if it meets certain requirements. Rule 902(14) seems particularly applicable to digital forensics. It reads as follows: *"Data copied from an electronic device, storage medium, or file,* ***if authenticated by a process of digital identification, as shown by a certification of a qualified person****. . . ."* The Committee Notes on Rules further points out that *"data copied from electronic devices, storage media, and electronic files are ordinarily authenticated by 'hash value' . . ."* (emphasis added)

To summarize, among the tools and technologies contributing to the evaluation of digital evidence authenticity are metadata, hash values, file formats, and computer processes, particularly in comparison to the ESI proposed for admission, as well as the description of what it is purported to be.

**File System Metadata and Internal File Metadata**

Metadata is information that describes and provides context for other data, which is important in forensic investigations for understanding the internal patterns, and distinctive characteristics of Electronically Stored Information (ESI) such as the Audio Recording. Within the broad umbrella of metadata, it is important to distinguish between metadata associated with a computer file system and metadata stored internally in files.

*File system metadata* is the information that an operating system, such as Apple iOS or Microsoft Windows, creates to manage and organize files. This includes attributes familiar to most computer users, such as Created, Modified, Accessed timestamps, which help in understanding the lifecycle of a file and can shed light on its circumstances, usage, and provenance.

Generally, the Created timestamp memorializes the point in time at which the file's data was first stored on the drive. This could reflect the time when data composed by the user in a new document was first saved to the drive, or it could reflect the time at which an already existing file was copied to the drive. File system metadata is stored outside the file.

By contrast, *internal file metadata* describes a set of attributes embedded within the file itself and provides information specific to the content and structure of the file. This form of metadata varies significantly depending on the file type.

For example, in a word processing document, internal file metadata can include the author's name, the dates and times the document was created, last modified, printed. This information can help forensic investigators trace the document's history, understand its usage, and assess its authenticity.

Similarly, for an audio file, metadata might include the date and time the file was made, the system that created the file, and technical aspects of the audio, such as whether it is in stereo or mono, the sample rate, and the algorithm, or Codec, used to encode the data. As with file system metadata, an examination of internal file metadata can be important in forensic analysis to help guide the examiner's interpretation of the evidence – its substance, internal patterns, and distinctive characteristics.

There is an important distinction to be made between the Created time stamp recorded in the file system versus the corresponding Created or Creation[2] timestamp internal to the file, as they describe different things. When a user composes a file in an application such as Microsoft Word and saves the file, the time at which the file first comes into being can be the same *inside* the file and as it reported by the *file system*, because those two events happen together. However, when a file is subsequently copied to another medium, these time stamps diverge. After copying a file, the file system metadata of the new file reflects the time the file was copied. However, that does not cause change in the Creation value stored inside the file. Thus, if a file is copied from one medium to another, the only reliable indicator of when it was created is the Creation date internal to the file.

**Hash Values**

As previously indicated, another widely used technology in digital forensic examiners is a set of mathematical algorithms known as cryptographic hashing.[3] A cryptographic hash is a one-way mathematical function that, for any stream of data (e.g., a single file or an entire forensic drive image), produces a fixed length sequence of letters and numbers (a "hash value"), allowing that data to be uniquely[4] identified to a reasonable degree of scientific certainty.

Hashing is routinely performed during the initial collection of ESI, so that copies of the ESI can later be verified as being true and authentic copies of the original, provided the hash values of the copy match the hash values of the original. Hash values are a linchpin in detecting where data has been changed either deliberately or accidentally, which is why e-discovery and digital forensics professionals rely on them so much.

**Ensuring Forensic Reliability of Software Tools**

An important requirement of forensic experts is to ensure that the tools and methodologies are sound and reliable. One of the resources available to the forensic community is the Computer Forensic Tools Testing Program[5] (CFTT), a joint project of the Department of Homeland Security (DHS), NIST and other US federal agencies.

[2] The terminology used by file systems and within files varies, including Created, Creation, and even "birth time" (e.g., prevalent in Unix-based file systems). In this report, I have treated Created and Creation as synonymous.
[3] See http://www.digitizationguidelines.gov/term.php?term=hashalgorithm
[4] Hashing algorithms are designed so that it is computationally infeasible for two different data streams to result in the same hash value. Since the likelihood of this happening is infinitesimally small, two data streams with the same hash value can be proven to be exactly the same data.
[5] https://www.nist.gov/itl/ssd/software-quality-group/computer-forensics-tool-testing-program-cftt

The following, a quote from one of CFTT's test reports, describes the objective and approach of this testing program:

> *The objective of the CFTT program is to provide measurable assurance to practitioners, researchers, and other applicable users that the tools used in computer forensics investigations provide accurate results. Accomplishing this requires the development of specifications and test methods for computer forensics tools and subsequent testing of specific tools against those specifications.*

### Forensic Software Used

The forensic software I used, and upon which I chiefly relied, for my examination of the Audio Recording was X-Ways Forensics, version 21.1. The X-Ways Forensics software has been a staple of the digital forensic community for over two decades, it has been tested by the CFTT, and it is accepted by the digital forensic community as a reliable tool.[6]

I also validated my results with the free open-source software called exiftool, version 12.87. Exiftool has also been in wide use in the digital forensic community for many years, nearly two decades. While it does not appear to have been tested by the CFTT, it has been tested by other organizations[7] and found to be reliable.

## VII. MISSING MESSAGE ANALYSIS

When requested to produce test messages between himself and his son Lucas, Peter Hicks claimed he was unable to do so, on the grounds that they no longer exist.

"After a thorough search of his phone, Plaintiffs have confirmed that no texts between Plaintiffs and Lucas Hicks exist prior to July, 2021."

[ECF No. 51-1, p. 22]

---

[6] See the following link for the results of recent testing of X-Ways Forensics: https://www.dhs.gov/sites/default/files/publications/test_results_nist_string_search_tool_x-ways_forensics_version_19.6-sr-4_x64_march_2019.pdf

[7] For example, a report prepared by the National Library of Australia, in which Exiftool was one of five tools tested, recommended its use as a reliable means of metadata extraction. See https://production.openpreservation.org/system/files/Digital%20Preservation%20Project%20Report%20-%20Testing%20Software%20Tools.pdf

It is my understanding that both the iPhone and iCloud account of Peter Hicks were collected and examined, but the Missing Messages were in neither collection.

I was asked by Defendants' counsel to evaluate the explanations made about Plaintiffs' inability to produce the Missing Messages in light of my knowledge, training, and experience with how iPhones work, as well as how messages are managed in Apple's iPhone technology ecosystem, including the way they are stored, backed up, and transferred to another device.

**Duty to Preserve began in September, 2020**

Referring to September 10, 2020, Plaintiffs state that "Less than a week later, Plaintiffs hired Mr. Robertson in anticipation of the underlying suit." I have been told to assume that Plaintiffs' duty to preserve relevant ESI began at that time in September 2020.

**Why the Missing Messages were missing**

Plaintiffs have made at least two possible explanations regarding how the messages came to be missing:

In his deposition, Peter Hicks explained how he thought his phone may have been damaged, resulting in the loss of the Lucas Hicks messages.

```
Q. And you said you dropped it on the sand?
A. Well, in the sand, yeah. I dropped it --
Q. Did it shatter or break?
A. No, no. What happened was the sand got all up in here.
Q. And you are pointing to where the charging cable appears?
A. Yeah, all of this stuff right here. It might have got in here. That's the only place I could think where it could breach. It got all in here. And I couldn't get the -- I tried to blow-dry the sand out. I tried everything I could, figuring that would potentially solve it, and nothing solved it. And it just got progressively worse and worse. So I couldn't use it anymore.
```

*Deposition of Peter Hicks (Vol. I), p. 94*

However, the next page seemingly presents a different explanation about how the messages could have gone missing, namely that it could have occurred as a result of a faulty data transfer operation by Apple, Peter Hicks testified as follows:

```
Q. How much time passed between when you dropped it and when you upgraded the phone to a new phone?
```

A. Less than a week.

Q. Okay. Were you unable to text on the phone? Did that stop working?

A. I wish I could remember the specifics. All I know is that some things would work, other things wouldn't work, and then more and more things wouldn't work. That's all I remember.

Q. Okay. And if I understood your testimony correctly, then, you didn't do anything personally to transfer data from your old phone to your new phone? That was all done at the Apple store?

A. Yeah, it's way beyond me to be able to do that kind of stuff. So I give it to those guys. I said, Guys, give me a new phone and make everything happen.

*Deposition of Peter Hicks (Vol. I), p. 95*

In relation to this speculation about Apple having lost (or failed to restore) the messages, Plaintiffs have stated "Plaintiff Peter Hicks has since changed his phone, and, **in the process**, lost text messages exchanged with Lucas Hicks. There was no ill-intent in losing those messages." [ECF No. 52, page 4, footnote 16] (emphasis added)

Thus, there were at least two explanations given by Plaintiffs as to why the Missing Messages were not on Mr. Hicks' phone: (i) the phone malfunctioned as a result of damage it sustained at the beach when Mr. Hicks dropped his phone in the sand, and (ii) that the loss of the messages was related to the process of Apple upgrading his previous iPhone to a new model.

### How Messages are Stored

It is important to understand that Apple's messaging technology, both with respect to mobile devices and Apple iCloud, functions by storing messages in a database. The full implementation, of course, is more complex[8] than that, but an accurate description of Apple messages, including SMS and iMessages, is that individual messages are not stored as individual files, perhaps in a folder structure, where one might imagine that a certain folder of data was accidentally deleted or missed. Rather, all the messages are stored together in a single, integrated database file called **sms.db**. All incoming and outgoing Apple messages, with individuals and with group, are all stored in that database.

[8] Similarly, more complex message data such as images, videos, audio attachments are stored in a second database, mms.db, which contains Multimedia Messaging Service (MMS) messages, In that mms.db is based on the same technology (SQLite) as sms.db, it shares similar characteristics, including that selective deletion of MMS data in the mms.db is extremely unlikely to occur at random.

Accordingly, to a reasonable and extremely high degree of technical certainty, it is my opinion that regardless which explanation we consider (dropping the phone on the beach vs. Apple's transfer process), text messages specifically between Peter Hicks and Lucas Hicks would not go missing in either scenario, particularly not the specific set of Missing Messages which relate to relevant issues in this litigation between April 2020 and March 2021. The Text Message Pivot spreadsheet included with this report shows that 343 text message threads between Peter Hicks and Lucas Hicks (other than the Missing Messages) were present on Peter Hicks' phone for the time period between June 2020 and March 2022. If, in the unlikely event that some kind of data loss could have been sustained to the sms.db file, it is my opinion that it would be either a random set of messages lost, or more likely, that the entire sms.db file would be corrupted, deleted, or otherwise completely unusable, resulting in the loss of *all* the messages on the device—not solely the text messages relevant to issues in this lawsuit between the user and one other person (in this case, text messages between Peter Hicks and Lucas Hicks).

It is also my strong opinion that the description Peter Hicks gives of moist sand somehow getting into the device and causing the data loss could not have caused the loss of Peter Hicks's text messages with just one other recipient, nor could it have selectively caused the deletion of only text messages relevant to this litigation, while leaving hundreds of other messages with the recipient unaffected. Unless the iPhone sustained significant damage, which he claims it did not, it is very unlikely in my opinion that sand could have entered anything other than the charging port and could have penetrated the sealed inner workings of the device. There are many reasons that iPhones periodically fail to function, but when they fail, it is extremely unlikely to result in selective data loss in the sms.db database or its Multimedia counterpart, mms.db.

Based on my training and experience, I conclude that the explanation that the data was somehow lost by Apple during the data transfer to a new phone to be equally unconvincing. While no software is perfect, Apple's process[9] for backing up and restoring iPhones is mature, reliable, and well established. In my experience and in my research, there are occasional reports[10] of problems, typically having to do with the loss of internet connection during a restore, faulty cables and ports, or a malfunction that prevents a backup or restore entirely, which is often solved by troubleshooting. However, I am unaware of any reports, nor would it be consistent with the way the technology works, that selective messages (i.e.,

---

[9] https://support.apple.com/en-us/108771
[10] See, for example: https://discussions.apple.com/thread/253692909?sortBy=best and https://discussions.apple.com/thread/254258092?sortBy=best

only with one recipient and only those relevant to issues in this lawsuit), could be "missed" in a backup or restore operation.

**Missing means Deleted**

In consequence of the way that messages are handled (sms.db) both on an iPhone and in the backup and restore process, it is my opinion that it is not possible that only certain messages between Peter Hicks and Lucas Hicks that are relevant to this lawsuit would either have been accidentally corrupted by a malfunctioning device, or have been "missed" in the backup/restore process. Therefore, it is my opinion, to a reasonable and extremely high degree of technical certainty, that the Missing Messages became lost or missing because they were deleted selectively by intentional user action.

## VIII. AUDIO RECORDING ANALYSIS

I received from counsel an audio file named "LH_00000342.WMA." The first thing I noticed was that no hash value was provided, and to the best of my knowledge, the provenance of this file is not documented in that there is no chain of custody, a narrative description of the way in which it was collected, and the credentials of the individual who collected it. Accordingly, the best and most reliable tools for confirming that it is a true and correct copy of an original audio recording on an iPhone are unavailable, already raising serious questions about its authenticity.

Next, I undertook to analyze it, chiefly by scrutinizing its internal file metadata. After creating a case file in X-Ways Forensics, I loaded the Audio Recording and using the Refine Volume Snapshot command, processed it and extracted its metadata. To cross-validate the results, I also examined the file with the software called Exiftool.[11] Both tools produced similar results, and the metadata export of X-Ways is attached as **Exhibit B**, while the metadata export from Exiftool is attached as **Exhibit C**.

In relation to the LH_00000342.WMA file, I found several attributes of significance, among them the Creation date, Codec name, and encoding settings, as listed in the table below.

[11] https://exiftool.org/

| Metadata Property | Value |
|---|---|
| Creation | 09/12/2022 07:11:22 -6 |
| Codec name | Windows Media Audio 9.2 |
| Encoding Settings: | |
| nSamplesPerSec | 44100 |
| bitrate | 48024 |
| nChannels | 1 |

*Metadata extracted from LH_00000342.WMA by X-Ways Forensics*

These values are significant in part because they indicate that the audio diverges from what would be expected of a file recorded on an iPhone, particularly in April of 2020.

In the absence of information about the origin of the file, it is difficult to make definitive judgements about it. However, starting with my understanding that a recording was purportedly made on Lucas Hicks' iPhone, it is reasonable to consider that it may have been created with the very easy to use and accessible app called Voice Memos, a built-in app that comes with all iPhones.

From my research and experimentation, the default settings of Apple Voice Memos in 2020 included using the Apple-invented encoding technology called "Apple iTunes AAC-LC (.M4A) Audio," with a sample rate of 48000, a bitrate in the range of 65.4 kbps, and in stereo.

Each of the internal file metadata properties is inconsistent with what would have been expected from an iPhone audio recording made in 2020, starting with the Creation date 09/12/2022!

Another red flag is that the Audio Recording is not in Apple's format, but rather in Windows' format. Windows Media Audio or WMA, though compatible with many versions of Windows, is an outdated format and it is extremely unlikely that the Audio Recording was made on an iPhone, in WMA format. This means that it was likely converted from Apple's M4A file type into the WMA file type.

In process of the conversion from one format to another, some important encoding settings appear to have changed, such as the sample rate, which can be thought of as the degree of granularity of the sound input, and the bitrate, which can be thought of as how much data is devoted to storing the compressed the sound output. Both these values in the WMA file are smaller than the default of Apple's Voice Memos, and the WMA audio is only one channel – mono – in contrast to the Voice Memos. It is likely, in my opinion, that there has been a loss of data precision, complicating any attempt to determine whether the Audio Recording has been tampered with, including whether some portions are simply fabricated.

These apparent discrepancies in the Audio Recording could have been mitigated by adhering to well-known and accepted e-discovery principles in managing ESI. If the following existed—chain of custody, documentation of collection by a qualified person, storage of the data in a tamper-resistant manner, and the calculation of a Hash Value at the time it was collected—it would likely go a long way to proving that the Audio Recording is what it purports to be. However, the evidence that the Audio Recording accurately portrays the contents of the April 2020 phone call is scant, limited perhaps to its contents. However, given today's (and 2020-2022) technology, even the contents are suspect.

**Availability of Deep Fake Technology**

Increasingly, over the past several years, the possibility of fabricated or tampered audio, so-called "Deep Fakes," has been more prominent. From my research, it appears that technology was available during the relevant period, for a knowledgeable user to have changed the Audio Recording in ways that would be extremely difficult to detect.

In a blog post[12] dated September 17, 2019, a provider of podcast editing software announced the following:

> *In 2017, Alexandre de Brebisson, Kundan Kumar, Jose Sotelo, PhD students studying at MILA under Yoshua Bengio, launched a startup called Lyrebird, allowing anyone to generate a realistic text-to-speech model of themself by uploading a few minutes of audio.*

The ease with which audio can be professionally edited increases the importance of relying on the proven methodology of e-discovery, and it makes it very difficult to rely on the accuracy of the Audio Recording, because it bears none of the hallmarks of authenticity. It is my opinion, to a reasonable degree of technical certainty and based on my experience and training, that the Audio Recording (in its current form) is not the original recording of the April 2020 phone call. Moreover, as an altered copy it does not meet the standards necessary to be followed to substantiate it as a legitimate or reliable copy of an original audio recording.

## IX. OPINIONS AND SUMMARY OF FINDINGS

Based on my training and experience, and the tested accuracy of the software that I used, and the reliable examination processes I followed, I express the following opinions:

[12] See https://www.descript.com/blog/article/introducing-descript-podcast-studio-overdub

In my opinion, the only explanation for the loss of Peter Hicks' numerous relevant text messages with Lucas was that the text messages were selectively and intentionally deleted.

Moreover, for numerous reasons, the audio file LH_00000342.wma cannot be authenticated as a true copy of a recording made by Lucas Hicks of the April 2020 telephone call. The audio file that I was provided bears none of the usual indicators of authenticity such as matching Hash Values; moreover, there are several serious discrepancies, as described above. The internal file metadata Creation date indicates that it was created more than two years after the call, September of 2022 versus April of 2020, the Audio Recording is stored in a file type inconsistent with the technology on which its creation was claimed, and its internal settings indicate that it was likely converted with a loss of data.

To the extent additional information is provided regarding the Missing Messages and/or the Audio Recording, I reserve the right to respond to such claims and provide additional information.

Respectfully submitted,

H. Scott Tucker

# EXHIBIT

# A

# CURRICULUM VITAE OF H. SCOTT TUCKER

## Contact Information

Name: H. Scott Tucker
Email: scott.tucker@aptegra.com
Office Telephone: (801) 999-8171
Mobile Telephone: (801) 930-0339

## Experience

**Aptegra Consulting, LLC** Lehi, UT 2005-Present
*President*

- President of firm offering digital forensics and Information Technology consulting
- Certified Cellebrite Advanced Apple Forensic Examiner (CAAF)
- Certified Mobile Forensics Examiner (CMFE)
- Oxygen Forensic Certified Instructor (OFCI)
- Certified Computer Forensics Examiner (CCFE)
- Certified Information Systems Security Professional (CISSP)
- Course Author and Adjunct Instructor of *Digital Forensics* (IS 6571) in the University of Utah's Master of Science in Information Systems (MSIS) and Master of Science in Cybersecurity Management (MSCM) programs
- Experienced in smartphone and computer data collection, data recovery, file system and internal document metadata analysis, Windows registry analysis, and email/file system search
- Experienced in working within stipulations, protective orders, and negotiated discovery protocols to ensure privacy of non-case-related data
- Experienced with deposition testimony and creating expert reports and rebuttals

### Classes and Presentations Presented

- 2023 Adjunct instructor: *Digital Forensics* (IS 6571) University of Utah
- 2022 Adjunct instructor: *Digital Forensics* (IS 6571) University of Utah
- 2021 Adjunct instructor: *Digital Forensics* (IS 6571) University of Utah
- 2020 Adjunct instructor: *Digital Forensics* (IS 6571) University of Utah
- 2019 Adjunct instructor: *Digital Forensics* (IS 6571) University of Utah
- 2019 *SQLite Databases*, Computer Technology Investigator's Network (CTIN) Annual Conference 2019, Redmond WA
- 2018 Instructor: Oxygen Forensic Complete Course presented to High Intensity Drug Trafficking Area (HIDTA) Task Force members, Phoenix, AZ
- 2018 Adjunct instructor: *Digital Forensics* (IS 6571) University of Utah
- 2018 *Cyberlaw Symposium*, Keynote Speaker: *Case Studies in Digital Forensics*, Utah State Bar Association, Cyberlaw Section, Lehi, Utah
- 2017 *Scope and Future of Digital Forensics* panel discussion, Data Security Council of India (DSCI) Annual Information Security Summit, Delhi, India.
- 2017 Adjunct instructor: *Digital Forensics* (IS 6571), University of Utah
- 2017 *SQLite Forensics: A Case Study*, Computer Technology Investigator's Network (CTIN) Annual Conference 2017, Redmond WA

- 2017 *Email Forensics: A Case Study*, Computer Technology Investigator's Network (CTIN) Annual Conference 2017, Bellevue WA
- 2016 *Secure by Design* panel discussion, Enigma'16 Cyber Security Conference, Symbiosis Centre for Information Technology, Pune, India
- 2016 Adjunct instructor: *Digital Forensics* (IS 6571), University of Utah
- 2015 *Navigating the Changing Landscape of Digital Forensics*, Executive Summit, American College of Forensic Examiners Institute, Santa Barbara, CA
- 2015 Adjunct instructor: *Digital Forensics* (IS 6571), University of Utah
- 2014 Utah State Bar Association Fall Forum presentation (with Hon. David Nuffer) entitled *Yours*, *Mine and Ours*
- 2014 Adjunct instructor: *Digital Forensics* (IS 6571), University of Utah
- 2013 Adjunct instructor: *IT Security* (IS 6570) and *IT Forensics* (IS 6571), University of Utah
- 2012 Adjunct instructor: *IT Forensics* (IS 6571), University of Utah

**Certifications and Professional Organizations**

- Certified Apple Advanced Forensic Examiner (CAAF), Cellebrite
- Certified Apple Intermediate Forensic Examiner (CAIF), Cellebrite
- Certified BlackLight (Digital Inspector) Examiner, Cellebrite
- Certified Mobile Forensics Examiner (CMFE), Information Assurance Certification Review Board (IACRB)
- Oxygen Forensic Certified Instructor (OFCI), Oxygen Forensics, Inc.
- Oxygen Forensic Detective Expert User, Oxygen Forensics, Inc.
- Certified Computer Forensics Examiner (CCFE), Information Assurance Certification Review Board (IACRB)
- Member, Board of Directors, Computer Technology Investigators Network (CTIN)
- Member, High Tech Crime Investigation Association (HTCIA)
- Member, Association of Certified Fraud Examiners (ACFE)
- Certified Information Systems Security Professional (CISSP), International Information Systems Security Certification Consortium (ISC)2
- Certified Cyber Forensics Professional (CCFP), International Information Systems Security Certification Consortium (ISC)2
- Oxygen Forensic Suite User Certification, PATCtech
- A+ Certification, CompTIA
- Amateur Radio License, Technician class (KF7JPB), US Federal Communications Commission

**Prior Testimony in the Past 4 Years**

- 8/21/2023 Vox Marketing Group LLC vs. Prodigy Promo LC et al., Case No. 160401386, State of Utah Fourth Judicial District Court, Utah County
- 2/22/2023 Estate of Kristina Martinez vs. Lint et al, Case No. 210301094, State of Utah Third Judicial District Court, Tooele County
- 8/11/2022 Omnishield Pest Control et al vs. Corbin et al, Case No. CV2020-017359, Superior Court of the State of Arizona, Maricopa County
- 1/13/2022 Brent Tanner vs. Kinnon Sandlin and Simon Hoyle, Case No. 200401605, State of Utah Fourth District Court, Utah County
- 11/30/2021 State of Utah vs. Christopher Weaver, Criminal No. 201501532, State of Utah Fifth District Court, Washington County
- 11/1/2021 Westshield Utah LLC vs. Robert S. Michaels, et al, Case No. 186932168, State of Utah Third Judicial Court, Salt Lake County

- 5/20/2020 Vox Marketing Group, LLC vs. Prodigy Promos L.C., et al, Case No. 2:18-cv-00632-HCN-PMW, United States District Court for the District of Utah
- 3/12/2020 Data Engine Technologies LLC vs. Google LLC, C.A. Case No. 14-1115 (LPS), United States District Court for the District of Delaware

**Conferences, Seminars, and Training Attended**

- 2/8/2024-2/9/2024 Metaspike Email Forensics Training, Online Class
- 9/19/2023-9/21/2023 High Tech Crime Investigation Association (HTCIA) International Conference and Expo, Phoenix, AZ
- 1/26/2023 SQLite Forensics with Belkasoft (Certificate of Achievement), Online Class
- 12/9/2022 A Deep Dive into Cell Phone Records and Tower Dumps, LLRMI, Online Class
- 9/7/0222-9/9/2022 Cellebrite Apple Advanced Forensics, Online Class
- 8/1/2022-8/3/2022 Cellebrite Apple Intermediate Forensics, Online Class
- 7/18/2022-7/21/2022 Cellebrite Computer Forensic Fundamentals, Online Class
- 9/21/2020-9/22/2020 Paraben's Forensic Innovations Conference, Online Class
- 7/27/2020-8/3/2020 Autopsy Basics and Hands On Training, Online Class
- 6/1/2020-6/5/2020 Oxygen Forensics Train the Trainer, Live Online Class
- 5/2/2021-7/26/2021 FOR500 – Windows Forensic Analysis, SANS Institute, Online Class
- 2/3/2020-2/6/2020 Oxygen Forensic Mobile Extraction Class, Salt Lake City, UT
- 11/5/2019-11/7/2019 Oxygen Forensic Detective Boot Camp, Las Vegas NV
- 9/10/2019-9/12/2019 Paraben's Forensic Innovations Conference, Park City, UT
- 5/22/2019-5/24/2019 Computer Technology Investigators Network Conference, Redmond, WA
- 9/5/2018-9/6/2018 Paraben's Forensic Innovations Conference, Park City, UT
- 4/12/2017-4/14/2017 Computer Technology Investigators Network Conference, Redmond, WA
- 8/14/2015 Mangrum and Benson on Expert Testimony, Salt Lake City, UT
- 3/16/2015-3/18/2015 Computer Technology Investigators Network Conference, Seattle, WA
- 3/2/2015-3/3/2015 X-Ways Forensics II Course, Washington, DC
- 11/12/2014-11/14/2014 Paraben's Forensic Innovations Conference, Snowbird, UT
- 10/23/2014-10/24/2014 Oxygen User Conference and Training, Las Vegas, NV
- 7/8/2014-7/22/2014 X-Ways Forensics Practitioner's Guide Online Course I
- 5/19/2014-5/22/2014 Computer and Enterprise Investigations Conference, Las Vegas, NV
- 11/13/2013-11/15/2013 Paraben's Forensic Innovations Conference, Snowbird, UT
- 9/26/2013 Intermountain eDiscovery Conference, Salt Lake City, UT
- 5/19/2013-5/22/2013 Computer and Enterprise Investigations Conference, Orlando, FL
- 4/22/2013-4/25/2013 AccessData User Conference, Las Vegas, NV
- 11/3/2012-11/6/2012 Paraben's Forensic Innovations Conference, Park City, UT
- 9/13/2012 Intermountain eDiscovery Conference, Salt Lake City, UT
- 5/8/2012-5/10/2012 AccessData User Conference, Las Vegas, NV
- 5/21/2012-5/24/2012 Computer and Enterprise Investigations Conference, Las Vegas, NV
- 4/25/2012 NBI: Evidence and Expert Testimony Best Practices, Salt Lake City, UT
- 3/25/2012-4/1/2012 ACFEI Effective & Credible Expert Witness Testimony, Ft. Lauderdale, FL
- 11/5/2011-11/9/2011 Paraben's Forensic Innovations Conference, Park City, UT
- 11/15/2010-11/17/2010 X-Ways Forensics Software Training, Reston, VA
- 11/7/2010-11/10/2010 Paraben's Forensic Innovations Conference, Park City, UT
- 10/25/2010-10/26/2010 TechnoForensics Conference, NIST Headquarters, Gaithersburg, MD
- 9/24/2010 Intermountain eDiscovery Conference, Salt Lake City, UT
- 1/28/2007-1/31/2007 IFIP WG 11.9 International Conference on Digital Forensics, National Center for Forensic Science, UCF, Orlando, FL

**Publications**

- *Protecting Data from Threats Far and Near*, Attorney at Law Magazine, Greater Salt Lake City Edition Vol. 6, No. 1. See http://bit.ly/hst-protectingdatafarandnear
- *I Think our Email Has Been Hacked!* Attorney at Law Magazine, Greater Salt Lake City Edition Vol. 4, No. 1. See http://bit.ly/hst-emailhacked
- *Exif: It's Just Metadata*, Attorney at Law Magazine, Greater Salt Lake City Edition Vol. 2, No. 1. See http://bit.ly/hst-exifitsjustmetadata
- *BYOD: Bring Your Own Discovery*, Attorney at Law Magazine, Greater Salt Lake City Edition Vol. 1, No. 2. See http://bit.ly/hst-bringyourowndiscovery
- *Smartphones are Everywhere*, Attorney at Law Magazine, Greater Salt Lake City Edition Vol. 1, No. 1. See http://bit.ly/hst-smartphones
- Principal contributor to the Computer History Museum's 2004 oral history entitled *PC Software Workshop: Lotus 1-2-3*. See www.computerhistory.org/collections/catalog/102658156

**Tiens Group, LLC** Midvale, UT 2017
*acting CIO*

- While a contractor, acted as Chief Information Officer of a direct selling startup, a US subsidiary of a Chinese multinational conglomerate. (See http://tiens-us.com)
- Supervised setup of IT infrastructure, including network, computers, printers, telephone system, domain name, Google Suite, Office 365, and other online services.

**SkillRazor, LLC** Draper, UT 2008-2009
*CTO, acting COO*

- While a contractor, acted as general manager of a software startup specializing in online education and coaching within a custom-built social network built using Ruby on Rails
- Broad responsibilities, including overall strategy, marketing (positioning and messaging), finance (budget and forecast), and software development management
- Using agile processes, led the development team from concept to release in under a year

**KMT Software, Inc.** Cambridge, MA 1992-2005
*Chief Technical Officer*

- After being retained as an expert witness in Caldera vs. Microsoft (DR-DOS), 1998-2001, I established a software development team in Pune, India, eventually employing 30+ developers
- Managed the development of dozens of end-user software products, including HP's *Real Estate Marketing Assistant*, Corel's *WordPerfect OfficeReady*, and TemplateZone's *High Impact eMail*
- Relationship manager for some of KMT's most valued clients, including Hewlett-Packard and Corel. Managed several custom projects from brainstorming to completed development
- Author or co-author of the following books:
  - The Winning Forms series (e.g., ISBN 0679742921)
  - Excel Power Toolkit (ISBN 1566046572)
  - Lotus 1-2-3 Power Tools (ISBN 055334966X)

*Vice President*

- Co-founder and principal software developer, using VB, InstallShield script, and Windows API
- Contributed to all major office products, including MS Works, StarOffice (OpenOffice.org), Quattro Pro, Corel Office; principal developer of the 1-2-3 SmartMasters technology
- Designed and programmed a custom budget system for a major Boston healthcare firm
- Conducted technical seminars on creating SmartMasters for Lotus 1-2-3 Release 5

- As a contractor, completed a 30-city U.S./Latin America tour introducing Lotus 1-2-3 Release 5

**Lotus Development Corp.** Cambridge, MA 1985-1992
*Director of Product Development, Spreadsheet Division*
- Managed a team responsible for all external interfaces to Lotus spreadsheet products, including user interface, localization, setup, file format, add-ins, and programmability
- Responsibilities included all OS platforms, including Windows, OS/2, DOS, and Unix/Solaris
- 1986-1992 Speaker at annual Developer Conferences by Lotus Development Corporation
- Author or co-author of the following books:
  - Lotus Guide to Spreadsheet Publishing (ISBN 0135393132)
  - Inside Lotus 1-2-3 Macros (ISBN 0134679784)
  - The Illustrated Symphony Book (ISBN 0915381885)

*Director, Consulting Division*
- Helped incubate Lotus's consulting division
- Consulted to several major Lotus clients, including Sears and Owens-Corning

*1-2-3 Product Manager*
- Responsible for the product marketing function of Lotus 1-2-3 (strategy, messaging); later assigned to lead the design of the next major releases of Lotus 1-2-3
- Performed extensive field research to determine needs and to establish relationships with key customers (e.g., originated and managed product councils and alpha program)
- Principal designer of Lotus 1-2-3 Releases 2.2 and 3.0
- Co-inventor of US Patent 5,312,478 on the 3D Spreadsheet, filed 4/11/90

*Manager of Developer Marketing*
- Wrote a developer newsletter, with emphasis on maintaining compatibility with new releases
- Managed publication of a book on document file formats and the Add-in Toolkit
- Organized Lotus's first annual developer conference in 1986

**OptionWare, Inc.** Hartford, CT 1983-1985
*Various positions leading to Director, R&D*
- Lead developer and manager of a team that created a library of business applications
- Early user of email and pre-internet technologies (e.g., Compuserve, RBBS-PC)
- Consulted to Mosaic and Paperback Software on compatibility of "clone" spreadsheets

## Education

**Brigham Young University** Provo, UT 1983
- Master of Business Administration, Finance

Dean's List (Top 5%), Beta Gamma Sigma, Phi Kappa Phi

**Dalhousie University** Halifax, NS, Canada 1981
- Bachelor of Commerce, Marketing

## Community Service

**Hearts Knit Together, a 501(c)(3) organization** 2015-Present

Hearts Knit Together (heartsknittogether.org) is a non-profit organization that delivers much-needed personal items to those escaping domestic violence, sexual abuse, or war. Volunteers collect, craft, and assemble kits which include hygiene items, toys, games, puzzles, clothing and stuffed animals for the children. These kits are distributed through violence shelters, victim support centers, and refugee organizations, to children and adults across the state of Utah. Its mission is to offer joy and order in the lives of those in our community who need it the most.

*Member, Board of Directors*

- Helped register HKT as a 501(c)(3) entity
- Established IT infrastructure, including registering the domain name and setting up Google Suite and Facebook accounts

# EXHIBIT

# B

Data from the Volume Snapshot

| | |
|---|---|
| **Name** | LH_00000342.wma |
| **Existent** | ✓ |
| **Description** | existing, copied |
| **Ext.** | wma |
| **Type** | wma |
| **Type status** | confirmed |
| **Type descr.** | Windows media |
| **Type category** | Audio |
| **Evidence object** | LH_00000342.wma |
| **Path** | \ |
| **Full path** | \LH_00000342.wma |
| **Parent name** | \ |
| **Size** | 10.6 MB (11,142,872) |
| **Created** | 06/08/2024 20:58:34.5 -6 |
| **Modified** | 05/31/2024 13:01:18.2 -6 |
| **Accessed** | 06/08/2024 21:00:31.1 -6 |
| **Content created** | 09/12/2022 07:11:22.8 -6 |
| **Attr.** | XA |
| **ID** | 2 |
| **Int. ID** | 1 |
| **Int. parent** | 0 |
| **Unique ID** | 0-1 |
| **Unique ID as GUID** | 00000001-0000-4000-9C31338555C3139A |
| **MD5** | 82AAF29D5917466494ACCA570319A43C |
| **SHA-1** | 0371604642CC6252BF0382844734BD6EF98B3213 |

Internal Metadata retrieved from the File Contents

### Advanced Streaming Format

**Extended Content Description** (2640 bytes)

| | |
|---|---|
| **WM/Codec** | WMA 9.2 |
| **WM/EncodingSettings** | 48 kbps, 44 kHz, mono CBR |
| **GW/EncoderProfile** | <profile version="589824" storageformat="1" name="" description=""> <streamconfig majortype="{73647561-0000-0010-8000-00AA00389B71}" streamnumber="1" streamname="" inputname="" bitrate="48024" bufferwindow="-1" reliabletransport="0" decodercomplexity="" rfc1766langid="en-us" > <wmmediatype subtype="{00000161-0000-0010-8000-00AA00389B71}" bfixedsizesamples="1" btemporalcompression="0" lsamplesize="0"> <waveformatex wFormatTag="353" nChannels="1" nSamplesPerSec="44100" nAvgBytesPerSec="6003" nBlockAlign="2230" wBitsPerSample="16" codecdata="008800000F0000000000"/> </wmmediatype> </streamconfig> </profile> |

| | |
|---|---|
| **WMFSDKVersion** | 12.0.19041.1889 |
| **WMFSDKNeeded** | 0.0.0.0000 |
| **IsVBR** | false |

**File Properties** (104 bytes)

| | |
|---|---|
| **Creation** | 09/12/2022 07:11:22 -6 |
| **Play duration** | 0:30:29 h |
| **File size** | 11142872 |
| **File ID** | {3A4816D3-76EF-477B-A268-A525E82493EB} |

**Header Extension** (4307 bytes)

**Codec list** (170 bytes)

| | |
|---|---|
| **Codec name** | Windows Media Audio 9.2 |
| **Codec description** | 48 kbps, 44 kHz, mono 1-pass CBR |

**Stream properties** (114 bytes)

| | |
|---|---|
| **Stream Type** | Audio(1) |
| **Codec** | 353 |
| **Channels** | 1 |

**Stream Bitrate Properties** (32 bytes)

# EXHIBIT

# C

# Exiftool Metadata Export

| | |
|---|---|
| SourceFile | LH_00000342.wma |
| ExifToolVersion | 12.87 |
| FileName | LH_00000342.wma |
| Directory | . |
| FileSize | 11 MB |
| ZoneIdentifier | Exists |
| FileModifyDate | 2024:06:18 11:51:43-06:00 |
| FileAccessDate | 2024:06:22 10:57:07-06:00 |
| FileCreateDate | 2024:06:22 10:56:04-06:00 |
| FilePermissions | -rw-rw-rw- |
| FileType | WMA |
| FileTypeExtension | wma |
| MIMEType | audio/x-ms-wma |
| Codec | WMA 9.2 |
| EncodingSettings | 48 kbps, 44 kHz, mono CBR |
| FileID | 3A4816D3-76EF-477B-A268-A525E82493EB |
| FileLength | 11142872 |
| CreationDate | 2022:09:12 13:11:22Z |
| DataPackets | 4925 |
| Duration | 0:30:30 |
| SendDuration | 0:30:30 |
| Preroll | 1579 |
| Flags | 2 |
| MinPacketSize | 2261 |
| MaxPacketSize | 2261 |
| MaxBitrate | 48.6 kbps |
| IsVBR | FALSE |
| AudioCodecName | Windows Media Audio 9.2 |
| AudioCodecDescription | 48 kbps, 44 kHz, mono 1-pass CBR |
| StreamType | Audio |
| ErrorCorrectionType | Audio Spread |
| TimeOffset | 0 s |
| StreamNumber | 1 |
| AudioCodecID | Windows Media Audio V2 V7 V8 V9 / DivX audio (WMA) / Alex AC3 Audio |
| AudioChannels | 1 |
| AudioSampleRate | 44100 |