Erik A. Christiansen, USB #7372
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher Robertson (*pro hac vice*)
**SEYFARTH SHAW LLP**
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: 617.946.4989
Facsimile: 617.790.6774
crobertson@seyfarth.com

*Attorneys for Plaintiffs PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PETER HICKS; HICKS, LLC; and WASATCH HICKS, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>TREVOR R. MILTON; M&M RESIDUAL, LLC; and T&M RESIDUAL, LLC,<br><br>Defendants. | **RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00166<br><br>Judge: Hon. Howard C. Nielson, Jr<br><br>Magistrate Judge: Hon. Daphne A. Oberg |

Plaintiffs Peter Hicks, Hicks, LLC ("the LLC"), and Wasatch Hicks, LLC (collectively "Plaintiffs"), submit this response to Defendants' Motion for Summary Judgment (the "Motion"). The Motion should be denied for multiple reasons.

To begin, Defendants are not arguing that they did not defraud Plaintiffs through misrepresentations and lies about Nikola's business. Mr. Milton's criminal conviction answers that question. Instead, Defendants argue that Mr. Milton's lies and deception somehow did not cause the losses suffered by investors (including Plaintiffs) when those lies were exposed. And then, incredibly, they argue that Plaintiffs did not suffer damages when the stock option provided as part of the transaction lost millions of dollars of value when the fraud was exposed. First, Defendants

have plainly suffered damages, and the amount of those damages must be left for trial. Defendants' argument that Plaintiffs cannot prove damages simply because Hicks sold the Wasatch Creeks Ranch (the "Ranch") for more than he bought it for misses the point, entirely. The option to purchase shares of Nikola that Trevor Milton used as a "sweetener" to induce Hicks to sell the Ranch (the "Option") had value, which was undisputably inflated by Milton's lies. Defendants' own expert concedes that the Option had value, he just quibbles with the amount established by Plaintiffs' expert. Those are questions classically left for a factfinder to answer.

Second, Plaintiffs have proved loss causation. For the reasons stated in Plaintiffs' summary judgment motion, all issues related to loss causation were fully litigated in Milton's criminal trial, even if "loss causation" was not a formal element of the criminal charges against him. But also, it cannot reasonably be disputed that Milton's conduct, which was uncovered by the Hindenburg report, "caused" Nikola stock to plummet in value. This is not a case where small corrective disclosures "leaked" out to the market over the course of several years, leaving one to wonder whether other factors during that time period may have caused the decline in a stock price. Rather, the Hindenburg Report was a proverbial burst pipe that exposed a massive fraud and drenched the market with Milton's misrepresentations about Nikola. Indeed, Defendants have not even tried to identify some alternative reason for the decline in the stock's value. And when faced with a nearly identical argument recently, an arbitration panel found that Milton's "no causation" argument was "demolished" by the Hindenburg report.

Third, Plaintiffs have demonstrated sufficient damage under the Utah Uniform Securities Act (the "Act"). Loss causation is not an element for claims under the Act; defrauded investors can recover the "consideration paid for the security." And here, there can be no dispute that Hicks paid consideration for the security, *i.e.*, the Ranch. Milton surely thought the Option had value, otherwise,

he would not have offered it as partial consideration for the Ranch. The parties' respective experts disagree as to the value of the Option based on the date of its valuation, but that is an issue that cannot be resolved on summary judgment and must be left for trial.

For these reasons, the Motion should be denied.

**RESPONSE TO DEFENDANTS' "UNDISPUTED MATERIAL FACTS"**

To avoid restating undisputed fact that are immaterial, Plaintiffs' state the following Paragraphs of Defendants' "Undisputed Material Facts" are immaterial (hereinafter referred to collectively as "**Immaterial Facts**"): 1–4, 6–13, 15–23, 26–36, 38–41, and 46–47.

Facts are material if they "affect the outcome of the suit under the governing law" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) or are "essential to the proper disposition of the claim." *Lazy S Ranch Properties, LLC v. Valero Terminaling and Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). "Only facts necessary to decide the motion should be included in this section." DUCivR 56-1(b)(3).

As will be provided in Plaintiffs' Argument Section, the substantive law does not take into consideration Defendants' Immaterial Facts. Nevertheless, Defendants wholly failed to even cite the Immaterial Facts in their Argument Section. Indeed, most of the Immaterial Facts simply recite communications leading up to the Ranch transaction, but do not otherwise touch on damages. This, in of itself, demonstrates the Immaterial Facts neither "affect the outcome of the suit" nor are "essential to the proper disposition of the case." If the substantive law called for the use of these facts, Defendants would have included them in their Argument Section. But they have not — inherently demonstrating the immateriality of their facts. Accordingly, the inclusion of the Immaterial Facts is a violation of this Court's local rules and should be disregarded.

5. At or around the time Peter Hicks closed on his purchase of the Property for $6.85

million in March 2020, he created a document stating his expectations for reselling the Property at a profit. He wrote that for resale within 1 year, $7.5 million would be below average and $8.5 million would be average, and that for resale within 2 years, $7.5 million would be below average, $9 million would be average, and $10 million would be above average. **Dkt. 111-14**, **Ex. I**, P. Hicks Dep. Vol. I, 53:17 to 55:20; **Dkt. 111-15**, **Ex. J**, Word Document Created by P. Hicks.

**Plaintiffs' Response:** The document speaks for itself. Further responding, the document confirms that Hicks was not willing to sell the ranch at the price initially proposed by Milton, and he needed additional value to be induced to sell the property, which Milton later provided in the form of an increased offer that included both cash and the Option.

12. Peter Hicks' adult son Lucas Hicks is a Yale graduate with experience working in investment banking as a stock analyst, and has experience in reviewing and researching SEC filings about companies to analyze their stock. Lucas Hicks used his experience in investment banking to assist Peter Hicks' investigation and analysis of the option to purchase Nikola stock, in connection with negotiations for the sale of the Property to Milton. **Dkt. 111-20**, **Ex. O**, March 21, 2024 Deposition of Lucas Hicks, 11:13 to 12:22, 20:22 to 22:8, 67:20 to 68:10; **Dkt. 111-14, Ex. I**, P. Hicks Dep. Vol. I, 75:25 to 78:11, 123:12 to 124:3.

**Plaintiffs' Response:** Disputed and immaterial. Lucas Hicks testified that at the time around the Ranch transaction, he was still an undergraduate student and had only worked as an investment banking intern for a few weeks during the summer. As he testified, at that time, he knew far less than he does now about investments. He also testified that he did not review any SEC filings in detail. **Dkt. 111-20, Ex. O**, March 21, 2024 Deposition of Lucas Hicks, 20:22 to 22:8, 49:19 to 50:2.

14. Peter Hicks testified that the statements Milton made during the April 10, 2020 phone call that "mattered to me" were that "[Milton] indicated that he had $14 billion worth of truck orders

and 80 percent of them he could make hard if he wanted to," "[h]e referred to various types of intellectual property that Nikola had, and in general terms, he talks about cornering the hydrogen fuel truck market between Phoenix and LA," "[h]e talked about… [g]etting the electric at a rate way below the prevailing market, which translated to getting hydrogen at a quarter or less of the prevailing cost of hydrogen…, " and "[h]e had consummated 13 routes with Anheuser-Bush. He had located and was creating the stations that were necessary to dispense the fuel…." **Dkt. 111-14, Ex. I**, P. Hicks Dep. Vol. I, 107:22 to 109:22; 117:12-118:24.

**Plaintiffs' Response:** Disputed and immaterial. Peter Hicks testified there were additional matters discussed during the phone call that influenced his decision. Further responding, Hicks was asked questions in detail about what he was told by Milton during the criminal trial and cross examined extensively about these issues. **Dkt. 83, Ex. 20-30 to Ex. 20-33**, Transcript of *USA v. Milton* (1:21-cr-00478) ("Milton Criminal Transcript"), Direct Examination of Peter Hicks at 2029-2199. For example, Peter Hicks was questioned about specific statements made by Milton that certain items were not aspirational but had already occurred, to which Milton responded that they had already occurred. **Dkt. 83,** Milton Criminal Transcript **Ex. 20-30** at 2049, 2055, 2059, **Ex. 20-31** at 2061. Among those items were issues such as technology, construction of hydrogen stations, electricity pricing and related issues. Milton's criminal conviction confirmed that he had lied about all these issues.

17. Nearly two months after the potential deal in April 2020 had died, on June 1, 2020, Milton was in town and contacted Peter Hicks (through Anderson), asking if he could tour the Property. Milton texted a new offer to buy the Property that afternoon, after touring it with Anderson:

> $8.5m cash. 30 day due diligence. 15 day close. 1mm deposit. $8.5m of options at today's closing price. 6 months from merger options are available for exercise. No obligation to exercise if you don't want. If shares are $67.94 at 6 month mark, you only pay $33.97 per share and make the difference. Shares can instant be sold that day

> on the Nasdaq. The 33.97 is real time quote but the option will be at today's closing price if you sign the contract today.

**Dkt. 81-5, Ex. 4** at HICKS 14; **Dkt. 111-10, Ex. E**, Anderson Dep., 76:17 to 79:14.

**Plaintiffs' Response:** Undisputed but Immaterial. Further responding, in the communication itself, Milton specifically identified a target price for the shares of at least double by referencing $67.94 in six months. By his own statement, he was representing his belief that the Option had significant value based on his expectation that it would double value in six months. This is consistent with Mark Gale's testimony that Milton used stock options as "sweeteners" when property sellers were reluctant to sell and had not listed their properties for sale. **Robertson Aff. at ¶ 2, Ex. 1**, May 7, 2024 Deposition of Mark Gale ("Gale Deposition"), 84:15 to 85:6**.**.

23. The parties executed Amendment No. 1 to the Option Agreement on August 14, 2020. The Option Amendment addressed two main issues: (1) amending the Exercise Period of the Option to begin on December 1, 2020 and end on December 31, 2020; and (2) confirming the parties' understanding of an adjustment to the number of shares and share price of the Option required under the terms of the original Option Agreement to reflect a stock conversion that occurred after the Option Agreement had been signed. **Dkt. 81-11, Ex. 10**, Amendment to Option.

**Plaintiffs' Response:** Undisputed that the parties renegotiated the Option in August 2020 because the original option was defective and unenforceable. Among other issues with the Option, Plaintiffs agree that the period to exercise was incorrect because it was only five months from when Milton received the restricted shares and not the six months required by law. Plaintiffs also do not dispute that the strike price and number of shares needed to be adjusted because the existing strike price and number of shares was also wrong. Lastly, there were inaccurate references to other parties and inaccurate references to the underlying share names. The renegotiation of these issues and the issuance of a new option agreement was handled by counsel and approved by Mr. Milton and Mr.

Hicks. The old options were then retired and new options were drafted with the correct terms. These options are dated August 14, 2020, which was also the date of the closing of the ranch transaction. **Ex. 12,** Gale Deposition, 68:17 to 69:16**.**

24. On September 10, 2020, a financial research firm that had taken a short position in Nikola, Hindenburg Research, published an article on its website wherein it asserted that Nikola was an "intricate fraud." Throughout the over 50-page article, the author accused Nikola and its founder Milton of making misrepresentations about at least 24 separate topics, almost all of which are unrelated to what Peter Hicks claims were representations made to him by Milton that mattered to his decision to sell the Property, and many of which were allegedly made after Peter Hicks had already signed the PSA and Option Agreement. Hindenburg Research concluded the article with a prominent disclaimer that the article was biased on account of the short position Hindenburg had taken, and that "Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information" presented in the article. **Dkt. 81- 14, Ex. 13**, Hindenburg Report. *See* SOF ¶ 14 above.

**Plaintiffs' Response:** Undisputed that Hindenburg Research published an article on Nikola and Trevor Milton on September 10, 2020. Further responding, the report speaks for itself and directly calls out as misrepresentations and lies a myriad of statements that had been previously made by Trevor Milton. **Dkt. 81- 14, Ex. 13**, Hindenburg Report.

25. Nikola addressed the Hindenburg Article in its Form 10-K Annual Report for the fiscal year ended December 31, 2020, released in February of 2021. There, it stated:

> The Hindenburg article alleged that Mr. Milton or the Company made a number of statements, which it asserted were inaccurate, including but not limited to the following:
>
> 1. In July 2016, the Company stated that it owned rights to natural gas wells, and in August 2016 that the wells were used as a backup to solar hydrogen

production;

2. In August 2016, Milton and the Company stated that the Company had engineered a zero emissions truck;

3. In December 2016, Milton stated that the Nikola One was a fully functioning vehicle;

4. That an October 2017 video released by the Company gave the impression the Nikola One was driven;

5. In April 2019, Milton stated that solar panels on the roof of the Company's headquarters produce approximately 18 megawatts of energy per day;

6. In December 2019 and July 2020, Milton stated that the Company "can produce" over 1,000 kg of hydrogen at the Company's demo station and that the Company was "down below" $3/kg at that time;

7. In July 2020, Milton stated that "all major components are done in house", he made similar statements in June 2020;

8. In July 2020, Milton stated that the inverter software was the most advanced in the world and that other OEM's had asked to use it; and

9. In July 2020, Milton stated that give trucks were "coming off the assembly line" in Ulm, Germany.

The statements listed above were inaccurate in whole or in part, when made. **In other respects, the Hindenburg article's statements about the Company were inaccurate.** For example, the Automotive Experts determines that: (1) the Company's workforce is led by technical and engineering leads that have deep industry experience and expertise; (2) the Company's technological contributions and development are consistent with other OEMs at similar stages of development; and (3) the Company's maturity level is consistent with that of an emerging OEM. **These findings are inconsistent with the main conclusion of the Hindenburg article that the Company was an "intricate" or "massive" fraud**.

**Dkt. 81-21, Ex. 15**, Nikola Form 10-K at HICKS 3318-3319.

**Plaintiffs' Response:** Undisputed but immaterial. Further responding, the document, which speaks for itself, was discussed extensively in the criminal trial. By its terms, the Company admitted that numerous statements made by Milton were false and that they were not corrected by

prior SEC filings. **Robertson Aff. at ¶ 5, Ex. 4,** SEC Consent Order, *In the Matter of Nikola Corporation* (No. 3-20687) at 2; **Dkt. 81-21, Ex. 15**, Nikola Form 10-K at HICKS3318-3319; **Dkt. 111-8**, Ex. C at 123:1 to 124:13. The jury in the criminal case rejected Milton's arguments that his statements were immaterial. Further responding, an arbitration panel awarded Nikola $165 million based on Milton's breach of fiduciary duty by making the misrepresentations that led to the Hindenburg Report. That arbitration award was confirmed by the United States District Court for the District of Arizona on September 9, 2024. *See Nikola Corp. v. Milton*, 2024 WL 4120320, at **10-11 (D. Ariz. Sept. 9, 2024).

36. As demonstrated in schedule 4 to the expert report of John Curtis (Defendants' counter expert on damages), Nikola's stock price was extremely volatile throughout 2020, experiencing drastic increases and decreases on a weekly if not daily basis. For example, between June 2, 2020 when the Option Agreement was signed and June 23, 2020, Nikola's stock price increased from $31.37 per share to $75.06 per share. The stock price then decreased down to $40.23 per share by July 7, 2020, then increased to $56.72 per share by July 9, 2020 before dropping down to $29.06 per share by July 30, 2020. This dramatic see-sawing of Nikola's stock price continued throughout August 2020, where the stock price increased to $45.96 per share by August 14, 2020, before dropping back down to $35.55 per share by September 4, 2020, which was before the Hindenburg article was released. On September 10, 2020, the date of the Hindenburg article, Nikola's stock price closed at $37.57. It then decreased gradually between September 11, 2020 and September 29, 2020 when it reached a low of $17.88 per share, before it started to climb again, reaching a high of $34.50 on November 24, 2020, approximately one week before the Exercise period of the Option began. **Appendix, Ex. DD**, Curtis Expert Report & Schedule 4 thereto.

**Plaintiffs' Response:** Undisputed that the stock price of Nikola was volatile during the period from June 1, 2020 through the end of December 2020. Further responding, Mr. Milton's public statements had a direct impact on the market price of the stock, as established in the criminal trial. Milton Criminal Transcript, **Dkt. 82-17, Ex. 20-17** at 1079; **Dkt. 83-2, Ex. 20-27** at 1758, 1770, 1773-1774; **Dkt. 84-8, Ex. 20-45** at 3059, 3069-3070, 3178. Likewise, as conceded by Mr. Curtis, the stock price dropped materially when Mr. Milton's misrepresentations were exposed, and Nikola's stock price never recovered to the levels it was at when the Ranch transaction closed on August 14, 2020.

37. As demonstrated by schedule 3 to the expert report of John Curtis, Plaintiffs' stock options were "in the money" (meaning they could have exercised the Option and sold the shares they acquired for a profit) during the Exercise Window between December 1, 2020 and December 31, 2020. For example, Plaintiffs could have made up to $1,276,504 in profit on December 3, 2020, and up to $1,587,105 in profit on December 9, 2020. If Plaintiffs had exercised the Option and held the stock for a few weeks until January or February of 2021, they could have sold the shares and realized up to $7,158,888 in profit. **Appendix, Ex. DD**, Curtis Expert Report at pp. 19-21 & Schedule 3.

**Plaintiffs' Response:** Plaintiffs do not dispute that on certain dates in December 2020, the strike price of the Option was below the market price of Nikola stock. However, as ignored by Mr. Curtis, in order to exercise the Option, Mr. Hicks would have been required to pay Mr. Milton $8 million in cash and there would be at least a few days between such payment and the sale of the stock. **Dkt. 134-7, Ex. JJ**, Expert Report of Henry Ferguson ("Ferguson Report") at 5, 8-10**.** Thus, Mr. Hicks would have been required to expose $8 million in cash to the volatility of the market with this hope of possibly making a fraction of that amount if the stock remained above

the strike price during the transfer period. In addition, as Mr. Hicks testified, there would be additional transaction costs that would further erode any potential profit. **Dkt. 111-14, Ex. I,** April 22, 2024 Deposition of Peter Hicks, 271:4 to 272:11**.** As Plaintiffs' expert Mr. Ferguson testified and detailed in his report, no reasonable investor in that environment would have exercised the option**. Dkt. 134-7, Ex. JJ**, Ferguson Report at 10**.**

42. All told, Peter Hicks received $10.2 million from Trevor Milton in compensation for the sale of the Wasatch Creeks Ranch property-- $8.5 million in cash at closing in August 2020, and another $1.7 million in March of 2021 when Peter Hicks sold Nikola's stock that Mr. Milton agreed to sell him at a discount, after Mr. Hicks had failed to exercise his options in December 2020. Mr. Hicks achieved more than the $10 million that he had estimated as an above-average return for resale of the Wasatch Creeks Ranch property within two years, in less than a year. **Dkt. 111-14, Ex. I**, P. Hicks Dep. Vol. I, 53:17 to 55:20, 249:11-21; **Dkt. 111-28, Ex. W**, P. Hicks Dep. Vol. II, 39:4 to 40:9.

**Plaintiffs' Response:** Disputed and immaterial. Defendants' calculations are incorrect and do not account for closing and transaction costs. Likewise, Plaintiffs dispute that the March 2021 transaction in any way reduces the losses caused by the Option transaction. There was no agreement among the parties that the March 2021 transaction in any way impacted or resolved the earlier Option transaction. In addition, by doing the March 2021 transaction, Milton was able to sell in a private transaction an additional $8 million of his restricted Nikola securities for cash, which he may not have been able to do in the public markets. Milton benefitted handsomely from the transaction. Moreover, as the Government contended in the criminal case, the transaction was part of Milton's criminal fraud and was embodied in Count 4 of the superseding indictment, for which Milton was convicted. **Dkt. 84-8, Ex. 20-45**, Milton Criminal Transcript at 3074.

47. When asked about the damages Plaintiffs are claiming in this lawsuit, Mr. Hicks reaffirmed the damage computation provided in the initial disclosures—$15 million, calculated by multiplying Nikola's stock price on August 14, 2020 (the date that the real estate transaction closed), by the number of shares that Plaintiffs had a right to purchase under the Option Agreement. **Appendix, Ex. II**, April 23, 2024 Deposition of Peter Hicks, Vol. II, at 44:3 to 47:7.

**Plaintiffs' Response:** Undisputed. Further responding, this was also the calculation of "loss" submitted with Peter Hicks' Victim Impact Statement in the criminal case. ***See* Robertson Aff. at ¶ 3, Ex. 2,** Peter Hicks Victim Impact Statement**.** In addition, Judge Ramos in the criminal case already noted in his opinion on forfeiture that the Option provided was worth approximately $15 million on the date the Ranch transaction closed in August 2020. *United States v. Milton*, 2024 WL 779210, at *6–7 (S.D.N.Y. Feb. 26, 2024). Thus, Mr. Hicks' testimony in this case and the criminal case is consistent, and is also consistent with the determination by Judge Ramos and also Plaintiffs' expert Mr. Ferguson.

48. Mr. Hicks confirmed that Plaintiffs are not seeking any other type of damages on any of its claims:

> Q: Okay. Are there any other areas of specific damages, other than something that would come under a statute like interest or trebling damages or anything like that, that is being claimed besides the 15 million?
>
> A: Subject to my lawyer's advice, I don't think so.

**Appendix, Ex. II**, April 23, 2024 Deposition of Peter Hicks, Vol. II, at 47:1-7.

**Plaintiffs' Response:** Disputed. ***See* ECF No. 2, Complaint at 77, Prayer for Relief II** (requesting that the Court enter a final judgment awarding Hicks "multiple damages as provided under Utah Code Section 61-1-22(2) for reckless or intentional conduct, prejudgment interest and attorney's fees and costs").

49. Plaintiffs never supplemented their Rule 26 computation of damages to disclose any damage theory other than the $15 million, calculated by multiplying the stock price on August 14, 2020 by the number of shares Plaintiffs had the right to purchase under the Option Agreement.

**Plaintiffs' Response:** Disputed. Plaintiffs have submitted an expert report on damages, in which Mr. Ferguson calculates the value of the Option using the Black Scholes model. **Dkt. 134-7, Ex. JJ,** Ferguson Report at 6**.** While Defendants may disagree with his conclusions and analysis, Plaintiffs' position on damages has been consistent throughout the criminal case and this case. Further responding, even Defendants' expert admits the Option had value that was lost when the price of Nikola stock dropped, and thus there are damages. **Dkt. 134-1, Ex. DD**, Expert Report of John H. Curtis at 13-15; 31-32**.** He simply opines that such damages were mitigated somehow by the subsequent securities transaction in March 2021. Whether such mitigation is appropriate is very much disputed, and is an issue to be determined at a trial on damages.

50. Plaintiffs produced their expert disclosures pursuant to Fed. R. Civ. P. 26(a)(2)(A) on June 24, 2024, disclosing a single expert, Henry R. Ferguson, to serve as an expert regarding Plaintiffs' damages. Mr. Ferguson's report states his opinion that the Option was worth $15,174,699 when the Ranch transaction closed on August 14, 2020, which he calculated by multiplying the number of shares Mr. Hicks had a right to purchase (515,095) by the closing stock price of Nikola on August 14, 2020 ($45,96), and then subtracting from that number the Strike Price multiplied by 515,095. Mr. Ferguson's report further states his opinion that Mr. Hicks has been damaged in the amount of $15,174,699 because the Option was rendered worthless as a result of the Hindenburg report and the subsequent decline in the value of Nikola stock. **Appendix, Ex. JJ**, Plaintiffs June 24, 2024 Expert Disclosures & Ferguson Expert Report.

**Plaintiffs' Response:** Plaintiffs dispute any characterizations of Mr. Ferguson's report and respond that the report and his testimony speak for themselves. He clearly articulated the amount of damages and the methodology for how those damages were calculated. Moreover, the Black Scholes Model is the accepted methodology for valuing options and is the same methodology utilized by Defendants' expert Mr. Curtis. The experts dispute the others' inputs, but not the methodology utilized.

51. Mr. Ferguson is assuming causation of the damages he calculated, and is not offering any opinions or testimony to establish that (a) any material misrepresentation by Mr. Milton was a cause of a loss to Mr. Hicks, caused a decline in Nikola stock, or caused the Option to become worthless; or (b) that the release of the Hindenburg Report in September 2020 caused a decline in the value of Nikola's stock or caused the Option to become worthless. **Appendix, Ex. KK**, August 28, 2024 Deposition of Henry R. Ferguson, 20:1-8, 70: 21 to 72:21, 106:13 to 107:7.

**Plaintiffs' Response:** Plaintiffs dispute any characterizations of Mr. Ferguson's report and respond that the report and his testimony speak for themselves. He clearly articulated the amount of damages and the methodology for how those damages were calculated. Mr. Ferguson is not being offered as an expert on causation because no such expert is required in this case. As the criminal case already established over vehement objections by Milton's counsel, his statements to the market and to Mr. Hicks were material. As the federal court in Arizona concluded in adopting the findings of an arbitration panel, the exposure of those statements as misrepresentations and lies directly caused the issuance of the Hindenburg Report. Likewise, Nikola's CEO and CFO, as well as Mr. Milton himself, testified regarding the direct causal effect of the Hindeburg Report on Nikola's share price. **Robertson Aff. at ¶ 6, Ex. 5**, April 24, 2024 Deposition of Trevor Milton ("Milton Deposition") at 210:20 to 211:16; **Robertson Aff. at ¶ 2,**

**Ex. 1**, Gale Deposition, 74:1-13; **Dkt. 111-8**, Ex. C at 61:16-18; **Dkt. 111-9**, Ex. D at 63:2-7. No expert is necessary to establish these facts, because they are easily understood by a factfinder. To the contrary, Defendants offer no expert testimony to support an argument that it was something *other than* Milton's lies and the exposure of those lies that caused Nikola's stock to plummet, from a place that it has never recovered.

53. Mr. Ferguson is also not offering any opinion or testimony about the value of the consideration that Plaintiffs paid for the Option Agreement (i.e., the ranch that Mr. Hicks sold to Defendants). **Appendix, Ex. KK**, Ferguson Dep., 107:8 to 108:1.

**Plaintiffs' Response:** Disputed as to the characterization of the cited testimony. Plaintiffs do not dispute that Mr. Ferguson is not an expert in property valuation and did not conduct an independent valuation of the Ranch as of the closing date on August 14, 2020. However, he will be offering an opinion that the value of the Option on August 14, 2020 was in excess of $15 million, which was the value of that component of the consideration paid for the Ranch on that date. Given that Mr. Milton was willing to part with securities worth, on that date, in excess of $15 million, as well as cash, he clearly placed significant value on the ranch property in excess of the cash he paid. This is only further supported by the fact that within six months after he purchased the ranch, he repackaged the ranch with some contiguous property and listed it for sale for $35 million. ***See* Robertson Aff. at ¶ 4, Ex. 3**, PC Bar Ranch Brochure; **Robertson Aff. at ¶ 6, Ex. 5**, Milton Deposition at 7:3 to 8:16, 210:5-19**..** As Judge Ramos found in the criminal case, clearly the ranch was worth more to Milton than just the cash offered, or he would not have offered the option**.** *United States v. Milton*, 2024 WL 779210, at *6–7 (S.D.N.Y. Feb. 26, 2024).

**STATEMENT OF ADDITIONAL MATERIAL FACTS**

1. On February 19, 2021, six months after the closing date of the Ranch transaction, David Anderson provided Peter Hicks with a sales brochure for property consisting of the Ranch and a contiguous parcel that had also been purchased by Milton, offering the combined property for sale for $35 million. **Robertson Aff. at ¶ 4, Ex. 3.**

2. On November 3, 2021, Nikola initiated arbitration proceedings against Milton for breach of fiduciary duty and various damages claims. ***Nikola Corp. v. Milton*, 2024 WL 4120320, at *2 (D. Ariz. Sept. 9, 2024).**

3. On December 21, 2021, Nikola entered into a settlement with the Securities and Exchange Commission ("SEC") in which Nikola agreed to a $125 million fine to resolve certain claims against Nikola. **Robertson Aff. at ¶ 5, Ex. 4.**

4. On November 17, 2023, the arbitration panel issued an award in favor of Nikola, holding "Milton violated his fiduciary duties of loyalty and good faith to Nikola, which caused damages to Nikola, and that Milton is liable for certain of those damages claimed by Nikola." *Id.* at *3. The arbitration panel found that Milton violated his duties "through his pattern of false and misleading public statements about the Company and by subverting all efforts by individuals . . . to review and approve Milton's public statements in advance." ***Nikola Corp.*, at *3.**

5. The arbitration panel ultimately entered an award against Milton and in favor of Nikola in the total amount of $167.7 million (the "**Arbitration Award**"). ***Id.***

6. On September 9, 2024, the United States District Court for the District of Arizona confirmed the Arbitration Award. ***Nikola Corp. v. Milton*, 2024 WL 4120320 (D. Ariz. Sept. 9, 2024).**

## ARGUMENT

### I. Plaintiffs Withdraw Their Claim Under Section 17(a) of the Securities Act

Plaintiffs will withdraw their claim under Section 17(a) of the Securities Act. While Plaintiffs acknowledge the controlling authority in the Tenth Circuit that there is no private right of action under Section 17(a), the issue is less well-settled in other Circuits and the Supreme Court has declined to opine on the matter. *See Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 492 (6th Cir. 1990) ("Whether section 17(a) provides for a private cause of action has been the subject of debate between the circuits and the Supreme Court for decades."). But given the strength of their other claims, Plaintiffs will not press for a change in the law in the Tenth Circuit and will withdraw their claim under Section 17(a).

### II. A Factfinder Must Decide Whether Plaintiffs Suffered Damage, and in What Amount

Defendants argue that Plaintiffs cannot demonstrate that they suffered any actual damage under the out-of-pocket rule because they sold the Ranch for more than they acquired it for. (Motion at 22-23). Accepting such a simplistic argument would turn damages law on its head, and the argument completely ignores the fact that this is a securities case, involving the sale of a fraudulently inflated security to induce the sale of real property. The key is the value of the fraudulently inflated security, not the real property. Defendants misapprehend the law; it must be left to a factfinder to determine whether Plaintiffs suffered damage, and if so, in what amount.

"The law on damages generally does not require a plaintiff to establish the quantum of damages with mathematical precision, but there must be sufficient evidence introduced by the plaintiff to provide a trier of facts with an intelligent means in determining an appropriate damages award without speculation or conjecture." *Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 301 (10th Cir. 1987) (quotation marks omitted). The correct measure of damages in a securities fraud

case "is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Randall v. Loftsgaarden*, 478 U.S. 647, 662 (1986).

By focusing on the price Hicks received for the Ranch, Defendants confuse the issue. Indeed, this is a case about *securities fraud*; therefore the issue is not the value of the Ranch, but the value of the Option. And Plaintiffs have offered more than sufficient evidence of the difference between the value Plaintiffs received for the Option (effectively nothing) and the value of the Option had Milton not lied to Peter (and the market) about Nikola. That Defendants' expert disagrees with Plaintiffs' expert is immaterial. In fact, Defendants' expert fundamentally uses the same valuation methodology that Plaintiffs' expert used, just with different inputs into the same formula. **Dkt. 134-1, Ex. DD**, Expert Report of John H. Curtis at 31-32. These disputes are regularly settled by factfinders, not on summary judgment. Plaintiffs further refer the Court to and incorporate by reference their Opposition to Defendants' Motion in Limine to Exclude Expert Opinions and Testimony of Henry R. Ferguson at pages 8-11.

Defendants' reliance on *Hickman v. Groesbeck*, 389 F.Supp. 769, 779-80 (D. Utah 1974) is misplaced. There, the plaintiffs purchased interests in a limited partnership that was formed for the purpose of acquiring two apartment complexes located in California. The limited partnership purchased the properties for $280,000, which was around their fair market value at the time of the sale. The plaintiffs alleged that certain marketing materials used in the sale of the partnership interests contained material misrepresentations or omissions. After a trial on the merits, the court held that the plaintiffs failed to show any damages because they paid fair market value for the properties, and they had failed to timely seek recission of the transaction. *Id.* at 780.

*Hickman* is easily distinguishable. Here, Milton induced Hicks to accept the Option as part of the consideration for the Ranch, because Hicks had previously rejected Milton's all-cash offer of $8.5 million. Indeed, Mark Gale, a Nikola paralegal who moonlighted as Milton's personal paralegal on certain real estate transactions, including the Ranch transaction, testified that Milton used Nikola options as a "sweetener" to convince owners to sell to Milton. *See* **Robertson Aff. at ¶ 2, Ex. 1**, Gale Deposition, 84:15 to 85:6.. On the date the Ranch transaction closed, the Option was worth approximately $15 million, based on the price Nikola stock closed that day. In other words, Hicks, unaware of Milton's deception, believed he was receiving something worth $15 million, in addition to $8.5 million in cash. And critically, and as the criminal court already concluded, Milton was willing to part with an Option worth $15 million in addition to the $8.5 million in cash in order to secure the closing of the Ranch transaction in August 2020. Thus, Milton clearly deemed the total consideration a fair exchange for the Ranch. One month later, the Hindenburg Report was published, following which the price of Nikola stock plummeted. Had Milton's lies been known to Hicks, and the market generally, Nikola stock, and by necessity, the value of the Option, would have been much lower when Milton offered it to Hicks, and when the Ranch transaction closed. Hicks is therefore out of pocket the difference between the value of the Option on the date the Ranch transaction closed and the value the Option would have had if Milton's misrepresentations were known to the market—effectively zero.

To analogize to the facts in *Hickman*, it is as though Milton knowingly sold Hicks an apartment building with a cracked foundation, faulty electrical wiring, and a leaky roof, without disclosing those defects. And when those defects became known, the value of the apartment building plummeted and it became unsellable. Had those facts been present in *Hickman*, the outcome would no doubt have been different.

Defendants also argue that Plaintiffs have failed to develop or disclose a damage theory or computation seeking actual damages under the out-of-pocket rule because they disagree with Plaintiffs' damages expert's theory that the Option was worth $15,174,669 and was rendered worthless when Nikola's stock price fell in the aftermath of the Hindenburg Report. (Motion at 23-24). Defendants suggest that Plaintiffs cannot recover such damages because they are "the expectant fruits of an unrealized speculation." (Motion at 24). Defendants again muddle the issues. Of course the value of the Option may have increased or decreased before Hicks could exercise it in December 2020; all publicly-traded securities fluctuate in value. Accepting Defendants' argument would mean that defrauded purchasers of public securities could never prove damages; after all, when they purchased the security they *could have* increased. Here, the issue is far more simple. The Option had value at closing and lost that value when Milton's lies were exposed to the market. That is the *sin qua non* of out of pocket damages.

The correct analysis is to determine what the Option's value *was* when the Ranch transaction closed (or, even using Plaintiffs' argument, when the Purchase and Sale Agreement was first signed) and what it became worth once Milton's lies were uncovered. Plaintiffs' expert, using the "Black Scholes" valuation method, valued the Option at $15,174,669 on the date the Ranch transaction closed.[1] Thus, when the Ranch transaction closed, Plaintiffs owned something valued at over $15 million. Plaintiffs are not seeking to recover as damages their expectation that the Option would be worth even more once they could exercise it in December 2020. In fact, the value of the Option did increase for a brief period of time after closing. That would be "the expectant fruits of an unrealized speculation." And Plaintiffs parted with something of value in

---

[1] "The 'Black-Scholes' valuation method is a Noble Prize-winning, option pricing theory" that is "accepted as a method to value options to purchase shares in a leveraged company." *Borghetti v. System & Computer Tech, Inc.*, 199 P.3d 907, 911 (Utah 2008).

exchange for the Option: 4,678 acres of land, which was sold for a combination of cash and the Option.[2] Accordingly, this is not a case about speculative damages; Hicks was clearly damaged. The factfinder should decide the amount of those damages.

### III. Plaintiffs Have Proven Loss Causation

Next, Defendants argue they are entitled to summary judgment because Plaintiffs have no evidence of "loss causation." To the contrary, Plaintiffs have proven loss causation such that Plaintiffs are entitled to summary judgment.

To prove loss causation, a plaintiff must submit evidence showing a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops. *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). For a disclosure to be corrective, it does not need to precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not some other negative information about the company. *Id.* at 1140. Additionally, under a theory of "materialization of a concealed risk," a plaintiff proves loss causation by "showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpun*, 782 F.3d at 1154. For loss causation under this theory, a plaintiff must show two facts: (1) the risk that was materialized was within the zone of risk concealed by the misrepresentation; and (2) the

---

[2] As Plaintiffs noted in their summary judgment reply brief, Judge Ramos wrote in a February 26, 2024 post-trial Opinion & Order that Milton "deprived Hicks of the value of his property," that Milton "relied on misrepresentations about the value of the stock options to induce Hicks to sell him the [R]anch," and that "Hicks clearly thought the [R]anch was worth more than [$8.5 million]—that is why the stock options, whose value Milton falsely misrepresented, were also part of the deal." *United States v. Milton*, 2024 WL 779210, at *6–7 (S.D.N.Y. Feb. 26, 2024).

materialization of the risk caused a negative impact on the value of the securities. *Id.* Plaintiffs have satisfied both loss causation theories.

### A. Defendants are collaterally estopped from relitigating loss causation after Milton's criminal conviction

As a threshold matter, Plaintiffs need not prove loss causation because Defendants are collaterally estopped from relitigating the issue following Milton's criminal conviction for defrauding Hicks in connection with the Ranch transaction. As Judge Ramos already found after Milton's criminal trial, Milton was convicted of engaging in a fraudulent scheme that "deprived Hicks of the value of his property" and that Milton "falsely represented" the value of the Option in order to persuade Hicks to sell the Ranch. *United States v. Milton*, 2024 WL 779210, at *6–7. And more recently, an Arizona federal district court confirmed an arbitration award entered against Milton and in favor of Nikola, where Milton made the same argument: that his misrepresentations about Nikola (which were couched as breaches of fiduciary duty in the arbitration) did not "cause" the Hindenburg Report and the resulting harm to Nikola. Quoting the arbitration panel, the Arizona court wrote:

> In reaching our determination, we cannot accept the position that Milton's falsehoods did not cause the Hindenburg Report. ***Any doubt that Milton's falsehoods caused the Hindenburg Report is demolished by the first bullet in the Hindenburg Report itself***, which states, "Today we reveal why we believe Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career." The second bullet reinforces the point: "We have gathered extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs—detailing dozens of false statements by Nikola Founder Trevor Milton. We have never seen this level of deception at a public company especially of this size." Likewise, the commencement of the class actions on September 15, 2020—only five days after publication of the Hindenburg Report—speaks volumes about the cause of the class actions.
>
> * * *
>
> As we have already discussed, on its face, the Hindenburg Report was aimed directly at falsehoods disseminated by Milton and asserted that Nikola was a sham

> company. In this context, ***the record evidence establishes direct linkage from Milton's breaches of fiduciary duty to the publication of the Hindenburg report and to Nikola's need to retain crisis management expertise to deal with the fallout of Milton's numerous false and misleading public statements.***

*Nikola Corp. v. Milton*, 2024 WL 4120320, at **10-11 (D. Ariz. Sept. 9, 2024) (emphasis added).

In other words, two courts have already concluded that Milton's misrepresentations "caused" the Hindenburg Report and "caused" Plaintiffs' to suffer harm by accepting the inflated Option as part of the consideration for the Ranch. Milton is thus precluded from relitigating loss causation in this case. *See In re Ivan F. Boesky Sec. Litig.*, 848 F. Supp. 1119, 1125–26 (S.D.N.Y. 1994) (applying offensive collateral estoppel on loss causation where it was established in a prior SEC action that the defendant's "comprehensive scheme to defraud was actually responsible for costs and losses caused to" the plaintiff).

### B. Regardless, the undisputed facts show that Milton's misrepresentations caused the Nikola stock price to plummet

Assuming, *arguendo*, that Milton is not precluded as a matter of law from relitigating loss causation, it is nonetheless undisputed that Milton's misrepresentations caused the decline in Nikola stock (and thus a decline in the value of the Option). It is undisputed that upon publication of the Hindenburg Report, the value of Nikola's securities plummeted. **Robertson Aff. at ¶ 6, Ex. 5**, April 24, 2024 Deposition of Trevor Milton ("Milton Deposition") at 210:20 to 211:16; **Robertson Aff. at ¶ 2, Ex. 1**, Gale Deposition, 74:1-13; **Dkt. 111-8**, Ex. C at 61:16-18; **Dkt. 111-9**, Ex. D at 63:2-7. The Company also entered into a consent Order with the SEC in which it agreed that Milton lied and misrepresented Nikola's business to investors, and when these lies were exposed, the value of the Company's securities fell. *See* **Robertson Aff. at ¶ 5, Ex. 4,** SEC Consent Order, *In the Matter of Nikola Corporation* (No. 3-20687). The Company has never

recovered.[3] *In re Williams* is inapt. There, the Tenth Circuit affirmed the trial court's summary judgment order after the trial court precluded the plaintiff's expert from offering opinion testimony on loss causation. The expert would have opined that the market was alerted to the defendant's fraud over the course of 18 months, during which "a number of tiny corrective disclosures" "leaked" out into the market. *Id.* at 1138. The court held that the expert failed to show "how the market learned of the fraud over that year-and-a-half," a time when the defendant's competitors experienced bankruptcies, there was a decline in the telecommunications industry as a whole, and the overall market declined following the 9/11 terrorist attacks. *Id.* at 1140. Not surprisingly, the Tenth Circuit determined that the trial court did not abuse its discretion in finding that the expert's failure to explain how the truth was revealed to the market and failure to then link the revelation of truth to a corresponding loss, rather than other factors, made his theory unreliable. *Id.*

It should go without saying that *In re Williams* is distinguishable. This is not a case where "tiny corrective disclosures" about Milton's lies "leaked" into the market. Instead, the Hindenburg report was proverbial burst pipe; a sudden and severe disclosure that caused Nikola stock to immediately tank. And this is not speculation; as the Arizona federal district court confirmed, any argument that Milton did not "cause" the Hindenburg report is "demolished" by the report itself, which specifically identifies Milton's misrepresentations as the worst deception at a public company that the authors had ever seen. *Nikola Corp. v. Milton*, 2024 WL 4120320, at **10-11. No complex expert calculations are necessary to establish loss causation under these circumstances. It is crystal clear that the exposure of Milton's lies directly caused the decrease in Nikola's share price. While Plaintiffs contend that Milton is collaterally estopped from relitigating the issue, the Court can nonetheless find that loss causation exists as a matter of law.

---

[3] Nikola's stock has recently traded for between $1.00 to $2.00 per share.

Milton continues to doggedly grasp to the fiction that his lies were "known to the market" because Nikola had allegedly disclosed accurate information in its public SEC filings. (Motion at 28). This was Milton's main defense during his criminal trial and the jury clearly rejected it, therefore Milton is collaterally estopped from relitigating it here. Defendants' argument that Plaintiffs "have no evidence" to show that the market knew about Milton's lies is incredible. Certainly, none of Nikola's public SEC filings said that its founder and CEO was repeatedly lying to the public (and Hicks privately). None of the SEC filings disclose anything that could possibly be considered evidence that the public knew about Milton's misrepresentations. And if Nikola thought that its SEC filings adequately disclosed Milton's dishonesty, then there would have been no reason for Nikola to seek (and obtain) a nine-figure judgment from Milton after Nikola paid that amount to settle claims brought by the SEC.

Defendants also argue that Plaintiffs have no evidence to "show" that the Hindenburg Report's disclosures about Milton's dishonesty "caused a decline in Nikola's stock," as opposed to "other content" in the report and "other factors" affecting Nikola's business. (Motion at 28). Notably, while Defendants reference so-called "other content" and "other factors" that may have caused the decline in Nikola's stock price, they offer no detailed explanation of what those factors were, or how they caused any decline in the stock price (let alone were *the cause* of the decline). Nor can they. Defendants even continue to protest that the Hindenburg Report's allegations were "unfounded," notwithstanding Milton's conviction for securities fraud and Nikola's settlement with the SEC. In any event, Defendants' arguments about other factors that may have contributed to the decline in Nikola stock (though not fully developed in their summary judgment briefing) might be relevant to a discussion of damages, but they are certainly not dispositive of the claims in this case.

## IV. Plaintiffs Have Offered Evidence of Damages Under the Utah Securities Act

Likely recognizing that the Utah Securities Act does not require a showing of loss causation, Defendants separately argue that Plaintiffs' claim under the Act must be dismissed because Plaintiffs have not suffered any damages. They posit that dismissal is proper because the Act only allows recovery of damages measured by the "consideration paid for the security." (Motion at 30-31). Defendants, notably, do not dispute that Milton made an "untrue statement of a material fact" in connection with the sale of any security. UT ST § 61-1-1.

Plaintiffs have offered sufficient evidence of damages under the Act. First, as Plaintiffs stated in their summary judgment reply brief, the Act was "intended to *reduce* the buyer's burden of investigation and inquiry, and make it *easier* for him to obtain redress on the basis of deception." *S & F Supply Co. v. Hunter*, 527 P.2d 217, 221 (Utah 1974) (emphasis added). Defendants' argument that Plaintiffs suffered no damages simply because Hicks sold the Ranch for more than he paid for it therefore misses the mark entirely. Plaintiffs are not seeking "the expectant fruits of the Option Agreement." As stated above, the Option undisputedly had value when the Ranch transaction was first entered into, and when it closed. That Defendants think the prior, rather than the later date, should be used for calculating the value of the Option is immaterial when adjudicating a summary judgment motion. Ultimately, a factfinder will need to determine the appropriate valuation of the Option, but there is no dispute that Plaintiffs paid *something* for it, otherwise, Milton would not have offered it in addition to the $8.5 million in cash.[4]

---

[4] "It is usually said that market value is what a willing buyer would pay in cash to a willing seller." *U.S. v. Sowards*, 370 F.2d 87, 89 (10th Cir. 1966). Thus, to the extent Defendants dispute the value of the Ranch (and therefore the amount of consideration that Hicks "paid" for the security) was no greater than $8.5 million, their argument is undermined by the fact that Milton was willing to close on the Ranch transaction at a time that the Option was worth more than $15 million, making the Ranch worth approximately $23.5 million when the transaction closed.

*Abu-Ulba v. Ananda Scientific, Inc.*, 2024 UT App 64, ¶ 29, 550 P.3d 480 confirms this. Defendants refer the Court to and incorporate by reference their analysis of *Abu-Ulba* in their response to Defendants' motion to exclude testimony from Plaintiffs' expert at pages 5-8. In short, the trial court in *Abu-Ulba* valued the "consideration paid for the security" (options to purchase stock in the plaintiff's employer) as the difference in the plaintiff's salary and the higher salary that he would have received once the company began selling product. *Id.* at ¶ 18. Similar principles can be applied here. There can be no real dispute that both Hicks and Milton believed that the Option had value, otherwise, there would have been no reason for Milton to offer it as consideration above the $8.5 million in cash Hicks had previously rejected. Both parties' experts agree that the Option had value; they disagree as to the amount based on the dates used to calculate the value. Like in *Abu-Ulba*, the factfinder in this case will need to determine the "consideration paid for the security" based on the facts of the case, including how much the Option was worth, and when the appropriate valuation date was. If anything, *Abu-Ulba* stands for the proposition that the "consideration paid for the security" is highly fact-specific and the factfinder has discretion on determining that amount based on the evidence presented at trial, particularly in cases where the securities transaction did not involve a simple "stock for cash" transaction.[5]

Moreover, Milton subsequently listed an aggregation of ranch properties including the Ranch, for a selling price in excess of $30 million. **Robertson Aff. at ¶ 4, Ex. 3,** PC Bar Ranch

---

[5] Defendants' last argument that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' claims for common law fraud and violation of the Act requires little response. Although Plaintiffs did not assert diversity jurisdiction as its original basis for removal, the parties in this case are clearly diverse and the amount in controversy easily clears the $75,000 jurisdictional requirement. Thus, even if the Court were to dismiss Plaintiffs' federal securities fraud claim, the Court would retain jurisdiction over the remaining state law claims because diversity of citizenship would continue. The Court therefore need not engage in any analysis over whether it should retain supplemental jurisdiction.

Brochure. Clearly, Milton understood that the value of real estate fluctuates and its value may or may not be affected by other adjacent properties. As he testified in his deposition, he acquired multiple Utah ranch properties with cash and securities, and the values of those properties was affected by a combination of factors, including access issues and aggregation. **Robertson Aff. at ¶ 6, Ex. 5**, Milton Deposition at 65:4 to 66:14. The single best indicator for the proper value of the transaction is not the value of the Ranch months earlier, but what Mr. Milton was willing to offer in the form of the Option on the date it closed in August 2020. As Plaintiffs' expert has opined, and as the criminal court has already ruled, that value exceeded $15 million.

### V. Damages For Plaintiffs' Overlapping Claims May Be Aggregated Under Either the Out of Pocket or a Benefit of the Bargain Rule

Throughout their Motion, Defendants attempt to distinguish between Plaintiffs' federal securities, common law fraud, and state securities claims, arguing that each claim has different damages requirements that Plaintiffs cannot satisfy. But the Tenth Circuit has held that if the elements for deceit are met across multiple claims (which they clearly are here), plaintiffs are entitled to all damages that proximately result from the defendant's false statements. In *Young v. Taylor*, 466 F.2d 1329 (10th Cir. 1972), the parties entered into an agreement to sell a building in Salt Lake City for a purchase price of $400,000, with payment to be made by the buyer assuming a $125,000 mortgage and delivering common stock with a value of $275,000. *Id.* at 1336. The plaintiff, as here, brought claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, the Utah Securities Act, and a common law fraud claim under Utah law. The jury returned a verdict in favor of the plaintiff and awarded general damages in the amount of $263,800, which was calculated by taking the value of the stock, minus certain credits. *Id.*

The Tenth Circuit described how the issue of damages was submitted to the jury:

> the trial court in essence charged that the plaintiffs would be entitled to damages that have proximately resulted from false statements, if the other elements of the

> case were established. The jury was told that it could consider the $400,000 purchase price agreed on by the parties, and that they might take into consideration the financial statement indicating the same amount as a declaration by the defendants that could be considered by them for such weight as they thought it entitled to. The court also referred to the credits outlined above which reduced the damages recoverable by the plaintiffs.

*Id.*

The Tenth Circuit affirmed the trial court's charge, finding "there is no problem here as to whether the benefit of the bargain rule or the out of pocket measure of damages was applied . . . ." *Id.* Additionally, applying the "limiting effect" of § 28(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), the Tenth Circuit found no error in the trial court permitting exemplary damages and attorney's fees, even though the Exchange Act does not permit recovery of such damages.

> As we have held, the instructions here in substance covered the elements of common law fraud as required by Utah law. The charge also embraced the elements of claims under the Federal and Utah securities laws. The elements of all three claims were combined in a single statement to the jury of the requirements for the plaintiffs to recover general damages, and no alternative bases for such recovery were submitted. Therefore no particular label can be attached to the general damages award made, to the exclusion of other theories. Nevertheless under the charge it is clear that the elements of a Utah Blue Sky claim and a common law fraud claim had to be found to arrive at the general damages award. Thus the elements of valid state claims were implicitly found to exist.

*Id.* at 1337.

This case is analogous to *Young* in many ways, including that the fraudulent security was used as partial consideration for the purchase of real property, and the plaintiff brought claims under both federal and state securities statutes, and a claim for common law fraud. And like the trial court in *Young*, the Court here need not dissect the individual damages analyses for each claim; Plaintiffs remedies are cumulative, and therefore the Court may (and should) allow the case to proceed to trial on a simple, general damages theory that compensates Plaintiffs for the harm caused by Milton's misconduct.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

DATED December 31, 2024.

/s/ Erik A. Christiansen
Erik A. Christiansen
PARSONS BEHLE & LATIMER

Christopher Robertson (*pro hac to be filed)*
SEYFARTH SHAW LLP

Attorneys for Plaintiff PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2024, I caused a true and correct copy of the foregoing document to be served to the parties of record:

Brent O. Hatch
H. Douglas Owens
Adam M. Pace
HATCH LAW GROUP
22 E 100 S STE 400
SALT LAKE CITY, UT 84111
801-869-1919
hatch@hatchpc.com
owens@hatchpc.com
pace@hatchpc.com

Curtis Tuttle
Ctuttle@cmtpllc.com

*Attorneys for Defendants*

*/s/ Alex Vandiver*
Alex Vandiver