Erik A. Christiansen, USB #7372
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher Robertson (*pro hac vice*)
**SEYFARTH SHAW LLP**
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: 617.946.4989
Facsimile: 617.790.6774
crobertson@seyfarth.com

*Attorneys for Plaintiffs PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

PETER HICKS; HICKS, LLC; and WASATCH HICKS, LLC,

Plaintiffs,

vs.

TREVOR R. MILTON; M&M RESIDUAL, LLC; and T&M RESIDUAL, LLC,

Defendants.

**APPENDIX OF EVIDENCE TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Case No. 2:22-cv-00166

Judge: Hon. Howard C. Nielson, Jr

Magistrate Judge: Hon. Daphne A. Oberg

Plaintiffs Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC, by and through their undersigned counsel, hereby submit the attached exhibits as an appendix to Plaintiffs' Response to Defendants' Motion for Summary Judgment:

| Exhibit No. | Description | Bates Stamps (if available) | Source |
|---|---|---|---|
| 1 | Transcript of Deposition of Mark Gale on May 7, 2024 | N/A | Plaintiffs |
| 2 | Peter Hicks Victim Statement, *USA v. Milton*, Case No. 1:21-cv-00478 (ECF 317-2) (S.D.N.Y. filed on December 15, 2023) | N/A | S.D.N.Y |
| 3 | PC Bar 10 Ranch Selling Brochure | N/A | Plaintiffs |
| 4 | Securities and Exchange Commission (SEC) Consent Order *In the Matter of Nikola Corporation* | N/A | SEC |
| 5 | Transcript of Deposition of Trevor Milton on April 24, 2024 (filed under seal) | N/A | Plaintiffs |

Erik A. Christiansen, USB #7372
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher Robertson (*pro hac vice*)
**SEYFARTH SHAW LLP**
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: 617.946.4989
Facsimile: 617.790.6774
crobertson@seyfarth.com

*Attorneys for Plaintiffs PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PETER HICKS; HICKS, LLC; and WASATCH HICKS, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>TREVOR R. MILTON; M&M RESIDUAL, LLC; and T&M RESIDUAL, LLC,<br><br>Defendants. | **AFFIDAVIT OF CHRISTOPHER ROBERTSON IN SUPPORT OF RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00166<br><br>Judge: Hon. Howard C. Nielson, Jr<br><br>Magistrate Judge: Hon. Daphne A. Oberg |

**AFFIDAVIT OF CHRISTOPHER ROBERTSON**

I, Christopher Robertson, hereby depose and state under penalty of perjury as follows:

1. My name is Christopher Robertson. I am a partner at Seyfarth Shaw LLP and one of the attorneys representing plaintiffs, Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC ("Hicks") in this action. I respectfully submit this affidavit in support of Plaintiff's Response to Defendants' Motion for Summary Judgment.

2. On May 7, 2024, I took the deposition of Mark Gale over videoconference. A true and correct copy of the transcript of this deposition is attached as Exhibit 1.

3. On August 17, 2023, Peter Hicks, through counsel, submitted a Victim Impact Statement to Assistant United States Attorney of the Southern District of New York, Matthew Podolsky. A true and correct copy of opinion is attached as Exhibit 2.

4. On February 19, 2021, only six months after the August 14, 2020 closing date of the sale of Wasatch Creeks Ranch from Peter Hicks to Trevor Milton, David Anderson provided Peter Hicks with a sale brochure for the ranch and a contiguous parcel that had also been purchased by Mr. Milton, offering the property at $35 million. The brochure contains photographs and descriptive material that had been provided to Mr. Milton by Peter Hicks in connection with the sale of the Wasatch Creeks Ranch. A true and correct copy of this brochure is attached as Exhibit 3.

5. A true and correct copy of the SEC Consent Order entered *In the Matter of Nikola Corporation* is attached as Exhibit 4.

6. On April 24, 2024, I took the deposition of Trevor Milton. Because the parties have designated the transcript as confidential under the existing Protective Order, the document will be filed separately under seal with the court. A true and correct copy of the transcript will be submitted under seal and is referenced in the motion as Exhibit 5.

Signed under penalties of perjury this 31st day of December, 2024.

*/s/ Christopher Robertson*
Christopher Robertson

# EXHIBIT 1

In the Matter of:

HICKS, et al.

vs

MILTON, et al.

MARK GALE

May 07, 2024

RED ROCK REPORTING
P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PETER HICKS; HICKS, LLC; and WASATCH HICKS, LLC, Plaintiffs, vs. TREVOR R. MILTON; M&M RESIDUAL, LLC; and T&M RESIDUAL, LLC, Defendants. | Videotaped Deposition of: Mark Gale<br>Civil No. 2:22-cv-00166<br>Judge Hon. Daphne A. Oberg |

Tuesday, May 7, 2024
10:58 a.m. Mountain Time
ALL PARTIES APPEARING VIA ZOOM

Reporter: Christina Holbrook, RPR
Videographer: Ryan Reverman, CLVS, CME, CTP



A P P E A R A N C E S

FOR THE PLAINTIFFS:
Christopher Robertson, Esq.
Sandy Recinos, Esq.
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210
Tele: (617) 946-4989
E-mail: crobertson@seyfarth.com
E-mail: srecinos@seyfarth.com
Erik A. Christiansen, Esq. (Not Present)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tele: (801) 532-1234
E-mail: echristiansen@parsonsbehle.com.

FOR THE DEFENDANTS:
Adam Pace, Esq.
HATCH LAW GROUP, PC
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Tele: (801) 869-1919
E-mail: pace@hatchpc.com.

FOR THE WITNESS:
Gregory F. Laufer, Esq.
Meaghan E. Brennan, Esq.
WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, New York 10019
Tele: (212) 373-3454
E-mail: glaufer@paulweiss.com
E-mail: mbrennan@paulweiss.com.



I N D E X


| MARK GALE | PAGE |
|---|---|
| Examination by Mr. Robertson | 5, 87 |
| Examination by Mr. Pace | 84 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | - "Mark Gale (Trevor's Paralegal) Texts" | 20 |
| 2 | - E-mail from M. Gale to D. Anderson, dated 7/23/20 | 24 |
| 3 | - E-mail from D. Anderson to multiple parities, dated 6/1/2032 | 29 |
| 4 | - E-mail from M. Gale to D. Anderson and others, dated 7/1/20 | 32 |
| 5 | - E-mail from M. Gale to M. Anderson and others, dated 6/2/20 | 35 |
| 6 | - E-mail chain from M. Gale, dated 6/2/20 | 37 |
| 7 | - E-mail from M. Gale to M. Anderson, dated 6/2/20 | 41 |
| 8 | - Purchase and Sale Agreement, dated 6/1/20 | 43 |
| 9 | - E-mail from M. Gale to M. Peterson, dated 8/4/20 | 51 |
| 10 | - Pre-Merger/Post-Merger Chart | 52 |
| 11 | - E-mail from M. Anderson to J. Thompson, dated 8/4/20 | 58 |
| 12 | - E-mail Chain | 61 |
| 14 | - E-mail Chain | 64 |
| 15 | - Amendment No. 1 to Option Agreement, dated 8/14/20 | 68 |
| 16 | - First American Title Insurance Company Final Settlement Statement | 71 |




P R O C E E D I N G S

-0-

THE VIDEOGRAPHER: We are now on the record. The time is approximately 11 o'clock a.m. Mountain Time, 1 o'clock p.m. Eastern Time. This is the video-recorded deposition of Mark Gale in the matter of Hicks, et al. versus Milton, et al., being conducted through the Zoom video platform on May 7th, 2024.

My name is Ryan Reverman. I am a Certified Legal Videographer here along with Certified Court Reporter, Christina Holbrook. We are both from the firm of Red Rock Reporting.

At this time, counsel will state their appearances for the record and the witness will be sworn.

MR. ROBERTSON: Thank you. For the plaintiffs, Christopher Robertson with the law firm of Seyfarth Shaw, and with me is Sandy Recinos from my office.

MR. PACE: Adam Pace, representing the defendants, Trevor Milton, T&M Residual, and M&N Residual.

MR. LAUFER: Greg Laufer with my colleague Meaghan Brennan from Weiss, Rifkind, Wharton &

Page 5

Garrison for the witness.

Mark Gale,
called as a witness, being first duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. ROBERTSON:
Q. Good morning, Mr. Gale -- in -- your morning. Good afternoon for me. I'm Chris Robertson. I'm with the law firm Seyfarth Shaw, and I represent Peter Hicks and Mr. Hicks' entities, Hicks, LLC and Wasatch Hicks, LLC in litigation against Trevor Milton and certain of his entities.
I asked you previously before we went on the record whether you've been deposed before and I believe you said you had not; is that right?
**A. Correct.**
Q. Have you ever testified in any other proceeding, whether it's a trial or any other court-type proceeding?
**A. No.**
Q. In connection with the Trevor Milton matter, did you at any point meet with anyone from the Department of Justice?

Page 6

**A. No.**
Q. Or the Securities and Exchange Commission?
**A. No.**
Q. Have you been asked to provide any written statements or sworn statements in connection with any proceedings between Trevor Milton and Nikola, the company?
**A. No.**
Q. Okay. Thank you for that.
Just quickly, Mr. Gale, since we don't have a record of any prior testimony, could you just briefly tell me your educational background?
**A. High school graduate.**
Q. Any college after that?
**A. No.**
Q. So you're not an attorney; is that correct?
**A. That's correct.**
Q. Okay. From graduating from high school, briefly could you give me your employment background? To the extent you can put time frames of years on it, so when did you graduate from high school and what have you done since?
**A. I graduated high school in 1983 --**
Q. As did I. There you go.

Page 7

**A. I spent four years in the Army after that. And then after I got out of the Army, I started working for title insurance and escrow companies. I worked for about 15 years as an examiner and a title officer. I have a couple years' experience with a 1031 exchange company. And after that, I worked about 10 years as a transactional real estate paralegal for a law firm. Then I have two years with Nikola after that.**
Q. What years were you with the law firm as a transactional --
**A. I was there for -- from 2004 to 2014.**
Q. Okay.
**A. And then I have -- I have some broken periods of self-employment and other -- I don't know the exact dates. And then I started with -- I went back -- excuse me, I worked for a law firm from 2004 to 2014, and I left for a couple of years. I went back for two years, so that would put me up to, like, 2016 to 2018, 2017 to '19, approximately.**
**I started with Nikola in the first quarter of 2019, and I left in the first quarter of 2021. And since then, I've just -- I've been self-employed.**
Q. Got it. Just briefly, what was the law firm that you worked for '04 to '14, and they went

Page 8

back for a period, '16 to '18-ish.
**A. Beus, Gilbert, PLLC.**
Q. I think I've seen in some of the texts, a name, Leo Beus, is that --
**A. Leo Beus, yeah, he was a principal.**
Q. And B-E-U-S for the reporter's benefit.
So how did you get introduced -- well, first of all, when you went to work for Nikola, who hired you?
**A. I was hired by Britton Worthen.**
Q. How did that come about? How did you get introduced to Britton Worthen?
**A. I knew Britton. He was an attorney at Beus, Gilbert.**
Q. I got'cha. Okay. And he had previously gone to Nikola?
**A. Yes.**
Q. When you were brought on to Nikola, what was your understanding of what your roles and responsibilities would be? Essentially, what were you hired to do, Mr. Gale?
**A. I was hired to negotiate the process of nondisclosure agreements.**
Q. Could you just put a little more on that? So nondisclosure agreements in what area, technology

Page 9

or?
A. Nondisclosure agreements between Nikola and parts suppliers and prospective customers.
Q. Prior to joining Nikola, did you have experience in reviewing nondisclosure agreements?
A. I did not.
Q. So during that period, did you report directly to Mr. Worthen?
A. No. I reported to Steve Cook.
Q. Who is Steve Cook?
A. He's an attorney for Nikola.
Q. Okay. Is Mr. Cook still there or?
A. I believe so.
Q. Did you have any roles and responsibilities beyond reviewing nondisclosure agreements in that 2019 to 2021 period?
A. Working for Nikola?
Q. Correct.
A. No.
Q. Did there come a point in time where you did work for Mr. Milton?
A. Yes.
Q. How did that come about?
A. Mr. Milton was familiar with my role as a transactional paralegal at Beus, Gilbert.

Page 10

Q. How was he aware of that?
A. I don't know exactly.
Q. Before you joined Nikola, had you ever met Mr. Milton?
A. No.
Q. To the extent he learned anything about what your background was or what prior work experience you had, it was after you got -- after you were employed at Nikola?
A. I don't know.
Q. Okay. So to the extent you can recall, how did the conversation come up about him -- about you performing work for him personally?
A. There was an existing real estate transaction that had not closed when I came on board at Nikola, and I was asked to review and manage the closing from a transactional standpoint.
Q. Where was that real estate located?
A. Utah.
Q. Do you recall what piece of property that involved?
A. That was the big ranch with the house on it that sat on the river. I can't remember who the seller was.
Q. So when you were first asked to look at

Page 11

the documentation, was that transaction already under contract, or what stage was it in, if you remember?
A. Yes. It was already under contract in escrow.
Q. Do you recall what the terms were of that transaction? By "that" I mean, was there -- was it all cash? Was there cash and any stock involved? Do you recall what the consideration was on that transaction?
A. Cash and stock was involved.
Q. To the extent you can recall, what was the total purchase price between the cash and the stock?
A. I don't remember.
Q. Were you asked, as part of reviewing the documents in that transaction -- asked to review any of the stock-related documents in addition to the real estate documents?
A. No.
Q. Prior to -- and just, generally, if you recall, you joined the company in 2019. Do you recall, generally, when that transaction roughly took place?
A. Right at the start, almost simultaneous with my onboarding.
Q. Got it. So late 2019?

Page 12

A. No. Early 2019, first quarter, 2019.
Q. Okay. Yeah, I didn't ask. Do you remember exactly what month you started at Nikola?
A. I don't.
Q. Prior to being asked to review the documentation on this 2019 real estate transaction, had you had any occasion to review any sort of stock agreements as part of your work prior to that?
A. No.
Q. Do you recall what the stock was -- stock in what company that was being used in that transaction?
A. I do not.
Q. Did that transaction close in 2019?
A. Yes, it did.
Q. Did you have any recollection of anything about the stock component of the transaction, how many shares or what the value was?
A. I do not.
Q. Were there any other transactions in 2019, real estate transactions for Mr. Milton, that you were involved in, if you remember?
A. I believe there were, yes.
Q. How many?
A. I can't remember. I don't know.

Page 13

Q. Do you know whether any of those other real estate transactions involved a combination of cash and stock?
**A. They did.**
Q. So I'll show you this document later on, but I'm going to -- maybe this will refresh your recollection again. I may show you a document, Mr. Gale, or ask you a question. If it refreshes your recollection about a name, then that's what I'm looking for. If it doesn't, that's fine as well. There's a list of transactions. There's one that's Bar X Ranch, owners, Goodell; does that sound familiar?
**A. Bar X Ranch does. I don't remember the surname though.**
Q. Okay. Crandall Canyon with Brasher?
**A. I do remember, yes.**
Q. Double Creek with Noyes?
**A. Yes.**
Q. Riverbend Ranch with Smith?
**A. Yes.**
Q. Is that the one with the house on it, Riverbend Ranch?
**A. I don't remember.**
Q. The sale price was $32 million?

Page 14

**A. For Riverbend Ranch? Who was the seller on that?**
Q. What I have listed is Smith.
**A. Oh, Vinny Smith, yeah. That's the big -- that's the first one, I believe, that I walked into. Yeah, Vinny Smith. Vincent Smith, I think, is his name.**
Q. Okay. And again -- yeah, so that's the biggest one. That's the highest-priced one and then it also appears to be the one with the most stock component. Is that consistent with your recollection?
**A. It was the highest price is my recollection.**
Q. And then we'll talk about the Hicks Wasatch Creek Ranch; do you recall that transaction?
**A. I do.**
Q. Again, just trying to put this in time. Do you know whether these transactions occurred before the company became a public company?
**A. Ask your question again, please.**
Q. Sure. Do you know the transactions -- well, Riverbend, you said, was 2019. We know Wasatch Creek's -- ended up closing. The initial purchase of sale was around June of 2020. I was just wondering,

Page 15

were the other real estate transactions -- do you know whether those closed before June when the -- Nikola became a publicly-traded company?
**A. I believe they did, yes.**
Q. Okay. Mr. Gale, you mentioned sort of doing the review of the nondisclosure agreements as part of your work with Nikola and these real estate transactions. Did you view those in any way as part of Nikola's business or personal to Mr. Milton?
**A. Personal to Mr. Milton.**
Q. Was the company aware at the time these transactions were occurring of these transactions, the terms of them?
MR. PACE: Objection to form.
**THE WITNESS: I don't know.**
Q. (By Mr. Robertson) Did you ever disclose to Mr. Worthen at the time these transactions were being negotiated that Mr. Milton was negotiating transactions with a combination of cash and securities?
**A. I do not remember having specific conversations with Britt Worthen.**
Q. Do you recall Mr. Worthen or anyone else at Nikola coming to you for information about these transactions that were occurring prior to the company

Page 16

becoming a public company?
**A. I don't remember.**
Q. Did Mr. Milton ever direct you not to discuss these transactions with company personnel?
**A. No.**
Q. So with regard to this work that you were doing for Mr. Milton, personally, how were you paid?
**A. I was paid through close of escrow.**
Q. Did you bill separately? Did you effectively have, you know, your Nikola work, but then separately conducted a bill for the work that you were doing for Mr. Milton?
**A. It was a flat rate per transaction.**
Q. Do you recall what that flat rate was?
**A. I do not.**
Q. Do you have any general range that you recall?
**A. I don't.**
Q. Was it a percentage or was it a flat dollar rate?
**A. It was just a flat dollar rate.**
Q. But you don't recall exactly what that was?
**A. I don't.**
Q. Okay. Did you have any separate agreement

with Mr. Milton with regard to performing those services for him?
**A. Rephrase, please.**
Q. I'm just wondering -- so, if I understand you, you went to work for Nikola. You were hired by Mr. Worthen to do the work you were doing for Nikola. By your testimony, separately, you were working with Mr. Milton reviewing real estate and working with him on real estate. I just wondered if you had a separate, written agreement with him for the performance of those services?
**A. I did not have a written agreement.**
Q. So this flat fee, was that just something that was discussed with Mr. Milton verbally and you agreed to do it?
**A. Yes.**
Q. Were there any other attorneys involved in these transactions representing Mr. Milton that you can recall?
**A. Only one that I recall, Andrew Lillywhite.**
Q. Was he involved in each of these transactions or only some of them?
**A. Only some of them.**
Q. Are you aware of whether any of the other owners or sellers who sold in those other



transactions to Mr. Milton -- do you know whether any of them have brought any claims related to the stock that they got as part of those transactions?
MR. PACE: Object to -- assumes facts and lack of foundation, but go ahead.
**THE WITNESS: Repeat the question, please.**
Q. (By Mr. Robertson) I'm just wondering if you are aware of whether, in any of these other transactions, to the extent that any of those sellers received securities, Nikola securities -- whether you're aware that they brought any claims?
**A. Other than this one, I'm not aware.**
Q. Were you involved in any negotiations between Mr. Milton and any other seller after the transactions closed?
**A. I don't understand the question.**
Q. I'm just wondering is -- after the transactions closed, were you involved at all in negotiating or resolving any disputes between the sellers and Mr. Milton?
**A. No.**
Q. With regard to the Hicks' transaction, how did you become aware that Mr. Milton was pursuing a purchase of the Wasatch -- well, first of all, if I refer to a piece of property as the Wasatch Creeks



Ranch; do you know what I'm speaking of?
**A. Peter Hicks' property.**
Q. Okay. I didn't ask you this before. Where do you currently live?
**A. Phoenix, Arizona.**
Q. Have you ever lived in Utah?
**A. Never.**
Q. Have you ever seen or been on the Wasatch Creeks Ranch?
**A. Never.**
Q. But were you generally aware of where the ranch was and its size?
**A. From Google Maps, and also surveys and county records, you know, GIS mapping.**
Q. How did you first become aware of a potential purchase of the Wasatch Creeks Ranch by Mr. Milton from Peter Hicks?
**A. I don't remember exactly.**
Q. Do you recall when you first -- when you first were contacted about a potential transaction involving the Wasatch Creeks Ranch?
**A. I do not.**
Q. Let me see if this will help.
MR. ROBERTSON: Sandy, if we have -- it's the document that's A5RE, and it starts at 1203 and



goes through -- let's see, it goes through 1223.
Q. (By Mr. Robertson) Hopefully this will work, Mr. Gale, pull up documents. There we go. Brilliant. We can magnify things if it's hard to read.
MR. ROBERTSON: Actually, we may want to do that, Sandy, magnify it a little bit right there.
(Gale Exhibit No. 1 was marked for identification.)
Q. (By Mr. Robertson) So looking at these texts, Mr. Gale -- and I'll represent to you these were produced by David Anderson. Do you know who Mr. Anderson is?
**A. I do.**
Q. Had any of the other -- and Mr. Anderson was the real estate broker involved in this transaction, correct?
**A. Correct.**
Q. Was he involved in any of the other transactions that you were involved in with Mr. Milton?
**A. He was.**
Q. All of them or some of them?
**A. I believe all of them after -- exclusive of Riverbend Ranch.**

Page 21

Q. Okay. So these appear to be texts dated -- and I'll represent to you, Mr. Gale, I should have figured this out the way they were produced. If you see, for example, the bottom of the first text, it says "received," and then if you look at the top of the next one, it says "received," so they're sort of overlapping a little bit. And it looks to be June 1st, 2020, that these texts were exchanged. And the top one says, "Forget about," blank, "Trevor calling you now on Hicks." Do you see that?

**A. I do.**

Q. Does this refresh your recollection that was on or about June 1st, that you were contacted about working with Mr. Milton on the Wasatch Creeks Ranch purchase?

**A. Contextually, I don't -- who is the other party on these texts?**

Q. It's you, if you roll up.

**A. No, I understand I am, but...**

Q. I'm sorry, David Anderson. David Anderson produced these texts to us, to all the parties in the case, and he identified the texts as texts he had exchanged with you.

**A. Okay. And so, ask your question.**

Page 22

Q. And I'll just -- just to make sure we have the record, there's a number at the top. It says "(602) 644-9666"; is that your phone number?

**A. No. Without getting in the weeds, that's not my personal cell number. I always used my personal cell. Nikola did not provide any phones. I don't recognize that number. It's not a number I'm familiar with.**

Q. Let's scroll down. Let's see if we can solve this mystery. Let's scroll down.

MR. ROBERTSON: It's 1205, Sandy, it's at the bottom. No, scroll back up.

Q. (By Mr. Robertson) So this is later. This is in July. It appears to be -- it says, "Please do not use (602) 644-9666 for any communications. I didn't realize, but all calls through that number are recorded. The fact that it's tied to Nikola Corporation is the problem. We don't need to leave any information trails that run to Trevor's personal deals"; do you see that?

**A. I do.**

Q. Do you recall giving that instruction in July of 2020 to not use the 9666 number?

**A. I don't think that's right. That text is to me. I believe somebody's instructing me not to use it. My response is in blue on the right.**

Page 23

Q. Okay, so that's your reading of this?

**A. I'm guessing that's the case, given the header of the screen shot says to Mark Gale. All of my responses would be on the right side of the -- that's typically how my phone works, so I don't believe that that comment at the top, "Please do not use 602 for any communications" is not -- I didn't initiate that. I received that and then responded to it.**

Q. Okay. Because if we look at the one on the left, it says, "Okay, thanks, Mark. Hope you're taking some time off. You deserve a break" is in the green. That would appear to be coming from Mr. Anderson, but, again, I don't want to testify for you. But you're reading of this is that that was not your text?

**A. Yeah -- well, the (602) 644 number is not David Anderson either.**

Q. That's what I'm trying to understand. Do recognize this (602) 644-9666 number?

**A. I don't remember it, no. It's not my -- it's not a number that was ever associated with me personally -- well, it's not a cell number or a landline that I've ever owned.**

Page 24

Q. Okay. Could it have been a Nikola number that was given to you?

**A. I don't believe so. During my time at Nikola, we were never assigned phone numbers. There was some public group use phones available, but I wouldn't have been able to text from them.**

Q. So do you recall ever telling anyone that "We don't need to leave any information trails that run to Trevor's personal deals"?

**A. I don't remember. I don't.**

Q. Let's --

MR. ROBERTSON: Sandy, can we pull that down for a minute and then can we pull -- pull down the whole document. And then if we could pull up 503, so A5RE 000503.

MR. PACE: Just for the record, are you marking these?

MR. ROBERTSON: We should mark that as Gale Number 1.

This will be Gale 2.

(Gale Exhibit No. 2 was marked for identification.)

MR. ROBERTSON: Sandy, can you pull up 503? Do you have it?

MS. RECINOS: One second.

Page 25

MR. ROBERTSON: Sure. It's A5RE 503.
We can come back to it, Sandy, if you can't find it.
MS. RECINOS: I don't see it right now. That might be best.
MR. ROBERTSON: Let's pull back up A5RE -- the one you just had, pull that back up. Yes, thank you. Go back up to the first page.
Q. (By Mr. Robertson) Mr. Gale, with regard to the Wasatch Creeks property; do you recall when you were contacted by Mr. Milton to work with him on this, that there was some urgency to getting the deal closed?
**A. I remember the urgency component as it related to getting the deal closed prior to the acquisition. I do not remember the nexus of that information.**
Q. Meaning, you knew that there was an urgency, but did you know why the urgency was there?
**A. My recollection is that the deal had to be documented prior to the acquisition, the merger.**
Q. Did you have any understanding that the reason it had to be documented before the merger was because there was a stock component to the deal?
**A. Ask the question again, please.**

Page 26

Q. Sure. With regard to why it needed to close before the transaction closed -- well -- let me back up.
Did you understand around this time Nikola was engaging in a transaction with a company called VectoIQ?
**A. I was.**
Q. And that after that transaction occurred that Nikola would be publicly traded?
**A. Yes.**
Q. Did you have any discussions with Mr. Milton about the fact that the reason this transaction needed to close was because there was a stock component in the transaction that had to close before the company went public?
**A. I do not remember.**
Q. Did you discuss the stock component of this transaction -- well, did you have an understanding, first of all, that the transaction would have a cash component and a stock component?
**A. Yes.**
Q. Did you ever speak with anyone at Nikola, other than Mr. Milton about the fact that the transaction had a stock component?
**A. Likely Matt Peterson.**

Page 27

Q. Who is Matt Peterson?
**A. Matt Peterson was Trevor's executive assistant.**
Q. Do you recall talking to anyone else at Nikola about the fact that Mr. Milton was looking to close this real estate transaction prior to Nikola becoming public?
**A. I don't recall.**
Q. Do you know whether the terms of the transaction, the cash and stock components, were reviewed by anyone within Nikola's legal department before the transaction closed?
**A. I don't know.**
Q. So, for example, do you recall whether you had any conversations with Mr. Worthen about this transaction prior to the VectoIQ/Nikola merger closing?
**A. I do not remember a specific discussion.**
Q. Okay. Did you -- were you asked to review any securities component of this transaction from the standpoint of -- well, let me say, other than reviewing the Option Agreement itself, were you asked to look into any securities, regulatory issues related to this transaction?
**A. Rephrase. I'm not quite understanding the question.**

Page 28

Q. Sure, sure. Were you asked in any capacity to look into whether this transaction, because it involved stock, required any additional disclosures or anything related to the securities loss?
**A. I don't remember.**
Q. And again, I think you testified that you had not had experience with securities prior to 2019, right?
**A. I had no -- I have never had experience with securities.**
Q. So even if you were asked to review the securities component of this, beyond the documentation, would you have had the expertise to evaluate that?
**A. I'm still -- I guess I'm still not understanding your question.**
Q. I guess I'll back up then --
**A. Expertise beyond just reviewing what had already been agreed to and documenting that?**
Q. Correct.
**A. No.**
Q. Okay. Do you know whether Mr. Milton ever sought counsel from anybody on whether or not -- and

Page 29

you can just say "yes" or "no" -- on any securities disclosure or securities obligations?
MR. PACE: Object to lack of foundation, but go ahead, if you know.
**THE WITNESS: Repeat the question, please.**
MR. ROBERTSON: Could you read it back, Christina?
(Last question read by the court reporter.)
**THE WITNESS: No.**
MR. ROBERTSON: So, Sandy, if we could pull up -- it would be 612020655.
Q. (By Mr. Robertson) So, Mr. Gale, I pulled up on the screen -- we'll mark this -- I think we're on Exhibit 3.
(Gale Exhibit No. 3 was marked for identification.)
Q. (By Mr. Robertson) It's an e-mail chain from June 1st, 2020, 6:55 p.m. It's David Anderson to Peter Hicks; Matthew Anderson; tspent@gmail.com and then mark.gale@nikolamotor; do you see that?
**A. I do.**
**Would it be possible to take a technology break here? There's a vertical string of all the participants that's blocking the --**

Page 30

Q. Oh, blocking the document?
**A. Yeah. I'm trying to figure out -- okay, I had it full screen, but now I can see it.**
MR. PACE: Could you tell me the Bates number on this one, if there is one.
MR. ROBERTSON: Yeah. It's A5RE 000511.
MR. PACE: Thank you.
Q. (By Mr. Robertson) So this is from Mr. Anderson. It says, "I am starting a group e-mail for everyone to correspond to on the verbal deal that was just struck between Peter Hicks as Seller and Trevor Milton as Buyer"; do you see that?
**A. I do.**
Q. Were you involved in any of the negotiation discussions over the terms of the transaction?
**A. I was not.**
Q. Were you involved in any of the conversations that occurred between Peter Hicks and Trevor Milton over the terms of the deal or the deal itself?
**A. No.**
MR. ROBERTSON: Let's scroll down a little bit, Sandy. There we go.
Q. (By Mr. Robertson) It says, "Buyer and

Page 31

Buyer Attorney: Trevor Milton (Buyer)." And then it has his cell phone and then tspent@gmail.com. Is that Mr. Milton's e-mail?
**A. Yes.**
Q. Then it says, "Mark Gale (Buyer's Attorney), Nikola Motor" and cell 9666; do you see that?
**A. I do.**
Q. So again, does that refresh your recollection as to whether that is a cell phone number that was provided by -- or cell phone that Nikola provided you?
**A. It was not -- Nikola never provided me a cell phone. Now, that -- my best recollection is -- is that I may have been using a Hangouts chat, you know, an online text program, so that I didn't have to use my personal phone.**
Q. I see, okay.
**A. Because --**
Q. Seeing this now, is that what you recollect?
**A. I'm guessing. Because I've never -- I had the same cell phone and cell phone number for a long, long, long time, long time, and I just honestly don't recognize that number.**

Page 32

Q. Okay. And that's fine, Mr. Gale. You know, we put things in front of you to see if you can remember, but if you can't, you can't.
And then you also had an e-mail @nikolamotor, correct?
**A. Yes.**
MR. ROBERTSON: So if we can pull that down, Sandy, and then pull up -- it's also 6/1/2020 at 7:05.
Q. (By Mr. Robertson) This just appears, Mr. Gale, to be a continuation.
MR. ROBERTSON: Adam, for your benefit, it's A5RE 454. And we'll introduce this as Gale Exhibit 4.
(Gale Exhibit No. 4 was marked for identification.)
Q. (By Mr. Robertson) It says, "All, I'm available to discuss the transaction at any time. It's my understanding that Buyer would like us to get the deal documented tonight if at all possible." Do you see that?
**A. Yes.**
Q. Again, did Mr. Milton, as the buyer, communicate to you that he wanted to get the transaction done, if possible, by the evening of

June 1st, 2020?
**A. Yes.**
Q. Again, was that because the transaction needed to close before the VectoIQ/Nikola deal closed?
**A. Yes.**
**That telephone number that appears under my name in my signature block, that's my long time cell phone number.**
Q. Okay. So the (623) 202-3150 is your cell number that you had a long time? The 602 number, you don't recall having an actual physical cell phone, but it may have been a text number?
**A. Yes.**
MR. ROBERTSON: So, Sandy, can we pull back up the texts that were 1203.
Q. ( By Mr. Robertson) Mr. Gale, would you agree with me between June 1st, when you first became notified of this deal through it closing, there was a lot of work to get done?
**A. Yes.**
Q. Let's scroll down. So this is a text -- right there, June 1st at 9:43 p.m. It says, "Mark, I'm sure you're aware, but the exhibits in the Option Agreement still have a bunch of references to" -- and



it's blanked out "and some to" blank. "I know that was a quick first template draft. Is there anything I could be doing to assist?" Do you see that?
**A. Yes.**
Q. Do you recall that the first draft of the Option Agreement had references to -- a thing called Naniloa?
**A. Yes.**
Q. Do you recall what Naniloa was?
**A. My recollection is they were a party to a previous real estate transaction and we failed to properly substitute their name in the PSA.**
Q. Do you know whether the -- did the Naniloa transaction close?
**A. I don't remember.**
Q. Do you know who drafted the documents for that transaction that were used other than for this one?
**A. I do not.**
MR. ROBERTSON: Sandy, you can pull that down, although, I'm going to need it again, so keep it handy. It's 6/2/2020 at 7:47.
MS. RECINOS: Repeat that one more time, please, Chris.
MR. ROBERTSON: Sure, it's 6/2/2020, 7:47



a.m.
Adam, it's A5RE 410.
(Gale Exhibit No. 5 was marked for identification.)
MR. ROBERTSON: Let's scroll down a little bit. Now, we're into June 2nd.
Q. (By Mr. Robertson) Do you recall, Mr. Gale, that the transaction didn't close on June 1st?
**A. I don't recall.**
Q. Okay. So on this document --
MR. ROBERTSON: First of all, let's scroll up to the top, Sandy.
Q. (By Mr. Robertson) This appears to be an e-mail from you to Matthew Anderson, copying David Anderson, Trevor Milton, and Peter Hicks; do you see that?
**A. I do.**
Q. Were you the primary point person on negotiating the agreements on behalf of Mr. Milton?
**A. Not a yes-or-no question. I only documented the already-agreed upon terms.**
Q. Because you mentioned Mr. Lillywhite, but do you recall Mr. Lillywhite being involved in this June time frame with regard to these agreements?



**A. I don't remember if Andrew Lillywhite was involved in this particular transaction. I don't believe he was.**
Q. Do you recall any other attorney being involved in these discussions in June --
**A. No.**
Q. -- on behalf of Mr. Milton? I should make it clear.
**A. No.**
Q. Do you know who Matthew Anderson was?
**A. Yes.**
Q. Was he counsel for Mr. Hicks?
**A. Yes.**
Q. Matt Anderson, in the e-mail below, the one at 6:33 a.m., says, "Two questions we had about the option: Can we make the option fully assignable (and remove the requirement for grantor's consent)," and then it says, "Can we secure (or otherwise ensure) the obligation to sell the shares at the option price, assuming proper exercise of the grant against the property? Put differently, what assurance do we have that the option will be honored?" Do you see that?
**A. Yes.**
Q. Do you recall this communication and these

Page 37

questions being raised by Mr. Hicks' attorney in connection with the transaction?
**A. I do not.**
Q. Okay. And you respond, "Option can be assignable" and "seller has right to pursue specific performance against Buyer, Section 8."
Do you recall responding in that way in June of 2020?
**A. I do not.**
Q. Beyond what's in this e-mail, do you recall any discussions about the assignability of the option as a discussion point in negotiations?
**A. No.**
MR. ROBERTSON: Sandy, let's take this down and we can pull up Bates Milton 2934.
(Gale Exhibit No. 6 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, this is a document dated June 2nd, 2020, from you to Mr. Hicks, Matthew Anderson, David Anderson, and Trevor Milton. Subject line is "PSA and Stock Option"; do you see that?
**A. Yes.**
Q. Do you recall the issue of whether the stock option and a 1031 exchange -- do you recall

Page 38

that issue coming up in connection with the negotiations and closing of this transaction?
**A. Yes.**
Q. What do you recall about the 1031 issue that arose?
**A. Just that it was last minute. We hadn't discussed it at all up to the point that the seller raised it.**
Q. So prior to June -- prior to -- well, you first had been notified that this thing was going to go forward the day before, right, on June 1st; is that correct?
**A. Yes.**
Q. So the next day, the issue of this 1031 came up. I think you mentioned earlier in your testimony you actually worked for a 1031 company for a couple of years, correct?
**A. Yes.**
Q. So you have a basic understanding of what a 1031 exchange is?
**A. I do.**
Q. Do you know whether there were with any discussions between either Mr. Hicks and Mr. Milton or Mr. Anderson, David Anderson, and Mr. Milton about the fact that there was a 1031 component to this

Page 39

proposed transaction?
**A. No.**
Q. And then it says, "Trevor is unwilling to revise the PSA to accommodate a seller review period in connection with the stock option"; do you see that?
**A. Yes.**
Q. Can you just can explain -- well, did you discuss this issue with Mr. Milton?
**A. I don't remember.**
Q. Do you have an understanding of what a seller review period in connection with the stock option -- what that means in the context of this e-mail?
**A. I don't remember.**
Q. Sitting here today, looking at it now, do you have any understanding of what you were referring to when you talked about a seller review period?
**A. Not specifically.**
Q. It also says, "He's also unwilling to secure ties to stock option with a performance deed of trust against the property"; do you see that?
**A. I do.**
Q. Do you have an understanding of what that means?

Page 40

**A. Yes.**
Q. What's your understanding of what that means?
**A. That the buyer was unwilling to secure the outcome, just basically what the sentence says. He's unwilling to secure ties to stock option with performance deed of trust against the property.**
Q. What's a performance deed of trust against the property, what does that mean?
**A. Foreclosable document in the event that the -- Trevor failed to transfer stock under the option.**
Q. Do you recall any discussions with Mr. Milton about his unwillingness to provide that security?
**A. No.**
Q. Do you recall any discussions about other alternatives -- strike that.
Were you involved in any discussions about other alternatives different than a stock option as part of this transaction?
**A. I do not recall.**
Q. Do you recall any discussions about not having it be a stock option but having it be stock?
**A. Restate the question.**

Page 41

Q. Sure. Rather than a stock option, do you recall any discussions about it being simply stock?
**A. No.**
MR. ROBERTSON: Let's pull up 6/2/2020 at 4:05. We'll mark this as Gale 7.
Scroll down, Sandy -- wait, stay there.
(Gale Exhibit No. 7 was marked for identification.)
Q. (By Mr. Robertson) First of all, Mr. Gale, this appears to be an e-mail from you to Matt Anderson, copying Mr. Hicks, David Anderson, and Trevor Milton, dated June 2nd at 4:05.
Do you recognize this e-mail as an e-mail that you sent?
**A. Yes.**
MR. ROBERTSON: Let's scroll down.
Q. (By Mr. Robertson) I assume, Mr. Gale, that during this period on June 2nd, there were multiple drafts of the documents being exchanged back and forth; is that consistent with your recollection?
**A. Yes.**
Q. Here at 2:19 p.m., it appears to be from Matthew Anderson to you, attaching an updated draft to the PSA. "It's the same as the version I sent earlier (where we had accepted all of our changes except the deletion of the confidentiality and the insertion of the contingency, both at your request)."

Page 42

Do you recall a discussion about whether or not there would be a confidentiality provision in connection with this transaction?
**A. I do not.**
Q. Do you recall any drafts going back and forth that either did or did not include a confidentiality provision?
**A. No.**
Q. Do you recall whether the confidentiality of this transaction was something that you discussed with Mr. Milton?
**A. No.**
Q. Do you have any recollection of Mr. Milton indicating to you he wanted this transaction to be confidential?
**A. No.**
Q. Okay.
MR. ROBERTSON: Sandy, we can take that down. If you could pull up Exhibit 1405 -- I guess it was Government Exhibit 1405, the Purchase and Sale Agreement.
Q. (By Mr. Robertson) How are you doing, Mr. Gale? We'll get through this and then we'll take a break.

Page 43

Mr. Gale, I pulled up on the screen -- we'll mark this as Gale Exhibit 8.
(Gale Exhibit No. 8 was marked for identification.)
Q. (By Mr. Robertson) This is a copy of the Purchase and Sale Agreement. Do you recognize this document?
**A. Yes.**
MR. ROBERTSON: Can we go to the bottom of the first page, Sandy.
Q. (By Mr. Robertson) It says, "The Purchase Price shall be paid by Buyer as follows: Funds to Escrow Holder." And it states, "Within five (5) business days after the Effective Date, Buyer shall deliver to Escrow Holder an amount in cash equal to one million dollars ($1,000,000,000)"; do you see that?
**A. Yes.**
Q. Do you recall that there was a $1 million deposit that was paid by Mr. Milton as part of the Purchase and Sale Agreement?
**A. No.**
Q. Do you know what the conditions were -- first of all, with regard to the Purchase and Sale Agreement that was signed in June, was there a period of due diligence that would occur after this document was signed, to your recollection?

Page 44

**A. Yes.**
Q. Then the transaction would close at a later date, correct?
**A. Yes.**
Q. Do you know what the conditions were where Mr. Milton would get the return of the deposit or he might lose the deposit?
**A. No.**
Q. Did you have an understanding, though, if the transaction didn't close, there might be circumstances where Mr. Milton would lose his deposit?
**A. That's typical of a Purchase and Sale Agreement.**
Q. Whatever those conditions would be would be contained in the agreement itself, correct?
**A. Yes.**
MR. ROBERTSON: Sandy, we'll have to go into the document a ways. If it helps with the Bates, let's get to 581 is the page.
Q. (By Mr. Robertson) This says, "Option Agreement between Trevor Milton; M&M Residual, LLC;

Page 45

T&M Residual, LLC; and Hicks, LLC; Wasatch Hicks, LLC"; do you see that?
**A. Yes.**
Q. Did you know at the time what M&M Residual, LLC, was?
**A. I did not.**
Q. Or T&M Residual, LLC?
**A. I did not.**
Q. Did you know who the owners were of those entities?
**A. Yes.**
Q. Who?
**A. Well, Trevor Milton was one of them. I believe there are others, but I don't remember.**
Q. Do you know whether Mr. Milton controlled those entities?
**A. I do not.**
Q. Did you ever review the underlying corporate documents that relate to these entities in connection with putting this Option Agreement together?
**A. I do not remember.**
Q. I should back up, Mr. Gale. Were you the one that originally drafted this Option Agreement?
**A. I do not remember.**

Page 46

MR. ROBERTSON: Let's scroll down. There's a table of contents. And scroll down to the bottom of this page, Sandy, so we can see the corner.
Q. (By Mr. Robertson) I mentioned this earlier, right there. It says, "Option Agreement Milton, Naniloa." Do you see that?
**A. I do.**
Q. And again, your understanding is that Naniloa was a prior transaction?
**A. Yes.**
Q. Do you have any recollection of using the documents from that transaction to create the documents for this transaction?
**A. It appears we did.**
Q. Do you know who drafted the earlier agreement?
**A. No.**
Q. Was it you?
**A. I don't have any recollection of doing it.**
Q. Did you have any understanding that the Option Agreement -- let's go down the page.
So if we look at the agreement, Mr. Gale, the Option Agreement is entered the first day of June 2020, by and between Trevor Milton, and then the entities, and then Peter Hicks; do you see that?

Page 47

**A. Yes.**
MR. ROBERTSON: If we scroll down, Sandy.
Q. (By Mr. Robertson) Here, the definition of company says, "...has the meaning set forth in the recitals above." But if we go above, do you know whether there's any reference as to what company is being referenced in terms of the shares -- oh, here it is. So it says, "...whereas, Grantors own shares of the common stock of VectoIQ Acquisition Corp. (the 'Company')"; do you see that?
**A. Yes.**
Q. So is it your understanding -- or was it your understanding at the time that what was being offered as the shares that would be subject to this option were VectoIQ Acquisition Corp. shares?
**A. Yes.**
Q. Do you know whether Mr. Milton, as of June 1st, actually owned any VectoIQ shares?
**A. I do not.**
Q. Do you know whether -- well, did you have an understanding that also these shares were going to be locked up for some period of time?
**A. Yes.**
Q. Do you know whether the lockup of the shares related to VectoIQ shares or some other

Page 48

company shares?
**A. Ask the question again, please.**
Q. Sure. I'm just curious whether -- did you ever review whatever the terms of the lockup were to determine whether the shares that were at issue were VectoIQ shares or some other company?
**A. No.**
Q. In terms of putting this document together, who provided you the information about what the shares would be, that would be the subject of this option?
**A. I don't remember.**
Q. Was it Mr. Milton?
**A. I don't remember.**
MR. ROBERTSON: Go to the next page, Sandy.
Q. (By Mr. Robertson) Then here, it says, "Grantor-Owned Shares"; do you see that?
**A. Yes.**
Q. It's L, it means, "All shares of capital stock of the Company beneficially owned by each of the Grantors as of June 2nd."
Just expanding on my prior question, do you know whether M&M Residual or T&M Residual or Mr. Milton owned any of the shares of VectoIQ as of

Page 49

June 2nd, 2020?
A. **I do not.**
Q. Okay. Do you know whether anyone at Nikola reviewed this agreement, this Option Agreement, before it was signed by Mr. Milton, other than Mr. Milton, reviewed this agreement prior to Mr. Milton signing it on or about June 1st or 2nd of 2020?
A. **I don't remember.**
Q. Do you recall any attorney on behalf of Mr. Milton being involved in reviewing this document before it was signed?
A. **No.**
MR. ROBERTSON: That's probably a good point for a break, which I could use as well. Take 10 minutes, folks? So 35 past the hour, we'll reconvene. Again, just to give you some comfort, I'm making good progress, so hopefully we'll be efficient, like I said.
THE VIDEOGRAPHER: Going off the record. The time is 12:24 Mountain, 2:24 Eastern Time.
(Brief recess.)
THE VIDEOGRAPHER: Returning on the record at 12:35 p.m. Mountain, 2:35 p.m. Eastern.
Counsel.

Page 50

MR. ROBERTSON: Thank you.
Q. (By Mr. Robertson) So, Mr. Gale, we found the document I was going to show you earlier, so why don't we go back and pull that up. It's Bates A5RE 503.
Mr. Gale, this is an e-mail from you to David Anderson, subject: "Trevor's Real Estate Transaction" and it's July 23rd, 2020, at 10:11 a.m.?
Do you recognize this e-mail from you to Mr. Anderson from July of 2020?
A. **Yes.**
Q. Do you recall you instructed Mr. Anderson, "On a go-forward basis, please do not use my Nikola e-mail address for Trevor's real estate deals"?
A. **Yes.**
Q. Why did you do that?
A. **We didn't want to use Nikola company asset for Trevor's personal transactions.**
Q. We showed you the text earlier, which I'll represent to you is dated the same day. So seeing this where you instruct Mr. Anderson by e-mail to not use your e-mail address, does that change any of your recollection or refresh your recollection about you also instructing him not to use that Nikola phone number in connection with real estate transactions

Page 51

involving Mr. Milton?
A. **Rephrase the question, please.**
Q. Sure. And I can pull it up. I showed you the text earlier --
A. **Yes.**
Q. And that also is dated July 23rd, 2020. My question is, seeing this document now and the prior text, do you recall instructing Mr. Anderson both by text and by e-mail not to use your Nikola e-mail or telephone number on a go-forward basis after July 23rd, 2020?
A. **Yes.**
MR. ROBERTSON: We can take that down, Sandy.
Sandy, can we pull up -- it's NKLA-Hicks_91. Let's scroll down.
(Gale Exhibit No. 9 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, do you recall at some point in July of 2020, any e-mails or conversations with Mr. Worthen about Mr. Milton's real estate transactions that involved a stock component?
A. **That's apparently the case, yes.**
Q. Separate from seeing it in this e-mail, do

Page 52

you recall that conversation coming up?
A. **No.**
Q. Do you know whether prior to July 22nd of 2020, Mr. Worthen was aware of the transactions that Mr. Milton had engaged in where he had used stock as part of the purchase price?
A. **Rephrase the question.**
Q. Sure.
MR. ROBERTSON: Actually, can you just read that back?
(Last question was read back by the court reporter.)
**THE WITNESS: No.**
(Gale Exhibit No. 10 was marked for identification.)
MR. ROBERTSON: Sandy, let's scroll down.
Q. (By Mr. Robertson) On the screen we have a chart -- a number of transactions, owners, and then other data in here and I'll just -- not to hike the ball, Mr. Gale, but this is what I was referring to earlier.
Do you recall this chart?
A. **Yes.**
Q. Did you create this chart?
A. **I did.**

Page 53

Q. Can you explain to me how you created this chart? From what information did you put this together?
**A. From the various Purchase and Sale Agreements.**
Q. Seeing this, do you recall that these are transactions that Mr. Milton engaged in where he utilized a stock component in the purchase price?
MR. PACE: Object. Lack of foundation. Go ahead.
Q. (By Mr. Robertson) What was your answer, Mr. Gale?
**A. Yes.**
Q. How did you -- well, were you involved in each of these in reviewing documentation related to them?
**A. Yes.**
Q. Do you know whether anyone at Nikola, other than Mr. Milton and yourself -- were also involved in any way in reviewing the documentation with regarded to these transactions?
**A. Matt Peterson.**
Q. Is Matt Peterson an attorney?
**A. No.**
Q. Do you know whether any attorney at Nikola

Page 54

reviewed any of the documentation relating to Mr. Milton's land transactions involving securities before they closed?
**A. No.**
Q. Okay. Looking at this chart, there is a column -- the transaction we talked about earlier, owner, acreage, sale price, dollar per acre; do you see that?
**A. Yes.**
Q. How did you come up with the dollar per acre number?
**A. Sales price divided by acreage.**
Q. Do you have any understanding of why, for example, the dollar per acre at Riverbend Ranch was $1,200 per acre versus Wasatch, which is $1,800 per acre or Crandall, which is $3,400 per acre?
**A. No.**
Q. Again, you weren't involved -- or were you involved in any of the financial negotiations on any of these transactions as to what Mr. Milton would pay?
**A. I was not involved in any of the financial...**
Q. And then there's a pre merger -- it says, "Number of Shares" and "Price Per Share"; do you see

Page 55

that?
**A. Yes.**
Q. Okay. Were you involved in negotiating, in any way, the strike prices that are listed here for at least three of these transactions?
**A. No.**
Q. And then there's a total value; do you see that?
**A. Yes.**
Q. So that's pre-merger. And then it says, "Post-merger, 1.901 Multiplier"; do you have an understanding what that relates to?
**A. I do not remember.**
Q. Did you recall there being some pre- and post-merger multiplier in terms of the number of shares and the price per share as it related to these options?
**A. You know, as evidenced by the -- by the spreadsheet, yes. But I don't remember the reasoning, the exact -- you know, the nexus of that multiplier.**
Q. Okay. Other than what's in the document itself, you don't have any independent recollection of how the multiplier or the pre- and post-merger number of shares or price per share worked?

Page 56

**A. No.**
Q. Okay. Do you recall that when --
MR. ROBERTSON: Let's scroll back up to the first page.
Q. (By Mr. Robertson) First of all, do you recall having any conversations with Mr. Worthen about the issues in this e-mail, or was it all by e-mail?
**A. I don't recall.**
Q. Did you have any discussions with anyone at Nikola where they indicated to you that prior to July of 2020, they were unaware of one or more of these transactions?
**A. Repeat the question.**
Q. Sure. Do you recall prior -- whether around this time you became aware -- strike that.
Do you recall anyone telling you -- anyone at Nikola -- either in July or at any other point in time that they had been unaware of the transactions that Mr. Milton had engaged in utilizing Nikola stock?
**A. No.**
Q. Did anyone ever communicate to you that they were aware of it?
**A. No.**

Page 57

Q. So sitting here today, do you have any understanding of why Mr. Worthen asked you to put the spreadsheet together?
**A. On behalf of Matt Peterson. Well, Matt Peterson is asking the question in this e-mail.**
Q. Well, let's scroll down. Here, it's Britton Worthen writing, "Can we create a spreadsheet that tracks all these obligations in one place with general terms added to account for timing of transfers and number of shares, et cetera," do you see that?
**A. Yes.**
Q. Was it Mr. Worthen that made the initial request?
**A. Apparently so.**
Q. Do you have any understanding of why he, in the middle of July, was requesting this information?
**A. I do not.**
Q. Did you have any discussions with anyone at Nikola about whether the fact that Mr. Milton had used securities to purchase real estate had legal significance for the company?
**A. Ask the question again.**
Q. Sure. Did you have any discussions with

Page 58

anyone that the fact that Mr. Milton had used securities to purchase real estate had legal significance for the company?
**A. I don't remember.**
Q. As of July of 2020, had the Hicks' transaction closed yet?
**A. I don't remember.**
MR. ROBERTSON: Let's pull up -- if you have it now, by Bates, Sandy, let's pull up A5RE 967. It's August 4th, 2020 at 3:56.
(Gale Exhibit No. 11 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, I'm showing you an e-mail from Mr. Anderson to jdthompson@firstam.com copying hicksmgt@aol; David Anderson; tfoster; andrew@hao-law.com, and mark.gale@nikolamotor; do you see that?
**A. Yes.**
MR. ROBERTSON: Let's scroll down, Sandy.
Q. (By Mr. Robertson) This appears to be from you to Matthew Anderson, the original e-mail, "Hicks-Milton Closing," and it says, "Great. So does that mean we will close on August 14?" Actually, that's from Mr. Anderson to you.
Do you recall in early August

Page 59

communications setting a closing date of August 14th for the Hicks' transaction?
**A. Outside of this e-mail, no.**
Q. Do you recall that the transaction closed at some point in the middle of August of 2020?
**A. No.**
Q. Let's scroll up.
So andrew@hao-law.com, is that Mr. Lillywhite?
**A. Yes, it is.**
Q. Do you recall when Mr. Lillywhite became involved in the closing of this transaction?
**A. August 4th, just the context of this e-mail. I don't remember --**
Q. Sorry, go ahead.
**A. Go ahead.**
Q. I'm just curious if you have any recollection of being involved before this date?
**A. I do not.**
MR. ROBERTSON: Then if we go back to the prior document, Sandy, which was the NKLA-HICKS 921. We'll scroll all the way to the top.
Q. (By Mr. Robertson) Here's an e-mail from you, Mr. Gale, and it looks to be sent August 2020 from Matthew Peterson copying Mr. Worthen.

Page 60

**A. Yes.**
Q. And attaching the spreadsheet that we looked at, do you recall with regard to the Hicks-Milton transaction, whether Mr. Worthen also became involved in communications about that transaction around this time in August of 2020?
**A. Based on this e-mail, yes.**
Q. Do you know why Mr. Lillywhite and Mr. Worthen were included, now, in the communications regarding the transactions?
**A. Not being an attorney, it was always my recommendation to Trevor that he engage a transactional attorney in Utah to review the transactions.**
Q. Did you have any discussions with him specifically that you can recall about him agreeing with that?
**A. No.**
MR. ROBERTSON: All right. Let's pull up -- if you have a Bates, Sandy, it's A5RE 000407.
MS. RECINOS: I'm not seeing it, Chris.
MR. ROBERTSON: It's August 7th, 2020, 11:56. If you don't have it, I can go to a different document and come back to it.
Do we have August 10th, 2020, at 12:11

Page 61

instead?
MS. RECINOS: Yes.
MR. ROBERTSON: A5 Real Estate 57.
(Gale Exhibit No. 12 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, I've placed in front of you what's been identified -- I think we're on Exhibit 12. It's from Matthew Anderson to you, copying Jay Thompson; hicksmgt@aol.com; David Anderson; and Toni Foster. Do you see that?
**A. Yes.**
Q. There's a number of items here that are called out. Do you recall -- first of all, do you recognize this document?
**A. Yes.**
Q. Do you recall that prior to the closing on August 14th a number of changes needed to be made to the stock option?
**A. It's apparent by this e-mail.**
Q. Okay. Including -- like, looking at number 2, the reference to Naniloa in the bottom corner, we looked at that earlier, needed to be changed, right?
**A. Yes.**
Q. And similarly, number 3, it talks about

Page 62

Naniloa Investment Company needs to be changed, correct?
**A. Yes.**
Q. And then it talks about Hicks, LLC and/or Wasatch, LLC have the option to purchase 514,824 shares at an aggregate price of 8.5; do you see that?
**A. Yes.**
Q. We can look at it again, but I think when I showed you the pre- and post-merger numbers, do you recall this is consistent with what was in that document in terms of the 1.9 multiplier?
**A. I don't recall.**
Q. We can pull it up.
**A. Okay.**
MR. ROBERTSON: Sandy, let's pull up it's the NKLA-HICKS 921. Scroll down to the chart.
Q. (By Mr. Robertson) So here, looking at the chart, it has pre- and post, and here, this actually has post-merger number of shares "515,094.96." And I'll represent to you the document we just looked at said 514,824. Do you have any understanding of why there would have been a difference?
**A. Other than a change in price of the price per share, no.**

Page 63

Q. But do you recall that because of the pre- and post-merger -- because of what occurred during the merger, the share number and strike prices had to be adjusted based upon the terms of the merger and the terms of the agreement?
**A. I have a recollection that we adjusted the numbers to hit the 8.5 million.**
Q. Okay. And that's where I'm going, Mr. Gale. You recall that ultimately it was the 8.5 million that needed to true up, right?
**A. Yes.**
Q. Okay, thank you.
MR. ROBERTSON: We can take that down, Sandy.
Q. (By Mr. Robertson) Mr. Gale, have you, yourself, ever owned any Nikola shares?
**A. Yes.**
Q. How did you come to own those shares?
**A. They were part of my -- they were given to me as compensation when I came on board at Nikola.**
Q. Did Mr. Milton ever compensate you for the real estate work with any shares of Nikola?
**A. No.**
Q. Okay. Were you generally following the stock price after the company went public in June?

Page 64

**A. Yes.**
Q. You understood that between June and August, the price had risen, correct?
**A. Yes.**
MR. ROBERTSON: Sandy, let's pull up Government 1406. Let's scroll down. There we go. No, keep going down.
(Gale Exhibit No. 14 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, I'm now looking at an e-mail that's dated August 11, 2020, from you to Matt Anderson and copying Britton Worthen, Jay Thompson, and Toni Foster; do you see that?
**A. Yes.**
Q. You're writing to Mr. Anderson. Do you know why at this point you're now copying in Mr. Worthen?
**A. I don't remember.**
Q. Did Mr. Worthen ask to be included in the communications regarding this transaction after you prepared that spreadsheet?
**A. I don't remember.**
Q. It says, "I carved this e-mail out of the previous thread to answer the questions posed by the

Page 65

1031 exchange company. All references to Naniloa and the Option Agreement," and it goes on. You say, "It's a scrivener's error." What did you mean by that?
A. Just an error. We didn't address the change when we used the Naniloa documents as a base document for this transaction.
Q. Okay. It says, "As to Section 2(a) of the Option Agreement, the number of shares was 270,960 and the share price was $31.37. The stock split multiplier is 1.901"; do you see that?
A. Yes.
Q. Do you recall -- what did you mean by that, the stock split multiplier is 1.901?
A. I don't remember what the stocking split multiplier, what its purpose was.
Q. Did you talk to anyone about that that you can recall?
A. I can't recall.
Q. Do you know how you learned that the -- there was a stock split multiplier that needed to be applied?
A. Just vaguely it was a pre-merger/post-merger -- how the shares were impacted prior to merger and after merger.

Page 66

Q. Do you have any recollection whether these were VectoIQ shares or Nikola shares; do you recall any of that discussion occurring?
A. I do not.
Q. Okay. Then you say, "The number of shares is 515,095, rounded up a full share, and the adjusted share price is $16.50." Was that a function of the multiplier?
A. I would believe so. I think if we looked back at the spreadsheet we could pencil out that math.
Q. Okay.
Let's scroll up. Here Matthew Anderson asks whether there's a lockup waiver; "(or do you need one) to convey in the 150- to 180-day period or would it work better for Trevor to shift that period to 180 to 210 days"; do you see that?
A. I do.
Q. Do you recall a discussion coming up as to whether Mr. Milton could have released shares related to the lockup -- whether he had available shares to -- if the option were exercised that were not locked up?
A. I don't recall.
Q. Okay. Do you know whether the shares that

Page 67

Mr. Milton intended to use in connection with this option were locked up for any specific period of time?
MR. PACE: Object to lack of foundation, but go ahead.
THE WITNESS: I don't recall.
Q. (By Mr. Robertson) Do you recall any conversations with Mr. Milton about whether he had shares available if the option were exercised after 150 days?
A. No.
Q. Scroll up.
It says, "Matt, here is a critical dates snapshot," then it says, "Option Date: 6/2/20; NKLA Trading Start Date: 6/4/20; Exercise Period: Begins 11/1/20; Exercise Period: Ends 12/1/20; Lockup Period: Expires 12/1/20." Do you see that?
A. Yes.
Q. Do you know where you got that information?
A. I assume I got it from the Purchase and Sale Agreement and Option Agreement.
Q. Okay. And as these dates note, you state, "The buyer cannot transfer any stock prior to expiration of the lockup period." Was that your

Page 68

understanding as of August 12th, 2020?
A. Yes.
Q. Based on the terms of the option, do you know whether Mr. Milton would have had any shares available that could have been used if the option under its existing terms was exercised?
A. I'm not aware.
Q. But it says, "Exercise Period: Ends 12/1; Lockup Period: Expires 12/1."
I guess I'll ask, looking at that, do you know whether there were concerns raised about whether the option actually could be exercised?
A. I don't remember.
MR ROBERTSON: Sandy, let's pull up 1407.
(Gale Exhibit No. 15 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, I placed up on the screen Amendment No. 1 to Option Agreement. Do you see that?
A. Yes.
Q. Do you recall that the Option Agreement needed to be amended?
A. You know, based on what I'm reading here, yes. I vaguely recall Hicks requesting an additional 30 days.

Page 69

Q. If we scroll down, it says, "The Parties hereby confirm the understanding with respect to the terms of the original agreement set forth in an e-mail from Mark Gale to Matthew L. Anderson on August 11th, 2020, at approximately 3:31, Mountain Time." Was that the exchange we just looked at?
**A. I believe it was, yes.**
Q. So you understood that -- do you recall that there were e-mails back and forth, adjustments to the -- first of all, do you recall there were e-mails back and forth about amendments to the Option Agreement?
**A. Yes.**
Q. And then those e-mails were incorporated into an amendment as reflected here, correct?
**A. Yes.**
Q. Do you know on August 14th what Nikola shares were trading at publicly on that date?
**A. I don't remember.**
Q. Do you recall whether you looked at the share price as it was trading on that date when this transaction closed?
**A. I did not track it religiously. I don't remember what the values were on various days immediately following the merger.**

Page 70

Q. Do you recall, did you have any conversations with Mr. Milton regarding the share price of Nikola on the August 14th?
**A. No.**
MR. ROBERTSON: Sandy, actually, let's go back to the texts, so that's A5RE 1203.
MS. RECINOS: Chris, will you repeat that for me one more time.
MR. ROBERTSON: Yeah, it's the text, starts at 1203 and go down to Bates 1205.
Q. (By Mr. Robertson) This appears to be texts, again, that David Anderson produced, and there's a text on August 17, 2020, it says, "What's the status of Hicks' closing?"
"Just gave authorization to close."
"Hicks is closed."
So do you recall that the transaction did close?
**A. Based on this -- yeah, based on this screenshot, yes.**
MR. ROBERTSON: We can drop that, Sandy, and pull up Government 1408. You got it, Sandy?
MS. RECINOS: I do.
MR. ROBERTSON: It's a settlement statement. There we go.

Page 71

(Gale Exhibit No. 16 was marked for identification.)
Q. (By Mr. Robertson) Mr. Gale, I'm placing in front of you what's been identified -- I believe we're at 16, Gale 16. It's a final settlement statement. Are you familiar with what a final settlement statement is?
**A. Yes, I am.**
Q. The settlement date is 8/14/2020; do you see that?
**A. I do, yes.**
Q. Is that your understanding of when the transaction closed?
**A. Yes.**
Q. We note in the body of the -- if we look down, it says, "Deposits in Escrow." There's the $1 million that looks to have been deposited on June 4th, 2020, and then 7,645,155.24. Is that consistent with what you understood the payments to be, the cash payments to be, that it was a million dollars deposit and another 7-plus at closing?
**A. Yeah. Based on the settlement statement, yes.**
MR. ROBERTSON: You can take that down, Sandy.

Page 72

Q. (By MR. Robertson) After the transaction closed -- first of all, do you recall whether there were any land transactions -- were there any land transactions that you were involved in after the Hicks' transaction closed with Mr. Milton?
**A. Yes.**
Q. How many?
**A. I don't recall the exact number.**
Q. More than one?
**A. Yes.**
Q. Do you recall in any of those transactions whether Mr. Milton used Nikola securities as part of the transaction price for payment?
**A. Yes.**
Q. How many, if you recall?
**A. I don't recall how many.**
Q. Do you know whether any of those transactions involved the use of stock options?
**A. I believe some did.**
Q. Do you have any recollection of the terms, in terms of what the stock strike price was or number of shares, anything along those lines?
**A. No.**
Q. Are you familiar with something called the Hindenburg Report?

Page 73

**A. Yes.**
Q. What's your understanding of what the Hindenburg Report was?
**A. It was an exposé of the value of the stock of Nikola and how the company was represented that may have affected people's decision to purchase Nikola stock.**
Q. Did you have any conversations with Mr. Milton about the Hindenburg Report or anything that was contained in it?
**A. No.**
Q. I didn't ask you: With regard to any transactions that occurred after the Hicks transaction, to the extent you can recall, do you know where those land transactions -- where the land was that was involved in those transactions?
**A. My recollection is that most of that land was west of the Hicks' property.**
Q. Were these transactions to -- were they contiguous to the Hicks' property; do you know?
**A. I don't recall.**
Q. Does the name Bertignole ring a bell?
**A. Say the last name again?**
Q. Bertignole, B-E-R-T-I-G-N-O-L-E.
**A. I don't recall.**

Page 74

Q. So after the Hindenburg Report came out, do you know what happened to the Nikola stock price?
**A. I believe it cratered, stock went down significantly.**
Q. What did that mean for your own holdings in Nikola stock?
**A. They had no value at that point and -- well, I don't remember, other than, by the time I left Nikola, I don't even think the stock value was above my strike price.**
Q. Because the value was not above the strike price, they were worthless to you, correct?
**A. Yes.**
Q. Did you read the Hindenburg Report?
**A. I did not.**
Q. Are you aware of a settlement that ultimately the company entered into with the Securities and Exchange Commission?
**A. Yes.**
Q. Have you read that document?
**A. I have not.**
Q. Are you aware, generally, of the misrepresentations that Mr. Milton was alleged to have made to the market?
**A. Yes.**

Page 75

MR. PACE: Lack of foundation, but go ahead.
Q. (By Mr. Robertson) Your answer was "yes"?
**A. Yes.**
Q. For example, are you aware that Mr. Milton was alleged to have misrepresented the ability of the Nikola One to drive on its own?
**A. Yes.**
Q. Did he ever talk to you about that?
**A. No.**
Q. Do you understand that one of the things that he's been alleged to have misrepresented was the ability of Nikola to produce its own hydrogen?
**A. Yes.**
Q. Do you have any understanding now, based on what you have seen, as to whether those representations were true or not?
MR. PACE: Lack of foundation.
**THE WITNESS: Ask the question again, please.**
Q. (By Mr. Robertson) Sure. Based on what you've seen since the Hindenburg Report came out, do you have any basis -- well, do you have any, I guess, opinion whether those statements are true or not?
MR. PACE: I need to make an objection for the record. Lack of foundation and also calls for speculation, but go ahead.

Page 76

MR. LAUFER: It also calls for permissible testimony from a fact witness.
**THE WITNESS: No.**
Q. (By Mr. Robertson) At no point do you have any knowledge of what Mr. Milton told Mr. Hicks directly in connection with this transaction; is that right?
**A. I have no knowledge of any discussions between Hicks and Milton.**
MR. ROBERTSON: Let's pull up the texts again, Sandy.
MS. RECINOS: I'm sorry, one more time.
MR. ROBERTSON: The texts. So that is starting at 1023. If we go to the last page of those texts, 1206. So actually, scroll up first, so scroll up first.
Q. (By Mr. Robertson) There's a text exchange here, Mr. Gale. It says, "July 29, 2021, at 12:15 p.m." And it says, "The day has come. Hopefully, you don't get dragged into this mess."
And the response, "Yep. I saw that. Is there a scenario where I would get dragged in?" Do you recall this text exchange?

A. Vaguely. This was -- I was no longer an employee of Nikola when this took place.
Q. Right. And do you recall that around July 29th, 2021, was when Mr. Milton's indictment was unsealed?
A. Vaguely.
Q. Do you recall having any discussions with anyone about the fact that Mr. Milton had been indicted?
A. Other than this screenshot, no.
Q. If we look at the left -- so this is in July. It looks like a month earlier there's a text to you, "Hey, Mark. Hope you are well. We are urgently trying to track down all the seller disclosures relating to Trevor's purchase of the ranch from Peter Hicks, and for some reason I don't see all of them in my file."
Do you recall that exchange that's reflected here in June of 2021, between you and Mr. Anderson?
A. Only to the extent that I see the screenshot.
Q. Okay. Nothing beyond what's in the texts?
A. No.
Q. Do you know whether you still had those as



of July 2021?
A. Just access to the Dropbox where we stored them.
Q. So the Dropbox was still active at that time?
A. Yeah, based on what I see here on the screenshots, yes.
Q. Do you know whether the Dropbox is still active or is it gone at this point?
A. I don't know.
MR. ROBERTSON: Let's scroll down, Sandy.
Q. (By Mr. Robertson) So then, there's an exchange that says, "Did you get subpoenaed?"
"Not formally subpoenaed, no. Did you?"
And then it says, "I was surprised they pivoted towards the real estate deals."
Is this your comment here?
A. It is.
Q. You say, "Hicks is such a greedy clown. Made money on the deal and pulled a fast one on the IRS with a 1031 exchange that wasn't within safe harbor guidelines."
Where did your understanding of whether this transaction did or did not comply with 1031 guidelines come from?



A. My recollection is that it was due to the inclusion of the stock value and the amount they moved forward to purchase replacement property.
Q. How did you come to know that? Where did you come up with that knowledge?
A. I can only guess based on the 1031 documents that were provided by the exchange company and the other settlement documents.
Q. Do you have any idea what happened to the proceeds of the transaction?
A. I don't.
Q. You don't?
A. I do not.
Q. Just to place this in time, do you know whether this text exchange -- well, do you recall that the indictment against Mr. Milton was superseded with an account specifically related to this real estate transaction?
A. I don't recall.
Q. Do you have any understanding of whether this exchange related to that superseding indictment?
A. Repeat the question, please.
Q. I'm looking at the comment and it says here, "October 2nd," it says, "No, I was surprised they pivoted towards the real estate deals."



My question is who is the "they"?
A. I don't remember, but I assume DOJ.
Q. Did you become aware that DOJ added an account to the indictment that related to this transaction?
A. Based on this screenshot, yes.
Q. Did you have concerns that because of that, you might be subpoenaed or pulled into that claim?
A. Yes.
Q. But you were never actually subpoenaed, correct?
A. I was not.
Q. Did you, in fact, ever speak to the government?
A. I did not.
MR. ROBERTSON: You can take that down, Sandy.
Q. (By Mr. Robertson) How many times did you actually personally meet or interact with Mr. Milton?
A. Extremely rarely. I couldn't -- close to never.
Q. Less than five?
A. I mean, well, in context of, what, all these real estate transactions?

Page 81

Q. Yeah, I'm just curious, Mr. Gale, in terms of you assisting with these real estate deals, was it all remote, or did you ever sit down with Mr. Milton in person and kind of talk through any of this?

**A. Largely remote. I may have had two or three face-to-face discussions. I don't know that any of those were specific to this transaction.**

Q. Do you recall any one-on-one discussions -- not e-mails or texts or whatever -- discussions with anyone internally at Nikola about the Hicks' transaction Mr. Milton engaged in?

**A. Yes.**

Q. With whom?

**A. Matt Peterson. And based on some of the previous e-mails we looked at as it related to stock shares price, the spreadsheet sheet, Britton Worthen.**

Q. Anyone else?

**A. No.**

Q. Have you seen or reviewed any SEC disclosures related to Mr. Milton's stock that was used in connection with any of these transactions, including Hicks?

**A. No.**

MR. ROBERTSON: Give me a minute. Why don't we take a break. We'll take five. I may be

Page 82

good, but I just wanted to look at my notes.

MR. LAUFER: Let's take more than five. Let's take 10.

Mark, what do you want?

**THE WITNESS: Ten is fine.**

MR. LAUFER: We'll come back at 3:50 Eastern.

THE VIDEOGRAPHER: Going off the record. The time is 1:40 p.m., Mountain Time; 3:40, Eastern.

(Brief recess.)

THE VIDEOGRAPHER: We are back on the record at 1:51 p.m., Mountain Time and 3:51, Eastern.

Counsel.

Q. (By Mr. Robertson) Just a couple questions, Mr. Gale, and I'll be through. Thank you, again, for your time today; I appreciate it.

Have you seen any of the -- have you read any of the criminal trial transcripts involving Mr. Milton's criminal trial?

**A. No, I have not.**

Q. Have you reviewed any of the exhibits that were part of that proceeding?

**A. No, I have not.**

Q. Are you aware that there was a recorded phone call between Mr. Hicks and Mr. Milton from

Page 83

April of 2020?

MR. PACE: Object; lack of foundation.

**THE WITNESS: I do not recall.**

Q. (By Mr. Robertson) So you haven't heard that recording or seen a transcript?

**A. No.**

Q. Are you aware that after the Hindenburg report came out, Nikola retained a law firm to do an internal investigation?

**A. Yes.**

Q. Did you provide any information or were you interviewed as part of that?

**A. No.**

Q. Anyone ever request to talk to you at any point in time from the company about any of the transactions you were involved in with Mr. Milton?

**A. No.**

Q. You are aware that after -- at the conclusion of Mr. Milton's criminal trial, he was convicted, correct?

**A. Yes.**

Q. Are you aware that he was convicted not only on -- well, on the specific count that was added related to this transaction?

**A. No.**

Page 84

MR. ROBERTSON: I think that's all I have.

Thank you very much, Mr. Gale. I appreciate your time today.

**THE WITNESS: Thank you.**

EXAMINATION

BY MR. PACE:

Q. I had a follow-up about your text message with David Anderson that Mr. Robertson was asking you about, that last one where you made the comment about Hicks being a "greedy clown" and the rest of that text. I can put it back up the screen if it helps, but do you recall that text and having seen it?

**A. Yes.**

Q. At the very last -- I guess, the last sentence of that text message, you wrote, "Super sophisticated seller playing the victim"; what did you mean by that?

**A. I meant that Peter Hicks is a high-level investor with significant resources: Tax attorney in Boston, transactional real estate attorney in Utah, I mean, to be expected, but all investors are aware that they have a potential to lose everything, and Peter Hicks, the nexus of that statement was, he received cash at close in excess of what he paid for**

Page 85

the property. You know, it was always my understanding that the stock was just an enticement to sell because they were marketing property owners that didn't have active listings for their property. And I just had a bad taste in my mouth for the whole deal once I -- on the back end of it.

Q. In all the deals that you were involved in, both in your prior experience and also working with Trevor, you had opportunity to work with various different sellers and buyers?

A. Yes.

Q. Based on that experience, would you rank Peter Hicks as being a sophisticated seller?

A. Absolutely.

Q. Okay. And then I have a question about Exhibit 13 that you were shown, which is an e-mail -- I can put it back up if it helps. But it was the one where Peter Hicks' lawyer was posing questions to you as if they were coming from the 1031 exchange company, and you were asked a series of four questions, and then another one about the lockup period; do you recall that e-mail, generally?

A. Yes.

Q. Did you believe at that time that there actually was a 1031 exchange company that was asking

Page 86

those questions?

A. Yes, I had no reason not to.

Q. Would it surprise you to know that Peter Hicks made that up and those questions were coming from him and not coming from a 1031 exchange company?

MR. ROBERTSON: Objection.

THE WITNESS: I'd be floored, yes.

Q. (By Mr. Pace) You would be surprised by that?

A. I would be.

Q. Why? Can you explain?

A. If memory serves me correctly, as part of the escrow, I believe we -- as typical with most escrows where a 1031 exchange is involved, the buyer is asked to sign a document, you know, that says, Hey, we understand the seller's doing a 1031 and we'll do whatever we need to do to help him at no cost to us, type of a deal.

I just have fleeting memory -- it's vague -- of the transaction, but I remembered that the 1031, as we discussed previously, was thrown in at the last second. Having a better-than-average understanding of the 1031 exchange process, having worked for a 1031 company, there were a few -- what I'll refer to as safer harbor violations.

Page 87

The first being that Peter Hicks didn't own the property for more than two years, so it was a short term -- it was not a long-term capital gain. And there was -- what I'll define -- I don't know what the proper word for it, but if I remember correctly, he was including the stock value in the total transaction value that he was intending to move forward with the exchange.

And I thought it was odd because it would have been my understanding that had the stock value been zero, that that would have been considered a taxable event to him. So the whole thing was just -- I didn't get it, but at the end of the day, I didn't care because it didn't effect our side of the transaction.

MR. PACE: No further questions for me, thanks.

MR. ROBERTSON: I just have one question and then I think we're good.

Sandy, can you pull back up 1408? It was the final settlement statement.

FURTHER EXAMINATION

BY MR. ROBERTSON:

Q. Mr. Gale, looking at this document, which

Page 88

I showed you before, you see where it says, "Seller."

A. I do.

Q. And then it says, "Strategic Property Exchanges, LLC as qualified intermediary for Hicks, LLC"; do you see that?

A. I do.

Q. Are you familiar with who Strategic Property Exchanges, LLC is?

A. I have no idea.

Q. Do you know if they're a 1031 intermediary?

A. I do not, other than they are claiming to be on this statement.

Q. Do you understand that the term "qualified intermediary" has meaning within the 1031 sphere?

A. I know that anyone can be a qualified intermediary, just not a related party to the transaction, whether they're qualified to be or not.

MR. ROBERTSON: Okay, thank you very much. Appreciate your time, Mr. Gale.

MR. LAUFER: No more questions from anyone?

MR. PACE: I had a question about the record. I may be missing some exhibits, but I didn't get an Exhibit 10 or an Exhibit 14; did we end up

Page 89

skipping numbers?

MR. ROBERTSON: I don't think so, Adam. We'll make sure it's complete. I don't believe so.

THE VIDEOGRAPHER: Off the record, counsel?

MR. ROBERTSON: Yes, please.

THE VIDEOGRAPHER: Going off the record. The time is approximately 2 o'clock p.m., Mountain Time and 4 o'clock, Eastern.

(The deposition concluded at 2:00 p.m.)

Page 90

REPORTER'S CERTIFICATE

STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, Christina Holbrook, Registered Professional Reporter in and for the State of Utah, do hereby certify:

That prior to being examined, the witness, MARK GALE, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in stenotype on Tuesday May 7, 2024, at the place therein named, and was thereafter transcribed and that a true and correct transcription of said testimony is set forth in the preceding pages.

I further certify that, in accordance with Rule 30(e), a request having been made to review the transcript, a reading copy was sent to Mr. Laufer for the witness to read and sign and then return to me for filing with Mr. Christiansen.

I further certify that I am neither counsel for nor related to any party to said action, nor in anywise interested in the outcome thereof.

WITNESS MY HAND AND OFFICIAL SEAL this 28th day of May, 2024.

[signature]
______________________
Christina Holbrook, RPR

Page 91

Case: Hicks, et al., vs. Milton, et al.
Case No: : 2:22-ev-00166
Reporter: Christina Holbrook
Date taken: 5/7/24

WITNESS CERTIFICATE

I, MARK GALE, HEREBY DECLARE:

That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof; that with these corrections I have noted this transcript truly and accurately reflects my testimony.

| PAGE-LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |
| ________ | ________________________ | ________ |

________ No corrections were made.

I, MARK GALE, HEREBY DECLARE UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE FOREGOING IS TRUE AND CORRECT.

____________________ ________
MARK GALE DATE

**Exhibits**

**Exhibit 01** 20:8
**Exhibit 02** 24:21
**Exhibit 03** 29:15,16
**Exhibit 04** 32:14,15
**Exhibit 05** 35:3
**Exhibit 06** 37:16
**Exhibit 07** 41:7
**Exhibit 08** 43:3,4
**Exhibit 09** 51:17
**Exhibit 10** 52:14 88:25
**Exhibit 11** 58:11
**Exhibit 12** 61:4,8
**Exhibit 14** 64:8 88:25
**Exhibit 15** 68:15
**Exhibit 16** 71:1

**$**

**$1** 43:20 71:17
**$1,000,000,000** 43:17
**$1,200** 54:15
**$1,800** 54:15
**$16.50** 66:7
**$3,400** 54:16
**$31.37** 65:10
**$32** 13:25

**(**

**(5)** 43:14
**(602)** 23:18

**-**

**-0-** 4:2

**0**

**000407** 60:20
**000503** 24:15
**000511** 30:6
**04** 7:25

**1**

**1** 4:5 20:8 24:19 68:18
**1.9** 62:11
**1.901** 55:11 65:11,14
**10** 7:7 49:16 52:14 82:3 88:25
**1023** 76:16
**1031** 7:6 37:25 38:4,14, 16,20,25 65:1 78:21,24 79:6 85:19,25 86:5,14, 16,21,23,24 88:10,15
**10:11** 50:8
**10th** 60:25
**11** 4:4 58:11 64:11
**11/1/20** 67:16
**11:56** 60:23
**11th** 69:5
**12** 61:4,8
**12/1** 68:8,9
**12/1/20** 67:16,17
**1203** 19:25 33:16 70:6, 10
**1205** 22:11 70:10
**1206** 76:17
**1223** 20:1
**12:11** 60:25
**12:15** 76:21
**12:24** 49:21
**12:35** 49:24
**12th** 68:1
**13** 85:16
**14** 7:25 58:23 64:8 88:25
**1405** 42:21,22
**1406** 64:6
**1407** 68:14
**1408** 70:22 87:20
**14th** 59:1 61:17 69:17 70:3
**15** 7:4 68:15
**150** 67:10
**150-** 66:15
**16** 8:1 71:1,5
**17** 70:13
**18-ish** 8:1
**180** 66:17
**180-day** 66:15
**19** 7:20
**1983** 6:24
**1:40** 82:9
**1:51** 82:12
**1st** 21:8,14 29:19 33:1, 18,23 35:9 38:11 47:18 49:7

**2**

**2** 24:20,21 61:21 89:8
**2(a)** 65:8
**2004** 7:12,17
**2014** 7:12,18
**2016** 7:20
**2017** 7:20
**2018** 7:20
**2019** 7:22 9:16 11:20, 25 12:1,6,14,20 14:23 28:9
**2020** 14:25 21:8 22:23 29:19 33:1 37:8,19 46:24 49:1,8 50:8,10 51:6,11,20 52:4 56:12 58:5,10 59:5,24 60:6, 22,25 64:11 68:1 69:5 70:13 71:18 83:1
**2021** 7:22 9:16 76:20 77:4,19 78:1
**2024** 4:9
**210** 66:17
**22nd** 52:3
**23rd** 50:8 51:6,11
**270,960** 65:9
**29** 76:20
**2934** 37:15
**29th** 77:4
**2:00** 89:10
**2:19** 41:22
**2:24** 49:21
**2:35** 49:24
**2nd** 35:6 37:19 41:12, 18 48:22 49:1,7 79:24

**3**

**3** 29:15,16 61:25
**30** 68:25
**35** 49:16
**3:31** 69:5
**3:40** 82:9
**3:50** 82:6
**3:51** 82:12
**3:56** 58:10

**4**

**4** 32:14,15 89:9
**410** 35:2
**454** 32:13
**4:05** 41:5,12
**4th** 58:10 59:13 71:18

**5**

**5** 35:3
**503** 24:15,24 25:1 50:5
**514,824** 62:5,21
**515,094.96** 62:20
**515,095** 66:6
**57** 61:3
**581** 44:23

**6**

**6** 37:16
**6/1/2020** 32:8
**6/2/20** 67:14
**6/2/2020** 34:22,25 41:4
**6/4/20** 67:15
**602** 23:8 33:11
**602 644-9666** 22:3,15 23:21
**612020655** 29:12
**623 202-3150** 33:10
**644** 23:18
**6:33** 36:15
**6:55** 29:19

**7**

**7** 41:5,7
**7,645,155.24** 71:18
**7-plus** 71:21
**7:05** 32:9
**7:47** 34:22,25
**7th** 4:8 60:22

**8**

**8** 37:6 43:3,4
**8.5** 62:6 63:7,10
**8/14/2020** 71:9

**9**

**9** 51:17
**921** 59:21 62:16
**9666** 22:23 31:6
**967** 58:9
**9:43** 33:23

**@**

**@nikolamotor** 32:5

**A**

**a.m.** 4:4 35:1 36:15 50:8
**A5** 61:3
**A5re** 19:25 24:15 25:1, 6 30:6 32:13 35:2 50:4 58:9 60:20 70:6
**ability** 75:6,13
**Absolutely** 85:14
**accepted** 41:25
**access** 78:2
**accommodate** 39:4
**account** 57:9 79:17 80:4
**acquisition** 25:16,21 47:9,15
**acre** 54:7,11,14,15,16
**acreage** 54:7,12
**active** 78:4,9 85:4
**actual** 33:12
**Adam** 4:21 32:12 35:2 89:2
**added** 57:9 80:3 83:23
**addition** 11:16
**additional** 28:4 68:24
**address** 50:14,22 65:5
**adjusted** 63:4,6 66:6
**adjustments** 69:9
**affected** 73:6
**afternoon** 5:10
**aggregate** 62:6
**agree** 33:18
**agreed** 17:15 28:21
**agreeing** 60:16
**agreement** 16:25 17:10,12 27:22 33:25 34:6 42:23 43:7,22 44:1,17,19,25 45:20,24 46:5,16,21,22,23 49:4, 5,6 63:5 65:2,9 67:22 68:18,21 69:3,12
**agreements** 8:23,25 9:2,5,16 12:8 15:6 35:20,25 53:5
**ahead** 18:5 29:4 53:10 59:15,16 67:5 75:2 76:2
**alleged** 74:23 75:6,12
**already-agreed** 35:22
**alternatives** 40:18,20
**amended** 68:22
**amendment** 68:18 69:15
**amendments** 69:11
**amount** 43:16 79:2
**and/or** 62:4
**Anderson** 20:12,13,15 21:21 23:15,19 29:19, 20 30:9 35:15,16 36:10, 14 37:20 38:24 41:11, 23 50:7,10,12,21 51:8 58:14,16,21,24 61:8,10 64:12,16 66:13 69:4 70:12 77:20 84:9
**Andrew** 17:20 36:1
**andrew@hao-law.com** 58:16 59:8
**apparent** 61:19
**apparently** 51:24 57:15
**appearances** 4:15
**appears** 14:10 22:14 32:10 33:7 35:14 41:10, 22 46:14 58:20 70:11
**applied** 65:22
**approximately** 4:4 7:20 69:5 89:8
**April** 83:1
**area** 8:25
**Arizona** 19:5
**Army** 7:1,2
**arose** 38:5
**asks** 66:14
**asset** 50:17
**assignability** 37:11
**assignable** 36:16 37:5
**assigned** 24:4
**assist** 34:3
**assistant** 27:3
**assisting** 81:2
**assume** 41:17 67:21 80:2
**assumes** 18:4
**assuming** 36:20
**assurance** 36:22
**attaching** 41:23 60:2
**attorney** 6:16 8:13 9:11 31:1,6 36:4 37:1 49:10 53:23,25 60:11,13 84:20,21
**attorneys** 17:17
**August** 58:10,23,25 59:1,5,13,24 60:6,22,25 61:17 64:3,11 68:1 69:5,17 70:3,13
**authorization** 70:15
**aware** 10:1 15:11 17:24 18:8,11,12,23 19:11,15 33:24 52:4 56:16,24 68:7 74:16,22 75:5 80:3 82:24 83:7,18,22 84:22

**B**

**B-E-R-T-I-G-N-O-L-E** 73:24
**B-E-U-S** 8:6
**back** 7:17,19 8:1 22:12 25:2,6,7,8 26:3 28:19 29:6 33:16 41:19 42:7 45:23 50:4 52:10,11 56:3 59:20 60:24 66:10 69:9,11 70:6 82:6,11 84:12 85:6,17 87:20
**background** 6:12,20 10:7
**bad** 85:5
**ball** 52:20
**Bar** 13:12,14
**base** 65:6
**based** 60:7 63:4 68:3, 23 70:19 71:22 75:15, 21 78:6 79:6 80:6 81:14 85:12
**basic** 38:19
**basically** 40:5
**basis** 50:13 51:10 75:23
**Bates** 30:4 37:15 44:23 50:4 58:9 60:20 70:10
**Begins** 67:15
**behalf** 35:20 36:7 49:10 57:4
**bell** 73:22
**beneficially** 48:21
**benefit** 8:6 32:12
**Bertignole** 73:22,24
**better-than-average** 86:22
**Beus** 8:2,4,5,14 9:25
**big** 10:22 14:4
**biggest** 14:9
**bill** 16:9,11
**bit** 20:7 21:7 30:24 35:6
**blank** 21:10 34:1
**blanked** 34:1
**block** 33:8
**blocking** 29:25 30:1
**blue** 23:1
**board** 10:15 63:20
**body** 71:15
**Boston** 84:21
**bottom** 21:4 22:12 43:10 46:3 61:21
**Brasher** 13:16
**break** 23:13 29:24 43:1 49:15 81:25
**Brennan** 4:25
**briefly** 6:12,20 7:24
**Brilliant** 20:4
**Britt** 15:22
**Britton** 8:10,12,13 57:7 64:12 81:16
**broken** 7:14
**broker** 20:16
**brought** 8:18 18:2,11
**bunch** 33:25
**business** 15:9 43:15
**buyer** 30:12,25 31:1 32:19,23 37:6 40:4 43:13,15 67:24 86:14
**buyer's** 31:5
**buyers** 85:10

**C**

**call** 82:25
**called** 5:4 26:5 34:6 61:13 72:24

**calling** 21:10
**calls** 22:16 76:1,3
**Canyon** 13:16
**capacity** 28:3
**capital** 48:20 87:3
**care** 87:14
**carved** 64:24
**case** 21:23 23:3 51:24
**cash** 11:7,10,12 13:3 15:19 26:20 27:10 43:16 71:20 84:25
**cell** 22:5,6 23:24 31:2,6,10,11,14,23 33:9,10,12
**Certified** 4:11,12
**cetera** 57:10
**chain** 29:18
**change** 50:22 62:24 65:6
**changed** 61:23 62:1
**chart** 52:18,22,24 53:2 54:5 62:16,18
**chat** 31:15
**Chris** 5:10 34:24 60:21 70:7
**Christina** 4:12 29:7
**Christopher** 4:18
**circumstances** 44:14
**claim** 80:9
**claiming** 88:12
**claims** 18:2,11
**clear** 36:8
**close** 12:14 16:8 26:2,13,14 27:6 33:4 34:14 35:8 44:5,13 58:23 70:15,18 80:21 84:25
**closed** 10:15 15:2 18:15,18 25:13,15 26:2 27:12 33:5 54:3 58:6 59:4 69:22 70:16 71:13 72:2,5
**closing** 10:17 14:24 27:17 33:19 38:2 58:22 59:1,12 61:16 70:14 71:21
**clown** 78:19 84:11
**colleague** 4:24
**college** 6:14
**column** 54:6
**combination** 13:2 15:19
**comfort** 49:17
**comment** 23:7 78:17 79:23 84:10
**Commission** 6:2 74:18
**common** 47:9
**communicate** 32:24 56:23
**communication** 36:25
**communications** 22:16 23:8 59:1 60:5,9 64:21
**companies** 7:3
**company** 6:7 7:6 11:20 12:11 14:20 15:3,11,25 16:1,4 26:5,15 38:16 47:4,6 48:1,6,21 50:17 57:23 58:3 62:1 63:25 65:1 73:5 74:17 79:7 83:15 85:20,25 86:5,24
**Company'** 47:10
**compensate** 63:21
**compensation** 63:20
**complete** 89:3
**comply** 78:24
**component** 12:17 14:11 25:14,24 26:14,17,20,24 27:20 28:14 38:25 51:23 53:8
**components** 27:10
**concerns** 68:11 80:7
**concluded** 89:10
**conclusion** 83:19
**conditions** 43:24 44:8,18
**conducted** 4:8 16:11
**confidential** 42:17
**confidentiality** 42:1,4,9,11
**confirm** 69:2
**connection** 5:23 6:5 37:2 38:1 39:5,12 42:5 45:20 50:25 67:1 76:8 81:21
**consent** 36:17
**consideration** 11:8
**considered** 87:11
**consistent** 14:11 41:20 62:10 71:19
**contacted** 19:20 21:14 25:11
**contained** 44:19 73:10
**contents** 46:2
**context** 39:13 59:13 80:24
**Contextually** 21:17
**contiguous** 73:20
**contingency** 42:2
**continuation** 32:11
**contract** 11:2,3
**controlled** 45:15
**conversation** 10:12 52:1
**conversations** 15:22 27:15 30:19 51:21 56:6 67:8 70:2 73:8
**convey** 66:15
**convicted** 83:20,22
**Cook** 9:9,10,12
**copy** 43:6
**copying** 35:15 41:11 58:15 59:25 61:9 64:12,17
**corner** 46:3 61:22
**Corp** 47:9,15
**corporate** 45:19
**Corporation** 22:18
**correct** 5:18 6:17,18 9:18 20:17,18 28:22 32:5 38:12,17 44:6,19 62:2 64:3 69:15 74:12 80:12 83:20
**correctly** 86:12 87:6
**correspond** 30:10
**cost** 86:18
**counsel** 4:14 28:25 36:12 49:25 82:13 89:5
**count** 83:23
**county** 19:14
**couple** 7:5,18 38:17 82:14
**court** 4:12 29:8 52:11
**court-type** 5:21
**Crandall** 13:16 54:16
**cratered** 74:3
**create** 46:12 52:24 57:7
**created** 53:1
**Creek** 13:18 14:16
**Creek's** 14:24
**Creeks** 18:25 19:9,16,21 21:15 25:10
**criminal** 82:18,19 83:19
**critical** 67:13
**curious** 48:3 59:17 81:1
**customers** 9:3

**D**

**data** 52:19
**date** 43:15 44:6 59:1,18 67:14,15 69:18,21 71:9
**dated** 21:2 37:19 41:12 50:20 51:6 64:11
**dates** 7:16 67:13,23
**David** 20:12 21:21 23:19 29:19 35:15 37:20 38:24 41:11 50:7 58:15 61:9 70:12 84:9
**day** 38:11,14 46:23 50:20 76:21 87:13
**days** 43:15 66:17 67:10 68:25 69:24
**deal** 25:12,15,20,24 30:10,20 32:20 33:4,19 78:20 85:6 86:18
**deals** 22:20 24:9 50:14 78:16 79:25 81:2 85:7
**decision** 73:6
**deed** 39:21 40:7,8
**defendants** 4:22
**define** 87:4
**definition** 47:3
**deletion** 42:1
**deliver** 43:16
**department** 5:25 27:11
**deposed** 5:16
**deposit** 43:21 44:9,10,15 71:21
**deposited** 71:17
**deposition** 4:6 89:10
**Deposits** 71:16
**deserve** 23:13
**determine** 48:5
**difference** 62:23
**differently** 36:21
**diligence** 44:2
**direct** 16:3

**directly** 9:8 76:8
**disclose** 15:16
**disclosure** 29:2
**disclosures** 28:5 77:15 81:20
**discuss** 16:4 26:17 32:18 39:9
**discussed** 17:14 38:7 42:12 86:21
**discussion** 27:18 37:12 42:3 66:3,19
**discussions** 26:11 30:15 36:5 37:11 38:23 40:13,17,19,23 41:2 56:10 57:20,25 60:15 76:10 77:7 81:6,9,10
**disputes** 18:19
**divided** 54:12
**document** 13:5,7 19:25 24:14 30:1 35:11 37:19 40:10 43:8 44:2,22 48:8 49:11 50:3 51:7 55:22 59:21 60:24 61:14 62:11,20 65:7 74:20 86:15 87:25
**documentation** 11:1 12:6 28:15 53:15,20 54:1
**documented** 25:21,23 32:20 35:22
**documenting** 28:21
**documents** 11:15,16, 17 20:3 34:16 41:19 45:19 46:12,13 65:6 79:7,8
**DOJ** 80:2,3
**dollar** 16:20,21 54:7, 10,14
**dollars** 43:17 71:21
**Double** 13:18
**draft** 34:2,5 41:23
**drafted** 34:16 45:24 46:15
**drafts** 41:19 42:7
**dragged** 76:22,24
**drive** 75:7
**drop** 70:21
**Dropbox** 78:2,4,8
**due** 44:2 79:1
**duly** 5:4

**E**

**e-mail** 29:18 30:9 31:3 32:4 35:15 36:14 37:10 39:14 41:10,13 50:6,9, 14,21,22 51:9,10,25 56:7,8 57:5 58:14,21 59:3,14,23 60:7 61:19 64:11,24 69:4 85:16,22
**e-mails** 51:20 69:9,11, 14 81:9,15
**earlier** 38:15 41:25 46:5,15 50:3,19 51:4 52:21 54:6 61:22 77:12
**early** 12:1 58:25
**Eastern** 4:5 49:21,24 82:7,9,12 89:9
**educational** 6:12
**effect** 87:14
**Effective** 43:15
**effectively** 16:10
**efficient** 49:19
**employed** 10:9
**employee** 77:2
**employment** 6:20
**end** 85:6 87:13 88:25
**ended** 14:24
**Ends** 67:16 68:8
**engage** 60:12
**engaged** 52:5 53:7 56:20 81:11
**engaging** 26:5
**ensure** 36:19
**entered** 46:23 74:17
**enticement** 85:2
**entities** 5:12,14 45:10, 16,19 46:25
**equal** 43:16
**error** 65:3,5
**escrow** 7:3 11:4 16:8 43:14,16 71:16 86:13
**escrows** 86:14
**Essentially** 8:20
**estate** 7:7 10:14,18 11:17 12:6,21 13:2 15:1,7 17:8,9 20:16 27:6 34:11 50:7,14,25 51:22 57:22 58:2 61:3 63:22 78:16 79:18,25 80:25 81:2 84:21
**et al** 4:7
**evaluate** 28:16
**evening** 32:25
**event** 40:10 87:12
**evidenced** 55:18
**exact** 7:16 55:20 72:8
**EXAMINATION** 5:7 84:6 87:23
**examined** 5:5
**examiner** 7:4
**excess** 84:25
**exchange** 6:2 7:6 37:25 38:20 65:1 69:6 74:18 76:20,25 77:18 78:13,21 79:7,15,21 85:19,25 86:5,14,23 87:8
**exchanged** 21:9,24 41:19
**Exchanges** 88:4,8
**exclusive** 20:24
**excuse** 7:17
**executive** 27:2
**exercise** 36:20 67:15, 16 68:8
**exercised** 66:22 67:9 68:6,12
**Exhibit** 20:8 24:21 29:15,16 32:14,15 35:3 37:16 41:7 42:21,22 43:3,4 51:17 52:14 58:11 61:4,8 64:8 68:15 71:1 85:16 88:25
**exhibits** 33:24 82:21 88:24
**existing** 10:14 68:6
**expanding** 48:23
**expected** 84:22
**experience** 7:5 9:5 10:8 28:9,11 85:8,12
**expertise** 28:15,20
**expiration** 67:25
**Expires** 67:17 68:9
**explain** 39:8 53:1 86:11
**exposé** 73:4
**extent** 6:21 10:6,11 11:11 18:9 73:14 77:21
**Extremely** 80:21

**F**

**face-to-face** 81:6
**fact** 22:17 26:12,23 27:5 38:25 57:21 58:1 76:4 77:8 80:14
**facts** 18:4
**failed** 34:11 40:11
**familiar** 9:24 13:13 22:8 71:6 72:24 88:7
**fast** 78:20
**fee** 17:13
**figure** 30:2
**figured** 21:3
**file** 77:17
**final** 71:5,6 87:21
**financial** 54:19,23
**find** 25:3
**fine** 13:10 32:1 82:5
**firm** 4:13,18 5:11 7:8, 10,17,25 83:8
**flat** 16:13,14,19,21 17:13
**fleeting** 86:19
**floored** 86:7
**folks** 49:16
**follow-up** 84:8
**Foreclosable** 40:10
**Forget** 21:9
**form** 15:14
**formally** 78:14
**forward** 38:11 79:3 87:8
**Foster** 61:10 64:13
**found** 50:2
**foundation** 18:5 29:3 53:9 67:4 75:1,18 76:1 83:2
**frame** 35:25
**frames** 6:21
**front** 32:2 61:7 71:4
**full** 30:3 66:6
**fully** 36:16
**function** 66:7
**Funds** 43:13

G

**gain** 87:3
**gale** 4:6 5:3,9 6:10 8:21 13:8 15:5 20:3,8,11 21:2 23:4 24:19,20,21 25:9 29:13,16 31:5 32:1,11,13,15 33:17 35:3,8 37:16,18 41:5,7, 10,17 42:25 43:2,3,4 45:23 46:22 50:2,6 51:17,19 52:14,20 53:12 58:11,13 59:24 61:4,6 63:9,15 64:8,10 68:15,17 69:4 71:1,3,5 76:20 81:1 82:15 84:2 87:25 88:20
**Garrison** 5:1
**gave** 70:15
**general** 16:16 57:9
**generally** 11:19,21 19:11 63:24 74:22 85:22
**Gilbert** 8:2,14 9:25
**GIS** 19:14
**give** 6:20 49:17 81:24
**giving** 22:22
**go-forward** 50:13 51:10
**good** 5:9,10 49:14,18 82:1 87:19
**Goodell** 13:12
**Google** 19:13
**got'cha** 8:15
**government** 42:22 64:6 70:22 80:15
**graduate** 6:13,22
**graduated** 6:24
**graduating** 6:19
**grant** 36:20
**grantor's** 36:17
**Grantor-owned** 48:18
**Grantors** 47:8 48:22
**Great** 58:22
**greedy** 78:19 84:11
**green** 23:14
**Greg** 4:24
**group** 24:5 30:9
**guess** 28:17,19 42:21 68:10 75:23 79:6 84:15
**guessing** 23:3 31:22
**guidelines** 78:22,25

H

**handy** 34:22
**Hangouts** 31:15
**happened** 74:2 79:9
**harbor** 78:22 86:25
**hard** 20:4
**header** 23:4
**heard** 83:4
**helps** 44:22 84:12 85:17
**Hey** 77:13 86:16
**Hicks** 4:7 5:12,13 14:15 19:17 21:10 29:20 30:11,19 35:16 36:12 37:19 38:23 41:11 45:1 46:25 62:4 68:24 70:16 73:13 76:7, 11 77:16 78:19 81:22 82:25 84:11,19,24 85:13 86:4 87:1 88:4
**Hicks'** 5:12 18:22 19:2 37:1 58:5 59:2 70:14 72:5 73:18,20 81:11 85:18
**Hicks-milton** 58:22 60:4
**hicksmgt@aol** 58:15
**hicksmgt@aol.com** 61:9
**high** 6:13,19,22,24
**high-level** 84:19
**highest** 14:13
**highest-priced** 14:9
**hike** 52:19
**Hindenburg** 72:25 73:3,9 74:1,14 75:22 83:7
**hired** 8:9,10,21,22 17:5
**hit** 63:7
**Holbrook** 4:12
**Holder** 43:14,16
**holdings** 74:5
**honestly** 31:24
**honored** 36:23
**Hope** 23:12 77:13
**hour** 49:16
**house** 10:22 13:22
**hydrogen** 75:13

I

**idea** 79:9 88:9
**identification** 20:9 24:22 29:17 32:16 35:4 37:17 41:8 43:5 51:18 52:15 58:12 61:5 64:9 68:16 71:2
**identified** 21:23 61:7 71:4
**immediately** 69:25
**impacted** 65:25
**include** 42:8
**included** 60:9 64:20
**including** 61:20 81:22 87:6
**inclusion** 79:2
**incorporated** 69:14
**independent** 55:23
**indicating** 42:16
**indicted** 77:9
**indictment** 77:4 79:16, 21 80:4
**information** 15:24 22:19 24:8 25:17 48:9 53:2 57:18 67:20 83:11
**initial** 14:24 57:13
**initiate** 23:9
**insertion** 42:2
**instruct** 50:21
**instructed** 50:12
**instructing** 22:25 50:24 51:8
**instruction** 22:22
**insurance** 7:3
**intended** 67:1
**intending** 87:7
**interact** 80:20
**intermediary** 88:4,11, 15,17
**internal** 83:9
**internally** 81:10
**interviewed** 83:12
**introduce** 32:13
**introduced** 8:7,12
**investigation** 83:9
**Investment** 62:1
**investor** 84:20
**investors** 84:22
**involved** 10:21 11:7,10 12:22 13:2 17:17,21 18:13,18 20:16,19,20 28:4 30:14,18 35:24 36:2,5 40:19 49:11 51:22 53:14,20 54:18, 19,22 55:3 59:12,18 60:5 72:4,18 73:16 83:16 85:7 86:14
**involving** 19:21 51:1 54:2 82:18
**IRS** 78:21
**issue** 37:24 38:1,4,14 39:9 48:5
**issues** 27:23 56:7
**items** 61:12

J

**Jay** 61:9 64:13
**jdthompson@firstam. com** 58:15
**joined** 10:3 11:20
**joining** 9:4
**July** 22:14,23 50:8,10 51:6,11,20 52:3 56:12, 18 57:17 58:5 76:20 77:4,12 78:1
**June** 14:25 15:2 21:8, 14 29:19 33:1,18,23 35:6,9,25 36:5 37:8,19 38:9,11 41:12,18 44:1 46:24 47:18 48:22 49:1, 7 63:25 64:2 71:18 77:19
**Justice** 5:25

K

**kind** 81:4
**knew** 8:13 25:18
**knowledge** 76:7,10 79:5

L

**lack** 18:5 29:3 53:9 67:4 75:1,18 76:1 83:2
**land** 54:2 72:3 73:15,17

**landline** 23:25
**Largely** 81:5
**late** 11:25
**Laufer** 4:24 76:3 82:2,6 88:21
**law** 4:18 5:11 7:8,10, 17,24 83:8
**lawyer** 85:18
**learned** 10:6 65:20
**leave** 22:19 24:8
**left** 7:18,22 23:12 74:9 77:11
**legal** 4:11 27:11 57:22 58:2
**Leo** 8:4,5
**Lillywhite** 17:20 35:23, 24 36:1 59:9,11 60:8
**lines** 72:22
**list** 13:11
**listed** 14:3 55:4
**listings** 85:4
**litigation** 5:13
**live** 19:4
**lived** 19:6
**LLC** 5:13 44:25 45:1,2, 5,7 62:4,5 88:4,5,8
**located** 10:18
**locked** 47:22 66:23 67:2
**lockup** 47:24 48:4 66:14,21 67:16,25 68:9 85:21
**long** 31:23,24 33:8,11
**long-term** 87:3
**longer** 77:1
**looked** 60:3 61:22 62:21 66:9 69:6,20 81:15
**lose** 44:10,14 84:23
**loss** 28:6
**lot** 33:20

M

**M&m** 44:25 45:4 48:24
**M&n** 4:22
**made** 57:13 61:17 74:24 78:20 84:10 86:4
**magnify** 20:4,7
**make** 22:1 36:7,16 75:25 89:3
**making** 49:18
**manage** 10:16
**mapping** 19:14
**Maps** 19:13
**mark** 4:6 5:3 23:4,12 24:18 29:14 31:5 33:23 41:5 43:3 69:4 77:13 82:4
**mark.gale@ nikolamotor** 29:21 58:17
**marked** 20:9 24:22 29:17 32:16 35:4 37:17 41:8 43:5 51:18 52:15 58:12 61:5 64:9 68:16 71:2
**market** 74:24
**marketing** 85:3
**marking** 24:17
**math** 66:11
**Matt** 26:25 27:1,2 36:14 41:11 53:22,23 57:4 64:12 67:13 81:14
**matter** 4:7 5:24
**Matthew** 29:20 35:15 36:10 37:20 41:23 58:21 59:25 61:8 66:13 69:4
**Meaghan** 4:25
**meaning** 25:18 47:4 88:15
**means** 39:13,25 40:3 48:20
**meant** 84:19
**meet** 5:24 80:20
**memory** 86:12,19
**mentioned** 15:5 35:23 38:15 46:4
**merger** 25:21,23 27:16 54:24 63:3,4 65:25 69:25
**mess** 76:22
**message** 84:8,16
**met** 10:3
**middle** 57:17 59:5
**million** 13:25 43:17,20 63:7,10 71:17,20
**Milton** 4:7,22 5:14,23 6:6 9:21,24 10:4 12:21 15:9,10,18 16:3,7,12 17:1,8,14,18 18:1,14, 20,23 19:17 20:21 21:15 25:11 26:12,23 27:5 28:24 30:12,20 31:1 32:23 35:16,20 36:7 37:15,20 38:23,24 39:9 40:14 41:12 42:13, 15 43:21 44:9,14,25 45:13,15 46:6,24 47:17 48:13,25 49:5,6,7,11 51:1 52:5 53:7,19 54:20 56:20 57:21 58:1 63:21 66:20 67:1,8 68:4 70:2 72:5,12 73:9 74:23 75:5 76:7,11 77:8 79:16 80:20 81:3,11 82:25 83:16
**Milton's** 31:3 51:21 54:2 77:4 81:20 82:19 83:19
**minute** 24:13 38:6 81:24
**minutes** 49:16
**misrepresentations** 74:23
**misrepresented** 75:6, 12
**missing** 88:24
**money** 78:20
**month** 12:3 77:12
**morning** 5:9,10
**Motor** 31:6
**Mountain** 4:5 49:21,24 69:5 82:9,12 89:8
**mouth** 85:5
**move** 87:7
**moved** 79:3
**multiple** 41:19
**multiplier** 55:11,15,21, 24 62:11 65:11,14,16, 21 66:8
**mystery** 22:10

N

**Naniloa** 34:7,9,13 46:6, 9 61:21 62:1 65:1,6
**needed** 26:1,13 33:4 61:17,22 63:10 65:21 68:22
**negotiate** 8:22
**negotiated** 15:18
**negotiating** 15:18 18:19 35:20 55:3
**negotiation** 30:15
**negotiations** 18:13 37:12 38:2 54:19
**nexus** 25:16 55:20 84:24
**Nikola** 6:6 7:9,21 8:8, 16,18 9:2,4,11,17 10:3, 9,16 12:3 15:3,7,24 16:10 17:5,6 18:10 22:6,18 24:1,4 26:4,9, 22 27:5,6 31:6,12,13 49:4 50:13,17,24 51:9 53:18,25 56:11,18,20 57:21 63:16,20,22 66:2 69:17 70:3 72:12 73:5,7 74:2,6,9 75:7,13 77:2 81:10 83:8
**Nikola's** 15:9 27:11
**NKLA** 67:14
**NKLA-HICKS** 59:21 62:16
**NKLA-HICKS_91** 51:16
**nondisclosure** 8:23,25 9:2,5,15 15:6
**note** 67:23 71:15
**notes** 82:1
**notified** 33:19 38:10
**Noyes** 13:18
**number** 22:2,3,5,7,17, 23 23:18,21,23,24 24:1, 19 30:5 31:11,23,25 33:7,9,11,13 50:25 51:10 52:18 54:11,25 55:15,25 57:10 61:12, 17,21,25 62:19 63:3 65:9 66:5 72:8,21
**numbers** 24:4 62:9 63:7 89:1

O

**Object** 18:4 29:3 53:9 67:4 83:2
**objection** 15:14 75:25 86:6
**obligation** 36:19
**obligations** 29:2 57:8
**occasion** 12:7

**occur** 44:2
**occurred** 14:19 26:8 30:19 63:2 73:13
**occurring** 15:12,25 66:3
**October** 79:24
**odd** 87:9
**offered** 47:14
**office** 4:20
**officer** 7:5
**onboarding** 11:24
**one-on-one** 81:8
**online** 31:16
**opinion** 75:24
**opportunity** 85:9
**option** 27:22 33:24 34:6 36:16,20,22 37:4, 12,21,25 39:5,13,21 40:6,12,20,24 41:1 44:24 45:20,24 46:5,21, 23 47:15 48:11 49:4 61:18 62:5 65:2,9 66:22 67:2,9,14,22 68:3,5,12, 18,21 69:11
**options** 55:17 72:18
**original** 58:21 69:3
**originally** 45:24
**outcome** 40:5
**overlapping** 21:7
**owned** 23:25 47:18 48:21,25 63:16
**owner** 54:7
**owners** 13:12 17:25 45:9 52:18 85:3

**P**

**p.m.** 4:5 29:19 33:23 41:22 49:24 76:21 82:9, 12 89:8,10
**Pace** 4:21 15:14 18:4 24:16 29:3 30:4,7 53:9 67:4 75:1,18,25 83:2 84:7 86:8 87:16 88:23
**paid** 16:7,8 43:13,21 84:25
**paralegal** 7:8 9:25
**part** 11:14 12:8 15:7,8 18:3 40:21 43:21 52:6 63:19 72:12 82:22 83:12 86:12
**participants** 29:25
**parties** 21:22 69:1
**parts** 9:3
**party** 21:18 34:10 88:17
**past** 49:16
**pay** 54:21
**payment** 72:13
**payments** 71:19,20
**pencil** 66:10
**people's** 73:6
**percentage** 16:19
**performance** 17:11 37:6 39:21 40:7,8
**performing** 10:13 17:1
**period** 8:1 9:7,16 39:4, 12,18 41:18 44:1 47:22 66:15,16 67:2,15,16,17, 25 68:8,9 85:22
**periods** 7:15
**permissible** 76:3
**person** 35:19 81:4
**personal** 15:9,10 22:5, 6,20 24:9 31:17 50:18
**personally** 10:13 16:7 23:24 80:20
**personnel** 16:4
**Peter** 5:12 19:2,17 29:20 30:11,19 35:16 46:25 77:16 84:19,24 85:13,18 86:3 87:1
**Peterson** 26:25 27:1,2 53:22,23 57:4,5 59:25 81:14
**Phoenix** 19:5
**phone** 22:3 23:6 24:4 31:2,10,11,14,17,23 33:9,12 50:24 82:25
**phones** 22:6 24:5
**physical** 33:12
**piece** 10:20 18:25
**pivoted** 78:16 79:25
**place** 11:22 57:8 77:2 79:14
**placing** 71:3
**plaintiffs** 4:18
**platform** 4:8
**playing** 84:17
**PLLC** 8:2
**point** 5:24 9:20 35:19 37:12 38:7 49:15 51:20 56:18 59:5 64:17 74:7 76:6 78:9 83:15
**posed** 64:25
**posing** 85:18
**post** 62:18
**post-merger** 55:11,15, 24 62:9,19 63:2
**potential** 19:16,20 84:23
**pre** 54:24
**pre-** 55:14,24 62:9,18 63:1
**pre-merger** 55:10
**pre-merger/post-merger** 65:24
**prepared** 64:22
**previous** 34:11 64:25 81:15
**previously** 5:15 8:15 86:21
**price** 11:12 13:25 14:13 36:20 43:13 52:6 53:8 54:7,12,25 55:16, 25 62:6,24 63:25 64:3 65:10 66:7 69:21 70:3 72:13,21 74:2,10,12 81:16
**prices** 55:4 63:3
**primary** 35:19
**principal** 8:5
**prior** 6:11 9:4 10:7 11:19 12:5,8 15:25 25:15,21 27:6,16 28:9 38:9 46:9 48:23 49:6 51:8 52:3 56:11,15 59:21 61:16 65:25 67:24 85:8
**problem** 22:18
**proceeding** 5:20,21 82:22
**proceedings** 6:6
**proceeds** 79:10
**process** 8:22 86:23
**produce** 75:13
**produced** 20:12 21:4, 22 70:12
**program** 31:16
**progress** 49:18
**proper** 36:20 87:5
**properly** 34:12
**property** 10:20 18:25 19:2 25:10 36:21 39:22 40:7,9 73:18,20 79:3 85:1,3,4 87:2 88:3,8
**proposed** 39:1
**prospective** 9:3
**provide** 6:4 22:6 40:14 83:11
**provided** 31:11,12,13 48:9 79:7
**provision** 42:4,9
**PSA** 34:12 37:21 39:4 41:24
**public** 14:20 16:1 24:5 26:15 27:7 63:25
**publicly** 26:9 69:18
**publicly-traded** 15:3
**pull** 20:3 24:12,13,14, 23 25:6,7 29:12 32:7,8 33:15 34:20 37:15 41:4 42:21 50:4 51:3,15 58:8,9 60:19 62:13,15 64:5 68:14 70:22 76:12 87:20
**pulled** 29:13 43:2 78:20 80:8
**purchase** 11:12 14:24 18:24 19:16 21:16 42:22 43:7,12,22,25 44:16 52:6 53:4,8 57:22 58:2 62:5 67:21 73:6 77:15 79:3
**purpose** 65:16
**pursue** 37:5
**pursuing** 18:23
**put** 6:21 7:19 8:24 14:18 32:2 36:21 53:2 57:2 84:12 85:17
**putting** 45:20 48:8

**Q**

**qualified** 88:4,14,16,18
**quarter** 7:21,22 12:1
**question** 13:8 14:21 18:6,16 21:25 25:25 28:1,18 29:5,8 35:21 40:25 48:2,23 51:2,7 52:7,11 56:14 57:5,24 75:19 79:22 80:1 85:15

87:18 88:23
**questions** 36:15 37:1 64:25 82:15 85:18,21 86:1,4 87:16 88:21
**quick** 34:2
**quickly** 6:10

R

**raised** 37:1 38:8 68:11
**ranch** 10:22 13:12,14, 20,23 14:1,16 19:1,9, 12,16,21 20:25 21:16 54:14 77:16
**range** 16:16
**rank** 85:12
**rarely** 80:21
**rate** 16:13,14,20,21
**read** 20:5 29:6,8 52:10, 11 74:14,20 82:17
**reading** 23:2,16 68:23
**real** 7:7 10:14,18 11:17 12:6,21 13:2 15:1,7 17:8,9 20:16 27:6 34:11 50:7,14,25 51:22 57:22 58:2 61:3 63:22 78:16 79:17,25 80:25 81:2 84:21
**realize** 22:16
**reason** 25:23 26:12 77:16 86:2
**reasoning** 55:20
**recall** 10:11,20 11:5,8, 11,20,21 12:10 14:16 15:23 16:14,17,22 17:19,20 19:19 22:22 24:7 25:10 27:4,8,14 33:12 34:5,9 35:7,10,24 36:4,25 37:7,11,24,25 38:4 40:13,17,22,23 41:2 42:3,7,11 43:20 49:10 50:12 51:8,20 52:1,22 53:6 55:14 56:2,6,9,15,17 58:25 59:4,11 60:3,16 61:13, 16 62:10,12 63:1,9 65:13,18,19 66:2,19,24 67:6,7 68:21,24 69:8, 10,20 70:1,17 72:2,8, 11,15,16 73:14,21,25 76:25 77:3,7,18 79:15, 19 81:8 83:3 84:13 85:22
**received** 18:10 21:5,6 23:9 84:25
**recess** 49:22 82:10
**Recinos** 4:19 24:25 25:4 34:23 60:21 61:2 70:7,23 76:14
**recitals** 47:5
**recognize** 22:7 23:21 31:25 41:13 43:7 50:9 61:14
**recollect** 31:21
**recollection** 12:16 13:7,9 14:12,14 21:13 25:20 31:10,14 34:10 41:20 42:15 44:3 46:11, 19 50:23 55:23 59:18 63:6 66:1 72:20 73:17 79:1
**recommendation** 60:12
**reconvene** 49:17
**record** 4:4,15 5:16 6:11 22:2 24:16 49:20,23 76:1 82:8,12 88:24 89:4,7
**recorded** 22:17 82:24
**recording** 83:5
**records** 19:14
**Red** 4:13
**refer** 18:25 86:25
**reference** 47:6 61:21
**referenced** 47:7
**references** 33:25 34:6 65:1
**referring** 39:17 52:20
**reflected** 69:15 77:19
**refresh** 13:6 21:13 31:9 50:23
**refreshes** 13:8
**regard** 16:6 17:1 18:22 25:9 26:1 35:25 43:25 60:3 73:12
**regarded** 53:21
**regulatory** 27:23
**relate** 45:19
**related** 18:2 25:15 27:24 28:5 47:25 53:15 55:16 66:20 79:17,21 80:4 81:15,20 83:24 88:17
**relates** 55:12
**relating** 54:1 77:15
**released** 66:20
**religiously** 69:23
**remember** 10:23 11:2, 13 12:3,22,25 13:14,17, 24 15:21 16:2 19:18 23:22 24:10 25:14,16 26:16 27:18 28:7 32:3 34:15 36:1 39:10,15 45:14,22,25 48:12,14 49:9 55:13,19 58:4,7 59:14 64:19,23 65:15 68:13 69:19,24 74:8 80:2 87:5
**remembered** 86:20
**remote** 81:3,5
**remove** 36:17
**repeat** 18:6 29:5 34:23 56:14 70:7 79:22
**Rephrase** 17:3 27:25 51:2 52:7
**replacement** 79:3
**report** 9:7 72:25 73:3,9 74:1,14 75:22 83:8
**reported** 9:9
**reporter** 4:12 29:9 52:12
**reporter's** 8:6
**Reporting** 4:13
**represent** 5:12 20:11 21:2 50:20 62:20
**representations** 75:17
**represented** 73:5
**representing** 4:21 17:18
**request** 42:2 57:14 83:14
**requesting** 57:17 68:24
**required** 28:4
**requirement** 36:17
**Residual** 4:22,23 44:25 45:1,5,7 48:24
**resolving** 18:19
**resources** 84:20
**respect** 69:2
**respond** 37:4
**responded** 23:9
**responding** 37:7
**response** 23:1 76:23
**responses** 23:5
**responsibilities** 8:20 9:15
**rest** 84:11
**Restate** 40:25
**retained** 83:8
**return** 44:9
**Returning** 49:23
**Reverman** 4:10
**review** 10:16 11:15 12:5,7 15:6 27:19 28:13 39:4,12,18 45:18 48:4 60:13
**reviewed** 27:11 49:4,6 54:1 81:19 82:21
**reviewing** 9:5,15 11:14 17:8 27:22 28:20 49:11 53:15,20
**revise** 39:4
**Rifkind** 4:25
**ring** 73:22
**risen** 64:3
**river** 10:23
**Riverbend** 13:20,23 14:1,23 20:25 54:14
**Robertson** 4:17,18 5:8, 11 15:16 18:7 19:24 20:2,6,10 22:11,13 24:12,18,23 25:1,6,9 29:6,11,13,18 30:6,8, 23,25 32:7,10,12,17 33:15,17 34:20,25 35:5, 7,12,14 37:14,18 41:4, 9,16,17 42:20,24 43:6, 10,12 44:21,24 46:1,4 47:2,3 48:15,17 49:14 50:1,2 51:13,19 52:9, 16,17 53:11 56:3,5 58:8,13,19,20 59:20,23 60:19,22 61:3,6 62:15, 17 63:13,15 64:5,10 67:7 68:14,17 70:5,9, 11,21,24 71:3,24 72:1 75:3,21 76:6,12,15,19 78:11,12 80:17,19 81:24 82:14 83:4 84:1,9 86:6 87:18,24 88:19 89:2,6
**Rock** 4:13
**role** 9:24
**roles** 8:19 9:14

**roll** 21:19
**roughly** 11:21
**rounded** 66:6
**run** 22:19 24:9
**Ryan** 4:10

S

**safe** 78:21
**safer** 86:25
**sale** 13:25 14:25 42:22 43:7,22,25 44:16 53:4 54:7 67:22
**Sales** 54:12
**Sandy** 4:19 19:24 20:7 22:11 24:12,23 25:2 29:11 30:24 32:8 33:15 34:20 35:13 37:14 41:6 42:20 43:11 44:21 46:3 47:2 48:16 51:14,15 52:16 58:9,19 59:21 60:20 62:15 63:14 64:5 68:14 70:5,21,22 71:25 76:13 78:11 80:18 87:20
**sat** 10:23
**scenario** 76:24
**school** 6:13,19,22,24
**screen** 23:4 29:14 30:3 43:2 52:17 68:18 84:12
**screenshot** 70:20 77:10,22 80:6
**screenshots** 78:7
**scrivener's** 65:3
**scroll** 22:9,10,12 30:23 33:22 35:5,12 41:6,16 46:1,2 47:2 51:16 52:16 56:3 57:6 58:19 59:7,22 62:16 64:6 66:13 67:12 69:1 76:17 78:11
**SEC** 81:19
**Section** 37:6 65:8
**secure** 36:18 39:21 40:4,6
**securities** 6:2 15:20 18:10 27:20,23 28:5,9, 12,14 29:1,2 54:2 57:22 58:2 72:12 74:18
**security** 40:15
**self-employed** 7:23
**self-employment** 7:15
**sell** 36:19 85:3
**seller** 10:24 14:1 18:14 30:11 37:5 38:7 39:4, 12,18 77:14 84:17 85:13 88:1
**seller's** 86:16
**sellers** 17:25 18:9,20 85:10
**sentence** 40:5 84:16
**separate** 16:25 17:10 51:25
**separately** 16:9,11 17:7
**series** 85:20
**serves** 86:12
**services** 17:2,11
**set** 47:4 69:3
**setting** 59:1
**settlement** 70:24 71:5, 7,9,22 74:16 79:8 87:21
**Seyfarth** 4:19 5:11
**share** 54:25 55:16,25 62:25 63:3 65:10 66:6,7 69:21 70:2
**shares** 12:18 36:19 47:7,8,14,15,18,21,25 48:1,5,6,10,18,20,25 54:25 55:16,25 57:10 62:6,19 63:16,18,22 65:9,24 66:2,5,20,21,25 67:9 68:4 69:18 72:22 81:16
**Shaw** 4:19 5:11
**sheet** 81:16
**shift** 66:16
**short** 87:3
**shot** 23:4
**show** 13:5,7 50:3
**showed** 50:19 51:3 62:9 88:1
**showing** 58:13
**shown** 85:16
**side** 23:5 87:14
**sign** 86:15
**signature** 33:8
**signed** 44:1,3 49:5,12
**significance** 57:23 58:3
**significant** 84:20
**significantly** 74:4
**signing** 49:7
**similarly** 61:25
**simply** 41:2
**simultaneous** 11:23
**sit** 81:3
**sitting** 39:16 57:1
**size** 19:12
**skipping** 89:1
**Smith** 13:20 14:3,4,6
**snapshot** 67:14
**sold** 17:25
**solve** 22:10
**somebody's** 22:25
**sophisticated** 84:17 85:13
**sort** 12:7 15:5 21:7
**sought** 28:25
**sound** 13:12
**speak** 26:22 80:14
**speaking** 19:1
**specific** 15:21 27:18 37:5 67:2 81:7 83:23
**specifically** 39:19 60:16 79:17
**speculation** 76:2
**spent** 7:1
**sphere** 88:15
**split** 65:10,14,15,21
**spreadsheet** 55:19 57:3,7 60:2 64:22 66:10 81:16
**stage** 11:2
**standpoint** 10:17 27:21
**start** 11:23 67:15
**started** 7:2,16,21 12:3
**starting** 30:9 76:16
**starts** 19:25 70:10
**state** 4:14 67:23
**statement** 70:25 71:6, 7,22 84:24 87:21 88:13
**statements** 6:5 75:24
**states** 43:14
**status** 70:14
**stay** 41:6
**Steve** 9:9,10
**stock** 11:7,10,12 12:7, 10,17 13:3 14:10 18:2 25:24 26:14,17,20,24 27:10 28:4 37:21,25 39:5,12,21 40:6,11,20, 24 41:1,2 47:9 48:21 51:22 52:5 53:8 56:21 61:18 63:25 65:10,14, 21 67:24 72:18,21 73:4, 7 74:2,3,6,9 79:2 81:15, 20 85:2 87:6,10
**stock-related** 11:16
**stocking** 65:15
**stored** 78:2
**Strategic** 88:3,7
**strike** 40:18 55:4 56:16 63:3 72:21 74:10,11
**string** 29:24
**struck** 30:11
**subject** 37:21 47:14 48:10 50:7
**subpoenaed** 78:13,14 80:8,11
**substitute** 34:12
**Super** 84:16
**superseded** 79:16
**superseding** 79:21
**suppliers** 9:3
**surname** 13:15
**surprise** 86:3
**surprised** 78:15 79:24 86:8
**surveys** 19:13
**sworn** 4:16 5:4 6:5

T

**T&m** 4:22 45:1,7 48:24
**table** 46:2
**taking** 23:13
**talk** 14:15 65:17 75:9 81:4 83:14
**talked** 39:18 54:6
**talking** 27:4
**talks** 61:25 62:4
**taste** 85:5
**Tax** 84:20
**taxable** 87:12
**technology** 8:25 29:23
**telephone** 33:7 51:10
**telling** 24:7 56:17
**template** 34:2
**Ten** 82:5

**term** 87:3 88:14
**terms** 11:5 15:13 27:9 30:15,20 35:22 47:7 48:4,8 55:15 57:9 62:11 63:4,5 68:3,6 69:3 72:20,21 81:1
**testified** 5:5,19 28:8
**testify** 23:15
**testimony** 6:11 17:7 38:16 76:4
**text** 21:5 22:24 23:17 24:6 31:16 33:13,22 50:19 51:4,8,9 70:9,13 76:19,25 77:12 79:15 84:8,12,13,16
**texts** 8:3 20:11 21:1,8, 18,22,23 33:16 70:6,12 76:12,15,17 77:23 81:9
**tfoster** 58:16
**thing** 34:6 38:10 87:12
**things** 20:4 32:2 75:11
**Thompson** 61:9 64:13
**thought** 87:9
**thread** 64:25
**thrown** 86:21
**tied** 22:18
**ties** 39:21 40:6
**time** 4:4,5,14 6:21 9:20 14:18 15:11,17 23:13 24:3 26:4 31:24 32:18 33:8,11 34:23 35:25 45:4 47:13,22 49:21 56:16,19 60:6 67:3 69:6 70:8 74:8 76:14 78:5 79:14 82:9,12,16 83:15 84:3 85:24 88:20 89:8,9
**times** 80:19
**timing** 57:9
**title** 7:3,4
**today** 39:16 57:1 82:16 84:3
**told** 76:7
**Toni** 61:10 64:13
**tonight** 32:20
**top** 21:6,9 22:2 23:7 35:13 59:22
**total** 11:12 55:7 87:7
**track** 69:23 77:14
**tracks** 57:8
**traded** 26:9
**trading** 67:15 69:18,21
**trails** 22:19 24:8
**transaction** 10:15 11:1, 6,9,15,21 12:6,12,14,17 14:16 16:13 18:22 19:20 20:17 26:2,5,8, 13,14,18,19,24 27:6,10, 12,16,20,24 28:3 30:16 32:18,25 33:3 34:11,14, 17 35:8 36:2 37:2 38:2 39:1 40:21 42:5,12,16 44:5,13 46:9,12,13 50:8 54:6 58:6 59:2,4,12 60:4,6 64:21 65:7 69:22 70:17 71:13 72:1,5,13 73:14 76:8 78:24 79:10, 18 80:5 81:7,11 83:24 86:20 87:7,15 88:18
**transactional** 7:7,11 9:25 10:17 60:13 84:21
**transactions** 12:20,21 13:2,11 14:19,22 15:1, 8,12,17,19,25 16:4 17:18,22 18:1,3,9,15,18 20:20 50:18,25 51:22 52:4,18 53:7,21 54:2,20 55:5 56:13,19 60:10,14 72:3,4,11,18 73:13,15, 16,19 80:25 81:21 83:16
**transcript** 83:5
**transcripts** 82:18
**transfer** 40:11 67:24
**transfers** 57:10
**Trevor** 4:22 5:14,23 6:6 21:10 30:12,20 31:1 35:16 37:20 39:3 40:11 41:12 44:25 45:13 46:24 60:12 66:16 85:9
**Trevor's** 22:20 24:9 27:2 50:7,14,18 77:15
**trial** 5:20 82:18,19 83:19
**true** 63:10 75:17,24
**trust** 39:22 40:7,8
**tspent@gmail.com** 29:20
**tspent@gmail.com.** 31:2
**type** 86:18
**typical** 44:16 86:13
**typically** 23:6

**U**

**ultimately** 63:9 74:17
**unaware** 56:12,19
**underlying** 45:18
**understand** 17:4 18:16 21:20 23:20 26:4 75:11 86:16 88:14
**understanding** 8:19 25:22 26:19 27:25 28:18 32:19 38:19 39:11,17,24 40:2 44:12 46:8,20 47:12,13,21 54:13 55:12 57:2,16 62:22 68:1 69:2 71:12 73:2 75:15 78:23 79:20 85:2 86:23 87:10
**understood** 64:2 69:8 71:19
**unsealed** 77:5
**unwilling** 39:3,20 40:4, 6
**unwillingness** 40:14
**updated** 41:23
**urgency** 25:12,14,19
**urgently** 77:14
**Utah** 10:19 19:6 60:13 84:21
**utilized** 53:8
**utilizing** 56:20

**V**

**vague** 86:19
**vaguely** 65:23 68:24 77:1,6
**values** 69:24
**Vectoiq** 26:6 47:9,15, 18,25 48:6,25 66:2
**Vectoiq/nikola** 27:16 33:4
**verbal** 30:10
**verbally** 17:14
**version** 41:24
**versus** 4:7 54:15
**vertical** 29:24
**victim** 84:17
**video** 4:8
**video-recorded** 4:6
**view** 15:8
**Vincent** 14:6
**Vinny** 14:4,6
**violations** 86:25

**W**

**wait** 41:6
**waiver** 66:14
**walked** 14:5
**wanted** 32:24 42:16 82:1
**Wasatch** 5:13 14:16,23 18:24,25 19:8,16,21 21:15 25:10 45:1 54:15 62:5
**ways** 44:22
**weeds** 22:4
**Weiss** 4:25
**west** 73:18
**Wharton** 4:25
**wondered** 17:9
**wondering** 14:25 17:4 18:7,17
**word** 87:5
**work** 8:8 9:21 10:7,13 12:8 15:7 16:6,10,11 17:5,6 20:3 25:11 33:20 63:22 66:16 85:9
**worked** 7:4,6,17,25 38:16 55:25 86:24
**working** 7:3 9:17 17:7, 8 21:15 85:8
**works** 23:6
**Worthen** 8:10,12 9:8 15:17,22,23 17:6 27:15 51:21 52:4 56:6 57:2,7, 13 59:25 60:4,9 64:13, 18,20 81:16
**worthless** 74:12
**writing** 57:7 64:16
**written** 6:4 17:10,12
**wrote** 84:16

**Y**

**years** 6:21 7:1,4,7,8,10, 18,19 38:17 87:2
**years'** 7:5
**yes-or-no** 35:21

| Z |
|---|
| **Zoom** 4:8 |

# EXHIBIT 2

Seyfarth

**Seyfarth Shaw LLP**
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210-2028
**T** (617) 946-4800
**F** (617) 946-4801

crobertson@seyfarth.com
T (617) 946-4989

www.seyfarth.com

August 17, 2023

Matthew Podolsky
Assistant United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re: United States v. Milton, 21 Cr. 478 (ER)

Dear AUSA Podolsky:

As you know, we are counsel for Peter Hicks and Hicks LLC ("Hicks"). We write in connection with the upcoming sentencing and restitution proceedings in the above matter against Trevor Milton ("Milton"). As you are aware, Mr. Milton was convicted of one count of mail fraud that specifically related to his fraudulent purchase of real property in Utah from Hicks. This letter will provide the losses that Mr. Hicks suffered due to Mr. Milton's fraudulent conduct and will also serve as a restitution request under the Mandatory Victims Restitution Act of 1996,18 U.S.C. §§ 3613A, 3663A ("MVRA"). Specifically, Hicks suffered losses of $15,174,698.70, calculated as the value of the fraudulent option on the date of the closing of the transaction, which then expired unexercised when the truth regarding Mr. Milton's lies and misrepresentations was revealed. Mr. Hicks is also entitled to prejudgment interest on this amount for the period August 14, 2020 to the date of the restitution judgment, and is entitled to a lien on the property to secure payment.

It is well settled that in calculating economic loss, courts "need only make a reasonable estimate of the loss," which is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A), 3(C). Economic loss should also take into account factors including "[t]he reduction that resulted from the offense in the value of equity securities" or in this case, the option that was used to secure the purchase of the real estate. *Id.*, cmt. 3(C)(5). A fundamental sentencing principle is that in a fraud case involving equity securities or similar corporate assets, economic loss is calculated as "[t]he reduction that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(C)(v). To make that calculation, courts generally adopt methodologies which attempt to capture the difference between the price of the security before and after the fraud was disclosed. *See, e.g., United States v. Bakhit*, 218 F. Supp. 2d 1232, 1242 (C.D. Cal. 2002). And in some instances, as here, the post-disclosure value is deemed to be zero. *See, e.g., United States v. Stitsky*, 536 F. App'x 98, 111 (2d Cir. 2013) (rejecting argument that the fraud victims "received securities with some value" because "the district court reasonably concluded that the … securities [at issue] had no value because there was no realistic possibility that [the company] would be able to generate a positive return for investors"); *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors. Without this deceit, she could not have obtained her victims' money."). Here, when the truth was revealed to the market, an option

that had a value in excess of $15 million at the time the transaction closed had collapsed in value and ultimately was not exercised, in part because exercising the option would have required Hicks to pay Milton, the man who defrauded him, another $8.5 million, for the privilege of taking additional risk in obtaining highly volatile Nikola securities that today were trading at under $2 per share. *See, e.g., United States v. Schwamborn*, 2012 WL 6050561, at *3 (E.D.N.Y. Dec. 3, 2012) ("determining the effect of defendant's fraud on the [option] price is not unduly complicated. Defendant was responsible for inflating the price of securities that were inherently worthless").

Restitution "serves a compensatory function and 'focuses on the victim and the harm proximately caused by the defendant's conduct.'" *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 102 (2d Cir. 2014) (citation omitted and quoting *United States v. Gossi*, 608 F.3d 574, 580 (9th Cir. 2010)). It "requires the defendant to return property to the owner or else pay him the value of the property." *United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010). The restitution amount need not "match the loss figure used for sentencing." *Id.* "Indeed, the amounts of loss and restitution can and do differ." *Id.*; *see also CES*, 753 F.3d at 102 (restitution and loss are "not identical" inquires).

Under the MVRA, a court "shall" order restitution to victims for "an offense against property under [Title 18], … including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A victim is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Restitution for "wire fraud is not 'limited to the specific act of fraud underlying the mailing or use of the wires for which the defendant is convicted,' but is available for any victim of 'the entire scheme or artifice to defraud furthered by the mailing or use of the wires.'" *United States v. Foley*, 508 F.3d 627, 635 (11th Cir. 2007) (quoting *United States v. Hasson*, 333 F.3d 1264, 1276 n.13 (11th Cir. 2003)).

There is no doubt that Hicks is a "victim" under the MVRA. Milton was convicted on a count of wire fraud that specifically related to the underlying land transaction and option. The MVRA provides that the Court "shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). Because this case involves damages or loss to property that cannot be returned, Defendants are required to:

> pay an amount equal to—
>
> (i) the greater of—
>
> > (I) the value of the property on the date of the damage, loss, or destruction; or
> >
> > (II) the value of the property on the date of sentencing, less
>
> (ii) the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1)(B). To be clear, Milton has never offered to return the ranch property, and the property has since been combined with other properties. We are also aware that he has

Seyfarth



listed the ranch for sale for a price of $35 million (listing attached), and he also attested that his ranch properties had a value sufficient to secure a bond of $100 million. While a forfeiture of Milton's ranch property to Hicks is certainly one restitution option, we believe a monetary amount with a security interest in the property to ensure collection is the most practicable and consistent with the MVRA. Specifically, "the MVRA unambiguously tells a court what to value . . . and even when to value it." *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006). But "[t]he statute is silent . . . on the question of how the referenced property is to be valued." *Id.* How to value the property is within the district court's discretion. *United States v. Kaplan*, 839 F.3d 795, 802 (9th Cir. 2016). Although "fair market value generally provides the best measure to ensure restitution in the 'full amount' of the victim's loss," courts can also use "replacement value" where the fair market value "is either difficult to determine or would otherwise be an inadequate or inferior measure of the value necessary to make the victim whole." *Id.*; *see also United States v. Frazier*, 651 F.3d 899, 904 (8th Cir. 2011) ("There are a variety of methods available to a court in determining the value of lost property …"). If "the 'actual cash value' of the damaged, lost, or destroyed property 'is difficult to ascertain-because an item is unique, or because there is not a broad and active market for it,' 'replacement cost' rather than fair market value may better compensate a victim for the full amount of his loss." *Boccagna*, 450 F.3d at 114 (quoting *United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999)).

The MVRA requires the Court to assess the lost value of the security or the value of the fraudulently obtained property "on the date of the damage, loss, or destruction" or the date of sentencing; whichever is greater. On either date, Hicks' option was "essentially worthless," and Hicks is entitled to a restitution award of the full amount of the now worthless option on the date of the closing, or the current value of the ranch property that was fraudulently obtained. *United States v. Ageloff*, 809 F. Supp. 2d 89 (E.D.N.Y. 2011), *aff'd sub nom. United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012), is instructive. In a traditional pump-and-dump scheme prosecution, the court held that "the victims are entitled to the return of the money they were fraudulently induced to hand over to [defendant]." *Id.* at 100. The court reached this conclusion because the stocks in question "were essentially worthless because the companies themselves were worthless." *Id.* The court acknowledged that "certain of these shares may have some theoretical residual paper value for a short period of time," but it found that these were "not material concerns for restitution purposes." *Id.*; *see also United States v. Hedges*, 175 F.3d 1312, 1314-15 n.6 (11th Cir. 1999) (noting that the corporation's "stock became worthless when the conspiracy was discovered"); *United States v. Scott*, 321 Fed. Appx. 71 (2d Cir. 2009) (defrauded investors are entitled to the loss of investment as well as any lost investment returns); *Levy v. United States*, 626 Fed. Appx. 319, 323 (2d Cir. 2015) ("evidence presented at trial demonstrated that the stock of the companies affected by Defendants' fraudulent schemes was left effectively worthless").

The same is true here. On September 10, 2020, the Hindenburg Report alleged that Milton had made a myriad of misrepresentations about Nikola and its products, technology and sales. After this report, which was proven true beyond a reasonable doubt at Milton's trial, Hicks option, which was worth in excess of $15 million at closing (and then actually increased further in value prior to the Hindenburg Report being issued) was rendered "essentially worthless." Given the record, we believe that a restitution order in the amount proposed is in fact conservative, because we understand the value of the subject property has increased substantially based on Milton's proposed sale price when he listed it for sale. A lien on the ranch property in favor of Hicks will secure payment of the restitution judgment. *See, e.g. Consolidated Edison Co. of N.Y. v. Razzouk*, 2022 WL 2532525, at *1 (E.D.N.Y. July 7, 2022) (issuing a lien on property in order to secure a restitution order); *United States v. Efthmimiou*, 2022 WL 854842, at *2 (E.D. Tex. Mar.

22, 2022) (pursuant to the MVRA, a lien on property to secure payment should issue at the time the restitution judgment is entered); *United States v. Edward D. Jones & Co. LP*, 2011 WL7025905, at *2 (E.D. Tex. Dec. 21, 2011) (issuing lien to secure restitution judgment).

Additionally, Hicks seeks an award of prejudgment interest. The Second Circuit has determined that prejudgment interest is available under the MVRA, including to corporate victims. *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). The rate of prejudgment interest "is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *United States v. Gordon*, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004). 28 U.S.C. § 1961(a), in turn, provides that the rate "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

After a comprehensive trial, a jury concluded that Milton defrauded Hicks. Restitution to Hicks is required under the MVRA, and the only open issue is the amount of that restitution. We believe the facts demonstrate that a restitution award of $15,174,698, plus prejudgment interest, is fully supported by the record, and we also believe that the issuance of some form of security or attachment over the subject ranch property to assure collection of the restitution judgment is also warranted. If the government or the Court believes it would be helpful, Hicks is prepared to support his restitution request with a submission form an independent expert.

We appreciate your continued efforts to remedy the fraud perpetrated by Milton.

Sincerely,

SEYFARTH SHAW LLP

*Christopher Robertson*

Christopher F. Robertson

Cc: AUSA Nicolas Roos
Peter Hicks
Paul V. Kelley

rh

# EXHIBIT 3

# PC BAR 10 RANCH

7,035 Acres

Morgan County, Utah




A5 REAL ESTATE

WWW.A5REALESTATE.COM

# PROPERTY FACTS

**OFFERING PRICE AND TERMS**

- Offering Price: $35,000,000
- Terms: Cash due at Closing
- Showings: Buyer qualification is required prior to showings
- Offers: All offers need to include proof of buyer's source of funds

**PROPERTY INFO**

- 7,035 acres located 10 miles northwest of Park City, and 15 miles northeast from Salt Lake City
- Paved year round access, with three main access points
- Starting on the river at 5,400 ft elevation, the ranch runs up to 8,200 ft in a private mountain drainage
- 5.0 miles of private live water fishing, including 1.0 miles East Canyon Creek, and 4.0 miles Sheep Creek
- Borders the 680-acre East Canyon Reservoir and State Park, a local favorite for fishing and boating
- Water Rights include prescriptive stock watering, and 7 acre-feet of Weber Basin contracts for wells
- This diverse ranch offers trophy big game hunting for Moose, Elk, and Mule Deer
- Additional wildlife and hunting include Bear, Mountain Lion, Turkeys, and Waterfowl
- Zoning for development is a mix of Mu-160 (Mixed Use) and F-1 (Forestry Zone)
- See separate Fishing and Hunting write-up sections on the next two pages









Case 2:22-cv-00166-HCN-DAO Document 150-1 Filed 12/31/24 PageID.6743 Page 48 of 69

# PREMIUM TAILWATER FISHERY

The East Canyon Creek flows through the PC Bar 10 Ranch on its way to the Weber River, ten miles downstream from the ranch. The Weber River is a top-three angling destination in Utah along with the Provo and Green Rivers. Deservedly, the Weber River is a state-designated “Blue Ribbon” river, and East Canyon Creek is one of its major tributaries, providing the same quality of angling but without the crowds. Like the Weber River, East Canyon Creek is a brown-trout factory.

East Canyon Creek flows a direct route through the up-river half of the ranch, where an angler must hunt the edges for slow pockets and calmer water. Stealth is important as is a keen eye for identifying pockets of softer water where trout can hold without expending energy. Slicks behind rocks and logs hold trout, and browns congregate at seams between currents where side channels meet the main current in holes such as *Deep Confluence* and an unnamed meeting-of-waters under an overhanging tree, where a skated caddis will tempt its larger browns.

The Creek’s winding through the lower half of the ranch is a different story. Long sinuous meanders curve back on themselves, and the water slows and swirls in prime eddies full of flotsam, insects, and rising trout. At prime holes such as *Log Flats, Red Cliff*, *Timber Swirls* and others, an angler can stand in one place and cast to a half-dozen rising brown trout, many of which measure in the upper teens. Hatches are common, and East Canyon’s brown trout have a penchant for dry flies, but do not eschew feeding on nymphs.

Because East Canyon Creek is a tailwater (merely a mile-and-a-half below a bottom-outlet dam), the Creek’s water temperature remains ideal all summer for vigorous insect and trout activity. Because runoff is buffered by the dam, the Creek almost always remains clear and fishable year-round, plus, it offers winter fishing--for an angler so inclined.

Golden-bodied cutthroat trout are hidden treasures in the ranch’s four miles of Sheep Creek. The native Bonneville cutthroat are a vestige population from ancient Lake Bonneville. Having been cut off from their native range in the Weber River, this obscure population retreated to Sheep Creek and thrives there. An angler pursuing these native cutts must abandon traditional overhead casting and employee tight-quarters casts such as roll casts, dapping, and bow-and-arrow casts, finding creative ways to offer a fly to trout in Sheep Creek’s plunge pools and deeper pockets.





# PREMIUM HUNTING & PRIVATE CWMU

**WILDLIFE OVERVIEW**

- The ecologically diverse PC Bar 10 Ranch is home to thriving and huntable populations of Moose, Elk, Mule Deer, Bear, Mountain Lion, and Turkeys, along with numerous small game, birds, and waterfowl
- The abundance of water and privacy created by the ranch topography create a wildlife sanctuary

**MULE DEER**

- Portion in CWMU for Mule Deer with 9 Guaranteed Landowner Buck Tags
- Remainder in general season unit (Chalk Creek/East Canyon/Morgan-South Rich)
- Very good buck mule deer hunting

**ELK**

- The entire ranch is in the East Canyon any bull elk unit
- Tags can be purchased over the counter, no limit on bull elk harvested on ranch by legal tag holders
- Excellent bull elk hunting

**MOOSE, TURKEY, LION & BEAR**

- Moose can be hunted on the ranch, tags are by drawing and are once in a lifetime.
- Turkey hunting is excellent on the ranch, and permits can be obtain through the Utah DWR
- Lion & Bear hunting is excellent on the ranch, a record book Black Bear was recently harvested on ranch







Roy
South Weber
Layton
Morgan
MORGAN
Henefer
Farmington
Centerville
Bountiful
Coalville
North Salt Lake
SLC
Salt Lake City
SALT LAKE CITY
West Valley City
Taylorsville
Holladay
Mount Olympus Wilderness
PARK CITY
Park City
Cottonwood Heights
Solitude
West Jordan
Twin Peaks Wilderness
Alta
South Jordan
Sandy


Whites Crossing
WOODS CREEK
East Canyon
Wildlife
Management
Area
WOODS CREEK
East Canyon
State Park
East Canyon
Reservoir
MONUMENT CREEK
FARRELLS CREEK
QUAKING ASP CREEK
66
65


QUAKING ASP CREEK
MONUMENT CREEK
DRY FORK CREEK
East Canyon Reservoir
East Canyon State Park
FARRELLS CREEK
WOODS CREEK
East Canyon Wildlife Management Area
Whites Crossing
65
66















THANK YOU FOR CONSIDERING THE

# PC BAR 10 RANCH

7,035 Acres
Morgan County, Utah



DAVID ANDERSON, BROKER
SALT LAKE CITY, UTAH
801-910-4040
DAVID@A5REALESTATE.COM

A5 REAL ESTATE

The information contained herein has been obtained through sources deemed reliable but cannot be guaranteed as to its accuracy, and a legal due diligence review and confirmation is recommended.

# EXHIBIT 4

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11018 / December 21, 2021**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 93838 / December 21, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20687**

**In the Matter of**

**Nikola Corporation,**

**Respondent.**

**ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER**

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Nikola Corporation ("Nikola" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Summary

1. Nikola, a publicly traded zero emissions transportation system provider, made numerous material misrepresentations to investors about key aspects of its business. From at least March 2020 through September 2020, Nikola deceived investors about its products, technical advancements, and commercial prospects.

2. Nikola primarily misled investors through scores of misrepresentations by its CEO and later Executive Chairman, Trevor R. Milton ("Milton"). Before Nikola had produced a single commercial product or had any revenues from truck or hydrogen fuel sales, Milton embarked on a public relations campaign aimed at inflating and maintaining Nikola's stock price. As described further below, from at least March 2020 through September 2020, Milton's statements in tweets and media appearances, individually and taken together, painted a picture of Nikola that diverged widely from its then-current reality. Milton misled investors about, among other things, Nikola's technological advancements, in-house production capabilities, reservation book, and financial outlook.

3. Nikola further misled investors by misrepresenting or omitting material facts about the refueling time of its prototype vehicles, the state of its headquarters demonstration hydrogen station, the anticipated cost and sources of electricity for its hydrogen production, and the economic risks and benefits associated with its contemplated partnership with General Motors. In addition, Nikola failed to maintain disclosure controls and procedures as required by the Exchange Act rules for issuers with a class of securities registered under the Exchange Act.

4. As a result of the conduct described above, Nikola violated Section 10(b) of the Exchange Act and Rules 10b-5 and 13a-15(a) thereunder and Section 17(a) of the Securities Act.

## Respondent

5. **Nikola Corporation** is incorporated in Delaware and is headquartered in Phoenix, Arizona. Nikola is a vertically integrated zero emissions transportation system provider that designs and manufactures battery electric vehicles ("BEV"), hydrogen fuel cell electric vehicles ("FCEV"), and hydrogen station infrastructure. Since approximately 2016, Nikola has focused on producing FCEV trucks. Later, Nikola also began to develop BEV trucks. Nikola's common stock is registered pursuant to Section 12(b) of the Exchange Act, and is quoted under the ticker symbol "NKLA" on the Nasdaq Global Select Market.

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Relevant Person

6. **Trevor R. Milton** is a resident of Oakley, Utah. In 2015, he founded Bluegentech LLC, which in July 2017 converted from a limited liability company to a Delaware corporation and changed its name to Nikola Corporation ("Legacy Nikola"). Milton was Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Legacy Nikola from its inception until June 3, 2020, when Legacy Nikola entered into the Business Combination (as defined below). From June 3, 2020 until September 20, 2020, Milton was Nikola's Executive Chairman. According to Nikola's filings with the Commission, Milton resigned as Executive Chairman of Nikola and from Nikola's Board of Directors on September 20, 2020.

## Background

*Nikola and its Business*

7. Nikola was created through the merger of Legacy Nikola and VectoIQ Acquisition Corp. ("VectoIQ"), a Delaware corporation headquartered in New York, New York. VectoIQ was formed in January 2018 as a special purpose acquisition corporation, or SPAC, for the purpose of effecting a business combination with one or more businesses. VectoIQ completed an initial public offering in May 2018, at which time its securities began to be quoted on The Nasdaq Capital Market.

8. On March 2, 2020, VectoIQ and Legacy Nikola entered into a Business Combination Agreement (the "Business Combination Agreement"), as well as certain related agreements, pursuant to which Legacy Nikola would merge with a subsidiary of VectoIQ, with Legacy Nikola remaining as the surviving company and as a wholly-owned subsidiary of VectoIQ. On June 3, 2020, Legacy Nikola and VectoIQ consummated the merger contemplated by the Business Combination Agreement (the "Business Combination"), and VectoIQ changed its name to Nikola Corporation.[2] On June 4, 2020, Nikola's common stock and warrants began trading on the Nasdaq Global Select Market.

9. Nikola advertised a business model that, among other things: (i) offered a bundled lease for its trucks that included the cost of hydrogen fuel; (ii) planned to construct a nationwide network of hydrogen refueling stations around routes of customers who have committed to lease Nikola's trucks; and (iii) sought to obtain cheap electricity that would enable the company to produce hydrogen at a fraction of current market rates.

10. Nikola's business plan required billions of dollars of capital to finance the development and manufacturing of trucks and station infrastructure. From 2015 through March 2020, Nikola raised over $500 million through private offerings directed mostly at institutional investors. In connection with the Business Combination, VectoIQ raised from institutional investors approximately $525 million in a private investment in public equity ("PIPE") offering. As a result of the Business Combination, Nikola received a net contribution of approximately

[2] Unless specified otherwise, references in this Order to Nikola refer to, depending on the context, Legacy Nikola prior to the Business Combination and to Nikola Corporation after the Business Combination. References in this Order to VectoIQ refer to VectoIQ prior to the Business Combination.

$594.5 million from VectoIQ, an amount that excludes a $70 million payout to Milton made at the closing of the transaction.

**Relevant Securities Offerings and Filings**

11. In connection with the Business Combination, on March 13, 2020, VectoIQ filed with the Commission a Registration Statement on Form S-4, which included a Preliminary Proxy Statement, Prospectus, and Information Statement. On May 8, 2020, this Registration Statement was declared effective and VectoIQ filed a Prospectus, a Notice of Meeting, and Proxy Statement.

12. On June 15, 2020, Nikola filed with the Commission a Registration Statement on Form S-1 relating to (i) the issuance of Nikola common stock issuable upon the exercise of warrants originally issued by VectoIQ, and (ii) the offer and sale from time to time of Nikola common stock held primarily by the PIPE investors, VectoIQ's sponsor, and certain of its affiliates. This Registration Statement was declared effective on July 17, 2020. On July 17, 2020, Nikola filed with the Commission a Registration Statement on Form S-1 relating to the offer and sale of Nikola common stock held by the founding shareholders of VectoIQ and by certain pre-Business Combination investors in Nikola (including entities controlled by Milton). This Registration Statement was declared effective on July 27, 2020.

13. Many of Nikola's false and misleading statements in this Order were made at the time securities were being offered and sold pursuant to these registration statements.

**Milton Aggressively Promoted Nikola**

14. During the time that he was CEO and then Executive Chairman, Milton was Nikola's primary public spokesperson. Milton used his personal Twitter account (@nikolatrevor) and personal Instagram account (@lakepowelltrevor) to publish material information about Nikola. When tweeting or posting material information about Nikola from his personal accounts, Milton did so in his capacity as CEO or Executive Chairman of Nikola.

15. Beginning at least as early as June 2020 and continuing through September 20, 2020, Milton included the following publicly available bio on his Twitter account: "Founder, Executive Chairman of @nikolamotor Nasdaq traded: NKLA. It's our duty to leave the world a better place and inspire people. Instagram: lakepowelltrevor." Milton also posted material information about Nikola from its corporate Twitter account (@nikolamotor). Milton repeatedly urged television viewers and podcast listeners to follow his social media accounts, claiming he used them to communicate "accurate data" about Nikola in a way that would enable followers to receive information "way faster than you get it anywhere else."

16. In the weeks prior to and following the June 3, 2020 Business Combination, Milton significantly increased his media presence, appearing on dozens of nationally televised programs and podcasts and tweeting hundreds of times. He told Nikola executives that his frequent media appearances and increased activity on social media were part of a "media blitz" designed to generate investor interest in Nikola, and that he hoped his presence on these platforms would increase and maintain the company's stock price.

**Nikola Did Not Have Adequate Disclosure Controls or Procedures**
**<u>Regarding Milton's Social Media Use and Media Appearances</u>**

17. Nikola's disclosure controls and procedures for monitoring or reviewing Milton's interviews and social media activity were deficient from at least June 3, 2020 through September 2020.

18. Milton did not routinely consult with anyone at Nikola before publishing Nikola-related information on his or Nikola's social media accounts, or before being interviewed about Nikola on television programs and podcasts. Likewise, no one at Nikola routinely reviewed Milton's social media posts prior to their publication, and executives and employees alike frequently learned of Milton's interviews after they aired. Further, Nikola did not correct these statements.

19. Nikola did not design, implement, or maintain adequate disclosure controls or procedures to assess whether the information Milton published via social media and television and podcast appearances was required to be disclosed in Nikola's Exchange Act reports within the time periods specified in the Commission's rules and forms. Similarly, Nikola did not have processes in place to ensure that information published by Milton was communicated to management to allow timely decisions regarding required disclosure.

**<u>Nikola's Material Misrepresentations to Investors through Milton</u>**

20. From approximately March 2020 through September 2020, in his capacity as CEO and later as Executive Chairman of Nikola, Milton made materially false and misleading statements on numerous critical topics related to Nikola's capabilities, technology, reservations, products, and commercial prospects.

21. *<u>Nikola One Capabilities.</u>* Milton made false and misleading statements about the capabilities of Nikola's first semi-truck prototype, the Nikola One, which could not run under its own power when Nikola unveiled it in December 2016 or at any time thereafter. For example, in or around early 2018, Milton posted, or directed the posting of, a video clip to Nikola's Twitter and Facebook accounts depicting the Nikola One truck moving on a road, seemingly at a high rate of speed. The video had no narration or text. The text of the tweet in which the video was embedded stated: "Behold, the Nikola One in motion. Pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category: weight, acceleration, stopping, safety and features – all with 500-1,000 mile range!" The "In Motion" video remained posted on Nikola's corporate Twitter, Facebook, and YouTube accounts, as well as on its website, and was available for viewing by investors and prospective investors until at least September 2020.

22. The video and the caption on the January 25, 2018 tweet were misleading because the video showed the Nikola One moving down a road with text that told viewers to "behold" the Nikola One "in motion," while omitting the fact that the truck was rolling down an incline due to gravity rather than under its own power. The "In Motion" video thus left viewers with the false impression that the Nikola One was capable of moving under its own power.

23. *Hydrogen.* Milton made a series of false and misleading claims about Nikola's then-current hydrogen production capabilities, its costs to produce hydrogen, and the costs at which it obtained electricity to produce hydrogen profitably.

24. In order to support the FCEV trucks that Nikola projected to put on the road, Nikola would need to produce tens of millions of kilograms of hydrogen each year. To do so, Nikola represented to investors that it intended to produce hydrogen via electrolysis, a process that uses electricity to split water into hydrogen and oxygen. However, producing Nikola's projected amount of hydrogen via electrolysis would require a significant amount of electricity. For purposes of its projections, Nikola assumed it could obtain electricity at an average of $0.035 per kilowatt-hour ("kWh") – a rate significantly cheaper than prevailing industrial rates – based on its expected large consumption and its goal of obtaining lower-cost renewable electricity during non-peak hours or sourcing it "behind the meter" (*i.e.*, from a source other than the grid). Nikola disclosed that if it was not able to obtain electricity at a significant discount to prevailing rates, it would not be profitable. Accordingly, Nikola's ability to produce hydrogen – and do it cost-effectively – was a critical component of the company's overall business model.

25. From approximately November 2019 through September 2020, Milton falsely claimed in posts from his personal Twitter account and in appearances on podcasts and television programs that, among other things: (i) Nikola was then currently producing hydrogen; (ii) Nikola reduced its cost to produce hydrogen from $16 per kilogram down to either $3 or $4 per kilogram; (iii) Nikola had contracts with electricity providers at rates of $0.03 or $0.04 per kWh; and (iv) the electricity that Nikola purportedly had sourced was generated using renewable or "clean" methods. All of these statements were false and misleading, because from inception through at least September 2020, Nikola never produced any hydrogen, did not have a station permitted to produce hydrogen, and did not have any contracts signed with any electricity providers.

26. *Badger.* Milton falsely and repeatedly claimed that Nikola had engineered and already completed a prototype of an electric pickup truck, the Badger, and that this vehicle used primarily Nikola's proprietary components.

27. From at least February 2020 through at least June 2020, Milton misrepresented that Nikola had "designed" or "engineered" the Badger to meet particular specifications, and that the prototype had already been completed. Milton made these statements in a Nikola press release that he drafted, as well as in posts from his personal Twitter account and in appearances on podcasts. The statements about Nikola having "designed" or "engineered" the Badger to meet particular specifications were false and misleading. At the time of these statements, Nikola had not performed any engineering work or any design work other than CGI renderings of a Nikola employee's prior illustrations, and Nikola's third-party suppliers were only completing computer-aided design and beginning tooling.

28. From at least April 2020 through September 2020, Milton also made several false statements in posts from his personal Twitter account and on podcast appearances regarding the proprietary nature of the Badger. Milton asserted, among other things, that Nikola built the Badger "from the ground up," "own[s] all the tech" and "developed all the tech" in the Badger, and that it "put" a "billion dollars" of its semi-truck technology into the Badger. All of these statements were

false, as third-party suppliers built the Badger prototype using "donor" vehicles manufactured by another company and little, if any, of Nikola's technology was used on the Badger prototype.

29. *Truck Reservations.* Milton made several false claims about Nikola's truck reservations and orders. As a pre-revenue company, Nikola consistently emphasized to potential investors that its pre-order book, which it characterized as a "backlog of interest," was a sign that the company was primed for profitability in the near future based on interest in its flagship FCEV semi-truck product. Although the vast majority of the pre-orders were indications of interest that were cancellable at any time, Milton misrepresented the non-binding nature of these orders. For example, in an appearance on a podcast on July 31, 2020, Milton stated that the pre-orders were "not letter of intents, they're actually contracts. . . . Yeah, billions and billions of dollars with contracts." This statement was false and misleading because Nikola had only one customer whose order for 800 FCEV trucks could be characterized as binding. There were not billions and billions of dollars in binding orders.

30. Similarly, Milton misrepresented the nature of the truck orders contemplated by Nikola's agreement with a publicly-traded waste collection company ("Customer A") for an order of 2,500 to 5,000 trucks. For example, Milton claimed on his personal Twitter account that this was the "[l]argest class 8 zero emission order in the industry 2,500 guaranteed." This statement was false and misleading, as under the terms of the agreement, for Customer A to incur any obligation, a series of conditions would have to be met, not all of which were even under Nikola's control. Moreover, if the parties could not agree on essential terms (including price, service and parts network, warranties, training program, and more), Customer A had the ability to terminate the agreement anytime on 30 days' notice. Finally, even if Nikola could meet all of those obligations, Customer A still had the right to cancel its orders without liability or penalty as long as the delivery date was at least 120 days out.

31. *"Breakthrough" Battery Technology.* Milton claimed falsely that Nikola "has achieved" a significant breakthrough in battery technology that would result in enormous performance gains for Nikola's vehicles. Milton made this claim in a November 19, 2019 press release that he drafted and Nikola published. The press release contained several unqualified claims relating to the "new battery," including, among others, vehicle range, energy density, number of cycles, and weight. In the days and months following the publication of the press release, Milton made similar statements in tweets from his personal account and in appearances on podcasts. These statements were misleading because they failed to disclose that the claimed battery attributes were applicable to coin-size battery cells that were being developed and tested in a controlled lab environment as part of a university research project. This fact was significant because to scale these coin-size lab-level cells to even a prototype size would require further development with no assurance of comparable performance levels. From there, developing the cells from prototype cells to commercial grade quality was a further, significant undertaking, with no assurance of utility for commercial applications.

32. *In-House Component Development*. Milton made numerous misstatements about Nikola's in-house component development and manufacturing capabilities. For example, from approximately February 2020 through at least August 2020, Milton made statements in posts from his personal Twitter account and in appearances on podcasts that created the misleading impression

that Nikola manufactured its own batteries and that Nikola designed the entire battery. These statements were false and misleading because Nikola used a third-party supplier to manufacture batteries for its first production vehicle, and this supplier both designed the modules for the batteries and provided Nikola assistance in the design of the battery pack. Further, Nikola lacked the capability to manufacture these batteries on its own. Similarly, during the same time period, Milton claimed in tweets and on podcast appearances that Nikola designed its own inverter. This statement was false because Nikola used "off the shelf" inverters for all of its semi-truck prototypes and it planned to use "off the shelf" inverters for its first production vehicle. Finally, Milton misled investors when he stated in an Instagram Live video posted from his personal Instagram account that Nikola "does full electric fluid submersion batteries" that "cool and heat . . . much faster, much more efficiently," and are "able to stop thermal propagation." This statement was misleading because it omitted to disclose that the submerged batteries to which Milton was referring were only being used in two truck prototypes and had severe functional limitations and associated safety issues. Milton's statements misled current and prospective investors to believe that these batteries were viable when, in fact, they were not.

33. *Total Cost of Ownership*. Finally, Milton also falsely claimed that the total cost of ownership ("TCO") of Nikola's trucks was 20 to 30 percent below that of diesel vehicles. Commercial vehicle buying decisions, particularly for large corporate fleets, are driven, in part, by the TCO, an analysis of the lifetime cost of a truck, from the acquisition through the operating period. By March 2019, Nikola had determined it could not project a TCO that was below that of diesel vehicles, and that its analysis of data could only support a projected TCO on par with diesel. However, on at least several occasions in July 2020, including during podcast appearances and in an Instagram Live video posted from his personal Instagram account, Milton falsely asserted that the TCO of Nikola's vehicles was "20 to 30 percent" cheaper than of diesel competitors.

34. In making the false and misleading statements described above, Milton at all times spoke in his capacity as CEO or Executive Chairman of Nikola.

**Nikola's Additional Material Misrepresentations**

35. In addition to the material misrepresentations that Nikola made through Milton, as described above, Nikola made other material misrepresentations to investors. These misrepresentations concerned hydrogen refueling time, the hydrogen demonstration station, the current and future costs and sources of electricity for the company's planned hydrogen production, and the economic risks and benefits associated with its contemplated partnership with General Motors.

36. *Refueling Time*. Nikola presented a misleading picture of its hydrogen refueling capabilities. Nikola understood that the ability to refuel FCEV trucks approximately as quickly as diesel trucks (10-15 minutes on average) was an important factor in achieving market adoption of FCEV technology. However, hydrogen's properties make it challenging to rapidly fill the tanks of a semi-truck. Completing a refueling this quickly – known as a "fast fill" – requires, among other things, cooling and compression as part of the fueling process. Although Nikola had an engineering plan and had run simulations that showed it was theoretically possible to conduct a fast fill in 20 minutes, it had not developed a solution to achieve a fast fill on a semi-truck. Instead, it

took Nikola 45-80 minutes to fill its semi-truck prototypes with hydrogen in 2020. However, after the Business Combination announcement, Nikola failed to disclose to the market the actual fill time of 45-80 minutes to investors. For example, in an April 2020 investor presentation Nikola prepared and provided to investors, Nikola stated, without qualification, that the refueling time for its FCEV was "10-15 minutes." Nikola's executives similarly claimed in 2020 that Nikola's FCEV refueling time compared favorably with diesel trucks.

37. *Hydrogen Station.* Nikola misled investors in 2020 regarding the status of its demonstration hydrogen station. Although Nikola was not producing hydrogen in 2020, it had installed a station at its headquarters designed to dispense test quantities of hydrogen it purchased from third parties. In its Registration Statement on Form S-1, filed on June 15, 2020, as well as in certain subsequent Registration Statements and Prospectuses filed in 2020, Nikola touted the demonstration station at its headquarters as a "as a model for future hydrogen stations." This statement was misleading because Nikola failed to disclose that this station was beset by significant operational and repair challenges. Nikola's analysis showed that the station operated only 21% of the time during 2020.

38. *Electricity.* Nikola made material omissions about costs and sources for electricity related to the company's planned hydrogen production – a critical component of its business model. In its Registration Statement on Form S-1, filed on June 15, 2020, as well as in certain subsequent Registration Statements and Prospectuses filed in 2020, Nikola disclosed that: (i) for its hydrogen production, "electricity costs account for approximately 75% to 85% of the total cost"; (ii) securing a reliable source of electricity for each of its fueling stations at a price per kwh below market retail rates was critical to its business model; (iii) it planned to produce hydrogen on-site at each hydrogen station; (iv) parties have been able to secure "Power Purchase Agreements" (or "PPAs") using solar energy at below market rates; and (v) the costs of energy production using solar and wind have been decreasing over time.

39. Certain of Nikola's statements regarding the cost and sources of electricity for its on-site hydrogen production were misleading. Although it accurately highlighted its need to obtain a reliable source of electricity for its fueling stations, Nikola omitted to disclose that it would require up to approximately 5% of all electricity consumed in the United States in 2019 to produce sufficient hydrogen per year for the fully-deployed version of its planned hydrogen network. Furthermore, although Nikola included some data about decreasing solar and wind electricity cost trends, it failed to disclose that its planned on-site hydrogen production would require Nikola to incur material additional costs beyond just the cost of electricity production, including, among other things, transmission, distribution, and energy storage costs. Moreover, in conjunction with its representations about needing to obtain below market retail rates, Nikola omitted that in the months prior to its S-1 filing it received significantly higher per kWh price indications from grid and solar energy suppliers than its target price point (which were primarily driven by, among other factors, battery storage costs and grid connection, transmission, or distribution costs).

40. *The General Motors Partnership.* Nikola misled investors by failing to disclose the potential economic impact of the proposed strategic partnership between Nikola and General Motors, pursuant to which General Motors would produce the Badger. In a press release dated

September 8, 2020 Nikola disclosed the strategic partnership with General Motors to develop the Badger and touted the purported cost-savings to Nikola from the partnership. Specifically, Nikola claimed that it "anticipates saving over $4 billion in battery and powertrain costs over 10 years and over $1 billion in engineering and validation costs." This claim was misleading because, although Nikola touted potential cost savings, Nikola failed to disclose that unless the market could support a "premium" MSRP price for the Badger, Nikola's internal projections showed that the entire Badger program could potentially generate a net loss of $3.1 billion over six years and threaten Nikola's solvency. A Nikola executive prepared these internal projections and provided them to Nikola's senior executives and its Board, noting that the projected unit economics from both the "premium" and "market based" pricing approaches. Nevertheless, Nikola went on to tout the discrete potential cost savings associated with one aspect of the program without disclosing the program's overall potential financial impact.

## **<u>Violations</u>**

41. As a result of the conduct described above, Nikola violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit any person from directly or indirectly in connection with the purchase or sale of securities knowingly or recklessly employing devices, schemes and artifices to defraud, making untrue statements of material facts, or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaging in acts, practices, and courses of business that operate as a fraud or deceit.

42. In addition, as a result of the conduct described above, Nikola violated Section 17(a) of the Securities Act, which prohibits, in the offer or sale of any securities, the employment of any device, scheme, or artifice to defraud, and further prohibits any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

43. In addition, as a result of the conduct described above, Nikola violated Rule 13a-15(a) under the Exchange Act. Rule 13a-15(a) requires issuers required to file annual reports pursuant to Section 13(a) or 15(d) of the Exchange Act to, among other things, maintain disclosure controls and procedures designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

## **<u>Nikola's Remedial Efforts and Cooperation</u>**

44. In determining to accept the Offer, the Commission considered remedial acts undertaken by Respondent and cooperation afforded the Commission staff.

## Undertakings

45. Nikola (including its officers, directors, and employees, and third-party consultants within Nikola's control) shall continue to cooperate fully with the Commission with respect to this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party and subject to compliance with applicable law. Nikola agrees that such cooperation shall include, but is not limited to:

a. Production of Information: at the Commission's request, upon reasonable notice, and without subpoena, Nikola (including its officers, directors, and employees, and third-party consultants within Nikola's control) shall truthfully and completely disclose all information in its possession requested by the Commission staff in connection with the Commission's investigation, litigation or other related proceedings;

b. Production of Documents: at the Commission's request, upon reasonable notice, and without subpoena, Nikola (including its officers, directors, and employees, and third-party consultants within Nikola's control) shall provide any document, record or other tangible evidence in its possession requested by the Commission staff in connection with the Commission's investigation, litigation or other related proceedings;

c. Production of Cooperative Personnel: at the Commission's request, upon reasonable notice, and without subpoena, Nikola (including its officers, directors, and employees, and third-party consultants within Nikola's control) shall secure the attendance and truthful statements, deposition, or testimony of any Nikola officer, director, or employee or third-party consultant within Nikola's control, excluding any person who is a party to any related litigated judicial or administrative proceeding, at any meeting, interview, testimony, deposition, trial, or other legal proceeding. Nikola shall also use its best efforts to secure the attendance and truthful statements, deposition, or testimony of any former Nikola officer, director, or employee, excluding any person who is a party to any related litigated judicial or administrative proceeding, at any meeting, interview, testimony, deposition, trial, or other legal proceeding.

The foregoing obligations are subject to Nikola's reservation of rights: (i) to claim that documents or information requested is subject to attorney-client privilege, attorney-work-product protection, or bank examiner privilege; and (ii) to seek entry of a confidentiality order as to: sensitive business documents or information; sensitive personnel documents or information; or confidential information pertaining to parties other than Nikola; and

d. Service and Personal Jurisdiction Consents: Nikola further agrees that, with respect to this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, it will: (i) accept service by email, mail or facsimile transmission of notices, requests, or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by the Commission staff ("Commission Service"); (ii) appoint Nikola's attorney as agent to receive Commission Service; (iii) with

respect to Commission Service, waive the territorial limits upon service contained in Rule 45 for the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Nikola's travel, lodging, and subsistence 18 expenses at the then-prevailing U.S. Government per diem rates; and (iv) consent to personal jurisdiction over Nikola in any United States District Court for purposes of enforcing any Commission Service.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, it is hereby ORDERED that:

A. Respondent Nikola cease and desist from committing or causing any violations and any future violations of Section 10(b) of the Exchange Act and Rules 10b-5 and 13a-15(a) thereunder, and Section 17(a) of the Securities Act.

B. Respondent shall pay a civil money penalty in the amount of $125,000,000 to the Securities and Exchange Commission. Payments shall be applied first to post order interest, which accrues pursuant to pursuant to 31 U.S.C. 3717. Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due. If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth below, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission. Payment shall be made in the following installments:

- Due within 14 days of the entry of this Order: $25,000,000 (the "Initial Payment")
- Due 184 days after the entry of this Order: $25,000,000
- Due 364 days after the entry of this Order: $25,000,000
- Due 544 days after the entry of this Order: $25,000,000
- Due 724 days after the entry of this Order: $25,000,000

Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Nikola as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Eric Werner, Associate Director, Division of Enforcement, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Fort Worth, Texas 76102.

C. Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalties referenced in paragraph IV.B. above. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, Respondent shall not argue that Respondent is entitled to, nor shall Respondent benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payments of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that Respondent shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary

# EXHIBIT 5
# (Filed Under Seal)