# Exhibit 1

Erik A. Christiansen, USB #7372
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher Robertson (*pro hac vice*)
**SEYFARTH SHAW LLP**
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: 617-946-4989
Facsimile: 617-790-6774
crobertson@seyfarth.com

*Attorneys for Plaintiffs PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PETER HICKS; HICKS, LLC; and WASATCH HICKS, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>TREVOR R. MILTON; M&M RESIDUAL, LLC; and T&M RESIDUAL, LLC,<br><br>Defendants. | **AFFIDAVIT OF CHRISTOPHER F. ROBERTSON**<br><br>Case No. 2:22-cv-00166<br><br>Judge: Hon. Howard C. Nielson, Jr<br><br>Magistrate Judge: Hon. Daphne A. Oberg |

I, Christopher F. Robertson, declare as follows:

1. I am an attorney admitted in Massachusetts and New York, and also *pro hac vice* in this case as counsel for the Plaintiffs Peter Hicks, Hicks LLC and Wasatch Hicks, LLC.

2. The complaint in this case was filed on March 14, 2022.

3. On October 22, 2022, Plaintiffs' Initial Disclosures were served on Defendants. An initial production of documents followed, including the production of documents that had been produced to Trevor Milton in the criminal matter pending in New York.

4. On April 26, 2023, Defendants served their First Set of Discovery Requests to As part of these requests, Defendants sought communications between Peter Hicks and nine individuals, as well as any representative of Nikola Corporation.

5. On June 16, 2023, Plaintiffs served their Response to Defendants' First Set of Discovery Requests to Plaintiffs, attached as Exhibit A. In response to the request for communications, the Plaintiffs objected to the request as overly broad and burdensome, but did commit to conducting an additional search of email and stated they would "produce any responsive communications concurrently." Plaintiffs also objected to providing any devices to Defendants and noted that the request to do so was not in compliance with the Federal Rules.

6. On July 25, 2023, counsel for Defendants emailed counsel for Plaintiffs to request a meet and confer with regard to Plaintiffs' responses. In this communication, counsel for Defendants acknowledged that Peter Hicks had not provided text messages, but that they had received text messages from Lucas Hicks. They stated: "Peter's response did not include any text messages. We know that Peter has responsive text messages with Lucas, so this indicates he did not search for them." Counsel also recognized that Lucas was claiming attorney-client privilege as to certain text messages between himself and Peter and argued that such privilege assertion was unfounded.

7. After the parties met and conferred on August 2, 2023, Plaintiffs' counsel agreed to search Peter's phone for any relevant text messages between him and Lucas. At this time they discovered various text chains with Lucas and direct text chains with Peter and Rose, his mother. The vast majority of these texts were entirely irrelevant to the present lawsuit, and involved such mundane items as what to order for dinner or weekend plans, as you would expect among family members.

8. While there were many text messages on Peter's phone between him and Lucas, a manual search of the phone did not reveal and text messages between Peter and Lucas that predated July 2021. Peter had no explanation for why that was the case, as there were texts with other individuals that did go back prior to July 2021. On August 11, 2023, Plaintiffs served their Supplemental Response to Defendants' First Set of Discovery Requests to Plaintiffs, attached as Exhibit B, wherein they clearly stated that no text messages could be produced from Peter's phone that predated 2021, because after a manual search of Peter's phone there did not appear to be any texts between Lucas and Peter dated prior to July 2021. At no time did they hide this fact, and they appropriately responded truthfully to the questions when raised.

9. Given a number of discovery disputes between the parties, both parties filed motions to compel additional discovery. As part of the meet and confer process, and even after the discovery motions were filed as part of an effort to narrow the issues, Plaintiffs offered to make Peter's phone available for inspection. Unsatisfied with this offer, Defendants pressed for a forensic review of Peter's phone and laptop, which the Court allowed.

10. In order to preserve privilege, the parties agreed that the forensic review would involve Peter providing his phone and laptop to a third-party vendor, Consilio, which would create an image of both devices. Defendants would then run search terms across the images and any "hits" would be downloaded for review by Plaintiffs' counsel for privilege. Defendants then provided a list of terms and those terms were run, producing tens of thousands of documents for review, which surprised Plaintiffs' counsel given that volume. However, counsel then realized that one of the terms used was "Milton" and Peter lives in Milton, Massachusetts. Consequently, tens of thousands of irrelevant documents, emails and texts were "hits" from the search, making

the process of review extremely taxing and expensive. Nonetheless, Plaintiffs agreed to undertake the work of reviewing every document, text and email, and also producing a privilege log.

11. Ultimately, over 13,000 additional non-privilege documents were produced to Defendants based on their broad search terms, most of which bear no relevance to this case, the Ranch transaction or Mr. Milton. Included within these documents were texts between Peter and Lucas that were dated between March 2021 and July 2021 that had not been uncovered during the manual search. At no time did Defendants assert that the production was not complete, nor were any additional discovery motions filed in this case claiming that Plaintiffs had not met the terms of the Court's prior orders or the review and production protocol agreed to by the parties.

12. Rather than press any issues with Peter's production, Defendants instead pressed Lucas with regard to his production, ultimately filing an action in New York to compel a forensic review of his electronic devices, including his cell phone. Because Lucas had recorded an April 2020 conversation between Peter and Mr. Milton, and the government sought to use the recording in the criminal case, Lucas had been granted immunity in connection with the recording.

13. The federal judge in New York denied Defendants' motion to compel a forensic review of Lucas' phone. However, during this process, Lucas agreed to and did produce all relevant text messages between himself and Peter, including texts for the period from April 2020 through July 2021. A transcript of this hearing in the SDNY is attached as Exhibit C.

14. Certain text messages an emails were withheld by both Lucas and Peter based on the assertion of attorney-client privilege. Defendants moved to compel production of these communications, which the Court denied. Defendants' assertion that "Plaintiffs and Lucas greatly interfered with the judicial process, stonewalling Defendants' efforts to obtain the texts in question at every turn" is flatly false and untrue. We offered to provide Peter's phone for review long before

the issue was brought to the Court, and even during the argument on Defendants' motion, once again offered to allow counsel to review Peter's phone, which the Court acknowledged in its Order. Likewise flatly untrue is any assertion that Plaintiffs violated a Court order or made any misrepresentations to the Court. At every turn, Plaintiffs made clear they had nothing to hide, offered to provide Peter's phone for review, and accurately reported what that manual review of the phone revealed.

15. As part of the review and production of documents, including the production of electronic materials, various privilege logs were created and provided to Defendants. Among the documents identified as privileged was a communication in June 2020 produced as HICKS002860 - HICKS002861 that had been redacted. However, this redaction was in error, as the exact same document had been produced to Mr. Milton's criminal trial counsel in the criminal case, and also produced in an unredacted form in this matter as HICKS000553 - HICKS000554. Thus, the production of a redacted copy and the listing of that document on our privilege log was in error. Likewise, to the extent the document was misidentified as work product, that is clearly not the case, as evidenced by the document itself, attached as Exhibit D. At no time did Defendants' counsel seek to meet and confer with regard to this item on the privilege log nor seek clarification as to its designation. Rather, the first time I was even aware of the issue was when the present motion was filed.

16. With regard to Mr. Tucker's report regarding the review of Peter's phone, after he submitted his original report, he acknowledged under oath at his deposition that it had errors and was required to be amended. A copy of cited excerpts from Mr. Tucker's deposition transcript is attached as Exhibit E. Mr. Tucker admitted that there were texts on certain devices that he had stated were not there originally, and admitted that his supplemental report had "typos." Exhibit F,

Transcript at 48, 54. He also admitted that he had not conducted any review of the search terms that were utilized to determine the number of relevant texts, as opposed to the total texts, that he estimated Peter may have sent to Lucas, and admitted he had no way to conclude whether any specific relevant texts were missing. *Id.* at 57-58. He also did not review Peter's phone with regard to any other recipients and, consistent with Peter's testimony, could not say whether any other texts with other individuals were or were not missing. *Id.* at 67-68.

17. We also analyzed the listing of 3,598 text messages between Peter Hicks and Lucas Hicks between March 5, 2021 and December 18, 2023 extracted from Peter Hicks' phone aggregated by Mr. Tucker. Specifically, Mr. Tucker identified 3,531 out of 3,598 messages as "outside search term results." This left 67 messages that had been identified and produced as relevant—based on the parties' agreed-upon search terms—during a span of over more than two and a half years, or 0.066 relevant messages per day. Based upon this analysis, the volume of texts produced by Lucas for the period between April 2020 and March 2021 is consistent with the expected number of relevant text messages between him and Peter, and there is no reason to believe that Lucas did not produce the relevant texts from that time frame that otherwise could not be located on Peter's phone.

18. A true an accurate copy of cited excerpts of the deposition transcript of Peter Hicks is attached hereto as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct and that this affidavit was executed on December 31, 2024, in Boston, Massachusetts.

*/s/ Christopher F. Robertson*
Christopher F. Robertson

# EXHIBIT A

Erik A. Christiansen, USB #7372
Alex N. Vandiver, USB #17700
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher Robertson (*pro hac vice*)
**SEYFARTH SHAW LLP**
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: 617-946-4989
Facsimile: 617-790-6774
crobertson@seyfarth.com

*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>TREVOR R. MILTON, M&M RESIDUAL, LLC and T&M RESIDUAL, LLC,<br><br>Defendants. | **RESPONSE TO DEFENDANTS' FIRST SET OF DISCOVERY REQUESTS TO PLAINTIFFS**<br><br>Case No. 2:22-cv-00166<br><br>Judge Howard C. Nielson, Jr<br><br>Magistrate Judge: Daphne A. Oberg |

Plaintiffs, by and through their counsel of record, and pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, hereby respond to Defendants' First Set of Discovery Requests to Plaintiffs as follows:

**REQUESTS FOR ADMISSION**

REQUEST NO. 1: Admit that for the time period between April 1, 2020 and April 1, 2021, you were an institutional "accredited investor" as defined in Rule 501(a)(1),(2),(3) or (7) under the Securities Act.

**RESPONSE:** Plaintiffs object to this Request for Admission on the basis that it contains a compound question. Per Defendants' definitions, "you" refers to "Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC, and any agents, representatives and other persons acting or purporting to act on their behalf." Thus, this Request for Admission should be bifurcated into, at least, three separate Requests for Admission addressing each individual entity.

Plaintiffs further object to this Request for Admission on the basis that the term "as defined in Rule 501(a)(1),(2),(3) or (7) under the Securities Act" is vague. Plaintiffs interpret this term to mean an "accredited investor" as defined by 17 C.F.R. § 230.501(a)(1), (2), (3), or (7).

Plaintiffs further object on the grounds that the request assumes that whether a party was an accredited investor is pertinent to the claims in the case. The transaction and option were not conducted or sold pursuant to Regulation D and no Form D was filed with the SEC in connection with the transaction. Moreover, whether a purchaser of securities is accredited is irrelevant where the seller has engaged in fraud. Plaintiffs furthermore object to this Request for Admission on the basis that it calls for a legal conclusion and seeks protected attorney work product.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Deny.

**INTERROGATORIES**

INTERROGATORY NO. 1: If your response to any of the requests for admission above was anything other than an unqualified admission, explain the factual basis of your denial or partial denial of each request for admission.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it pertains to a compound question and, thus, is a compound question itself. Per Defendants' definitions, "you" refers to "Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC, and any agents, representatives and other persons acting or purporting to act on their behalf." Thus, this Interrogatory should be bifurcated into, at least, three separate Requests for Admission addressing each individual entity.

Plaintiffs further object to this Interrogatory on the basis that the underlying Request for Admission(s) are vague. The term "accredited investors" as defined "in Rule 501(a)(1),(2),(3) or (7) under the Securities Act" is vague. Plaintiffs interpret this term to mean an "accredited investor" as defined by 17 C.F.R. § 230.501(a)(1), (2), (3), or (7).

Plaintiffs further object on the grounds that the request assumes that whether a party was an accredited investor is pertinent to the claims in the case. The transaction and option were not conducted and sold pursuant to Regulation D and no Form D was filed with the SEC in connection with the transaction. Moreover, whether a purchaser of securities is accredited is irrelevant where the seller has engaged in fraud. Plaintiffs furthermore object to this Interrogatory on the basis that it calls for a legal conclusion and seeks protected attorney work product.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follow: Peter Hicks was never requested to represent nor did he represent to Defendants that he, Hicks, LLC, or Wasatch Hicks, LLC are accredited investors. He was never asked to complete an accredited investor questionnaire nor was any such document required as part of the transaction.

INTERROGATORY NO. 2: Identify all real estate transactions that you or any entity you own, control, or have an interest in has been involved in, in any capacity, from January 1, 2010 to present. For each transaction, identify your role in the transaction (i.e., purchaser or seller); a description of the type of property (i.e. commercial; residential; ranch; etc.); and the name under

which you or an entity you have an interest in purchased or sold the property. For each purchase, please identify the form of payment that you used to purchase the property (i.e. cash, bank loan, etc.); and identify whether the purchase involved a 1031 exchange.

**ANSWER:** Plaintiffs object that this Interrogatory is a compound question by asking about three different categories of information from three separate entities. This Interrogatory should be bifurcated into, at least, three interrogatories.

Plaintiffs further object that this Interrogatory is irrelevant and overbroad. As such, Plaintiffs object that this Interrogatory is intended to harass and cause undue hardship to Plaintiffs. Whatever real estate transaction(s) that Plaintiffs partook or conducted over the last 13 years have no bearing in this case—which relates to the fraudulent actions Defendants did to induce Plaintiffs into the sale of Wasatch Creek Ranch.

Plaintiffs furthermore object that this Interrogatory on the basis that it is equally available to Defendants through public records.

Subject to and without waiving any of the foregoing objections, Plaintiffs is willing to identify the real estate transactions that Peter Hicks, Hicks LLC, or Wasatch Hicks LLC, partook in as a listed party to the real estate transaction in Utah, between January 1, 2019, and August 14, 2020:

On January 30, 2019, Hicks LLC sold its tenants in common interest in Gailey/Wasatch Peaks Ranch real estate to Wasatch Peaks Ranch LLC after having converting Hicks LLC ownership from an LLC membership to a similar percentage tenants in common interest.

On July 29, 2019, Wasatch Hicks LLC purchased a tenants in common interest in Ward Farm from Jeff's Hillbrook Ranch, LLC, R. Charles Ward, Jeff's Road, LLC, and Jeffrey F. Ward.

On November 7, 2019, Wasatch Hicks LLC sold its 50% tenants in common interest in Ward Farm to Jeff's Hillbrook Ranch, LLC, R. Charles Ward, Jeff's Road, LLC, and Jeffrey F. Ward.

On March 13, 2020, Hicks LLC and Wasatch Hicks LLC purchased Wasatch Creeks Ranch from the Hatch Group, LLC.

On August 14, 2020, Hicks LLC and Wasatch Hicks LLC sold Wasatch Creeks Ranch to Defendants.

All transactions except the subject of this lawsuit were for cash. All of them involved 1031 exchanges.

INTERROGATORY NO. 3: Identify everyone who participated in any way in the April 10, 2020 phone call referred to in paragraphs 177-179 of the Complaint.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that the phrase "participated in any way" is vague. Plaintiffs interpret this phrase to mean any person that was present at the time of the phone call and made their presence known to Plaintiffs at some point during the phone call.

Plaintiffs further object to this Interrogatory to the extent that it asks Plaintiffs to speculate on whom might have been on the other side of the line, whom Plaintiffs may or may not have been aware of their presence, involvement, or participation in the phone call.

Plaintiffs furthermore object to this Interrogatory on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call. As such, Plaintiffs object to this Interrogatory on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond, as follows: Peter Hicks, Lucas Hicks, David Anderson, and Trevor Milton.

INTERROGATORY NO. 4: Identify with specificity all documents that refer or relate to the April 10, 2020 phone call referred to in paragraphs 177-179 of the Complaint, including any recordings, notes, communications, or other evidence of the substance of the phone call. For any recordings, identify the name of the person who created the recording; the method used to create the recording; the model and present location of the device(s) that the recording was originally created on; and the model and present location of all devices the recording has been stored on at any time since its original creation.

**ANSWER:** Plaintiffs object to Interrogatory No. 4 on the basis that the phrase "refer or related to" is vague. Plaintiffs interpret this phrase to mean documents that Plaintiffs prepared during the phone call.

Plaintiffs further object to this Interrogatory to the extent that it asks Plaintiffs to speculate on the documents that Defendants or others might have been referring to or relating to, which Plaintiffs may or may not have been aware of at the time of the phone call. Plaintiffs also object to this Interrogatory to the extent it seeks documents that are not in possession or control of Plaintiffs.

Plaintiffs furthermore object to this Interrogatory on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call and have been previously disclosed to Defendants through the associated criminal trial. As such, Plaintiffs object to this Interrogatory on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond, as follows: Peter Hicks took handwritten notes during the referenced phone call. These have been produced as Hicks000010–11. Lucas Hicks also typed notes and recorded the referenced phone call on his iPhone. The recording of the phone call was transcribed. Those documents have already been produced to Defendants in the criminal case pending in the Southern District of New York.

INTERROGATORY NO. 5: Identify with specificity each and every "false statement" or "misrepresentation" that you allege Trevor Milton made during the April 10, 2020 call referred to in paragraphs 177-179 of the Complaint. For each statement, identify the specific words used and identify any documents, notes, recordings, communications, or other evidence which supports your allegation that the alleged statement or misrepresentation was made.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is overbroad. Plaintiffs further object to this Interrogatory on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call. Furthermore, given the fact that Defendants made the false statements and misrepresentations in the referenced call and is knowledgeable about the falsity of those statements and misrepresentations, Plaintiffs object to this Interrogatory on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond as follows: Plaintiffs are producing a highlighted transcript of the referenced phone call with highlights depicting the statements that Plaintiffs believe were false as HICKS000818-1273. The referenced phone call was not completely recorded; therefore, the transcript of the recorded portion of the phone call does not reflect a complete account of every false statement made during the referenced phone call. Plaintiffs are also producing a copy of Mr.

Peter Hicks' and Lucas Hicks' notes with highlights depicting the statements that Plaintiffs believe were false as HICKS000814-817 as well as a copy of Mr. Peter Hicks' testimony at the criminal trial with highlights depicting the statements that Plaintiffs believe were false.

In addition, Defendants stated to Plaintiffs that: Nikola headquarters had large installation of solar on the roof that produced enough energy to take the HQ off the grid. Nikola had the world's largest hydrogen refueling station in the world which was producing large amounts of hydrogen. Hydrogen trucks rendered the era of diesel over. Nikola had broad intellectual property. Nikola's trucks, would be in the market in 14 months and would begin production in 2021. Nikola had contracts for the sale of trucks worth $14 Billion. Nikola One was a fully functioning truck.

Plaintiffs assert that this is not a complete representation of all the false statements and misrepresentations that Defendants made to Plaintiffs in order to induce the sale of Wasatch Creek Ranch. Plaintiffs reserve the right to supplement their Answer to this Interrogatory as discovery is conducted and reveals additional statements to be false.

INTERROGATORY NO. 6: Identify the date you or any entity you have an interest in purchased the Wasatch Creeks Ranch property from its prior owner; the parties involved in the transaction; the real estate agent(s) and brokerage(s) that represented you in the transaction; and the purchase price you paid for the property.

**ANSWER:** On March 13, 2020, Wasatch Hicks LLC and Hicks LLC purchased the Wasatch Creeks Ranch from Lazy H Ranch, LLC and the Hatch Group, LLC for $6,850,000.00. Wasatch Hicks LLC and Hicks LLC were not represented by a broker in the transaction. David Anderson from A5 Real Estate was the broker for the Hatch Group LLC. A true and correct copy of the purchase agreement will be produced concurrently as HICKS000359.

<u>INTERROGATORY NO. 7</u>: Identify all individuals who represented or assisted you in any way with your purchase of the Wasatch Creeks Ranch property from its prior owner. List each individual(s)' name, current address and phone number, and a description of the role the individual played in the transaction.

**<u>ANSWER</u>:** Plaintiffs object to this Interrogatory on the basis that the phrase "assisted you in any way" is overly broad and vague. Plaintiffs interpret this Interrogatory to seek the identity of any person that Plaintiffs expressly hired to assist them in the real estate transaction of the Wasatch Creeks Ranch from the Hatch Group LLC. Plaintiffs further object to the extent this Interrogatory seeks privileged or confidential information. Plaintiffs' response should not be interpreted in any way, shape, or form as a waiver of any of its rights and/or privileges held in relation to privileged and/or confidential information discussed with any of the identified persons.

Subject to and without waiving any objections, Plaintiff responds as follows:

Wasatch Hicks LLC and Hicks LLC were unrepresented by a broker in the real estate transaction with the Hatch Group LLC over the Wasatch Creeks Ranch.

Peter Hicks, on behalf of Wasatch Hicks LLC and Hicks LLC, negotiated the real estate transaction of the Wasatch Creeks Ranch with the Hatch Group LLC independently and without any representation.

Matthew Anderson from Fabian VanCott (90 South State Street, Suite 2300, Salt Lake City, UT 84111, 801-323-2267) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC regarding the purchase agreement.

Michael Callahan from Callahan and Associates (10 Smith Lane, Swampscott, MA 01907, 781-258-1471) provided privileged transaction advice to Wasatch Hicks LLC and Hicks LLC.

Cory Bildodeau from McLaughlinQuinn LLC (148 River Street – Suite 1E, Providence RI 02904, 401-655-2203) provided confidential tax advice to Wasatch Hicks LLC and Hicks LLC. Steve Robison Esq from Strategic Property Exchanges, LLC (11353 Reed Hartman Hwy, Ste 300, Cincinnati, OH 45241, 513-412-3481) was the exchange company for the transaction.

Eric Wall Plaintiff from Unita Engineering and Surveying, Inc. (808 Main Street, Evanston WY 82930, 307-789-3602) provided title related work to Wasatch Hicks LLC and Hicks LLC.

David Anderson from A5 Real Estate (2825 E. Cottonwood Parkway, Suite 500, Salt Lake City, UT 84121, 801-910-4040) was the seller's broker for the transaction.

Cottonwood Title Insurance Agency, Inc., Escrow Officer Cort Ashton, 801-277-9999, was the Hatch Group LLC's title insurance company.

INTERROGATORY NO. 8: Identify all individuals who represented or assisted you in any way with your sale of the Wasatch Creeks Ranch to Riverbend Bar Milton Ranch, LLC. List each individual(s)' name, current address and phone number, and a description of the role the individual played in the transaction.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that the phrase "assisted you in any way" is overly broad and vague. Plaintiffs interpret this Interrogatory to seek the identity of any person that Plaintiffs expressly hired to assist them in the real estate transaction of the Wasatch Creeks Ranch to Riverbend Bar Milton Ranch, LLC. Plaintiffs further object to the extent this Interrogatory seeks privileged or confidential information. Plaintiffs' response should not be interpreted in any way, shape, or form as a waiver of any of its rights and/or privileges held in relation to privileged and/or confidential information discussed with any of the identified persons.

Subject to and without waiving any objections, Plaintiff responds as follows:

Peter Hicks, on behalf of Wasatch Hicks LLC and Hicks LLC, negotiated the real estate transaction of the Wasatch Creeks Ranch with the Hatch Group LLC independently and without any representation.

Matthew Anderson from Fabian VanCott (90 South State Street, Suite 2300, Salt Lake City, UT 84111, 801-323-2267) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC regarding the purchase agreement.

Michael Callahan from Callahan and Associates (10 Smith Lane, Swampscott, MA 01907, 781-258-1471) provided privileged transaction advice to Wasatch Hicks LLC and Hicks LLC.

Jeffrey Mussman and Chris Robertson from Seyfarth Shaw LLP (Two Seaport Lane, Suite 1200, Boston MA 02210-2028, 617-946-4989) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC.

Peter Litman, esq. (PO Box 970074, Boston MA 02297; 617-737-5000) provided privileged transaction advice.

Cory Bildodeau from McLaughlinQuinn LLC (148 River Street – Suite 1E, Providence RI 02904, 401-655-2203) provided confidential tax advice to Wasatch Hicks LLC and Hicks LLC.

Mathew Joyce from Rubin and Rudman LLP (53 State St Boston MA, 617-330-7158) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC.

Strategic Property Exchanges, LLC, through Steve Robison, (11353 Reed Hartman Hwy, Ste 300, Cincinnati, OH 45241, 513-412-3481) was the exchange company for the transaction.

Eric Wall Plaintiff from Unita Engineering and Surveying, Inc. (808 Main Street, Evanston WY 82930, 307-789-3602) provided title related work to Wasatch Hicks LLC and Hicks LLC.

First American Title Insurance Company, through Escrow Officer Jay Thompson, 801-536-3100, was the title insurance company for the transaction.

David Anderson from A5 Real Estate (2825 E. Cottonwood Parkway, Suite 500, Salt Lake City, UT 84121, 801-910-4040) was the Defendants' broker for the transaction.

INTERROGATORY NO. 9: Identify all appraisals or valuations of the Wasatch Creeks Ranch in your possession, custody, or control, including the name of the individual(s) performing the appraisal or valuation; the date of the appraisal or valuation; and the location of any documents or communications that refer or relate to the appraisal or valuation.

**ANSWER:** Plaintiffs object to the terms, "appraisals" and "valuations," as vague. Plaintiffs interprets these terms to mean a report (commonly referred to as an "appraisal") assessing or estimating the fair market value of the Wasatch Creeks Ranch by a certified general real property appraiser. Plaintiffs further object to the Interrogatory as vague and overbroad as the Interrogatory fails to provide a timeframe.

Subject to and without waiving any objections, Plaintiff responds as follows: Plaintiffs did not obtain any formal appraisal for the Wasatch Creeks Ranch from a certified general real property appraiser in 2020.

INTERROGATORY NO. 10: Identify all stock option contracts that you or any entity that you own, control, or have an interest in has been involved in, in any capacity, from January 1, 2000 to present.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is overbroad, vague, and intended to cause undue hardship on Plaintiff by seeking information related to "any entity that you own, control, or have an interest in has been involved in, in any capacity[.]" Plaintiffs object to this Interrogatory to the extent it asks Plaintiffs to respond on behalf of another entity, and Plaintiffs assert that they will not respond on behalf of any other entity. Plaintiffs further object to the phrase "involved in" as vague and ambiguous. Plaintiffs interpret this Interrogatory to

identify all stock option contracts that Plaintiffs have ever been a signing party to. Plaintiffs furthermore object that the timeframe is excessively overbroad and intended to harass Plaintiffs.

Subject to and without waiving any objections, Plaintiffs respond as follows: Apart from the underlying transaction, Plaintiffs have never been a party to any stock option contracts.

INTERROGATORY NO. 11: Identify all brokerage or investment accounts that you directly or indirectly control. For each account, identify the name of the financial institution that manages the account; the last 4 digits of the account number; the types of investments held in the account and the approximate value of the account.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it seeks irrelevant information relating to highly private and sensitive financial information from Plaintiffs. Plaintiffs' brokerage and/or investment accounts have no bearing whatsoever on the underlying case. Plaintiffs object to this Interrogatory on the basis that it is clearly intended to harass and cause undue burden on Plaintiffs. Accordingly, Plaintiffs will not provide an Answer to this Interrogatory without an Order from the Court.

INTERROGATORY NO. 12: Identify with specificity each and every "public statement by Milton" that you reviewed after April 10, 2020, as alleged in paragraphs 181 and 188 of the Complaint. For each statement, identify the date and media (i.e. Twitter, podcast, etc.) that the statement was made, the substance of the statement, the date on which you reviewed the statement; what, if any action you took to investigate or further inquire into the statement after you reviewed it; and identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you reviewed the statement.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is compound as it seeks at least three different categories of information: (1) The statements that Plaintiffs reviewed,

(2) the "action you took to investigate or further inquire the statement," and (3) the proof that Plaintiffs reviewed the statements. This Interrogatory should be bifurcated into, at least, three interrogatories.

Plaintiffs further object to this Interrogatory on the basis that it is overbroad. Plaintiffs cannot reasonably provide a complete list of "each and every 'public statement by Milton'" that Plaintiffs reviewed. Defendant Trevor Milton was, and still is, a public figure. In 2020, Defendant Trevor Milton made numerous public statements, over many different platforms and mediums, sometimes several times a day, to promote Nikola, which Plaintiffs may have casually "reviewed" without tracking the statements, the research put into verifying the information, and the proof that Plaintiffs reviewed the statements.

Plaintiffs furthermore object to this Interrogatory as vague and intended to be overly burdensome. Defendants ask Plaintiffs to "identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you reviewed the statement." However, Defendants do not define the type of document that might "support [Plaintiffs'] allegation that [Plaintiffs] reviewed the statement[s]." This is excessively vague and broad to the point that Plaintiffs cannot provide a response.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: At this time, Plaintiffs cannot recall each and every statement made by Defendant Trevor Milton, the substance of the statements, and/or the date in which Plaintiffs reviewed the statements. Plaintiffs reserve the right to supplement their Answer to this Interrogatory as Plaintiffs may later recall additional statements. At this time, Plaintiff recalls "review[ing]" many statements by Trevor Milton, including, but not limited to:

- Phone call on April 10, 2020. As provided above, Plaintiffs have a recording and transcript of the phone call as well as handwritten and typed notes from the phone call.
- Interview of Defendant Trevor Milton on CNBC on or about June 4, 2020. https://www.youtube.com/watch?v=NYBj83HttG4
- Interview of Defendant Trevor Milton on Fox Business on or about July 31, 2020. https://www.foxbusiness.com/video/6177205510001
- Interview of Defendant Trevor Milton on Fox Business. https://www.facebook.com/FoxBusiness/videos/nikola-ceo-trevor-milton-on-varney-co/597144274240904
- Interview of Defendant Trevor Milton on CNBC on or about August of 2020. https://www.cnbc.com/video/2020/08/05/full-interview-with-nikola-founder-trever-milton.html
- Nikola video featuring Trevor Milton and truck. https://youtu.be/7LSrvRMgIqw (This video has since been removed from the internet.)
- Other videos of the Nikola trucks sometime in summer of 2020.

For context, Plaintiffs regularly watched news media outlets and clicked on threads to current stories including analyst recommendations based on public information coming from Defendant Trevor Milton and Nikola regularly after April of 2020. Plaintiffs referred to real time trading prices and article links to Nikola and Trevor Milton when clicking on MarketWatch—which was regularly and often more than once a day.

INTERROGATORY NO. 13: Identify with specificity each and every statement that you contend you "actually and reasonably relied on," as referred to in paragraphs 1, or "relied upon" as referred to in paragraph 188 of the Complaint. For each statement, identify the date and media

(i.e. Twitter, podcast, etc.) that the statement was made, the substance of the statement, the date on which you heard or reviewed the statement; what, if any action you took to investigate or further inquire into the statement after you reviewed it; and identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you heard or reviewed the statement.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is compound as it seeks at least three different categories of information: (1) The statements that Plaintiffs reviewed, (2) the "action you took to investigate or further inquire the statement," and (3) the proof that Plaintiffs reviewed the statements. This Interrogatory should be bifurcated into, at least, three interrogatories.

Plaintiffs also object to this Interrogatory to the extent it calls for Plaintiffs to make a legal conclusion. Specifically, it calls for Plaintiffs to determine what they "reasonably relied on." Plaintiffs also object to this Interrogatory to the extent it is duplicative of Interrogatories Nos. 5 and 12.

Plaintiffs further object to this Interrogatory on the basis that it is overbroad and intended to be unduly burdensome. Plaintiffs cannot reasonably provide a complete list of "each and every statement that [Plaintiff]… 'actually and reasonably relied on.'" Defendant Trevor Milton was, and still is, a public figure. In 2020, Defendant Trevor Milton made numerous public statements, over many different platforms, sometimes several times a day, to promote Nikola, which Plaintiffs may have casually "reviewed" and "relied on" without tracking the statements, the research put into verifying the information, and the proof that Plaintiffs reviewed the statements.

Plaintiffs furthermore object to this Interrogatory as vague and intended to be overly burdensome. Defendants ask Plaintiffs to "identify any documents, notes, recordings,

communications, or other evidence which supports your allegation that you reviewed the statement." However, Defendants do not define the type of document that might "support [Plaintiffs'] allegation that [Plaintiffs] reviewed the statement[s]." This is excessively vague and broad to the point that Plaintiffs cannot provide a response.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate their Answers to Interrogatories Nos. 5 and 12 by reference. Plaintiffs further assert that, as provided in their Answers to Interrogatories Nos. 5 and 12, their Answer to Interrogatory No. 13 is not a complete list of all the false statements and misrepresentations that Plaintiffs relied upon. At this time, Plaintiffs cannot recall each and every statement that they relied upon as provided in the Complaint. Plaintiffs reserve the right to supplement their Answer to this Interrogatory as Plaintiffs may later recall additional statements.

INTERROGATORY NO. 14: Identify with specificity what, if any, due diligence you or anyone acting on your behalf performed to investigate or evaluate the value of Nikola stock at any time after the April 10, 2020 conversation you allege you had with Milton in paragraphs 177-179 of the Complaint.

**ANSWER:** Plaintiffs object to this Interrogatory because the term "due diligence." It asks for Plaintiffs to make a legal conclusion. Plaintiffs further object to this Interrogatory as duplicative of Interrogatories Nos. 12 and 13, which ask Plaintiffs to identify "what, if any action you took to investigate or further inquire into the statement after you reviewed it."

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Peter Hicks followed Nikola and Trevor Milton on the internet. Regularly, Mr. Hicks searched VectoIQ and Nikola to see stock prices and read articles article about them. Mr. Hicks

also watched interviews of Trevor Milton and Nikola on YouTube and other platforms. Mr. Hicks saw several of Trevor Milton's social media posts that made headlines on the news.

INTERROGATORY NO. 15: Identify the past and present owners of Hicks, LLC for the last five years. Also indicate the percentage of shares owned by each owner.

**ANSWER:** Between 2000 and 2019, Peter Hicks owned two thirds of Hicks, LLC. The other third of Hicks, LLC was half owned by David Hansen and half owned by Paul Diaz. Since January 2019, Peter Hicks has owned 99.5% of Hicks, LLC and Lucas Hicks has owned the remaining .5% of Hicks, LLC.

INTERROGATORY NO. 16: Identify the past and present owners of Wasatch Hicks, LLC for the last five years. Also indicate the percentage of shares owned by each owner.

**ANSWER:** Hicks LLC has wholly owned Wasatch Hicks LLC since the inception of Wasatch Hicks LLC.

INTERROGATORY NO. 17: Identify every email and social media account (Facebook, Instagram, Snapchat, Twitter, etc.) owned or used by you between January 1, 2019 and the present. Please provide the email address for each email account. Please provide the username for each social media account and identify when the account was first created.

**ANSWER:** Plaintiffs object to Interrogatory No. 17 as irrelevant. Plaintiffs' email account(s) and/or social media account(s) have no relevance or bearing in the underlying case. Plaintiffs further object to Interrogatory No. 17 because the phrase "used by you" makes the Interrogatory overly broad and vague. Plaintiffs interpret the Interrogatory to seek information relating to email accounts and social media accounts that Plaintiffs own.

Subject to and without waiving any objections, Plaintiffs respond as follows: Wasatch Hicks LLC and Hicks LLC do not own any email addresses or social media accounts. Mr. Peter

Hicks owns two email addresses: hicksmgt87@gmail.com and hicksmgt@aol.com, and he owns two social media accounts: Instagram and Twitter. Mr. Hicks does not know how to use either of his social medial accounts and, accordingly, cannot provide the username for the social media accounts. Mr. Hicks believes that he opened the Twitter account sometime in early 2023, and Mr. Hicks does not recall when he opened the Instagram account. He has engaged in no material activities in connection with any social media account, and has not posted any commentary in connection with Mr. Milton or Nikola at any time.

INTERROGATORY NO. 18: Identify how you used the Wasatch Creek Ranch property during the time that you owned it. If you rented or leased any portion of the property, identify the parties involved and the terms of the lease.

**ANSWER:** Plaintiffs object to Interrogatory No. 18 because the term "used" is vague. Plaintiffs interpret the term to mean any "use[]" for economic profit. Plaintiffs further object to Interrogatory No. 18 for being a compound question, seeking at least two separate categories of information. Interrogatory No. 18 should be bifurcated into at least two interrogatories.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Plaintiffs kept the property as an unoccupied mountain recreational ranch. Plaintiffs gave Elite Hunting Company a license to hunt on the property and Jeff Jones a license to graze.

Plaintiffs also planned to create an extensive recreational road system, used surveyors (Uinta Engineering) for selected segments, and began construction of the road system (with Justin Richins). However, on the day that construction began, within hours, Milton asked Plaintiffs to stop the construction as negotiations were completing. Plaintiffs ordered that the construction stop. With the property under contract, the work did not resume.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

REQUEST NO. 1: Produce all documents and communications referred to or relied upon in answering the foregoing requests for admission and interrogatories.

**RESPONSE:** Plaintiffs object to Request No. 1 as vague, ambiguous, and overly broad. Accordingly, Plaintiffs cannot provide a response to Request No. 1.

REQUEST NO. 2: Produce copies of everything you received in response to any subpoenas issued to third parties in connection with this lawsuit, including specifically the subpoena to Nikola Motor Company LLC identified in your March 21, 2023 Notice of Intent to Issue Subpoena Duces Tecum. Please include copies of all documents that you received in response to the subpoena(s) as well as all communications between you or your representatives and the recipient of the subpoena(s) which refer or relate in any way to the subpoena(s).

**RESPONSE:** Plaintiffs cannot produce responsive documents to Request No. 2 because Plaintiffs have not received any documents in response to any issued subpoenas to third parties in connection with this lawsuit. Therefore, the documents and communications are not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 3: Produce all documents and communications that refer or relate to your sale of the Wasatch Creeks Ranch property to Riverbend Bar Milton Ranch, LLC. Include all communications between you and any real estate agent(s) or brokerage(s), including David Anderson, that represented you in connection with this transaction.

**RESPONSE:** Plaintiffs object to Request No. 3 as overbroad and vague. Defendants fail to identify the parties between whom the "documents and communications" that they seek were exchanged. Further, Defendants fail to identify a relevant timeframe; Plaintiffs interpret this Request to seek documents from between January 1, 2020, to August 14, 2020 (i.e., the date that the real estate transaction closed). Moreover, Plaintiffs object to Request No. 3 to the extent that

the referenced and related documents and communications are equally available to Defendants. Furthermore, Plaintiffs object to Request No. 3 to the extent that the Request erroneously states that Plaintiffs were "represented" by "any real estate agent(s) or brokerage(s)" in the referenced real estate transaction. As provided in response to Interrogatory No. 8, Plaintiffs were not represented by any real estate agents or brokers in the referenced real estate transaction. Subject to and without waiving the foregoing objection, Plaintiffs respond as follows: Plaintiffs will concurrently produce responsive documents and communications.

REQUEST NO. 4: Produce all documents and communications that refer or relate to your purchase of the Wasatch Creeks Ranch property from its prior owner. Include all communications between you and any real estate agent(s) or brokerage(s) that represented you in connection with this transaction.

**RESPONSE:** Plaintiffs object to Request No. 4 as overbroad and vague. Defendants fail to identify the parties between whom the "documents and communications" that they seek were exchanged. Further, Defendants fail to identify a relevant timeframe. Furthermore, Plaintiffs object to Request No. 4 to the extent that the Request erroneously states that Plaintiffs were "represented" by "any real estate agent(s) or brokerage(s)" in the referenced real estate transaction. As provided in response to Interrogatory No. 6, Plaintiffs were not represented by any real estate agents or brokers in the referenced real estate transaction. Moreover, Plaintiffs object to Request No. 4 for being completely irrelevant. There is no basis for which the sought documents and communications would be relevant. In addition, the sought documents and communications have confidential business information that Plaintiffs have an interest in maintaining confidential. Based on the foregoing, Plaintiffs will not produce documents or communications in response to Request No. 4 without an Order from the Court.

REQUEST NO. 5: Produce all documents and communications that refer or relate to any appraisals or valuations of the Wasatch Creek Ranch property.

**RESPONSE:** Plaintiffs object to Request No. 5 because the terms "appraisals" and "valuations" are vague. Plaintiffs interprets these terms to mean a report (commonly referred to as an "appraisal") assessing or estimating the fair market value of the Wasatch Creeks Ranch by a certified general real property appraiser. Plaintiffs further object to this Request as vague and overbroad because it fails to provide a timeframe.

Subject to and without waiving any of the foregoing objections, Plaintiffs cannot produce responsive documents to Request No. 5 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 6: Produce all documents and communications that refer or relate to the April 10, 2020 phone call referred to in paragraphs 177-179 of the Complaint, including any recordings, notes, communications, or other evidence of the substance of the phone call. Include copies of the document(s) in their native format with all metadata intact.

**RESPONSE:** Plaintiffs object to Request No. 6 on the basis that the phrase "refer or related to" is vague. Plaintiffs interpret this phrase to mean documents that Plaintiffs prepared or used during the phone call.

Plaintiffs further object to Request No. 6 to the extent that it asks Plaintiffs to speculate on the documents that Defendants might have been referring to or relating to, which Plaintiffs may or may not have been aware of at the time of the phone call. Plaintiffs also object to Request No. 6 to the extent it seeks documents that are not in possession or control of Plaintiffs.

Plaintiffs furthermore object to Request No. 6 on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call. As such,

Plaintiffs object to the Request on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond, as follows: Peter Hicks took handwritten notes during the referenced phone call. These have been produced as Hicks000010–11. Lucas Hicks also typed notes and recorded the referenced phone call on his iPhone. The recording of the phone call was transcribed. Those documents will be produced concurrently as HICKS000814-817 and HICKS000818-1273.

REQUEST NO. 7: Produce all documents and communications establishing any financial loss that you claim to have suffered as a result of the conduct alleged in your Complaint for which you seek damages in this lawsuit.

**RESPONSE:** Plaintiffs object to Request No. 7 as vague and overbroad. Plaintiffs further object to Request No. 7 to the extent it is asking Plaintiffs to either make a legal conclusion or set forth their legal research, opinions, or theory of the case to Defendants. Furthermore, Plaintiffs object to Request No. 7 as being premature. The parties have not completed discovery or trial preparation. Upon further discovery, legal research, and analysis, Plaintiffs may be able to supply additional information to the extent it does not improperly request the legal theory of Plaintiffs' case. Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: At this time, Plaintiffs cannot produce responsive documents to Request No. 7 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 8: Produce copies of every written or recorded statement in your possession, custody, or control which relates in any way to the subject matter of this lawsuit.

**RESPONSE:** Plaintiffs object to Request No. 8 to the extent it is asking Plaintiffs to set forth their legal research, opinions, or theory of the case to Defendants. Further, Plaintiffs object to the extent that Request No. 8 is duplicative of the other fifteen requests herein. Moreover, Plaintiffs object to Request No. 8 as vague and overbroad. Accordingly, Plaintiffs cannot provide a response.

REQUEST NO. 9: Produce all documents and communications that refer or relate to any stock option contracts that you or any entity that you own, control, or have an interest in has been involved in, in any capacity, from January 1, 2000 to present.

**RESPONSE:** Plaintiffs hereby incorporate their response to Interrogatory No. 10 by reference. Plaintiffs cannot produce responsive documents to Request No. 9 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 10: Produce documents sufficient to show all brokerage or investment accounts that you directly or indirectly control, including for each account the name of the financial institution that manages the account; the last 4 digits of the account number; the types of investments held in the account and the approximate value of the account.

**RESPONSE:** Plaintiffs hereby incorporate their response to Interrogatory No. 11 by reference. Plaintiffs object to Request No. 10 on the basis that it seeks irrelevant information relating to highly private and sensitive financial information from Plaintiffs. Plaintiffs' brokerage and/or investment accounts have no bearing whatsoever on the underlying case. Plaintiffs object to this Request on the basis that it is clearly intended to harass and cause undue burden on Plaintiffs. Accordingly, Plaintiffs will not provide a response to this Request without an Order from the Court.

REQUEST NO. 11: For each social media account you identified in response to Interrogatory No. 17 above, produce copies or screenshots of all posts which refer or relate in any way to Trevor Milton, Nikola, Wasatch Creeks Ranch, or the subject matter of this lawsuit.

**RESPONSE:** Plaintiffs cannot produce responsive documents to Request No. 11 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 12: Produce copies of all documents and communications that refer or relate in any way to Trevor Milton, Nikola Motors, or the Wasatch Creek Ranch Property from January 1, 2020 to the present. Include all responsive communications between or among you and any of the following individuals: 1) David Anderson; 2) Lucas Hicks; 3) Andrew Lillywhite; 4) Jay Thompson; 5) Toni Foster; 6) Mark Gale; 7) Britton Worthen; 8) Mark Russell; 9) Kim Brady; and 10) any other representative of Nikola Motors.

**RESPONSE:** Plaintiffs object to Request No. 12 as overbroad and vague. As to the phrase "any other representative of Nikola Motors," Plaintiffs object that Defendants fail to identify whom the "documents and communications" that they seek for were exchanged with. Further, Defendants fail to identify a relevant timeframe; Plaintiffs interpret this Request to seek documents from between January 1, 2020, to July 29, 2021 (i.e., the date that Trevor Milton was indicted). Moreover, Plaintiffs object to Request No. 12 to the extent that the referenced and related documents and communications are equally available to Defendants. Plaintiff further objects that this Request is duplicative and intended to burden and harass Plaintiffs because the vast majority of responsive documents have already been produced to Defendants in the criminal matter pending in the Southern District of New York, pursuant to a trial subpoena issued by Mr. Milton in that case. This production included communications with each of the identified individuals, as well as

additional communications relating to the transaction, the option agreement, and Nikola's securities. Subject to and without waiving any of the foregoing objections, Plaintiffs will also conduct an additional search of email and will produce any responsive communications concurrently.

REQUEST NO. 13: Make the devices you identified in response to Interrogatory No. 4 above available for inspection, examination, and copying of all recordings and associated files and metadata.

**RESPONSE:** Plaintiffs object to Request No. 13 to the extent it requests Plaintiffs to produce "devices" that are not in their possession, control, or custody. Plaintiffs further object that this Request is duplicative of Request No. 6 (asking Plaintiffs to produce all documents that "refer or relate to the April 10, 2020 phone call… in their native format with all metadata intact"). Furthermore, Plaintiffs object that Defendants have failed to comply with the Federal Rule of Civil Procedure 34(b) in attempt to request an inspection of Plaintiffs' "devices." Accordingly, at this time, Plaintiffs cannot and will not comply with this Request. However, Plaintiffs are willing to meet and confer on the issue.

REQUEST NO. 14: Produce copies of all text messages between you and Trevor Milton.

**RESPONSE:** Plaintiffs object to Request No. 14 for seeking documents equally available to Defendant Trevor Milton. Subject to and without waiving the foregoing objection, Plaintiffs respond as follows: Plaintiffs have already produced all of the responsive communications requested in Request No. 14 in their initial disclosures. To avoid duplication, Plaintiffs will not re-produce the same communications.

REQUEST NO. 15: Produce copies of all documents and communications that refer or relate to the March 1, 2021 Stock Purchase Agreement or the March 2, 2021 Amended and Restated Stock Purchase Agreement (see DEF 000067-000072).

**RESPONSE:** Plaintiffs have already produced all of the responsive documents and communications that are not privileged with their initial disclosures. To avoid duplication, Plaintiffs will not re-produce the same documents and communications. To the extent Request No. 15 seeks documents and communications that are privileged under the attorney-client privilege or attorney work product privilege, Plaintiffs object to the Request and refuse to produce any of those documents and communications under those privileges.

REQUEST NO. 16: Produce copies of all documents in your possession, custody, and control not previously identified that relate in any way to the subject matter of this lawsuit.

**RESPONSE:** Plaintiffs object to Request No. 16 as vague, ambiguous, and overly broad. Accordingly, Plaintiffs cannot provide a response to Request No. 16.

DATED June 16, 2023.

*/s/ Alex N. Vandiver*
Erik A. Christiansen
Alex N. Vandiver
PARSONS BEHLE & LATIMER

Christopher Robertson (*pro hac to be filed)*
SEYFARTH SHAW LLP

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2023, I caused a true and correct copy of the foregoing **RESPONSE TO DEFENDANTS' FIRST SET OF DISCOVERY REQUESTS TO PLAINTIFFS,** to be served to the parties of record:

Brent O. Hatch
H. Douglas Owens
HATCH LAW GROUP
22 E 100 S Ste 400
Salt Lake City, UT 84111
801-869-1919
hatch@hatchpc.com
owens@hatchpc.com

Adam M. Pace
22 E 100 S Ste 400
Salt Lake City, UT 84111
801-869-1919
pace@hatchpc.com

*Attorneys for Defendants*

*/s/ Alex Vandiver*
Alex Vandiver

# EXHIBIT B

Erik A. Christiansen, USB #7372
Alex N. Vandiver, USB #17700
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
EChristiansen@parsonsbehle.com
ecf@parsonsbehle.com

Christopher Robertson (*pro hac vice*)
**SEYFARTH SHAW LLP**
Seaport East
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone: 617-946-4989
Facsimile: 617-790-6774
crobertson@seyfarth.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>TREVOR R. MILTON, M&M RESIDUAL, LLC and T&M RESIDUAL, LLC,<br><br>Defendants. | **SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF DISCOVERY REQUESTS TO PLAINTIFFS**<br><br>Case No. 2:22-cv-00166<br><br>Judge Howard C. Nielson, Jr<br><br>Magistrate Judge: Daphne A. Oberg |

Plaintiffs, by and through their counsel of record, and pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, hereby supplements their responses to Defendants' First Set of Discovery Requests to Plaintiffs as follows:

## REQUESTS FOR ADMISSION

REQUEST NO. 1: Admit that for the time period between April 1, 2020 and April 1, 2021, you were an institutional "accredited investor" as defined in Rule 501(a)(1),(2),(3) or (7) under the Securities Act.

**RESPONSE:** Plaintiffs object to this Request for Admission on the basis that it contains a compound question. Per Defendants' definitions, "you" refers to "Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC, and any agents, representatives and other persons acting or purporting to act on their behalf." Thus, this Request for Admission should be bifurcated into, at least, three separate Requests for Admission addressing each individual entity.

Plaintiffs further object to this Request for Admission on the basis that the term "as defined in Rule 501(a)(1),(2),(3) or (7) under the Securities Act" is vague. Plaintiffs interpret this term to mean an "accredited investor" as defined by 17 C.F.R. § 230.501(a)(1), (2), (3), or (7).

Plaintiffs further object on the grounds that the request assumes that whether a party was an accredited investor is pertinent to the claims in the case. The transaction and option were not conducted or sold pursuant to Regulation D and no Form D was filed with the SEC in connection with the transaction. Moreover, whether a purchaser of securities is accredited is irrelevant where the seller has engaged in fraud. Plaintiffs furthermore object to this Request for Admission on the basis that it calls for a legal conclusion and seeks protected attorney work product.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Deny.

## INTERROGATORIES

INTERROGATORY NO. 1: If your response to any of the requests for admission above was anything other than an unqualified admission, explain the factual basis of your denial or partial denial of each request for admission.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it pertains to a compound question and, thus, is a compound question itself. Per Defendants' definitions, "you" refers to "Peter Hicks, Hicks, LLC, and Wasatch Hicks, LLC, and any agents, representatives and other persons acting or purporting to act on their behalf." Thus, this Interrogatory should be bifurcated into, at least, three separate Requests for Admission addressing each individual entity.

Plaintiffs further object to this Interrogatory on the basis that the underlying Request for Admission(s) are vague. The term "accredited investors" as defined "in Rule 501(a)(1),(2),(3) or (7) under the Securities Act" is vague. Plaintiffs interpret this term to mean an "accredited investor" as defined by 17 C.F.R. § 230.501(a)(1), (2), (3), or (7).

Plaintiffs further object on the grounds that the request assumes that whether a party was an accredited investor is pertinent to the claims in the case. The transaction and option were not conducted and sold pursuant to Regulation D and no Form D was filed with the SEC in connection with the transaction. Moreover, whether a purchaser of securities is accredited is irrelevant where the seller has engaged in fraud. Plaintiffs furthermore object to this Interrogatory on the basis that it calls for a legal conclusion and seeks protected attorney work product.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Peter Hicks was never requested to represent nor did he represent to Defendants that he, Hicks, LLC, or Wasatch Hicks, LLC are accredited investors. He was never asked to complete an accredited investor questionnaire nor was any such document required as part of the transaction.

INTERROGATORY NO. 2: Identify all real estate transactions that you or any entity you own, control, or have an interest in has been involved in, in any capacity, from January 1, 2010 to present. For each transaction, identify your role in the transaction (i.e., purchaser or seller); a description of the type of property (i.e. commercial; residential; ranch; etc.); and the name under

which you or an entity you have an interest in purchased or sold the property. For each purchase, please identify the form of payment that you used to purchase the property (i.e. cash, bank loan, etc.); and identify whether the purchase involved a 1031 exchange.

**ANSWER:** Plaintiffs object that this Interrogatory is a compound question by asking about three different categories of information from three separate entities. This Interrogatory should be bifurcated into, at least, three interrogatories.

Plaintiffs further object that this Interrogatory is irrelevant and overbroad. As such, Plaintiffs object that this Interrogatory is intended to harass and cause undue hardship to Plaintiffs. Whatever real estate transaction(s) that Plaintiffs partook or conducted over the last 13 years have no bearing in this case—which relates to the fraudulent actions Defendants did to induce Plaintiffs into the sale of Wasatch Creek Ranch.

Plaintiffs furthermore object that this Interrogatory on the basis that it is equally available to Defendants through public records.

Subject to and without waiving any of the foregoing objections, Plaintiffs is willing to identify the real estate transactions that Peter Hicks, Hicks LLC, or Wasatch Hicks LLC, partook in as a listed party to the real estate transaction in Utah, between January 1, 2019, and August 14, 2020:

On January 30, 2019, Hicks LLC sold its tenants in common interest in Gailey/Wasatch Peaks Ranch real estate to Wasatch Peaks Ranch LLC after having converting Hicks LLC ownership from an LLC membership to a similar percentage tenants in common interest.

On July 29, 2019, Wasatch Hicks LLC purchased a tenants in common interest in Ward Farm from Jeff's Hillbrook Ranch, LLC, R. Charles Ward, Jeff's Road, LLC, and Jeffrey F. Ward.



4879-6945-9061

On November 7, 2019, Wasatch Hicks LLC sold its 50% tenants in common interest in Ward Farm to Jeff's Hillbrook Ranch, LLC, R. Charles Ward, Jeff's Road, LLC, and Jeffrey F. Ward.

On March 13, 2020, Hicks LLC and Wasatch Hicks LLC purchased Wasatch Creeks Ranch from the Hatch Group, LLC.

On August 14, 2020, Hicks LLC and Wasatch Hicks LLC sold Wasatch Creeks Ranch to Defendants.

All transactions except the subject of this lawsuit were for cash. All of them involved 1031 exchanges.

INTERROGATORY NO. 3: Identify everyone who participated in any way in the April 10, 2020 phone call referred to in paragraphs 177-179 of the Complaint.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that the phrase "participated in any way" is vague. Plaintiffs interpret this phrase to mean any person that was present at the time of the phone call and made their presence known to Plaintiffs at some point during the phone call.

Plaintiffs further object to this Interrogatory to the extent that it asks Plaintiffs to speculate on whom might have been on the other side of the line, whom Plaintiffs may or may not have been aware of their presence, involvement, or participation in the phone call.

Plaintiffs furthermore object to this Interrogatory on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call. As such, Plaintiffs object to this Interrogatory on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond, as follows: Peter Hicks, Lucas Hicks, David Anderson, and Trevor Milton.

INTERROGATORY NO. 4: Identify with specificity all documents that refer or relate to the April 10, 2020 phone call referred to in paragraphs 177-179 of the Complaint, including any recordings, notes, communications, or other evidence of the substance of the phone call. For any recordings, identify the name of the person who created the recording; the method used to create the recording; the model and present location of the device(s) that the recording was originally created on; and the model and present location of all devices the recording has been stored on at any time since its original creation.

**ANSWER:** Plaintiffs object to Interrogatory No. 4 on the basis that the phrase "refer or related to" is vague. Plaintiffs interpret this phrase to mean documents that Plaintiffs prepared during the phone call.

Plaintiffs further object to this Interrogatory to the extent that it asks Plaintiffs to speculate on the documents that Defendants or others might have been referring to or relating to, which Plaintiffs may or may not have been aware of at the time of the phone call. Plaintiffs also object to this Interrogatory to the extent it seeks documents that are not in possession or control of Plaintiffs.

Plaintiffs furthermore object to this Interrogatory on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call and have been previously disclosed to Defendants through the associated criminal trial. As such, Plaintiffs object to this Interrogatory on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond, as follows: Peter Hicks took handwritten notes during the referenced phone call. These have been produced as Hicks000010–11. Lucas Hicks also typed notes and recorded the referenced phone call on his iPhone. The recording of the phone call was transcribed. Those documents have already been produced to Defendants in the criminal case pending in the Southern District of New York.

INTERROGATORY NO. 5: Identify with specificity each and every "false statement" or "misrepresentation" that you allege Trevor Milton made during the April 10, 2020 call referred to in paragraphs 177-179 of the Complaint. For each statement, identify the specific words used and identify any documents, notes, recordings, communications, or other evidence which supports your allegation that the alleged statement or misrepresentation was made.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is overbroad. Plaintiffs further object to this Interrogatory on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call. Furthermore, given the fact that Defendants made the false statements and misrepresentations in the referenced call and is knowledgeable about the falsity of those statements and misrepresentations, Plaintiffs object to this Interrogatory on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond as follows: Plaintiffs are producing a highlighted transcript of the referenced phone call with highlights depicting the statements that Plaintiffs believe were false as HICKS000818-1273. The referenced phone call was not completely recorded; therefore, the transcript of the recorded portion of the phone call does not reflect a complete account of every false statement made during the referenced phone call. Plaintiffs are also producing a copy of Mr.

Peter Hicks' and Lucas Hicks' notes with highlights depicting the statements that Plaintiffs believe were false as HICKS000814-817 as well as a copy of Mr. Peter Hicks' testimony at the criminal trial with highlights depicting the statements that Plaintiffs believe were false.

In addition, Defendants stated to Plaintiffs that: Nikola headquarters had large installation of solar on the roof that produced enough energy to take the HQ off the grid. Nikola had the world's largest hydrogen refueling station in the world which was producing large amounts of hydrogen. Hydrogen trucks rendered the era of diesel over. Nikola had broad intellectual property. Nikola's trucks, would be in the market in 14 months and would begin production in 2021. Nikola had contracts for the sale of trucks worth $14 Billion. Nikola One was a fully functioning truck.

Plaintiffs assert that this is not a complete representation of all the false statements and misrepresentations that Defendants made to Plaintiffs in order to induce the sale of Wasatch Creek Ranch. Plaintiffs reserve the right to supplement their Answer to this Interrogatory as discovery is conducted and reveals additional statements to be false.

INTERROGATORY NO. 6: Identify the date you or any entity you have an interest in purchased the Wasatch Creeks Ranch property from its prior owner; the parties involved in the transaction; the real estate agent(s) and brokerage(s) that represented you in the transaction; and the purchase price you paid for the property.

**ANSWER:** On March 13, 2020, Wasatch Hicks LLC and Hicks LLC purchased the Wasatch Creeks Ranch from Lazy H Ranch, LLC and the Hatch Group, LLC for $6,850,000.00. Wasatch Hicks LLC and Hicks LLC were not represented by a broker in the transaction. David Anderson from A5 Real Estate was the broker for the Hatch Group LLC. A true and correct copy of the purchase agreement will be produced concurrently as HICKS000359.

INTERROGATORY NO. 7: Identify all individuals who represented or assisted you in any way with your purchase of the Wasatch Creeks Ranch property from its prior owner. List each individual(s)' name, current address and phone number, and a description of the role the individual played in the transaction.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that the phrase "assisted you in any way" is overly broad and vague. Plaintiffs interpret this Interrogatory to seek the identity of any person that Plaintiffs expressly hired to assist them in the real estate transaction of the Wasatch Creeks Ranch from the Hatch Group LLC. Plaintiffs further object to the extent this Interrogatory seeks privileged or confidential information. Plaintiffs' response should not be interpreted in any way, shape, or form as a waiver of any of its rights and/or privileges held in relation to privileged and/or confidential information discussed with any of the identified persons.

Subject to and without waiving any objections, Plaintiff responds as follows:

Wasatch Hicks LLC and Hicks LLC were unrepresented by a broker in the real estate transaction with the Hatch Group LLC over the Wasatch Creeks Ranch.

Peter Hicks, on behalf of Wasatch Hicks LLC and Hicks LLC, negotiated the real estate transaction of the Wasatch Creeks Ranch with the Hatch Group LLC independently and without any representation.

Matthew Anderson from Fabian VanCott (90 South State Street, Suite 2300, Salt Lake City, UT 84111, 801-323-2267) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC regarding the purchase agreement.

Michael Callahan from Callahan and Associates (10 Smith Lane, Swampscott, MA 01907, 781-258-1471) provided privileged transaction advice to Wasatch Hicks LLC and Hicks LLC.

Cory Bildodeau from McLaughlinQuinn LLC (148 River Street – Suite 1E, Providence RI 02904, 401-655-2203) provided confidential tax advice to Wasatch Hicks LLC and Hicks LLC. Steve Robison Esq from Strategic Property Exchanges, LLC (11353 Reed Hartman Hwy, Ste 300, Cincinnati, OH 45241, 513-412-3481) was the exchange company for the transaction.

Eric Wall Plaintiff from Unita Engineering and Surveying, Inc. (808 Main Street, Evanston WY 82930, 307-789-3602) provided title related work to Wasatch Hicks LLC and Hicks LLC.

David Anderson from A5 Real Estate (2825 E. Cottonwood Parkway, Suite 500, Salt Lake City, UT 84121, 801-910-4040) was the seller's broker for the transaction.

Cottonwood Title Insurance Agency, Inc., Escrow Officer Cort Ashton, 801-277-9999, was the Hatch Group LLC's title insurance company.

INTERROGATORY NO. 8: Identify all individuals who represented or assisted you in any way with your sale of the Wasatch Creeks Ranch to Riverbend Bar Milton Ranch, LLC. List each individual(s)' name, current address and phone number, and a description of the role the individual played in the transaction.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that the phrase "assisted you in any way" is overly broad and vague. Plaintiffs interpret this Interrogatory to seek the identity of any person that Plaintiffs expressly hired to assist them in the real estate transaction of the Wasatch Creeks Ranch to Riverbend Bar Milton Ranch, LLC. Plaintiffs further object to the extent this Interrogatory seeks privileged or confidential information. Plaintiffs' response should not be interpreted in any way, shape, or form as a waiver of any of its rights and/or privileges held in relation to privileged and/or confidential information discussed with any of the identified persons.

Subject to and without waiving any objections, Plaintiff responds as follows:

Peter Hicks, on behalf of Wasatch Hicks LLC and Hicks LLC, negotiated the real estate transaction of the Wasatch Creeks Ranch with the Hatch Group LLC independently and without any representation.

Matthew Anderson from Fabian VanCott (90 South State Street, Suite 2300, Salt Lake City, UT 84111, 801-323-2267) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC regarding the purchase agreement.

Michael Callahan from Callahan and Associates (10 Smith Lane, Swampscott, MA 01907, 781-258-1471) provided privileged transaction advice to Wasatch Hicks LLC and Hicks LLC.

Jeffrey Mussman and Chris Robertson from Seyfarth Shaw LLP (Two Seaport Lane, Suite 1200, Boston MA 02210-2028, 617-946-4989) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC.

Peter Litman, esq. (PO Box 970074, Boston MA 02297; 617-737-5000) provided privileged transaction advice.

Cory Bildodeau from McLaughlinQuinn LLC (148 River Street – Suite 1E, Providence RI 02904, 401-655-2203) provided confidential tax advice to Wasatch Hicks LLC and Hicks LLC.

Mathew Joyce from Rubin and Rudman LLP (53 State St Boston MA, 617-330-7158) provided privileged legal advice to Wasatch Hicks LLC and Hicks LLC.

Strategic Property Exchanges, LLC, through Steve Robison, (11353 Reed Hartman Hwy, Ste 300, Cincinnati, OH 45241, 513-412-3481) was the exchange company for the transaction.

Eric Wall Plaintiff from Unita Engineering and Surveying, Inc. (808 Main Street, Evanston WY 82930, 307-789-3602) provided title related work to Wasatch Hicks LLC and Hicks LLC.

First American Title Insurance Company, through Escrow Officer Jay Thompson, 801-536-3100, was the title insurance company for the transaction.

David Anderson from A5 Real Estate (2825 E. Cottonwood Parkway, Suite 500, Salt Lake City, UT 84121, 801-910-4040) was the Defendants' broker for the transaction.

INTERROGATORY NO. 9: Identify all appraisals or valuations of the Wasatch Creeks Ranch in your possession, custody, or control, including the name of the individual(s) performing the appraisal or valuation; the date of the appraisal or valuation; and the location of any documents or communications that refer or relate to the appraisal or valuation.

**ANSWER:** Plaintiffs object to the terms, "appraisals" and "valuations," as vague. Plaintiffs interpret these terms to mean a report (commonly referred to as an "appraisal") assessing or estimating the fair market value of the Wasatch Creeks Ranch by a certified general real property appraiser. Plaintiffs further object to the Interrogatory as vague and overbroad as the Interrogatory fails to provide a timeframe.

Subject to and without waiving any objections, Plaintiff responds as follows: Plaintiffs did not obtain any formal appraisal for the Wasatch Creeks Ranch from a certified general real property appraiser in 2020.

INTERROGATORY NO. 10: Identify all stock option contracts that you or any entity that you own, control, or have an interest in has been involved in, in any capacity, from January 1, 2000 to present.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is overbroad, vague, and intended to cause undue hardship on Plaintiff by seeking information related to "any entity that you own, control, or have an interest in has been involved in, in any capacity[.]" Plaintiffs object to this Interrogatory to the extent it asks Plaintiffs to respond on behalf of another entity, and Plaintiffs assert that they will not respond on behalf of any other entity. Plaintiffs further object to the phrase "involved in" as vague and ambiguous. Plaintiffs interpret this Interrogatory to

identify all stock option contracts that Plaintiffs have ever been a signing party to. Plaintiffs furthermore object that the timeframe is excessively overbroad and intended to harass Plaintiffs.

Subject to and without waiving any objections, Plaintiffs respond as follows: Apart from the underlying transaction, Plaintiffs have never been a party to any stock option contracts.

INTERROGATORY NO. 11: Identify all brokerage or investment accounts that you directly or indirectly control. For each account, identify the name of the financial institution that manages the account; the last 4 digits of the account number; the types of investments held in the account and the approximate value of the account.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it seeks irrelevant information relating to highly private and sensitive financial information from Plaintiffs. Plaintiffs' brokerage and/or investment accounts have no bearing whatsoever on the underlying case. Plaintiffs object to this Interrogatory on the basis that it is clearly intended to harass and cause undue burden on Plaintiffs. Accordingly, Plaintiffs will not provide an Answer to this Interrogatory without an Order from the Court.

INTERROGATORY NO. 12: Identify with specificity each and every "public statement by Milton" that you reviewed after April 10, 2020, as alleged in paragraphs 181 and 188 of the Complaint. For each statement, identify the date and media (i.e. Twitter, podcast, etc.) that the statement was made, the substance of the statement, the date on which you reviewed the statement; what, if any action you took to investigate or further inquire into the statement after you reviewed it; and identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you reviewed the statement.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is compound as it seeks at least three different categories of information: (1) The statements that Plaintiffs reviewed,

(2) the "action you took to investigate or further inquire the statement," and (3) the proof that Plaintiffs reviewed the statements. This Interrogatory should be bifurcated into, at least, three interrogatories.

Plaintiffs further object to this Interrogatory on the basis that it is overbroad. Plaintiffs cannot reasonably provide a complete list of "each and every 'public statement by Milton'" that Plaintiffs reviewed. Defendant Trevor Milton was, and still is, a public figure. In 2020, Defendant Trevor Milton made numerous public statements, over many different platforms and mediums, sometimes several times a day, to promote Nikola, which Plaintiffs may have casually "reviewed" without tracking the statements, the research put into verifying the information, and the proof that Plaintiffs reviewed the statements.

Plaintiffs furthermore object to this Interrogatory as vague and intended to be overly burdensome. Defendants ask Plaintiffs to "identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you reviewed the statement." However, Defendants do not define the type of document that might "support [Plaintiffs'] allegation that [Plaintiffs] reviewed the statement[s]." This is excessively vague and broad to the point that Plaintiffs cannot provide a response.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: At this time, Plaintiffs cannot recall each and every statement made by Defendant Trevor Milton, the substance of the statements, and/or the date in which Plaintiffs reviewed the statements. Plaintiffs reserve the right to supplement their Answer to this Interrogatory as Plaintiffs may later recall additional statements. At this time, Plaintiff recalls "review[ing]" many statements by Trevor Milton, including, but not limited to:

- Phone call on April 10, 2020. As provided above, Plaintiffs have a recording and transcript of the phone call as well as handwritten and typed notes from the phone call.
- Interview of Defendant Trevor Milton on CNBC on or about June 4, 2020. https://www.youtube.com/watch?v=NYBj83HttG4
- Interview of Defendant Trevor Milton on Fox Business on or about July 31, 2020. https://www.foxbusiness.com/video/6177205510001
- Interview of Defendant Trevor Milton on Fox Business. https://www.facebook.com/FoxBusiness/videos/nikola-ceo-trevor-milton-on-varney-co/597144274240904
- Interview of Defendant Trevor Milton on CNBC on or about August of 2020. https://www.cnbc.com/video/2020/08/05/full-interview-with-nikola-founder-trever-milton.html
- Nikola video featuring Trevor Milton and truck. https://youtu.be/7LSrvRMgIqw (This video has since been removed from the internet.)
- Other videos of the Nikola trucks sometime in summer of 2020.

For context, Plaintiffs regularly watched news media outlets and clicked on threads to current stories including analyst recommendations based on public information coming from Defendant Trevor Milton and Nikola regularly after April of 2020. Plaintiffs referred to real time trading prices and article links to Nikola and Trevor Milton when clicking on MarketWatch—which was regularly and often more than once a day.

INTERROGATORY NO. 13: Identify with specificity each and every statement that you contend you "actually and reasonably relied on," as referred to in paragraphs 1, or "relied upon"

as referred to in paragraph 188 of the Complaint. For each statement, identify the date and media (i.e. Twitter, podcast, etc.) that the statement was made, the substance of the statement, the date on which you heard or reviewed the statement; what, if any action you took to investigate or further inquire into the statement after you reviewed it; and identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you heard or reviewed the statement.

**ANSWER:** Plaintiffs object to this Interrogatory on the basis that it is compound as it seeks at least three different categories of information: (1) The statements that Plaintiffs reviewed, (2) the "action you took to investigate or further inquire the statement," and (3) the proof that Plaintiffs reviewed the statements. This Interrogatory should be bifurcated into, at least, three interrogatories.

Plaintiffs also object to this Interrogatory to the extent it calls for Plaintiffs to make a legal conclusion. Specifically, it calls for Plaintiffs to determine what they "reasonably relied on." Plaintiffs also object to this Interrogatory to the extent it is duplicative of Interrogatories Nos. 5 and 12.

Plaintiffs further object to this Interrogatory on the basis that it is overbroad and intended to be unduly burdensome. Plaintiffs cannot reasonably provide a complete list of "each and every statement that [Plaintiff]… 'actually and reasonably relied on.'" Defendant Trevor Milton was, and still is, a public figure. In 2020, Defendant Trevor Milton made numerous public statements, over many different platforms, sometimes several times a day, to promote Nikola, which Plaintiffs may have casually "reviewed" and "relied on" without tracking the statements, the research put into verifying the information, and the proof that Plaintiffs reviewed the statements.

Plaintiffs furthermore object to this Interrogatory as vague and intended to be overly burdensome. Defendants ask Plaintiffs to "identify any documents, notes, recordings, communications, or other evidence which supports your allegation that you reviewed the statement." However, Defendants do not define the type of document that might "support [Plaintiffs'] allegation that [Plaintiffs] reviewed the statement[s]." This is excessively vague and broad to the point that Plaintiffs cannot provide a response.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Plaintiffs incorporate their Answers to Interrogatories Nos. 5 and 12 by reference. Plaintiffs further assert that, as provided in their Answers to Interrogatories Nos. 5 and 12, their Answer to Interrogatory No. 13 is not a complete list of all the false statements and misrepresentations that Plaintiffs relied upon. At this time, Plaintiffs cannot recall each and every statement that they relied upon as provided in the Complaint. Plaintiffs reserve the right to supplement their Answer to this Interrogatory as Plaintiffs may later recall additional statements.

INTERROGATORY NO. 14: Identify with specificity what, if any, due diligence you or anyone acting on your behalf performed to investigate or evaluate the value of Nikola stock at any time after the April 10, 2020 conversation you allege you had with Milton in paragraphs 177-179 of the Complaint.

**ANSWER:** Plaintiffs object to this Interrogatory because the term "due diligence." It asks for Plaintiffs to make a legal conclusion. Plaintiffs further object to this Interrogatory as duplicative of Interrogatories Nos. 12 and 13, which ask Plaintiffs to identify "what, if any action you took to investigate or further inquire into the statement after you reviewed it."

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Peter Hicks followed Nikola and Trevor Milton on the internet. Regularly, Mr. Hicks



4879-6945-9061

searched VectoIQ and Nikola to see stock prices and read articles about them. Mr. Hicks also watched interviews of Trevor Milton and Nikola on YouTube and other platforms. Mr. Hicks saw several of Trevor Milton's social media posts that made headlines on the news.

INTERROGATORY NO. 15: Identify the past and present owners of Hicks, LLC for the last five years. Also indicate the percentage of shares owned by each owner.

**ANSWER:** Between 2000 and 2019, Peter Hicks owned two thirds of Hicks, LLC. The other third of Hicks, LLC was half owned by David Hansen and half owned by Paul Diaz. Since January 2019, Peter Hicks has owned 99.5% of Hicks, LLC and Lucas Hicks has owned the remaining .5% of Hicks, LLC.

INTERROGATORY NO. 16: Identify the past and present owners of Wasatch Hicks, LLC for the last five years. Also indicate the percentage of shares owned by each owner.

**ANSWER:** Hicks LLC has wholly owned Wasatch Hicks LLC since the inception of Wasatch Hicks LLC.

INTERROGATORY NO. 17: Identify every email and social media account (Facebook, Instagram, Snapchat, Twitter, etc.) owned or used by you between January 1, 2019 and the present. Please provide the email address for each email account. Please provide the username for each social media account and identify when the account was first created.

**ANSWER:** Plaintiffs object to Interrogatory No. 17 as irrelevant. Plaintiffs' email account(s) and/or social media account(s) have no relevance or bearing in the underlying case. Plaintiffs further object to Interrogatory No. 17 because the phrase "used by you" makes the Interrogatory overly broad and vague. Plaintiffs interpret the Interrogatory to seek information relating to email accounts and social media accounts that Plaintiffs own.

Subject to and without waiving any objections, Plaintiffs respond as follows: Wasatch Hicks LLC and Hicks LLC do not own any email addresses or social media accounts. Mr. Peter Hicks owns two email addresses: hicksmgt87@gmail.com and hicksmgt@aol.com, and he owns two social media accounts: Instagram and Twitter. Mr. Hicks does not know how to use either of his social medial accounts and, accordingly, cannot provide the username for the social media accounts. Mr. Hicks believes that he opened the Twitter account sometime in early 2023, and Mr. Hicks does not recall when he opened the Instagram account. He has engaged in no material activities in connection with any social media account and has not posted any commentary in connection with Mr. Milton or Nikola at any time.

INTERROGATORY NO. 18: Identify how you used the Wasatch Creek Ranch property during the time that you owned it. If you rented or leased any portion of the property, identify the parties involved and the terms of the lease.

**ANSWER:** Plaintiffs object to Interrogatory No. 18 because the term "used" is vague. Plaintiffs interpret the term to mean any "use[]" for economic profit. Plaintiffs further object to Interrogatory No. 18 for being a compound question, seeking at least two separate categories of information. Interrogatory No. 18 should be bifurcated into at least two interrogatories.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: Plaintiffs kept the property as an unoccupied mountain recreational ranch. Plaintiffs gave Elite Hunting Company a license to hunt on the property and Jeff Jones a license to graze.

Plaintiffs also planned to create an extensive recreational road system, used surveyors (Uinta Engineering) for selected segments, and began construction of the road system (with Justin Richins). However, on the day that construction began, within hours, Milton asked Plaintiffs to



4879-6945-9061

stop the construction as negotiations were completing. Plaintiffs ordered that the construction stop. With the property under contract, the work did not resume.

**REQUESTS FOR PRODUCTION OF DOCUMENTS**

REQUEST NO. 1: Produce all documents and communications referred to or relied upon in answering the foregoing requests for admission and interrogatories.

**RESPONSE:** Plaintiffs object to Request No. 1 as vague, ambiguous, and overly broad. Accordingly, Plaintiffs cannot provide a response to Request No. 1.

REQUEST NO. 2: Produce copies of everything you received in response to any subpoenas issued to third parties in connection with this lawsuit, including specifically the subpoena to Nikola Motor Company LLC identified in your March 21, 2023 Notice of Intent to Issue Subpoena Duces Tecum. Please include copies of all documents that you received in response to the subpoena(s) as well as all communications between you or your representatives and the recipient of the subpoena(s) which refer or relate in any way to the subpoena(s).

**RESPONSE:** Plaintiffs cannot produce responsive documents to Request No. 2 because Plaintiffs have not received any documents in response to any issued subpoenas to third parties in connection with this lawsuit. Therefore, the documents and communications are not in the possession, custody, or control of Plaintiffs.

**SUPPLEMENTAL RESPONSE:** Plaintiffs will concurrently produce the documents that they have received from Nikola Motor Company LLC to date. Plaintiffs are still in the process of obtaining documents from Nikola Motor Company LLC and will produce any additional documents obtained from Nikola Motor Company LLC once Plaintiffs have receive them.

REQUEST NO. 3: Produce all documents and communications that refer or relate to your sale of the Wasatch Creeks Ranch property to Riverbend Bar Milton Ranch, LLC. Include all

communications between you and any real estate agent(s) or brokerage(s), including David Anderson, that represented you in connection with this transaction.

**<u>RESPONSE</u>:** Plaintiffs object to Request No. 3 as overbroad and vague. Defendants fail to identify the parties between whom the "documents and communications" that they seek were exchanged. Further, Defendants fail to identify a relevant timeframe; Plaintiffs interpret this Request to seek documents from between January 1, 2020, to August 14, 2020 (i.e., the date that the real estate transaction closed). Moreover, Plaintiffs object to Request No. 3 to the extent that the referenced and related documents and communications are equally available to Defendants. Furthermore, Plaintiffs object to Request No. 3 to the extent that the Request erroneously states that Plaintiffs were "represented" by "any real estate agent(s) or brokerage(s)" in the referenced real estate transaction. As provided in response to Interrogatory No. 8, Plaintiffs were not represented by any real estate agents or brokers in the referenced real estate transaction. Subject to and without waiving the foregoing objection, Plaintiffs respond as follows: Plaintiffs will concurrently produce responsive documents and communications.

**<u>SUPPLEMENTAL RESPONSE:</u>** The Parties met and conferred on August 2, 2023, and Defendants have asked Plaintiffs to produce text messages between Peter Hicks and Lucas Hicks pursuant to Request No. 3. Plaintiffs restate their prior objections, including, but not limited to, Defendants' failure to identify a relevant timeframe. Plaintiffs continue to interpret Request No. 3 to seek documents from between January 1, 2020, to August 14, 2020.

Further, Plaintiffs object to Request No. 3 to the extent it is duplicative of Defendants' subpoena to Lucas Hicks. On May 15, 2023, Defendants subpoenaed Lucas Hicks for the same documents, followed by a motion to compel. After a hearing on the motion, Lucas Hicks produced

relevant emails and text messages along with a privilege log. Based on Lucas Hicks' production, Defendants believe that Plaintiffs have failed to produce responsive documents. This is untrue.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:

Plaintiffs cannot produce any text messages between Peter Hicks and Lucas Hicks exchanged prior to 2021, because Plaintiffs do not possess those text messages. After a thorough search of his phone, Plaintiffs have confirmed that no texts between Plaintiffs and Lucas Hicks exist prior to July 2021.

Moreover, it appears the text messages that may have existed in 2020 are privileged attorney-client communications and/or privileged attorney work product. Lucas Hicks is a co-owner of Wasatch Hicks LLC. In his capacity as co-owner of Wasatch Hicks LLC, Lucas Hicks communicated with Peter Hicks (individually and his capacity as co-owner of Wasatch Hicks LLC) and Christopher Robertson (attorney for Plaintiffs). In his capacity as co-owner of Wasatch Hicks LLC, Lucas Hicks also communicated with Peter Hicks about Mr. Robertson's mental impressions of the underlying suit. In addition to attorney-client privilege, these communications also appear to be attorney work product produced in anticipation of the current litigation.

Further, Plaintiffs confirm that Plaintiffs have produced all documents and communications that were exchanged between Peter Hicks and "anyone at Wells Fargo, including but not limited to Robert Heinemann." This was produced with Plaintiffs' Initial Disclosures as HICK000292.

<u>REQUEST NO. 4</u>: Produce all documents and communications that refer or relate to your purchase of the Wasatch Creeks Ranch property from its prior owner. Include all communications between you and any real estate agent(s) or brokerage(s) that represented you in connection with this transaction.

**RESPONSE:** Plaintiffs object to Request No. 4 as overbroad and vague. Defendants fail to identify the parties between whom the "documents and communications" that they seek were exchanged. Further, Defendants fail to identify a relevant timeframe. Furthermore, Plaintiffs object to Request No. 4 to the extent that the Request erroneously states that Plaintiffs were "represented" by "any real estate agent(s) or brokerage(s)" in the referenced real estate transaction. As provided in response to Interrogatory No. 6, Plaintiffs were not represented by any real estate agents or brokers in the referenced real estate transaction. Moreover, Plaintiffs object to Request No. 4 for being completely irrelevant. There is no basis for which the sought documents and communications would be relevant. In addition, the sought documents and communications have confidential business information that Plaintiffs have an interest in maintaining confidential. Based on the foregoing, Plaintiffs will not produce documents or communications in response to Request No. 4 without an Order from the Court.

**SUPPLEMENTAL RESPONSE:** The Parties met and conferred on August 2, 2023, regarding Request No. 4. Defendants asked Plaintiffs to "withdraw [their] objections and produce the requested documents." Defendants claimed that the relevance of the documents was to assert whether Plaintiffs had made a financial gain or loss between the purchase and the sale of the Wasatch Creek Ranch. As counsel noted, Defendants already must have the relevant information because they unsuccessfully raised this exact argument when cross-examining Mr. Hicks at Mr. Milton's criminal trial. Counsel knew the exact amount that Plaintiffs paid for the property, which is a matter of public record. Plaintiffs do not see how any of this is relevant to Plaintiffs' claims that Defendants defrauded Plaintiffs' into selling Wasatch Creek Ranch to them. Plaintiffs already produced the Purchase and Sale Agreement from when Plaintiffs purchased the Wasatch Creek Ranch. Plaintiffs do not believe any other documents or communications are relevant to the

underlying case. Nonetheless, as we discussed Plaintiffs are willing to produce the purchase and sale agreement from the prior purchase of the property by Plaintiffs, if Defendants will agree that this satisfies the request and they will not seek additional documents from the closing of the prior transaction. Otherwise, Plaintiffs maintain and reassert their prior objections.

REQUEST NO. 5: Produce all documents and communications that refer or relate to any appraisals or valuations of the Wasatch Creek Ranch property.

**RESPONSE:** Plaintiffs object to Request No. 5 because the terms "appraisals" and "valuations" are vague. Plaintiffs interpret these terms to mean a report (commonly referred to as an "appraisal") assessing or estimating the fair market value of the Wasatch Creeks Ranch by a certified general real property appraiser. Plaintiffs further object to this Request as vague and overbroad because it fails to provide a timeframe.

Subject to and without waiving any of the foregoing objections, Plaintiffs cannot produce responsive documents to Request No. 5 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 6: Produce all documents and communications that refer or relate to the April 10, 2020 phone call referred to in paragraphs 177-179 of the Complaint, including any recordings, notes, communications, or other evidence of the substance of the phone call. Include copies of the document(s) in their native format with all metadata intact.

**RESPONSE:** Plaintiffs object to Request No. 6 on the basis that the phrase "refer or related to" is vague. Plaintiffs interpret this phrase to mean documents that Plaintiffs prepared or used during the phone call.

Plaintiffs further object to Request No. 6 to the extent that it asks Plaintiffs to speculate on the documents that Defendants might have been referring to or relating to, which Plaintiffs may or

may not have been aware of at the time of the phone call. Plaintiffs also object to Request No. 6 to the extent it seeks documents that are not in possession or control of Plaintiffs.

Plaintiffs furthermore object to Request No. 6 on the basis that the information is equally accessible to Defendants given that Defendants partook in the referenced phone call. As such, Plaintiffs object to the Request on the basis that it is intended to harass and cause undue hardship to Plaintiffs.

Subject to and without waiving any of the foregoing objections, upon information and belief, Plaintiffs respond, as follows: Peter Hicks took handwritten notes during the referenced phone call. These have been produced as Hicks000010–11. Lucas Hicks also typed notes and recorded the referenced phone call on his iPhone. The recording of the phone call was transcribed. Those documents will be produced concurrently as HICKS000814-817 and HICKS000818-1273.

REQUEST NO. 7: Produce all documents and communications establishing any financial loss that you claim to have suffered as a result of the conduct alleged in your Complaint for which you seek damages in this lawsuit.

**RESPONSE:** Plaintiffs object to Request No. 7 as vague and overbroad. Plaintiffs further object to Request No. 7 to the extent it is asking Plaintiffs to either make a legal conclusion or set forth their legal research, opinions, or theory of the case to Defendants. Furthermore, Plaintiffs object to Request No. 7 as being premature. The parties have not completed discovery or trial preparation. Upon further discovery, legal research, and analysis, Plaintiffs may be able to supply additional information to the extent it does not improperly request the legal theory of Plaintiffs' case. Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: At this time, Plaintiffs cannot produce responsive documents to Request No. 7 because the Request

seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

**SUPPLEMENTAL RESPONSE:** Plaintiffs maintain their prior objections. Request No. 7 is vague and overbroad. Plaintiffs interpret Request No. 7 to seek documents "establishing" their damages such as expert testimony or expert reports. If so, Plaintiffs restate that such an expert report and supporting analysis are premature and not yet existing. On August 2, 2023, the Parties met and conferred regarding Request No. 7. Therein, Defendants clarified that Request No. 7 sought documents *evidencing* or *proving* (as opposed to "establishing") any financial loss.

Subject to and without waiving any of the foregoing objections, Plaintiffs respond as follows: To the extent Defendants seek documents *evidencing* Plaintiffs' financial loss, Plaintiffs assert that such documents do exist. Those are the option agreement itself, which became worthless when the truth regarding Mr. Milton's misrepresentations became known to the market, as well as any and all documents evidencing Defendants' misrepresentations of Nikola Motor Company's stock value. Those documents have been described in the Complaint and in the above Interrogatories as well as disclosed in Plaintiffs' Initial Disclosures and/or produced in response to Plaintiffs' Response to Defendants' First Set of Discovery Requests. Plaintiffs also cite to public market and share information and documents, as well as analyst reports and the Hindenburg Report that exposed the inflation in Nikola stock and the option sold to Mr. Hicks once it exposed Defendants' lies and misrepresentations. As noted in the Complaint, the value of the option on the date of the final closing was in excess of $15 million, and the option was clearly "in the money." When the true facts were revealed, the option value plummeted, and the option expired unexercised. While we anticipate providing expert testimony and analysis that will specifically state the damages and loss, we believe that damage based on the documents already produced and

the publicly available market information is no less than $15 million. We also believe there were lost opportunities due to the fraud, including lost opportunities with regard to a 1031 exchange. There is also pre- and post-judgment interest, attorneys' fees and punitive damages as set forth in the Complaint.

REQUEST NO. 8: Produce copies of every written or recorded statement in your possession, custody, or control which relates in any way to the subject matter of this lawsuit.

**RESPONSE:** Plaintiffs object to Request No. 8 to the extent it is asking Plaintiffs to set forth their legal research, opinions, or theory of the case to Defendants. Further, Plaintiffs object to the extent that Request No. 8 is duplicative of the other fifteen requests herein. Moreover, Plaintiffs object to Request No. 8 as vague and overbroad. Accordingly, Plaintiffs cannot provide a response.

REQUEST NO. 9: Produce all documents and communications that refer or relate to any stock option contracts that you or any entity that you own, control, or have an interest in has been involved in, in any capacity, from January 1, 2000 to present.

**RESPONSE:** Plaintiffs hereby incorporate their response to Interrogatory No. 10 by reference. Plaintiffs cannot produce responsive documents to Request No. 9 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 10: Produce documents sufficient to show all brokerage or investment accounts that you directly or indirectly control, including for each account the name of the financial institution that manages the account; the last 4 digits of the account number; the types of investments held in the account and the approximate value of the account.

**RESPONSE:** Plaintiffs hereby incorporate their response to Interrogatory No. 11 by reference. Plaintiffs object to Request No. 10 on the basis that it seeks irrelevant information relating to highly private and sensitive financial information from Plaintiffs. Plaintiffs' brokerage and/or investment accounts have no bearing whatsoever on the underlying case. Plaintiffs object to this Request on the basis that it is clearly intended to harass and cause undue burden on Plaintiffs. Accordingly, Plaintiffs will not provide a response to this Request without an Order from the Court.

REQUEST NO. 11: For each social media account you identified in response to Interrogatory No. 17 above, produce copies or screenshots of all posts which refer or relate in any way to Trevor Milton, Nikola, Wasatch Creeks Ranch, or the subject matter of this lawsuit.

**RESPONSE:** Plaintiffs cannot produce responsive documents to Request No. 11 because the Request seeks documents and communications that do not exist and that are, therefore, not in the possession, custody, or control of Plaintiffs.

REQUEST NO. 12: Produce copies of all documents and communications that refer or relate in any way to Trevor Milton, Nikola Motors, or the Wasatch Creek Ranch Property from January 1, 2020 to the present. Include all responsive communications between or among you and any of the following individuals: 1) David Anderson; 2) Lucas Hicks; 3) Andrew Lillywhite; 4) Jay Thompson; 5) Toni Foster; 6) Mark Gale; 7) Britton Worthen; 8) Mark Russell; 9) Kim Brady; and 10) any other representative of Nikola Motors.

**RESPONSE:** Plaintiffs object to Request No. 12 as overbroad and vague. As to the phrase "any other representative of Nikola Motors," Plaintiffs object that Defendants fail to identify whom the "documents and communications" that they seek for were exchanged with. Further, Defendants fail to identify a relevant timeframe; Plaintiffs interpret this Request to seek documents

from between January 1, 2020, to July 29, 2021 (i.e., the date that Trevor Milton was indicted). Moreover, Plaintiffs object to Request No. 12 to the extent that the referenced and related documents and communications are equally available to Defendants. Plaintiff further objects that this Request is duplicative and intended to burden and harass Plaintiffs because the vast majority of responsive documents have already been produced to Defendants in the criminal matter pending in the Southern District of New York, pursuant to a trial subpoena issued by Mr. Milton in that case. This production included communications with each of the identified individuals, as well as additional communications relating to the transaction, the option agreement, and Nikola's securities. Subject to and without waiving any of the foregoing objections, Plaintiffs will also conduct an additional search of email and will produce any responsive communications concurrently.

**SUPPLEMENTAL RESPONSE:** The Parties met and conferred on August 2, 2023, and Defendants have asked Plaintiffs to produce text messages between Peter Hicks and Lucas Hicks pursuant to Request No. 3. Plaintiffs restate their prior objections, including, but not limited to, Defendants' failure to identify a relevant timeframe. Plaintiffs continue to interpret Request No. 3 to seek documents from between January 1, 2020, to August 14, 2020.

Further, Plaintiffs object to Request No. 3 to the extent it is duplicative of Defendants' subpoena to Lucas Hicks. On May 15, 2023, Defendants subpoenaed Lucas Hicks for the same documents, followed by a motion to compel. After a hearing on the motion, Lucas Hicks produced relevant emails and text messages along with a privilege log. Based on Lucas Hicks' production, Defendants believe that Plaintiffs have failed to produce responsive documents. This is untrue.

Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:

Plaintiffs cannot produce any text messages between Peter Hicks and Lucas Hicks exchanged prior to 2021, because Plaintiffs do not possess those text messages. After a thorough search of his phone, Plaintiffs have confirmed that no texts between Plaintiffs and Lucas Hicks exist prior to July 2021.

Moreover, it appears the text messages that may have existed in 2020 are privileged attorney-client communications and/or privileged attorney work product. Lucas Hicks is a co-owner of Wasatch Hicks LLC. In his capacity as co-owner of Wasatch Hicks LLC, Lucas Hicks communicated with Peter Hicks (individually and his capacity as co-owner of Wasatch Hicks LLC) and Christopher Robertson (attorney for Plaintiffs). In his capacity as co-owner of Wasatch Hicks LLC, Lucas Hicks also communicated with Peter Hicks about Mr. Robertson's mental impressions of the underlying suit. In addition to attorney-client privilege, these communications also appear to be attorney work product produced in anticipation of the current litigation.

Further, Plaintiffs confirm that Plaintiffs have produced all documents and communications that were exchanged between Peter Hicks and "anyone at Wells Fargo, including but not limited to Robert Heinemann." This was produced with Plaintiffs' Initial Disclosures as HICK000292.

REQUEST NO. 13: Make the devices you identified in response to Interrogatory No. 4 above available for inspection, examination, and copying of all recordings and associated files and metadata.

**RESPONSE:** Plaintiffs object to Request No. 13 to the extent it requests Plaintiffs to produce "devices" that are not in their possession, control, or custody. Plaintiffs further object that this Request is duplicative of Request No. 6 (asking Plaintiffs to produce all documents that "refer or relate to the April 10, 2020 phone call… in their native format with all metadata intact").

Furthermore, Plaintiffs object that Defendants have failed to comply with the Federal Rule of Civil Procedure 34(b) in attempt to request an inspection of Plaintiffs' "devices." Accordingly, at this time, Plaintiffs cannot and will not comply with this Request. However, Plaintiffs are willing to meet and confer on the issue.

REQUEST NO. 14: Produce copies of all text messages between you and Trevor Milton.

**RESPONSE:** Plaintiffs object to Request No. 14 for seeking documents equally available to Defendant Trevor Milton. Subject to and without waiving the foregoing objection, Plaintiffs respond as follows: Plaintiffs have already produced all of the responsive communications requested in Request No. 14 in their initial disclosures. To avoid duplication, Plaintiffs will not re-produce the same communications.

REQUEST NO. 15: Produce copies of all documents and communications that refer or relate to the March 1, 2021 Stock Purchase Agreement or the March 2, 2021 Amended and Restated Stock Purchase Agreement (see DEF 000067-000072).

**RESPONSE:** Plaintiffs have already produced all of the responsive documents and communications that are not privileged with their initial disclosures. To avoid duplication, Plaintiffs will not re-produce the same documents and communications. To the extent Request No. 15 seeks documents and communications that are privileged under the attorney-client privilege or attorney work product privilege, Plaintiffs object to the Request and refuse to produce any of those documents and communications under those privileges.

**SUPPLEMENTAL RESPONSE:** A privilege log will be produced concurrently with these Supplemental Responses.

REQUEST NO. 16: Produce copies of all documents in your possession, custody, and control not previously identified that relate in any way to the subject matter of this lawsuit.

**<u>RESPONSE</u>:** Plaintiffs object to Request No. 16 as vague, ambiguous, and overly broad. Accordingly, Plaintiffs cannot provide a response to Request No. 16.

DATED August 11, 2023.

*/s/ Erik A. Christiansen*
Erik A. Christiansen
PARSONS BEHLE & LATIMER

Christopher Robertson (*pro hac to be filed)*
SEYFARTH SHAW LLP

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2023, I caused a true and correct copy of the foregoing **SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF DISCOVERY REQUESTS TO PLAINTIFFS,** to be served to the parties of record:

Brent O. Hatch
H. Douglas Owens
HATCH LAW GROUP
22 E 100 S Ste 400
Salt Lake City, UT 84111
801-869-1919
hatch@hatchpc.com
owens@hatchpc.com

Adam M. Pace
22 E 100 S Ste 400
Salt Lake City, UT 84111
801-869-1919
pace@hatchpc.com

*Attorneys for Defendants*

*/s/ Alex Vandiver*
Alex Vandiver



4879-6945-9061

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------:

LUKAS HICKS, : Case No.: 23-mc-0195

Plaintiff, :

v. :

TREVOR R. MILTON, et al., : New York, New York

Defendants. : July 6, 2023

----------------------------:

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE ROBERT W. LEHRBURGER

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: McDERMOTT WILL & EMERY LLP
BY: Edward B. Diskant, Esq.
One Vanderbilt Avenue
New York, New York 10017

For Defendants: HUGHES HUBBARD & REED
BY: Terence Healy, Esq.
Carl Mills, Esq.
One Battery Park Plaza
New York, New York 10004

For Defendants: HATCH LAW GROUP
BY: Adam. L. Pace, Esq.
22 East 100 South
Suite 400
Salt Lake City, Utah 84111

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

THE COURT: All right. So we are here for Hicks versus Milton; 23-MC-195, in regards to a subpoena that has been served on the particular target in connection with litigation out in Utah.

Counsel, please put in your appearances, starting with the movants.

MR. HEALY: Good morning, Your Honor. Terence Healy of Hughes Hubbard & Reed on behalf of Trevor Milton and the movants in this matter. I am joined by my colleague, Carl Mills of Hughes Hubbard, and underlying counsel in the case, Adam Pace.

THE COURT: All right.

MR. HEALY: He'll introduce himself.

THE COURT: Mr. Pace?

MR. PACE: Good morning, Your Honor. Adam Pace of Hatch Law Group, P.C. I represent the defendants, Trevor Milton, M&M Residual, LLC and T&M Residual, LLC in the underlying case. And I've also entered a pro hac in this case.

THE COURT: Okay. Great.

And for the -- or actually for the respondent?

MR. DISKANT: Yes. Good morning, Your Honor. Edward Diskant of McDermott Will &

Emery on behalf of respondent, Lucas Hicks.

THE COURT: Good morning.

All right. So thank you for the papers you've submitted. And I want to address a couple issues first, and then I do want to address some of the merits of it.

So, first, I find that the objections have not been waived, particularly because there was a corrected subpoena that issued, and the responses to that were certainly within time. And even with respect to the initial subpoena, the privileges that are being asserted are ones that would be preserved anyway.

Secondly, I do note that it appears that defense counsel -- oh, sorry respondent's counsel has made a point about failure to meet and confer.

Let me ask the movants why that alone shouldn't be reason to deny the application.

MR. PACE: Your Honor, we have satisfied the meet and confer requirements. I had a phone call personally with Mr. Diskant on May 30, 2023. We discussed the subpoena at length. Mr. Diskant made it very clear what his position was, what he was willing to do and wasn't willing to do. We were -- there was no room for a middle ground

essentially because Mr. Diskant told me that he wasn't willing to produce anything other than a partial production of what was already produced in response to the criminal subpoena, would not produce anything having to do with the recording, would not search for or even look for any text messages or anything else beyond that.

I believe that we thoroughly discussed the -- what was requested in the subpoena. I listened to Mr. Diskant explain why he thought I should narrow it. I explained why we shouldn't. And Mr. Diskant confirmed that we had met and conferred in the letter that he sent us, which is exhibit -- I believe it's 2 to our motion. The first line that he says in there is that we met and conferred, and so I think we fully satisfied our meet and confer requirements.

THE COURT: But wasn't that before he actually responded and produced documents? I thought he responded and produced documents and, in his cover letter, said that, if there were any questions or issues, to get in touch with him.

MR. PACE: Well, yes, but we had already discussed everything ahead of time, Your Honor. And his production is exactly what he said he was going

to do when we spoke.

THE COURT: And, Mr. Diskant, in, sort of, looking at the realistic view here, is there anything that meet and confer really would have done at this point, given what appears to be the objections that are consistent with everything that the movants have indicated where there are areas of disagreement?

MR. DISKANT: Yes, Your Honor, I think a meet and confer might have been productive.

To take a half step back, you know, we obviously strongly disagree with Mr. Pace's characterization of the May 30th phone conversation. But leaving that aside, many of the issues that were raised in the motion were not and could not possibly have been discussed in that meet and confer because they pertained to the manner in which we had made a production.

So, for example, one of the issues they have raised is a lack of a privilege log. Had Mr. Pace contacted me upon receiving the production and asked for a privilege log, that is probably something that we could have worked out between the parties and not had a need for motion practice on.

Similarly, to the extent Mr. Pace had come

back and said, you haven't produced any text messages, we want to focus what we're looking for just on the issue of text messages, we might have been able to have a conversation about whether or not that was something we could agree to do.

What respondent has been looking for all along is some meaningful parameters on what more he is being asked to do short of "we want everything," which was the only thing that Mr. Pace said on the initial call. So I actually do think a meet and confer after we had made our production might have been productive.

THE COURT: All right. So, yeah, look, it's always a concern when there's not a fulsome meet and confer process. I encounter it, unfortunately, too often. And, you know, in this instance, it doesn't seem like it was fully complied with in spirit or actual letter, but I'm not going to deny the motion on that basis because there, at least, clearly are some issues that are live and clearly where the parties disagree. But just a warning for the future that all efforts should be made if, for any reason, you're back before this Court in this matter.

The next issue I just want to address, sort

of, as a global issue is the Fifth Amendment issue and the respondents' invocation of the Fifth Amendment as a reason not to produce certain materials. And at least it seems that movants are taking a position that Lucas Hicks did not have a right to be invoking his Fifth in response to this subpoena.

Mr. Diskant had responded and noted that the United States Attorney in the criminal action had granted immunity to him. Why doesn't that alone sufficiently answer and give credibility and veracity to a Fifth Amendment invocation?

That's for the movants.

MR. PACE: Oh, yeah. Your Honor, the Fifth Amendment -- I think there's two categories of things that we could talk about. One, there's something that he's already produced in the criminal case, which is a partial recording of that phone call and which he produced in that case. We would ask that that be produced to us, where he's already voluntarily produced it once.

And as I told Mr. Diskant when we talked on the phone, if he's going to invoke the Fifth on other things, I'd just ask that it be a clear and unequivocal invocation so we know where the lines

are. And if he's taken the position that anything else having to do with that recording is -- he's going to plead the Fifth on, then that's fine. We just need to know what the parameters of that invocation are.

THE COURT: Okay. Well, that then appears to be yet another thing that could have been discussed and figured out without having to come before the Court if you're just looking for clarification, and we'll get to that in a minute in terms of a log or anything like that. But I certainly find that invocation of the Fifth Amendment is appropriate for at least a considerable amount of what is at issue here.

I do want to ask, Mr. Diskant, in connection with the immunity that was given in connection with the criminal action, is there no way in which that would also apply to any action taken here in the civil action?

MR. DISKANT: It would not, Your Honor. The term -- the terms of the order, which is very similar to ones I'm sure Your Honor has seen in other cases, because the U.S. Attorney's office tends to use the same order in all contexts, applies exclusively to matters that are disclosed in a grand

jury in connection with the criminal proceeding, which is, in fact, the manner as laid out in my affidavit, pursuant to which certain materials were produced.

I would just add -- and I know it's in our papers -- that to the extent what movants are seeking is the version of the recording that was offered in the criminal trial, that's a public record. It is readily obtainable from the U.S. Attorney's Office. I've also -- I've confirmed that with the U.S. Attorney's Office. It is also readily obtainable from Milton's criminal counsel because it is an exhibit at trial and, therefore, not subject to the protective order.

THE COURT: Yeah. Well, let me start with that because we have four requests, and the first request concerns the phone recording and documents related to the phone recording.

So, Mr. Pace, why is -- why can't you just obtain the recording from the criminal proceeding or criminal counsel, particularly, as I understand from Mr. Diskant, that it was admitted into evidence there without any objection to authenticity or completeness?

MR. PACE: Yeah, Your Honor, my

understanding there -- I talked with the criminal counsel, and it was my understanding that the protective order did apply to all materials that were produced in that case. And it was just a simple request that we have it produced in our case so we can use it and not get at adds with the criminal case and their protective order.

THE COURT: All right. Well -- but it sounds like it's a public record.

Mr. Diskant, do you just have different information?

MR. DISKANT: I do. And if it would resolve this matter, I will obtain from the U.S. Attorney's Office the public-record version of this and provide it to movant's counsel.

THE COURT: What do you think, Mr. Pace? Sound like a good idea?

MR. PACE: On the recording piece of it, I think that's fine. And, again, there's other aspects of this that I'm sure we'll get to, so ...

THE COURT: Understood.

So that's the recording itself. Mr. Diskant, will procure that from the government.

Okay, then documents regarding the recording. I understand, again, per the paper

submitted by Mr. Diskant, that there are at least some typewritten notes of some sort that were produced or are being produced, but there appears to be a concern that there may be other documents or notes about the recording and that the movants are asking for those.

Is that correct, Mr. Pace?

MR. PACE: Well, yeah. We don't know what else exists besides what they've told us. And all we know is that there's some notes that they produced, and we otherwise understand that they're asserting the Fifth on everything having to do with the recording.

THE COURT: Right. Right.

And, I mean, what's your response to that, though, in terms -- if they're asserting the Fifth, then they're asserting the Fifth. And like you said, you want clarification on that. They will have to -- I am going to ask them, as we'll discuss at the end, to provide a log. But other than that, I'm not sure what your -- you can do at the moment.

MR. PACE: I think we could move on to the other topics in the subpoena, Your Honor. I think that resolves the recording piece, so ...

THE COURT: Okay. Great.

MR. DISKANT: Your Honor, can I just briefly address the issue of a log there? I don't want to front-run that if the Court plans to get to it later, but I would --

THE COURT: Yeah, go ahead.

MR. DISKANT: I would just note that I think our concerns about active production would be equally impacted by producing a specific log of what was or was not being produced, which is why no log has been provided there.

THE COURT: Yeah. No, I understand. And we should discuss that at the end because the point being, I assume, that if you provide a written log and identify documents, it has the same concern as if those documents are being produced. It could amount to an admission that Mr. Hicks, in fact, has documents of the type that may give concern to the Fifth Amendment issue, but let's discuss that at the end, how to deal with that. All right.

The second request is for any recording devices or devices on which Mr. Hicks copied the recording.

What's the justification for that, Mr. Pace?

MR. PACE: Well, okay, so this case -- if I

could back up and give a little detail. If I'm overexplaining it. I apologize. And I'll fast-forward.

THE COURT: No, no. Go ahead.

MR. PACE: This case centers around an April 10, 2020 phone call that took place between Mr. Milton, Peter Hicks. His son, Lucas Hicks, was on the phone. And I believe their real estate agent, David Anderson, was on the phone.

Our case is a civil lawsuit where the plaintiffs -- which, by the way, Mr. Lucas Hicks, is an owner, a part owner of one of the plaintiffs, and he has a financial stake in this lawsuit. He's not a disinterested third party. They're asking for $45 million in damages from my clients alleging securities fraud and common-law fraud, all centered around representations that were allegedly made in an April 10, 2020 phone call.

Now, we'd like to get the entire recording of that call, if it exists, for context, because only a partial recording of that was ever produced and played in a criminal trial. And, again, context is key, I think, in what was said and what -- the things surrounding what was said in the case as to whether it's something that the plaintiffs can claim

that they reasonably relied on, to their detriment, for their fraud claims.

That's what we're asking for. That's the relevance of the information. I understand with Mr. Hicks' invocation of the Fifth Amendment covering all the recordings that that's likely going to extend to request number 2 as well, and that we've probably addressed that one in our conversation previously, but that's why we're asking for it, is we wanted the recording. We're trying --

THE COURT: But let's distinguish two things then because one is the notion that there's some other part to this recording, so put that to the side for the moment. The second would be the actual devices, which I took potentially to include a telephone or whatever was used to make a recording, anything it was copied onto. And you're actually asking for those devices so that you can search those devices. Do I have that wrong?

MR. PACE: No. That's right. But we're asking to search it to get the recording. That's why it's included.

THE COURT: Right. So let me come back to that then, which was the first way I was looking at it, which is -- and maybe this camp -- there ought

to be a way to figure this out, perhaps, without having to trigger the Fifth Amendment issue, but I'm not sure.

But it seemed -- I, sort of, took away -- and maybe it was just an inference that was not appropriate to take -- that there really is no other part to the recording. And because in the testimony -- I think it was the excerpt of the testimony that was submitted. It sounded like the recording was turned on partway into the call, which would mean it would only be part of the call.

But do you have any insight into that?

MR. PACE: Well, here's the problem, Your Honor: Lucas Hicks has not testified, will not testify. He's pleading the Fifth on everything having to do with --

THE COURT: Sure.

MR. PACE: -- the recording, so, you know, I'd love to ask him, and say, is there another part to that? But I can't. He's going to plead the Fifth on it.

THE COURT: Okay. I just didn't know if it was something that came out in -- you know, elsewhere, be it the criminal proceedings or otherwise.

Mr. Diskant, is there anything you can address at the moment?

MR. DISKANT: To your last point, Your Honor, I believe the criminal testimony is consistent with Your Honor's representation of it. And I would note again that this recording came in without objection; that is, there was no concern by Milton's criminal counsel that there was some other version of this recording out there. Presumably, they would have raised this objection if, based on the trial testimony or otherwise, they shared Mr. Pace's concern. It's otherwise not clear to me what good-faith basis Mr. Pace has for asserting there is some other version of the recording.

THE COURT: All right. Well, I guess it's going to fall, essentially, under the same Fifth Amendment issue, but, again, it also seems like it may be chasing something that's not there.

Obviously, if there was another part to the recording, I would understand why the movants would want that, of course. Just seems like it might be chasing something that's not there. All right.

The request number 3 were the communications regarding Nicola and its stock. It sounds like the respondent has produced the e-mails

that are responsive to that, but has not produced or searched for texts.

Do I have that right, Mr. Diskant?

MR. DISKANT: I think that's right, Your Honor. If I can, sort of, anticipate where the Court may be going, if 3 and 4 are put together and 3 or 4 are bounded by what we would suggest is a reasonable time limit because the subpoena has no time period otherwise, I am prepared to represent to the court that, in connection with both the U.S. government and Milton's own criminal counsel, we conducted not one, but two searches for responsive material.

We represented to Milton's criminal counsel that, again, at least limited to the relevant time period, we didn't have any reason to believe there was any meaningful volume of text messages because during the time period of the deal, my client and his father were living at home together, and they were not text messaging a whole heck of a lot, and so it was understood between everyone that it would be unduly burdensome to compel him to search and review his phone.

And so that is why we put in -- I put in the June 5th letter that we believe we had gathered

substantially everything that was responsive to requests 3 and 4. I continue to believe that is true. And what I can't do is I can't tell the Court that I have imaged my client's phone and done a forensic review of it. I haven't done that. I've never been asked to do that, at least by the government or movant's prior criminal counsel. And it would be very expensive and burdensome to do so.

But that is the scope of what we have collected and produced. It's what we produced in the criminal case and what, now, we have produced to Mr. Pace.

THE COURT: All right.

Mr. Pace, your view on that?

MR. PACE: Yeah, so, I guess, two concerns I have. One, let's talk about the e-mails. In the letter that I received from Mr. Diskant, he indicates that we received "substantially" all. And that word, the qualifier, concerns me because I don't know what's being held back. So that's as to the e-mails. If he can tell me, you've got all the e-mails, fine, you know, but there's some issues with privilege on some of the e-mails that I'd like to address in a moment.

Text messages is another story. As

Mr. Diskant just told us, as consistent with our meet and confer conversation, he told me that we hadn't searched for text messages. I'd like him to search for and produce the text messages. I don't think it's unduly burdensome to ask someone that's got -- you know, one of the plaintiffs or an owner of a plaintiff asking for $45 million to search for their text messages.

I have reason to believe from other discovery that Mr. Hicks, Peter Hicks and Lucas Hicks, were in close communication with each other, talking about the stock, researching the stock. These are sophisticated investors that were not, you know, like you're -- like a little, old lady investing her life savings in some, you know, security or something. These are sophisticated people that were planning, you know, what happens if this stock goes up and what happens if it goes down.

And so their communications with each other are very relevant and important to this case to understand their fraud reliance allegations. I don't see why it would be hard to just go look on his phone. It doesn't require imaging if there's only a handful of text, and then that should be easy to pull off.

THE COURT: Well -- you do hit on something there, but I think you raise a few things.

First of all, you mentioned they were in close communication, and so they're going -- you know, it's going to be important. Well, it sounds like the main form of those communications were e-mails and oral discussions at home. I agree with you; it doesn't leave out the possibility that there could be a text, and there may only be one text, and that text could be very pivotal in a litigation. But I want to pick up on what you said at the end there because I think I was thinking along the same lines.

And I'm going to ask, Mr. Diskant, is there any reason that he -- Mr. Hicks can't just do a manual search for the text on his phone, and whatever he finds, he finds, and that will be sufficient? He won't have to do a forensic-type search.

MR. DISKANT: So, Your Honor, this is precisely what a meet and confer might have been able to achieve. If Mr. Pace is prepared to limit the request to text messages between Lucas Hicks and Peter Hicks from the 2020-to-2021 time period, I can try and have my client, assuming that that phone --

those -- to the extent those still exist, you know, go back, scroll back through years of text messages with his father to see what is there and subject to any privilege concerns or Fifth Amendment concerns produce that -- produce, effectively, screenshots of the same. I do not have any reason to believe there is a meaningful volume of that stuff, but that seems like a reasonable compromise.

THE COURT: How does that sound, Mr. Pace?

MR. PACE: So in one respect, it's too limited because he said only with Peter Hicks, and I know that there's communications with other people besides just Peter Hicks, you know, investment advisors that the Hicks were communicating with, the real estate agent. I mean, there's other people besides just Peter Hicks that they were in communication with about this investment, you know, getting advice on it; things like that.

And so I think that it would be appropriate if we could just keep it at the scope of what's requested in the actual request, which is not limited to just Peter Hicks.

THE COURT: Mr. Diskant?

MR. DISKANT: Then we start to get in -- first and foremost, then we start to get into burden

issues. I have no idea whether any of these people exist or whether they're dozens of these people. But second, they've made no effort to obtain this material from Peter Hicks, who's the party to the litigation, which they should. And third, it's not clear to me that Mr. Pace has any good-faith basis for believing that this stuff exists, which I would think would be a predicate for requiring a third party to engage in this exercise.

And if I could just briefly address this issue of Mr. Hicks being an owner of Hicks, LLC, Lucas Hicks owns one half of 1 percent of Hicks, LLC, which I understand is something that his father did years ago because he is his only child. He does not receive any dividends from it. He doesn't receive any payments from it. You know, no one has ever suggested that Lucas Hicks is an entirely disinterested third party. It is his father, after all. But his ownership interest in Hicks, LLC I don't believe is a meaningful factor in the analysis of these issues.

THE COURT: Understood.

So is -- Mr. Pace, do you -- you said you're interested in communications with other individuals. Would you be able to provide a list of

the individuals that you have in mind?

MR. PACE: Yeah, I --

THE COURT: In other words, because when you do a manual search -- and maybe I'm wrong -- for texts on a phone, I assume the easiest thing to do is by the thread of who you're communicating with. I don't know if you can search for all -- across who you communicate with for any discussion about Nicola, for instance. Maybe you can. But, again, manually, I don't know, so that's why I'm asking.

MR. PACE: Yeah, I could give him several names. I don't know that it would be exhaustive of everyone that he communicated with. I'd have to figure that out later on through a depo or something like that, which is fine, and we could circle back to this. Maybe he supplements if he tells me there's another person that he produced with, but I could certainly give him a list to start with and we could go from there.

THE COURT: All right. Well, why don't you do that. And, you know, I don't know how many people are going to be on that list. It's possible that Mr. Diskant will still have an objection of some sort based on that, so he can certainly reserve that right, but I think it makes sense for the

movants to provide a list of those individuals, and then to the extent he believes it is reasonable to do so, Mr. Diskant can work with his client to do a manual search of the phone.

MR. PACE: And I could even give that here if it's helpful. I've got it off the top of my head. I mean, it's not that long of a list.

THE COURT: All right.

MR. PACE: It's David Anderson, the real estate agent. Teed Welch, who's a friend that's communicated with at least Peter about the investment stuff. And there's two individuals at Wells Fargo Investment Advisors who have been communicating with at least Peter. I'd like to know if Lucas was -- Lucas was involved.

You know, and I said I could do this off the top of my head, but I apologize; I'll have to go get those names for you. But there's two names from Wells Fargo. But that's the list that I can give you.

THE COURT: So it's four individuals?

MR. PACE: Yeah, four.

THE COURT: In addition to Peter Hicks.

MR. DISKANT: Your Honor, I'm prepared to await the list and look at it. I would note that my

understanding of the underlying litigation has to do with the accuracy of representations that Mr. Pace's client made to Peter Hicks. It is, therefore, entirely unclear to me what the relevance would be of communications, assuming they exist, between Lucas Hicks and Wells Fargo, or any of these other people for that matter.

THE COURT: Mr. Pace?

MR. PACE: Well, yeah. So some of the investment advice that was given from these Wells Fargo individuals, to Peter at least, was talking about how volatile the stock was, making plans to short it, for example, coming in with contingency plans, you know, saying, if it's up, we're going to sell and make a profit; if it's down, we're going to short it; stuff like that.

And so this is important, Your Honor, because -- and I'll go -- just step back to the background section again. This is -- this case arises from a real estate transaction where Mr. Milton bought, you know, this 4,600-something acre of ranch property. There was a cash component, and there was an option component, you know, for an option to purchase Nicola stock at a strike price of -- I think it was $16.50 a share.

And so being an option, you know, whether that's going to be worth money or not depends on what the shares are worth at the time they can exercise it. And so the theory that's being alleged in this civil lawsuit is that Peter heard all these things that were said on the April 10th phone call, you know, believed that Nicola was going to be a winner and only purchased -- or only sold the property because of that and was planning to sell these options and make a ton of money. That's how they come up with the $45 million in damages, you know, computation, is they're claiming that it was going to go to the moon, they were going to sell it, and then they want treble damages under one of the securities statutes.

And so when you have evidence showing that they know that it's volatile, that they're planning, you know, for it to be down, they're actually shorting it -- things like that -- that's very relevant to whether they're actually relying on representations made in the phone call in order to enter into this purchase or not.

It's indicative that they know that the stock is volatile, that it's not going to go up, that it's an option, and that it can certainly go

down. That's why it's relevant to our case. And so it's those kind of communications -- and I know Lucas is involved in many of the e-mails we've seen, and so there's reason to believe that he may have texts or other communications along the same line.

THE COURT: Mr. Diskant?

MR. DISKANT: If I can just -- yeah, just briefly, two things.

First and foremost, I am not trying the civil case. And so, therefore, I am not prepared to address the elements of the claims in dispute. My understanding, certainly, in the context of things like federal wire fraud and the like is that -- the issue is whether or not the statements that the defendant made were true or materially false. What other people were saying is, sort of, immaterial.

But the second thing is just to keep in mind, the entire premise of this exercise is that the U.S. Attorney's Office for the Southern District of New York and Milton's own very aggressive and very capable criminal counsel somehow left out there on the table super relevant information to these claims. I am hard pressed to believe that that premise is true, which is why I continue to think this entire thing is a bit of a fishing expedition,

and that is the lens through which I see the relevance, or lack thereof, of some of these issues.

THE COURT: Well, I understand, and -- but it sounds to me like with that few number of individuals and the limited nature of the time period that -- and doing a manual search, this is not really going to be that difficult. And it's proportional in the sense that it is a limited search that given some potential relevance, at least as articulated by Mr. Pace -- I know you mentioned about the truth or falsity of the information, but, of course, I think Mr. Pace's point was they might have a defense of some sort of -- based on no reliance or reliance on something else.

But I don't know anything about the civil litigation either; certainly, less than Mr. Diskant. But I think what's been asked, based on that narrowing, that it should go forward. All right. So that takes care of the text issues.

What about the communications with the government? Where are we on that, Mr. Pace?

MR. PACE: Well -- so, as I understand it, Mr. Diskant has refused to produce those, arguing that they're not relevant. And I don't know if his other objections apply to that as well.

I'd say they are relevant. They deal with this very subject matter that we're dealing with in our civil lawsuit, the April 10th phone call. What happened as far as producing that phone call -- those e-mails are not privileged. They're between Mr. -- I presume, Mr. Diskant and the government in that case, and they would be discussing the phone call and other evidence, so they're relevant, should be admissible. They're not privileged. Shouldn't be that burdensome for him to produce them. We'd ask they be produced.

THE COURT: Mr. Diskant?

MR. DISKANT: Your Honor, the communications of counsel for Mr. Hicks and the government are of no discernible relevance to the truth or lack thereof of Mr. Milton's statements to Peter Hicks three years ago.

Again, the closest Mr. Pace seems to be coming is this -- a rehashing of this theory that perhaps the recording that was offered at trial is somehow incomplete. There's just no good-faith basis for that accusation, or certainly, he hasn't articulated one, and, therefore, no reason that any of this stuff is relevant.

THE COURT: And just remind me, the

criminal proceedings went to what stage? How far did they go? All the way through?

MR. DISKANT: They were tried. Tried to conviction. Mr. Milton is set to be sentenced this fall.

THE COURT: Okay. All right.

And in the communications with the government, was that in connection with evidence presented to the grand jury? Was it something else?

MR. DISKANT: Your Honor, I am looking at my e-mails now. I think I maybe have a dozen or slightly more e-mails with an AUSA for the government, virtually all of which appear to be logistical in nature.

THE COURT: You say "virtually," so maybe there's one that's not, but who knows?

Again, these --

MR. DISKANT: I think there's one in which he gave me the names -- the e-mail addresses for Mr. Milton, I presume because he wanted me to run them, although I don't remember specifically. That's about as close to substantive as they come.

THE COURT: Well, let me ask you this: If that's what you're seeing in what they are, are you willing to just go ahead and produce them?

MR. DISKANT: Your Honor, if that is what it takes to resolve this, I would have to talk to my client about that. But, again, I really -- I mean allowing a civil litigant to fish into conversations between counsel for the government and counsel for a non-party is deeply invasive, and there is just no relevance to them whatsoever.

THE COURT: No, I understand, and I have trouble understanding the relevance either. Certainly understand the argument that, well, Counsel's description of what happened or what might be a proffer of evidence could lead to something that could be a thread that the movants could tug on. But, again, that's -- that is entirely speculative and, sort of, a fishing expedition, although it is in connection with the criminal proceeding, which raises the same issues, or similar issues to what's at issue here.

And, you know, it sounds, sort of -- it does, sort of, sound ridiculous, but given the few that you've referenced, I ask that you go consult with your client and consider whether you will produce those. Have a further discussion with Mr. Pace about it. If there's still an issue, you can bring that back to me.

MR. DISKANT: Understood, Your Honor.

THE COURT: All right.

MR. PACE: Yeah, I guess, Your Honor, it's unclear. Are we going to have a resolution on what he is to produce or isn't, or are we going to have to meet and confer again? I'm just trying to understand.

THE COURT: Well, in terms of that, it was really to see if -- perhaps if Mr. Diskant was going to -- after conferring with his client was going to be amenable to producing them, then that would solve the problem. If the concern -- if there's any concern that Mr. Diskant would not want to do that without a court order, then yeah, then it would require coming back.

What I -- the only reason I'm hesitating at the moment is because I don't really know what's in there that may be objectionable, other than reasons that Mr. Diskant has mentioned. It sounds like there will not be.

But let me ask you, Mr. Diskant, would you be taking the position that you wouldn't produce them even if your -- after conferring with your client without a court order?

MR. DISKANT: No. Not -- no, Your Honor.

I would like to talk to my client. I am prepared to represent, having scrolled through these, which is consistent with my memory, that to the extent there was a discussion of a hypothetical recording that might or might not exist, that did not occur by e-mail.

To the -- there was no written attorney proffer of what Mr. Hicks would say. I don't believe there is anything that is remotely relevant in these e-mails. I appreciate the Court's point, that that same point could cut in the opposite direction. Why not just turn it over? But this, to me, seems like a fishing expedition.

THE COURT: Well, it is, but it is targeted fishing expedition in that it's like fishing for a pike and knowing that you're in a lake where there are only pikes because it's about this particular subject matter.

So, for me, it just -- it, sort of, resolves it if there -- if, from your viewpoint, taking your representation is true, they're, sort of, non-consequential and there's only a limited handful, why not produce them?

If there are e-mails, like you said, that go to the Fifth Amendment issue in some way, that's

a separate question.

MR. DISKANT: Correct.

THE COURT: Those would not have to be produced.

MR. DISKANT: Okay. Let me -- rather than trying to do this in real time, let me more carefully review the materials that we have. Let me speak with my client, and I will get back to Mr. Pace and, if need be, to the Court.

THE COURT: I think that sounds fine.

All right. That brings us to privilege log.

So Mr. Diskant identified the issue that it may be difficult to do an item-by-item privilege log and likely can't be done that way because of the same Fifth Amendment concerns.

Mr. Pace, what's your view on that?

MR. PACE: Yeah, I think that with respect to the recording and anything that he's asserting the Fifth on, a generic, but clear and unequivocal statement that I'm asserting the Fifth on anything having to do with the recording of this phone call, or something like that, would be sufficient for the privilege claim on that.

But there's another bucket of stuff, which

are the e-mails that were produced. There's a -- I'd say at least a dozen pages that are fully blacked out that I can't discern who the party -- who is the "to" or "from" line or what the content of the e-mail is or what the basis for privilege is.

I had asked for a privilege log as -- and as I understand Rule 45, it requires that some information be given, you know, to give us a chance to understand what the basis of that privilege is.

THE COURT: Mr. Diskant?

MR. DISKANT: So to be clear, he asked for a privilege log by moving to compel. There was no discussion of a privilege log at any time prior to moving to compel. If the Court feels it is necessary, we will produce one.

I will say at a categorical level -- and I realize that the rules permit categorical -- all of these communications are between Peter Hicks and Lucas Hicks and counsel to Peter Hicks on the deal. The identity of counsel is known to Mr. Pace, or certainly to his clients, so there's not a particular secret here. It seems like doing an e-mail-by-e-mail log is unduly burdensome.

THE COURT: Well, again, how many are there?

MR. DISKANT: A dozen or two.

THE COURT: Yeah. I mean, look, you can do category if they're all the -- involving the same people, the same subject, and it's the same privilege.

MR. DISKANT: I would just note --

THE COURT: But it sounds like the -- what was produced, though, doesn't really give any indication of what may be on those pages to allow them to assess the privilege. And I think they need that information to at least have that information to assess.

MR. DISKANT: Your Honor, obviously, we will comply with the Court's direction. This, to me, is a manner in which the Court could exercise its discretion to fault them for failing to meet and confer and simply deny it because what I'm concerned about is we're then going to be back before the Court when they are challenging the privilege log, which they should have done in one motion practice rather than forcing my client to litigate this multiple times.

THE COURT: I understand that, and I recognize that there are definitely burdens of the multiple aspects to this, but it sounds like given,

A, you can do it categorically, B, there are not even that many, that I want it to be done. I think it's important for that type of information to be ...

MR. DISKANT: Understood. So just so -- sorry. I apologize.

THE COURT: No. Go ahead. Go ahead.

MR. DISKANT: I just want to make sure I understood my takeaways from this, which were that we are going to obtain from the U.S. Attorney's Office a copy of the public record of the recording that was offered at trial, and we will produce that to Mr. Pace.

We will provide a privilege log of materials that were withheld on the basis of attorney-client privilege. We will do so categorically.

Mr. Pace is going to give us a list of the five individuals for whom he wants us to search for text messages between the period 20 -- April 2020 and July of 2021, to include Peter Hicks; David Anderson; Teed, if I had that correctly, Welch; and two unspecified individuals from Wells Fargo.

MR. PACE: Oh, sorry. I was going to give you the name. Teed, T-E-E-D; Welch, W-E-L-C-H.

MR. DISKANT: Okay. And I think that is it, unless I'm missing anything.

THE COURT: That sounds right to the Court.

Mr. Pace?

MR. PACE: Yeah. In your privilege log, you were going to give some statement about the Fifth. That's just as I understood that, right? Is that correct?

Like, we're asserting the Fifth for everything having to do with the recording or something to that effect.

MR. DISKANT: So, Your Honor, I think we have sufficiently covered this in -- for two different reasons. One, the statement that we've put in our letter of response indicates that he is otherwise invoking as to requests 1 or 2.

I offered Mr. Pace the option of narrowing the request. He declined to do so. I don't think it is Mr. Hicks' obligation to be further specific about why he is invoking. He has a good-faith basis to invoke. And the more narrow it gets, the more it comes to potentially confirming or acknowledging the existence of material that might implicate his Fifth Amendment rights.

THE COURT: I just want to make sure I

understand something you said, though, Mr. Diskant.

You were talking about scope of the Fifth. I took Mr. Pace to just be wanting a clear assertion that the Fifth is being asserted, and obviously, if so, with respect to what.

Is -- are you saying you're concerned about identifying the "what"?

MR. DISKANT: I certainly don't think it's Mr. Hicks' obligation to do so. That said, what I'm prepared to do, if it is amenable to the Court and to Mr. Pace, is to represent that, to the extent a recording exists and to the extent the subpoena seeks materials relating to the existence of a recording or a recording that may or may not exist, Mr. Hicks is invoking, which I think is fairly understood between the parties, but I want to be very careful about what it is that I'm saying in that regard.

THE COURT: That actually sounded appropriate and sufficient.

Mr. Pace?

MR. PACE: The way he said it just now sounded fine to me, I mean, if he wants to use that.

THE COURT: Okay.

Is that something you can just put in

writing, Mr. Diskant --

MR. DISKANT: I can, Your Honor.

THE COURT: -- even though you said it here on the record?

MR. DISKANT: I can, Your Honor.

THE COURT: Okay. Thank you. All right.

I believe that addresses the issues, but is there anything else, Mr. Pace?

MR. PACE: No, Your Honor. We appreciate your time this morning. I think that gives us our next steps here.

THE COURT: All right.

Mr. Diskant, anything from you?

MR. DISKANT: No, Your Honor. Thank you.

THE COURT: All right. Well, nice seeing you, all. Hopefully everything will be smooth sailing from here, but I'm here if not. And we're adjourned.

0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Hicks v. Milton; Docket Number: 23MC0195 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature *Adrienne M. Mignano*___________________________

ADRIENNE M. MIGNANO, RPR

Date: December 1, 2023

# EXHIBIT D

**From:** hicksmgt@aol.com,
**To:** lucas.r.hicks@gmail.com
**Subject:** [redacted]
**Date:** Thu, Jun 4, 2020 6:10 am
**Attachments:** [redacted]

-----Original Message-----
From: Peter Hicks <hicksmgt@aol.com>
To: david@a5realestate.com <david@a5realestate.com>; manderson@fabianvancott.com <manderson@fabianvancott.com>; tspent@gmail.com <tspent@gmail.com>; mark.gale@nikolamotor.com <mark.gale@nikolamotor.com>
Sent: Mon, Jun 1, 2020 10:54 pm
Subject: Soils map

-----Original Message-----
From: David Anderson <david@a5realestate.com>
To: Peter Hicks <hicksmgt@aol.com>; 'Matthew L. Anderson' <manderson@fabianvancott.com>; tspent@gmail.com <tspent@gmail.com>; mark.gale@nikolamotor.com <mark.gale@nikolamotor.com>
Sent: Mon, Jun 1, 2020 8:55 pm
Subject: Wasatch Creeks Ranch (Peter Hicks and Trevor Milton)

All,

I am starting a group email for everyone to correspond to on the verbal deal that was just struck between Peter Hicks as Seller, and Trevor Milton as Buyer, for the Wasatch Creeks Ranch - 4,678 acres located in Morgan County, Utah.

Here is a list of contact info for all parties to this email:

**Seller and Seller Attorney:**

Peter Hicks (Seller)
Cell 339-235-2876
hicksmgt@aol.com

Matthew L Anderson (Seller's Attorney)
FabianVanCott
801-323-2267
manderson@fabianvancott.com

**Buyer and Buyer Attorney:**

Trevor Milton (Buyer)
Cell 602-739-3095
tspent@gmail.com

Mark Gale (Buyer's Attorney)
Nikola Motor
Cell 602-644-9666
mark.gale@nikolamotor.com

Thanks,

**David Anderson**
President | Owner
Principal Broker – Utah
Responsible Broker – Wyoming
Designated Broker – Idaho

**A5 Real Estate**
2825 E. Cottonwood Parkway, Ste 500, Salt Lake City, UT 84121
Office 801-449-1842 | Cell 801-910-4040
david@a5realestate.com | www.a5realestate.com

CONFIDENTIALITY NOTICE: The contents of this email message and any attachements are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

**From:** hicksmgt@aol.com,
**To:** lucas.r.hicks@gmail.com,
**Subject:** Fwd: Soils map
**Date:** Thu, Jun 4, 2020 6:10 am
**Attachments:** WBR DD soils maps.pdf (499K)

-----Original Message-----
From: Peter Hicks <hicksmgt@aol.com>
To: david@a5realestate.com <david@a5realestate.com>; manderson@fabianvancott.com <manderson@fabianvancott.com>; tspent@gmail.com <tspent@gmail.com>; mark.gale@nikolamotor.com <mark.gale@nikolamotor.com>
Sent: Mon, Jun 1, 2020 10:54 pm
Subject: Soils map

-----Original Message-----
From: David Anderson <david@a5realestate.com>
To: Peter Hicks <hicksmgt@aol.com>; 'Matthew L. Anderson' <manderson@fabianvancott.com>; tspent@gmail.com <tspent@gmail.com>; mark.gale@nikolamotor.com <mark.gale@nikolamotor.com>
Sent: Mon, Jun 1, 2020 8:55 pm
Subject: Wasatch Creeks Ranch (Peter Hicks and Trevor Milton)

All,

I am starting a group email for everyone to correspond to on the verbal deal that was just struck between Peter Hicks as Seller, and Trevor Milton as Buyer, for the Wasatch Creeks Ranch - 4,678 acres located in Morgan County, Utah.

Here is a list of contact info for all parties to this email:

**Seller and Seller Attorney:**

Peter Hicks (Seller)
Cell 339-235-2876
hicksmgt@aol.com

Matthew L Anderson (Seller's Attorney)
FabianVanCott
801-323-2267
manderson@fabianvancott.com

**Buyer and Buyer Attorney:**

Trevor Milton (Buyer)
Cell 602-739-3095
tspent@gmail.com

Mark Gale (Buyer's Attorney)
Nikola Motor
Cell 602-644-9666
mark.gale@nikolamotor.com

Thanks,

**David Anderson**
President | Owner
Principal Broker – Utah
Responsible Broker – Wyoming
Designated Broker – Idaho

**A5 Real Estate**
2825 E. Cottonwood Parkway, Ste 500, Salt Lake City, UT 84121
Office 801-449-1842 | Cell 801-910-4040
david@a5realestate.com | www.a5realestate.com

CONFIDENTIALITY NOTICE: The contents of this email message and any attachements are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

PETER HICKS, HICKS, LLC, and WASATCH HICKS, LLC,

Plaintiffs,

vs.

TREVOR R. MILTON, M&M RESIDUAL, LLC and T&M RESIDUAL, LLC,

Defendants.

Videotaped Deposition of:

SCOTT TUCKER

Case No. 2:22-cv-00166

Judge Hon. Daphne A. Oberg

Thursday, October 3, 2024
10:00 a.m. - 12:13 p.m.
Mountain Time

Location: Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111

Reporter: Christina Holbrook, RPR
Ryan Reverman, CLVS, CME, CTP



A P P E A R A N C E S

FOR THE PLAINTIFFS:
Christopher Robertson, Esq.
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts 02210
Tele: (617) 946-4989
E-mail: crobertson@seyfarth.com
Erik A. Christiansen, Esq.
(Not Present)
Alex Vandiver, Esq.
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tele: (801) 532-1234
E-mail: echristiansen@parsonsbehle.com

FOR THE DEFENDANTS:
Tyler Snow, Esq.
HATCH LAW GROUP, PC
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Tele: (801) 869-1919
E-mail: snow@hatchpc.com



I N D E X


| SCOTT TUCKER | PAGE |
|---|---|
| Examination by Mr. Robertson | 6 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 - | Aptegra Expert report of H. Scott Tucker, dated 6/24/24 | 7 |
| 2 - | Text conversation chart between L. Hicks and P. Hicks, dated between 4/20-11/23 | 10 |
| 3 - | Rule 901. Authenticating or Identifying Evidence, FRE Rule 901 | 16 |
| 4 - | Rule 902. Evidence That Is Self-Authenticating, FRE Rule 902 | 16 |
| 5 - | Transcript and Status Conference Hearing, Re: Hicks vs. Milton, dated 9/6/23 | 19 |
| 6 - | Letter from E. Diskant to A. Pace, dated 7/20/23 | 22 |
| 7 - | Transcript of partial testimony | 24 |
| 8 - | Transcript of partial testimony | 27 |
| 9 - | Transcript of recorded conversation between T. Hicks, P. Hicks, L. Hicks and D. Anderson, dated 4/10/20 | 38 |
| 10 - | Aptegra Supplemental Expert report of H. Scott Tucker, dated 9/6/24 | 40 |
| 11 - | Text message conversation with L. Hicks | 63 |
| 12 - | E-mail from P. Hicks to dated 4/15/2020 | 66 |
| 13 - | Peter Hicks text conversation | 67 |




E X H I B I T S (cont'd)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 14 - | E-mail from P. Hicks to T. Walker, Dated 4/8/20 | 68 |
| 15 - | Text conversation between P. Hicks and Broker Frank, dated 6/8/20 | 68 |
| 16 - | Text conversation between P. Hicks, L. Hicks and Rose, dated 12/18/20 | 71 |
| 17 - | Text conversation between P. Hicks and D. Anderson, dated 7/7/20 | 73 |
| 18 - | E-mail from T. Welch to P. Hicks forwarded to L. Hicks, dated 4/8/20 | 74 |

Page 9

A. Sure. As I understand Consilio's role, they were the group -- it's an eDiscovery and forensics company, as I'm sure you're familiar. And they were tasked with and responsible for the initial collection of the iCloud and iPhone and laptop.

But also, as I understand it, they were not -- they were held to strict restrictions on what information they could share. And at least at the beginning, at the time that I prepared this expert report, I did not have access to the original forensic data that they were currently holding. And so, I don't know whether they're playing the role of a neutral or it's simply that there were restrictions on what information they were able to provide.

Q. Do you have an answering -- I know you're not a lawyer -- of what the term "a non-testifying expert" is?

A. I have a basic understanding of that, yes.

Q. Are you aware that Mr. Milton's counsel designated Consilio as a non-testifying expert in this case?

A. I wasn't specifically aware of that. It doesn't change my opinions.

Q. So on the point you just made -- so when you prepared this original report, you didn't

Page 10

actually have access to the underlying Consilio data; is that right?

A. That is correct.

Q. Who provided you the data that you then utilized to prepare the report?

A. Well, I should make the distinction between the original forensic data, which is the data that I considered to be collected according to forensically-sound means, versus reports that come out of that data.

And so, I was provided with certain reports, certain high level aggregate-type reports, and so on, from Consilio through Defendant's counsel.

(Plaintiffs' Exhibit No. 2
was marked for identification.)

Q. (BY MR. ROBERTSON) Mr. Tucker, I placed in front of you Exhibit 2, which is a chart. Take whatever time you need to look through it.

Do you recognize this chart?

A. I do.

Q. Who prepared this chart?

A. This was prepared, as I understand, largely by Mr. Snow, by counsel.

Q. Okay. So did you actually prepare this chart which was then attached to your report?

Page 11

A. I didn't prepare this chart, that's correct.

Q. But in your report, did you adopt this chart as part of your report?

A. Well, I certainly referred to it. I suppose you could say that I adopted it, and I suppose you could also say I didn't write this part because this was prepared by counsel, nor did I write the Consilio parts that were prepared by Consilio, but I referred to them in my report.

Q. Before you adopted this report into your expert report, or this exhibit, what did you do to verify the voracity of what was in this chart?

A. Very little. There was very little that I actually could do, given that I didn't have the original forensic data. In fact, a key part of the supplemental report was, after I received the forensic data, I was able to do a much more thorough review and reconciliation, really, of the data that was in this table with what was on the phone.

Q. Okay. We'll get to your supplemental report. But in terms of your original report --

A. Right.

Q. -- I'll just re-ask the question. What specifically did you do to verify the accuracy of

Page 12

what was in this exhibit, this attachment?

MR. SNOW: Objection. It's asked and answered.

Q. (BY MR. ROBERTSON) You can still answer.

A. Yeah. I'm not sure that I recall everything that I did because, again, recognizing that there were some limitations, but I do recall checking with the Bates number. Because I did have the PDFs of the screen captures of the text messages that Lucas had produced, and so I did at least some correlation between those PDF files and this table. But it wasn't a thorough and comprehensive review.

Q. For example, did you actually look at the texts that Lucas Hicks provided and actually match those up with the texts that were on Peter's phone?

A. Yeah, I think that's what I was trying to explain here. I did that with at least some of them but not a comprehensive attempt at a one-to-one review for all of them.

Q. So you did not do that. You didn't take each line item and look at the texts that Mr. Lucas provided and match it up with a text that Peter Hicks may or may not have provided?

A. Correct.

Q. Do you now know, sitting here today, that

Page 41

A. I'm only pausing because I don't know for sure what was provided to you and, therefore, it's a little bit difficult for me to do a comparison. But my understanding is -- my vague understanding is that Consilio provided the same thing to both you and to me. And so, my understanding is, yes, we got the same thing.
Q. What you say in your report on page 2 is you received forensic images of Peter Hicks' iPhone and iCloud data collected by Consilio?
A. Indeed.
Q. So the record is clear, you understand that there were some limitations on certainly date ranges and things of what Consilio could look at, right?
A. That's my understanding, yes.
Q. So, for example, in the chart that was provided as part of your original report, there's a -- under the column "On Peter's Phone," it looks like anything after March 14th, 2022 is NA because that's not part of what the parties agreed would be obtainable from Consilio, right?
A. Right. There's a footnote that talks about the permissible scope, maybe four pages from the back or five pages, or something. That's right.

Page 42

Q. As noted in this chart, Lucas did in fact provide texts that go past that date, right?
A. That's what I understand, yes.
Q. Again, do you have any knowledge of the agreement that was reached between Mr. Milton's counsel and Lucas Hicks' counsel with regard to how Mr. Hicks would review and produce texts from his phone?
A. Can you repeat the question?
MR. ROBERTSON: Could you read it back? I don't think I could do better.
(The last question was read back by the court reporter.)
THE WITNESS: And the Mr. Hicks at the end, you meant Lucas Hicks?
Q. (BY MR. ROBERTSON) Correct.
A. I don't know about those conversations.
Q. But you do know, based on the chart and your report, that Lucas Hicks did produce texts from his phone?
A. Yes, that's my understanding as screenshots, and they came to me as PDFs.
Q. And you had the opportunity to review those?
A. Yes, I did.

Page 43

Q. But I think you testified earlier you reviewed some of them but not all of them; is that right?
A. I reviewed all of the produced texts. It was, as I said, sometimes difficult to tell the exact dates and times of certain messages. But, yes, I reviewed all those PDFs.
Q. Okay, you did. You reviewed all the PDFs from Lucas Hicks?
A. Correct.
Q. But again, you don't have an understanding of what Lucas Hicks did to pull the relevant texts from his phone for production to Mr. Milton?
A. I don't know the specifics. Some inferences can be drawn, but the fact that there are screenshots would indicate to me that this was not a forensic collection. It seems to me as though Lucas himself was the one making the decision about which text messages to provide, and so on, and not a third party reviewing forensic evidence. That's what I'm inferring from the way these were produced.
Q. But you don't have any knowledge, nor can you opine, on whether any information is missing from Lucas Hicks' phone, right?
MR. SNOW: Objection. Foundation.

Page 44

THE WITNESS: It would be nice to be able to review a forensic collection of Lucas' phone, or the original phone, to be able to know. But, no, I haven't had the opportunity to review the forensically sound data.
Q. Okay. Well, let me ask my question.
Can you go back to my question?
THE WITNESS: Oh, okay. Sorry.
(The last question was read back by the court reporter.)
THE WITNESS: Correct.
Q. (BY MR. ROBERTSON) Thank you.
Just to be clear, in your supplemental report, you have an attachment you can look at. It's Exhibit D. It says, "List of text messages between Peter Hicks and Lucas Hicks 1/1/2020 to 12/18/23"; do you see that?
A. I do. I'm trying to flip to the first page of this, but it's a long document.
Q. Yes.
A. Okay. I'm looking at this page.
Q. And then there's a chart and it's lengthy and appears to have all -- a listing of all the texts for that date range between Peter Hicks and Lucas Hicks, correct?

**A. Correct.**
Q. From Peter Hicks' phone, right?
**A. That's right.**
Q. You'll see texts in the text column. I haven't counted, Mr. Tucker, but it seems like the vast majority of these, you have outside search term results; do you see that?
**A. I do see that.**
Q. So you understood that lots and lots and lots of texts between Mr. Hicks and his son, Lucas Hicks, likely had nothing to do with this case, right?
MR. SNOW: Hold on. It's vague and ambiguous.
Q. (BY MR. ROBERTSON) Let me break it down.
Do you know when you say, "outside search term results," do you know who came up with those search terms?
**A. I don't know specifically who came up with them, but I should point out that this is -- this is terminology that it's intended to be put as a placeholder, so that the contents of the text messages were not disclosed because it would have been easier for me to have simply left them in.**
**But my understanding was that the reason**



**they didn't show up is probably because there was a search run. They didn't show up in the search and therefore that's the reason they're not there. But I don't know specifically for sure that that's the reason that they were not included.**
**To some degree, I'm just drawing an inference; the reason that they didn't show up is probably because they didn't match the search terms.**
Q. That's very helpful. My question was, do you know who came up with the search terms that were run across Peter Hicks' phone to determine what would be pulled as relevant in this case?
**A. I don't know specifically.**
Q. Okay. Likewise, you don't know what terms Mr. Lucas Hicks ran on his phone to identify the text that he believed were relevant to this case, right?
**A. Well, that assumes that search terms were used on Lucas' phone. I have no idea whether they were or not.**
Q. So you don't know what he did to come up with the production set that he produced to Mr. Milton in this case?
**A. Exactly.**
Q. Looking at this first page, while we're on it, you see it says -- number 4 says, "Outgoing



3/5/21"?
**A. Yes.**
Q. "Nikola at 15.07"?
**A. I see that.**
Q. And then, if we go to what was your attachment to the original report on page -- well, it's text number 145.
**A. Almost there.**
Q. Sure. It says, "Sender Peter Hicks at 3/05/2021 at 10:14 a.m."; do you see that?
**A. I do.**
Q. It says, "Nikola at 15.07." And then in the chart, it says, "Lucas produced yes. On Peter's phone no."
**A. Right.**
Q. So that's wrong. It is, in fact, on Peter's phone because there it is right here, right?
**A. And so, I think what this means is that it couldn't be found based on what had been produced, but indeed it is on the phone and that's the beauty of looking at the original forensic data.**
Q. My question, Mr. Tucker, is on an exhibit to your original report, there's a representation that the March 5th, 2021, e-mail "Nikola at 15.07" was not on Mr. Peter Hicks' phone. But based on your



supplemental report, in fact, it is on Mr. Hicks' phone; is that true?
MR. SNOW: Asked and answered.
MR. ROBERTSON: It was asked. I don't think it was answered.
**THE WITNESS: Yeah, that looks true. There were clearly some changes, some differences. Another example on that same page, probably, is the one from March 8th, which is this one that "Nikola stock is falling." That doesn't look like it was produced by Lucas. So there were definitely some changes that were made between my review of the forensic data, which came after the creation of this initial table.**
Q. (BY MR ROBERTSON) So the original table is wrong?
**A. The original table has some inaccuracies that have been corrected, yes.**
Q. For example, let's go to 158. There's 9/20/21, and it says, "When do you think?" Again, the representation that was made here is that this was not on Peter's phone, right?
**A. Right. The representation made here --**
Q. And then, if we look at your chart, page 16 of 112, we go to that date, "Outgoing. 9/20/21,

"When do you think? Peter Hicks." There it is, right? So, in fact, it is on Peter's phone.
A. Right. I think you're kind of highlighting the reason that it's much easier to do this with the full forensic data and the difficulties of interpreting screenshots. But right --
Q. These aren't screenshots. I'm not talking about what's on Lucas's phone. There is a representation made and an exhibit to your original report that certain texts were not on Peter Hicks' phone, right?
A. Correct.
Q. And now, in your supplemental report, we're finding out that, in fact, they are on Peter Hicks' phone; isn't that true?
A. Yeah, I think that's fair. I think I did a more thorough and accurate review in the supplemental.
Q. In fact, what you determined when you actually looked at the data was there appeared to not be texts -- as I read your supplemental report, there appear to not be texts that predate March 5th, 2021, right?
A. Well, there's a lengthy interval prior to March 5th, 2021, where there are missing text



messages between Peter and Lucas. In fact, there are some older texts between them going back to 2015, '16, '17, but I didn't feel it was necessary to include that as part of the report. I took kind of an arbitrary beginning date of April 1st, 2020, but in fact, texts are missing well before that as well.
Q. Okay. My question is, I guess, a little bit different. Have you found any texts individually between Peter Hicks and Lucas Hicks that predate March 5th on Peter Hicks' phone?
A. Yes.
Q. You have, okay.
A. Yes.
Q. And that don't involve a third party? That don't involve, for example, Rose, who is Lucas Hicks' mother?
A. That's correct. We're talking about one-to-one messages involving only Peter and Lucas Hicks.
Q. But you don't discuss those here?
A. Well, I don't. Again, I somewhat arbitrarily chose April 1st, 2020. It was a round number. It was before the phone call. It seemed to be a relevant period. But I could have certainly included, you know, dates prior to that where there



are zero messages between them. But, yes, going back to 2015, '16, '17 and I think up until January of 2018, there are some one-to-one text messages between them.
Q. Did you do any review of any text messages between Peter Hicks and anyone else, any other individual?
A. Well, it depends, I guess, on what you mean by "review." Yes, I certainly did look at -- as I was doing the analysis of one-to-one text messages with a variety of individuals, I didn't do this level of analysis. But, yeah, in fact I referred to some of this in my report in terms of how many messages there were, and so on.
Q. What specific individuals did you look at other than Lucas Hicks?
A. I didn't expressly choose individuals and go in and analyze their messages. If that's something you'd like me to do, I can certainly do that.
Q. Are you aware that other witnesses in this case produced texts?
A. I don't think I am aware of that. That doesn't sound familiar to me and I don't believe I reviewed them.



Q. So, for example, are you aware that David Anderson produced texts, the broker?
A. I'm not and I certainly haven't reviewed them.
Q. Or T. Welch. Are you familiar with him having produced documents and texts?
A. I'm not.
Q. So you haven't done any analysis to determine what may or may not exist on Peter Hicks' phone relative to the texts that were produced by these other witnesses?
A. I haven't done that analysis.
Q. What about Trevor Milton? Are you aware that Trevor Milton produced texts?
A. I'm not.
Q. I want to go back to the transcript of the July 6th hearing. That's the one that's folded there, yeah. Then we'll take a break.
So if we go to page 17 of the transcript of the hearing in the Lucas Hicks' Southern District case --
A. Okay. I'm on page 17.
Q. Again, you didn't review any of the pleadings or correspondence in that case?
A. No.

Q. Looking at -- Mr. Diskant is speaking, and he says, "We represented to Milton's criminal counsel that again that at least limited to the relevant time period, we didn't have any reason to believe there was any meaningful volume of text messages because during the time period of the deal, my client and his father were living at home together and they were not text messaging a whole heck of a lot, so it was understood between everyone that it would be unduly burdensome to compel him to search and review his phone"; do you see that?
**A. I see this.**
Q. Were you aware that during this time frame of 2020, due to COVID that Mr. Lucas Hicks was living at home?
**A. No. I don't think that would change my opinion.**
MR. ROBERTSON: Okay. Why don't we take a break.
THE VIDEOGRAPHER: Going off the record. The time is approximately 11:10 a.m.
(Brief recess.)
THE VIDEOGRAPHER: Returning on the record. 11:24 a.m. is the time.
Counsel.



Q. (BY MR. ROBERTSON) Excellent.
So Mr. Tucker, if you could go to your supplemental report. On page 4 of the report, you have the estimated number of messages deleted; do you see that?
**A. I do.**
Q. First of all, you say, "Even if the rate increased over time and we only look at the messaging rate for the 12 months from 3/5/21 to 4/30/21" -- do you see that?
**A. I do.**
Q. That's not 360 days, right?
**A. Yeah. I'd have to look at my original spreadsheet, and I remember doing the calculation to calculate the number of days. And so, there's a table here. Yeah, where's the other exhibit? Is it maybe at the end?**
Q. It's your report, so...
**A. Well, I didn't print it.**
Q. Just so the record is clear, when you orient yourself, just let us know what you're looking at.
(Witness reviews document.)
**THE WITNESS: So this really is -- this appears to be a typo, and I'm referring to March 5th,**



**2021 to March 1st, 2022. You can see at the end of February 2022, the number is 869. And I think that you'll find from March 5th to the end of February -- in other words, just before March 1st is going to be 360 days, so I apologize for the typo.**
Q. (BY MR. ROBERTSON) In this section, "Estimated number of messages deleted," just to be clear, and looking at your Exhibit D --
MR. SNOW: E.
Q. (BY MR. ROBERTSON) No, D now.
**A. D, okay.**
Q. So part of what you were looking at in terms of the total texts between Peter Hicks and Lucas Hicks was all of the texts, right? So, all these texts in Exhibit D, right?
**A. Well, yes, right. Right, the numbers correspond, yeah.**
Q. Did you do any analysis of how many of those texts actually hit on search terms?
**A. I don't have that number off the top of my head, yeah.**
Q. So, in fact, do you have any number in here of the number of messages over the periods that you looked at that actually hit on the search terms versus texts that didn't hit on search terms?



**A. Well, I should be clear here that in terms of hitting the search terms, I'm really relying on work that others have done, for example, Consilio. Because they're the ones that apparently ran the search term search -- ran the search based on the terms and came back with this report. And so, I'm not entirely sure, not having been personally involved, how that search was done and how the reports were generated, and so on. So I'm not certain that they don't match search term results. I think I explained before that this was entered as a placeholder.**
**We could have put anything in there, you know, "Text message not disclosed." But the term that we came up with was, it's probably because it was outside the search term results, but I don't know that for certain.**
Q. If I told you I went and did the work and I looked at the period from March 5th '21 to December 18th, 2023, and there were 67 messages that contained search terms hits, do you have any basis to dispute that?
**A. I probably would have to do the detailed work.**
Q. Which you have not done sitting here

today?
A. **Well, no. You just proposed the hypothetical to me just now, so, no, I haven't done that.**
Q. It's not a hypothetical. It's not a hypothetical. If I actually did the work and came up with a number within the range we're talking about of the ones that actually hit on the search terms, my question was, do you have any reason to dispute that?
MR. SNOW: It assumes facts not in evidence and it is an incomplete hypothetical.
Q. (BY MR. ROBERTSON) Can you answer the question?
A. **Without doing the work myself, then I wouldn't have any basis to agree or disagree.**
Q. Okay. So have you done any estimate -- you have an estimate here about how many messages you are ready to opine are missing for certain periods of time, correct?
A. **Correct.**
Q. Have you done any analysis of how many of those messages are likely to have hit on the search terms?
A. **I haven't. I would want to take the search terms, do the search myself and see if I got**



**similar results, and I haven't done that work.**
Q. And if those results of what actually hit on the search terms were within the number of text messages that Lucas Hicks provided, is it fair that the texts have been provided by Lucas?
MR. SNOW: It assumes facts not in evidence. Calls for speculation.
**THE WITNESS: I'm not entirely sure I understand what you're asking. Do you mind asking it again?**
Q. (BY MR. ROBERTSON) Let's say, for example, we looked at this time frame -- and let me represent to you that there were 67 messages that contain search terms hits. Do you have an understanding of how many texts during this period Lucas Hicks provided from his phone?
A. **I don't know the aggregate number off the top of my head.**
Q. Is it possible that whatever texts are missing from Mr. Peter Hicks' phone were in fact produced by Lucas Hicks to the extent they're relevant to this case?
MR. SNOW: Calls for speculation. Lack of foundation.
**THE WITNESS: You're asking if something**



**is possible?**
Q. (BY MR. ROBERTSON) Yes.
A. **Since I don't really know what process was followed by Lucas Hicks in producing the messages that he did -- and we're assuming that we could run -- do another run of search terms of a search -- another run of the search using the search terms. I don't really know how that would come out.**
**I do know that I'm a little concerned about Lucas Hicks' production, in part, because of all the times that he was taking the Fifth Amendment to avoid testifying about certain aspects, certainly with respect to the recording, and that makes me wonder about the completeness of the text messages as well.**
Q. Again, if we go back to the letter that we looked at earlier -- so do you understand that Lucas Hicks' counsel actually made a representation with regard to the documents that he was taking the Fifth Amendment with regard to?
A. **Do you mind pointing me to that portion of the letter?**
Q. Sure.
A. **I'm afraid I got a lot of documents. This probably is it, Exhibit 6?**



Q. Yes.
A. **Okay.**
Q. Do you see the top of the second page?
A. **Okay, I'm on the second page.**
Q. It says, "With respect to item 4 and as discussed at the July 6th conference, while Mr. Hicks does not intend to individually log any items that may have been withheld, based on his proper invocation of his Fifth Amendment, he does note without suggesting or confirming the existence of any responsive document or record in his possession, custody or control, that Mr. Hicks is invoking as to any request that calls for any recording."
It goes on. Do you see that?
A. **I do see it. It's dense text that I'm taking some time to parse.**
Q. That's fine.
A. **Because it's one big sentence, right?**
(Witness reviews document.)
**THE WITNESS: I'm sorry. I'm pretty good at reading dense text, but this is a bit of a struggle here.**
MR. SNOW: It's vague and ambiguous.
MR. ROBERTSON: All right.
**THE WITNESS: It says, "Mr. Hicks does not**

**intend to individually log any items, which may have been withheld" -- and the presumably Mr. Hicks is Lucas Hicks?**

MR. ROBERTSON: Correct.

**THE WITNESS: Okay. "While he does not intend to log things that may have been withheld, he does note without suggesting or confirming the existence of any responsive document or record in his possession that Mr. Hicks is invoking. He does note that he is invoking as to any request that calls for any recording made or any document" -- sorry. I can't figure out what this sentence means.**

Q. (BY MR. ROBERTSON) I won't press it, but you don't have any understanding of what specific discussions occurred between counsel as to what would or would not be produced, right?

**A. Right.**

Q. Okay.

**A. This doesn't appear to refer to text messages as all, right? Maybe text messages about the recording?**

Q. Well, I'll just leave it at that. That's fine.

Then if we go to page 5 of your supplemental report, you say, "Another noteworthy



finding illustrated by Exhibit D is that all of the text messages present on Peter Hicks' phone and between Lucas Hicks' telephone number and Peter Hicks' Apple ID," none of the messages are with Peter Hicks' telephone number; do you see that?

**A. I do.**

Q. Did you have any understanding of how Mr. Hicks' texts were set up relative to his Apple ID?

**A. I don't have specific knowledge of how his texts were set up in relation to his Apple ID. I simply found it unusual.**

Q. Okay. Are you aware that Mr. Hicks' e-mail that he uses is that hicksmanagement@aol.com?

**A. Right. I'm aware of his AOL e-mail address.**

Q. Again, in preparing your report or doing any of your analysis, did you do any analysis on Mr. Hicks' e-mail?

**A. No.**

Q. So you're not proposing to offer any testimony that any e-mails between Mr. Hicks and Lucas Hicks are missing?

**A. No, I haven't analyzed the e-mail at all.**

Q. So you haven't looked at any e-mails?



**A. I don't recall having looked at any e-mails at all, no.**

Q. So for example, are you aware that there are lots and lots of e-mails that were produced in this case between Peter Hicks and Lucas Hicks from April of 2020?

**A. I'm not, but that's interesting because if -- it seems like if they were in the same home then the same argument would apply to texts and e-mails. So if there were a bunch of e-mails, you would expect to see a bunch of texts, too. No, I don't know anything about the e-mails.**

Q. Okay. So, again, you're not contending that Mr. Hicks intentionally or deliberately deleted any e-mails?

**A. No.**

(Plaintiffs' Exhibit No. 11 was marked for identification.)

Q. (BY MR. ROBERTSON) Mr. Tucker, I've placed before you what's been identified as Exhibit 11. It's a thick document, so take whatever time you need to review it.

My question will be whether you've seen this document before today.

**A. That's the question you want me to answer?**



Q. When you're ready.

**A. Oh, okay. Well, this looks like the PDFs that were supplied, which as I understand it, are screen captures of text messages that came from Lucas' iPhone.**

Q. Just so I understand, sort of, how text messages work -- so for example, on the first page, there's Trevor Milton and Nikola Motors, and then a blue circle that says, "What about him? Unique offer on ranch." Do you see that?

**A. I do.**

Q. So that one side would be one of the participants in the chain and the other side would be the other, correct?

**A. That's fair.**

Q. For example, in this text from April of 2020, it says, "Trevor Milton - Nikola Motors. What about him? Unique offer on ranch." Can you tell me who is Peter and who is Lucas, assuming this was produced from Lucas' phone?

**A. Yeah, I think that Lucas is on the left and Peter is on the right. But I have not spent a lot of time on this document, per se, aside from correlating it from the data I got on Peter Hicks' phone from the forensic data.**

Q. Okay. But I guess my simple question is, in getting this information from Lucas Hicks, you're getting both sides of the conversation. You're not just getting Lucas Hicks' texts, but you're getting Pete Hicks' texts as well, correct?
MR. SNOW: Objection. Lack of foundation. Calls for speculation.
MR. ROBERTSON: He's the expert.
MR. SNOW: You're assuming this is all complete.
Q. (BY MR. ROBERTSON) I'm just asking in a normal production of a text chain, do you get both participants of the text chain in that production?
MR. SNOW: Same objections.
**THE WITNESS: Right. To the extent that we can believe that it's complete and unaltered and so on, then sure. If you're looking at a text conversation, it's with both parties.**
Q. (BY MR. ROBERTSON) Got it. Thank you.
Did you also understand that certain e-mails and texts were withheld based on privilege?
**A. I see that.**
Q. Did you do any analysis of what was withheld based on privilege?
**A. I did not. And, you know, looking at this**



**I'm actually a little surprised because this looks like -- it's not entirely clear to me who is -- who is on which side, and so on. I want to compare this with the forensic data and get clarity about that, at any rate.**
Q. Okay.
(Plaintiffs' Exhibit No. 12 was marked for identification.)
Q. (BY MR. ROBERTSON) Mr. Tucker, I placed in front of you what has been marked as Exhibit 12. I think you stated already you have not reviewed any e-mails; is that right?
**A. I have not reviewed e-mails.**
Q. So, have you done any analysis of the relative volume of e-mail communications between Lucas Hicks and Peter Hicks versus text communications between Lucas Hicks and Peter Hicks?
**A. Before we address that question, can we go back to your question about the nature of these text messages here, because I think I misspoke. If you look at an example, March 8, 2022, at 10:13 a.m., you've got an incoming text that says, "Getting back to Trevor today," meaning that this is a text from Lucas to Peter, and that's on the right side. And so, this is Lucas over here.**



Q. Right. Lucas in blue. Peter in black.
**A. Exactly. So I think I may have misspoken.**
Q. That's fine. But seeing now your schedule, you can frame that that's -- but, again, you're getting both sides of the conversation, right?
**A. Right. You get both sides of the conversation in a forensic collection as well. Now we can go to -- you had an e-mail question.**
MR. ROBERTSON: I hate to ask you to read it back...
(The last question was read back by the court reporter.)
**THE WITNESS: I have not.**
(Plaintiffs' Exhibit No. 13 was marked for identification.)
Q. (BY MR. ROBERTSON) So I placed it in front of you, what's been marked as Exhibit 13. I'll represent to you this is a document that was produced by David Anderson.
Have you seen this document before today?
**A. No.**
Q. So, again, you didn't do any analysis of any production of text messages by any other individual other than Lucas Hicks?
**A. Sorry, Lucas and Peter.**



Q. And that's it?
**A. Yes.**
Q. You didn't analyze, for example, David Anderson's production against what's on Peter's phone?
**A. That's correct.**
(Plaintiffs' Exhibit No. 14 was marked for identification.)
Q. (BY MR. ROBERTSON) Similar question, Mr. Tucker. This is a text exchange between Peter Hicks and T. Welch.
Have you seen this document before today?
**A. I think I have seen this.**
Q. Okay.
**A. The format leads me to believe that this came from relativity as opposed to a screenshot or from something else, so I may have seen this.**
Q. To the extent this is a text between T. Welch and Peter Hicks, did you do any analysis of any text communications between Mr. Welch and Mr. Hicks?
**A. I did not.**
(Plaintiffs' Exhibit No. 15 was marked for identification.)
Q. (BY MR. ROBERTSON) Looking at what's been marked as Exhibit 15, this is a text exchange between

# EXHIBIT F

accurate statement or you know it to be inaccurate.
A. I think it's accurate.
Q. Okay. Is it your testimony under oath that there are no text messages between you and Lucas Hicks prior to July 2021 on your phone?
MR. ROBERTSON: Objection. Asked and answered.
BY MR. PACE:
Q. You can answer the question. Well, we didn't cover this, but with objections, they are for the record. There is not the judge here to rule on them.
MR. ROBERTSON: You can answer.
THE WITNESS: Could you repeat it, please?
BY MR. PACE:
Q. Yeah, is it your testimony under oath that there are no text messages on your phone right now that you have between you and Lucas Hicks that are dated prior to July of 2021?
A. I think that is accurate. But you folks would know better than I, because you photocopied my phone. You know what is in it.
Q. Well, I want to know: Are all text messages with everyone missing on your phone prior to July of 2021 or is it just between you and Lucas?



A. I don't know the answer to that question.
Q. Have you ever noted that any text messages with anyone else other than Lucas were missing?
A. No.
Q. So you have all the text messages with everyone, all of your other contacts, and the only ones that were lost were between you and Lucas?
A. I don't know the answer to that. There may be others that are missing. I don't know the answer because I haven't looked.
Q. Did you delete text messages between you and Lucas?
A. No.
Q. Do you have any explanation for how they disappeared from your phone?
A. I have no explanation other than dropping the phone in the sand.
Q. In -- in one of the court filings in this case, it is Docket 52, this is what your counsel wrote, they said -- I'm going to quote from page 4 Note 16 [reading] Plaintiff Peter Hicks has since changed his phone and in the process lost text messages exchanged with Lucas Hicks.
Is that an accurate statement?
A. So I'm told.



Q. Well, I don't want to have it be based on what you have been told. I want it based on your knowledge.
Is that accurate?
A. I think it is.
Q. Okay. All right. Let's get back to --
Tell me where the beach is where you dropped your phone at. This is really important; right?
A. Do you want the answer?
Q. I do want it. I want to know. Because I want to test your memory on this and see what the --
A. Okay.
Q. You know, you are telling me this -- your testimony about what happened here. I would like some details to see how well you remember it. So tell me where the beach is.
A. Well, I don't know what they call the beach, but if you take a highway over the two bridges to get to the outside island, there's a Marriott resort right there. It's on a beach there. It was a beach there. I don't know which grain of sand, but it was the beach there.
Q. Were you there alone or with anyone else?
A. With my wife.



Q. With your wife?
A. I don't know that she was literally with me the moment -- she probably was -- when I dropped it, but I think if she was I would remember and I would have been lectured in a major way.
Q. Right. Let's come back to the -- to the April 10th -- before we went on this detour, we were talking about April 10th, 2020, the phone call.
We established you and Lucas were in the same room together on your phone. That's the setting, right, when this call took place?
A. Correct.
Q. All right. Did you record the call?
A. Did I record the call? No.
Q. Did Lucas record the call?
A. I think I can say the answer is yes.
Q. And why are you hesitant in saying that?
A. I don't know much about it, but -- I'm not hesitant. Yes, he recorded the call.
Q. And how do you know that he recorded it?
A. I was told.
Q. By Lucas?
A. No. In a conversation -- no. How I first learned it?
Q. No, my question is: Who told you that